# In the United States Court of Appeals
# for the Fifth Circuit

NetChoice, L.L.C., a 501(c)(6) District of Columbia organization doing business as NetChoice; Computer & Communications Industry Association, a 501(c)(6) non-stock Virginia Corporation doing business as CCIA,

*Plaintiffs-Appellees,*

*v.*

Ken Paxton, in his official capacity as Attorney General of Texas,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## BRIEF FOR APPELLANT

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Judd E. Stone II
Solicitor General

Ryan S. Baasch
Assistant Solicitor General
Ryan.Baasch@oag.texas.gov

Counsel for Defendant-Appellant Ken
Paxton, Attorney General of Texas

# Certificate of Interested Persons

No. 21-51178

NetChoice, L.L.C., a 501(c)(6) District of Columbia organization doing business as NetChoice; Computer & Communications Industry Association, a 501(c)(6) non-stock Virginia Corporation doing business as CCIA,

*Plaintiffs-Appellees,*

*v.*

Ken Paxton, in his official capacity as Attorney General of Texas,

*Defendant-Appellant.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellant, as a governmental party, need not furnish a certificate of interested persons.

/s/ Ryan S. Baasch

Ryan S. Baasch
*Counsel for*
*Defendant-Appellant*

## Statement Regarding Oral Argument

This case raises issues of exceptional constitutional importance and warrants oral argument. Among other issues, this case presents the question of whether the government can constitutionally require communications platforms like Facebook, YouTube, and Twitter not to discriminate against their users based on the viewpoints expressed by those others. The Plaintiffs here claim that these same communications platforms have a First Amendment right to so-discriminate. If the Plaintiffs are correct, it will have enormous and long-lasting implications for the future of free speech in the 21st Century, where these communications platforms function in the Supreme Court's words as a "modern public square." Oral argument will assist the Court in evaluating how these communications platforms' practices intersect with First Amendment precedent regarding whether and when private entities have a right to discriminate against speakers.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ............................................... i

Statement Regarding Oral Argument ....................................................... ii

Table of Authorities ................................................................................ iv

Introduction ............................................................................................ 1

STATEMENT OF JURISDICTION ..................................................... 4

STATEMENT OF ISSUES ................................................................. 4

STATEMENT OF THE CASE .............................................................. 5

    A.   The Platforms' Evolution into Internet Censors ................................ 5

    B.   HB 20 .............................................................................................. 11

    C.   Section 230 ..................................................................................... 12

    D.   Procedural History ........................................................................ 14

STANDARD OF REVIEW .................................................................. 15

SUMMARY OF ARGUMENT ............................................................. 16

ARGUMENT ....................................................................................... 17

  I.   The Platforms Are Unlikely to Succeed on the Merits of Their Claim that the Hosting Rule Violates the First Amendment. ..................... 17

    A.   The Hosting Rule does not implicate the First Amendment. ............. 17

    B.   The Hosting Rule is also a historically-grounded common carriage regulation, and is subject to at most intermediate scrutiny which it survives. ................................................................. 25

    C.   The District Court's and the Platforms' alternative bases to enjoin the Hosting Rule fail. ................................................................ 31

  II.  The Platforms Are Unlikely to Succeed on the Merits of Their Claim that HB 20's Disclosure Rules Violate the First Amendment. .................................................................................... 37

  III.  The Equitable Factors Favor Lifting the Preliminary Injunction. ............. 42

CONCLUSION ................................................................................... 44

Certificate of Service ............................................................................... 45

Certificate of Compliance ........................................................................ 45

# Table of Authorities

Page(s)

**Cases:**

*Agency for Int'l Dev. v. Alliance for Open Soc'y, Int'l, Inc.*,
   140 S. Ct. 2082 (2020) ............................................................. 1, 17, 24

*Am. Beverage Ass'n v. City & Cnty. of S.F.*,
   916 F.3d 749 (9th Cir. 2019) .................................................................. 40

*Am. Meat Inst. v. USDA*,
   760 F.3d 18 (D.C. Cir. 2014) ................................................................. 37

*Atchafalaya Basinkeeper v. U.S. Army Corps of Engineers*,
   894 F.3d 692 (5th Cir. 2018) ........................................................... 15, 42

*Barr v. Am. Ass'n of Political Consultants, Inc.*,
   140 S. Ct. 2335 (2020) ........................................................................... 31

*Biden v. Knight First Amend. Inst.*,
   141 S. Ct. 1220 (2021) ................................................................... *passim*

*CTIA – The Wireless Ass'n v. City of Berkeley*,
   928 F.3d 832 (9th Cir. 2019) ........................................................... 37, 43

*Cubby, Inc. v. CompuServe, Inc.*,
   776 F. Supp. 135 (S.D.N.Y. 1991) .................................................... 12, 13

*Daniels v. Alphabet Inc.*,
   No. 20-CV-04687, 2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) ....................... 5

*E.T. v. Paxton*,
   19 F.4th 760 (5th Cir. 2021) ................................................................. 42

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ......................................................... 12, 19

*FCC v. League of Women Voters of Cal.*,
   468 U.S. 364 (1984) ......................................................................... 4, 43

*Fla. Power & Light Co. v. FERC*,
   660 F.2d 668 (5th Cir. 1981) ................................................................. 27

*Force v. Facebook, Inc.*,
   934 F.3d 53 (2d Cir. 2019) .......................................................... 5, 13, 22

*Gonzalez v. Google LLC*,
2 F.4th 871 (9th Cir. 2021) ..............................................................13

*Harper v. Agency Rent-A-Car, Inc.*,
905 F.2d 71 (5th Cir. 1990) ............................................................ 27

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
515 U.S. 557 (1995)..............................................................18, 23, 24

*Jones v. Dirty World Ent. Recordings LLC*,
755 F.3d 398 (6th Cir. 2014) ......................................................... 14

*Marshall's Locksmith Serv. Inc. v. Google, LLC*,
925 F.3d 1263 (D.C. Cir. 2019) ...................................................... 22

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974) .................................................. 19, 20, 21, 22, 23

*Morrison v. Olson*,
487 U.S. 654 (1988) ..................................................................35, 36

*N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*,
556 F.3d 114 (2d Cir. 2009)........................................................ 37, 40

*NARUC v. FCC*,
525 F.2d 630 (D.C. Cir. 1976) ......................................................... 26

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
272 F.3d 104 (2d Cir. 2001) ........................................................... 43

*Nat'l Inst. of Fam. and Life Advocs. v. Becerra*,
138 S. Ct. 2361 (2018) .................................................................... 39

*Nat'l Socialist Party of Am. v. Vill. of Skokie*,
432 U.S. 43 (1977) (per curiam) ................................................35, 42

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
591 F.3d 250 (4th Cir. 2009) .......................................................... 21

*NetChoice, LLC v. Moody*,
546 F. Supp.3d 1082 (N.D. Fla. 2021) ............................................ 23

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978)....................................................................41, 42

*Pacific Gas & Electric Company v. Public Utilities Commission of California*,
475 U.S. 1 (1986) ...................................................................... 23, 24

*Packingham v. North Carolina*,
137 S. Ct. 1730 (2017).................................................................1, 4

*In re PGS Home Co. Ltd*,
No. 19-MC-80139, 2019 WL 6311407 (N.D. Cal. Nov. 25, 2019) ...................... 5

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
413 U.S. 376 (1973) ................................................. 20, 22

*Primrose v. W. Union Tel. Co.*,
154 U.S. 1 (1894) ...................................................... 25

*PruneYard Shopping Ctr. v. Robins*,
447 U.S. 74 (1980) ................................................ *passim*

*Refrigerated Transp. Co. v. ICC*,
616 F.2d 748 (5th Cir. 1980) (per curiam) ......................... 25

*Rumsfeld v. Forum for Acad. & Institutional Rights*,
547 U.S. 47 (2006) ............................................... *passim*

*Ry. Emps.' Dep't v. Hanson*,
351 U.S. 225 (1956) ................................................... 35

*Semon v. Royal Indem. Co.*,
279 F.2d 737 (5th Cir. 1960) .................................... 25-26

*Sierra Club, Lone Star Chapter v. FDIC*,
992 F.2d 545 (5th Cir. 1993) ........................................ 6

*Snyder v. Phelps*,
562 U.S. 443 (2011) .................................................. 35

*Stratton Oakmont, Inc. v. Prodigy Services Co.*,
1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) .................... 12, 13, 33

*Tah v. Glob. Witness Publ'g*,
991 F.3d 231 (D.C. Cir. 2021) ....................................... 4

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
989 F.3d 368 (5th Cir. 2021) ..................................... 38-39

*Texas v. Johnson*,
491 U.S. 397 (1989) .................................................. 35

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ("*Turner I*") ............................... *passim*

*Turner Broad. Sys., Inc., v. FCC*,
520 U.S. 180 (1997) ("*Turner II*") .............................. *passim*

*United States v. Caronia*,
703 F.3d 149 (2d Cir. 2012) ....................................... 8-9

*United States v. Hunter*,
459 F.2d 205 (2d Cir. 1972) ........................................ 21

*United States v. O'Brien*,
  391 U.S. 367 (1968) ......................................................... 32
*United States v. Stevens*,
  559 U.S. 460 (2010) ......................................................... 35
*Universal Commc'n Sys., Inc. v. Lycos, Inc.*,
  478 F.3d 413 (1st Cir. 2007) ...................................... 13, 21
*Veasey v. Abbott*,
  870 F.3d 387 (5th Cir. 2017) ......................................... 42
*VIA Metro. Transit v. Meck*,
  620 S.W.3d 356 (Tex. 2020) ........................................... 25
*W. Union Tel. Co. v. James*,
  162 U.S. 650 (1896) ......................................................... 25
*Williamson v. Lee Optical of Okla. Inc.*,
  348 U.S. 483 (1955) ......................................................... 41
*Yates v. United States*,
  574 U.S. 528 (2015) ......................................................... 34
*York Co. v. Cent. R.R.*,
  70 U.S. 107 (1865) ........................................................... 25
*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
  471 U.S. 626 (1985) ................................................... 16, 37

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const. amend. I ................................................... *passim*
28 U.S.C.:
  § 1292(a)(1) ...................................................................... 14
47 U.S.C.:
  §§ 201-202 ........................................................ 25, 27, 32
  § 230 .......................................................................... *passim*
  § 230(a)(3) ........................................................................ 43
  § 230(c)(1) ...................................................... 2, 13, 21, 33
  § 230(c)(2) .................................................... 13, 33, 34, 35
  § 230(f)(3) ........................................................... 13, 14, 21
Tex. Bus. & Com. Code:
  § 120.001 .......................................................................... 10
  § 120.002 .......................................................................... 10
  § 120.051 .......................................................... 11, 37, 38, 40

§ 120.052 .................................................................11, 37, 38, 40

§ 120.053 .................................................................11, 37, 39, 40

§ 120.053(a)(1) ................................................................... 41

§ 120.053(a)(2) ................................................................... 41

§§ 120.101-.104 .......................................................11, 37, 38, 41

§ 120.151 ............................................................................11

Tex. Civ. Prac. & Rem. Code:

§ 143A.001(a) ..................................................................... 10

§ 143A.002 ......................................................................... 10

§ 143A.006(a) ......................................................................11

§ 143A.006(b) ......................................................................11

§ 143A.007(a) ......................................................................11

§ 143A.008 ..........................................................................11

HB 20:

§ 1(2) ................................................................................. 29

§ 8 ......................................................................................31

## Other Authorities:

Brian Flood, *Trump supporter, 76, blames 'fake news' CNN for threats following reporter ambush*, Fox News (Feb. 24, 2018)............................ 8

Brief for Facebook as Defendants-Appellees at 1, *Klayman v. Zuckerberg*, No. 13-7017, 2013 WL 5371995 (D.C. Cir. Sept. 25, 2013) ....................................................................................... 13, 21

Bryant et al., *Ivermectin for Prevention and Treatment of COVID-19 Infection*, 28 Am. J. Therapeutics 434 (2021) ...................................... 8

CDC Health Advisory (Aug. 26, 2021), https://emergency.cdc.gov/han/2021/pdf/CDC_HAN_449.pdf ................... 8

CNN Tweet (Feb. 20, 2018), archived at perma.cc/VL7Q-6VBF........................ 8

Evelyn Douek, *Governing Online Speech: From 'Posts-as-Trumps' to Proportionality and Probability*, 121 Colum. L. Rev. 759 (2021) ........................ 5

Facebook, Terms of Service § 4.3, https://perma.cc/HK4X-QPL8 .................... 18

Fox News, *AG Barr on Tech Companies Censoring Viewpoints: 'There's Something Very Disturbing About What's Going On'* (June 21, 2020) .................. 6

H.R. Conf. Rep. No. 104-458 (1996) ...............................................13

Internet Archive Wayback Machine, Twitter, The Twitter Rules (Jan. 18, 2009), https://bit.ly/31UlaJx ........................................................ 5

John Hendel, *Twitter CEO: Iranian Leader's 'Saber Rattling' Doesn't Violate Our Policies*, Politico (Oct. 28, 2020), https://politi.co/3GzTdpG ................................................................. 7

Joseph A. Wulfsohn, *Twitter says it permanently suspended Project Veritas, locked founder James O'Keefe out of his account,* Fox News (Feb. 11, 2021) ................................................................. 7

Josh Halliday, *Twitter's Tony Wang: 'We are the free speech wing of the free speech party'*, The Guardian (Mar. 22, 2012), https://bit.ly/3dKjXHx ................................................................. 5

Letter from Ranking Members on Committee on Oversight and Reform to Xavier Becerra at App'x. 4 (Jan. 11, 2022), https://republicans-oversight.house.gov/wp-content/uploads/2022/01/Letter-Re.-Feb-1-Emails-011122.pdf......................... 9

Marisa Fernandez, *Twitter Fact-Checks Chinese Official's Claims that Coronavirus Originated in U.S.*, Axios (May 28, 2020), https://bit.ly/3lFWfjM ................................................................. 7

Mary Anne Franks, *The Free Speech Black Hole: Can the Internet Escape the Gravitational Pull of the First Amendment?*, Knight First Amend. Inst. Columbia Univ. (Aug. 21, 2019), https://perma.cc/HAX8-3RZN ................................................................. 43

Motion to Dismiss Reply, *Colon v. Twitter, Google, and Facebook*, No. 6:18-CV-00515, 2019 WL 7835413 (M.D. Fla. Dec. 20, 2019) ..................... 21-22

Raphael Ahren, *Twitter to MKs: Unlike Trump Tweets, Khamanei's 'Eliminate Israel' Posts Are OK*, Times of Israel (July 30, 2020), https://bit.ly/336th6V ................................................................. 7

Ravi Somaiya, *How Facebook Is Changing the Way Its Users Consume Journalism*, The New York Times (Oct. 27, 2014) ............................................. 6

Ron Johnson, *YouTube Cancels the U.S. Senate*, Wall St. J. (Feb. 2, 2021) ................................................................. 9

*Taylor v. Twitter, Inc.*, Tr. Hr'g, No. CGC-18-564460 (Cal. Super. Ct. S.F. Cnty., June 14, 2018) ................................................................. 20

Testimony of Facebook CEO Mark Zuckerberg before the United States Senate Committee on Commerce, Science, and Transportation (Oct. 28, 2020), https://bit.ly/3LjY8Ot ................................. 22

Testimony of Jack Dorsey before the United States Senate Committee on Commerce, Science, and Transportation (Oct. 28, 2020), https://bit.ly/3Jnbyrj ................................................................. 38

Thomas Barrabi, *Facebook Ends Ban on Posts Claiming COVID-19 is Man-made*, Fox Business (May 26, 2021), https://fxn.ws/3y0L8qD.................. 6

Twitter Motion to Dismiss, *Fields v. Twitter, Inc.*, No. 3:16-cv-00213, 2016 WL 2586923 n.5 (N.D. Cal. Apr. 6, 2016) .................................................. 21

Twitter, Terms of Service § 3, https://perma.cc/2QCU-VLW4 ......................... 18

Twitter, Updating Our Approach to Misleading Information (May 11, 2020), https://perma.cc/K8CT-NQHZ ......................................................18-19

White House, *Press Briefing by Press Secretary Jen Psaki* (July 16, 2021)................. 10

White House, *Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy* (July 15, 2021) ........................................................ 9

YouTube "Covid-19 Medical Misinformation Policy," https://perma.cc/9ZUK-T2E6 (as of Feb. 28, 2022).......................................... 9

# Introduction

The First Amendment protects free speech. But the Plaintiffs (Facebook, YouTube, and Twitter, collectively "the Platforms")[1] say it also allows them to squelch free speech. These entities control the "modern public square" and "provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). But they discriminate by viewpoint as to who can speak in that square. Texas responded to this problem with classic anti-discrimination and transparency legislation known as HB 20, which requires that the Platforms (1) host speakers regardless of their viewpoint, and (2) disclose purely factual information about how they police their spaces. The Platforms, however, claim the First Amendment gives them a right to discriminate freely against viewpoints, without any sunlight.

The Platforms are wrong. "Requiring someone to host another person's speech is often a perfectly legitimate thing for the Government to do." *See Agency for Int'l Dev. v. Alliance for Open Soc'y, Int'l, Inc.*, 140 S. Ct. 2082, 2098 (2020) (three-Justice dissent, offering undisputed summary of Court precedent). The First Amendment poses no bar because hosting rules govern a host's "*conduct*, not [its] speech." *See Rumsfeld v. Forum for Acad. & Institutional Rights*, 547 U.S. 47, 60 (2006) ("*FAIR*") (emphasis added); *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980). And this

---

[1] Nominally, the Plaintiffs are two trade associations who represent the Platforms. For clarity and simplicity, however, this brief uses the term "Platforms" interchangeably with "Plaintiffs" because Plaintiffs represented below that only Facebook, YouTube, and Twitter are affected by the Texas law at issue here. ROA.1306.

principle has added force when the regulated entities are communications mediums, like the Platforms. "The First Amendment's command that government not impede the freedom of speech does not disable the government from taking steps to ensure that private interests not restrict, through physical control of a critical pathway of communication, the free flow of information and ideas." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 657 (1994). It is also well-established that government can require companies to disclose purely factual information about their products. *See infra* at 37-38.

The Platforms obtained a preliminary injunction by persuading the lower court that they are functionally no different than a newspaper or parade—the types of entities that enjoy narrow carveouts from the Supreme Court's repeated holdings that government can require enterprises to host speakers equally. Newspapers and parades enjoy this carveout because, among other things, the speech they host is legally considered their *own*. *FAIR*, 547 U.S. at 63. The Platforms operate nothing like that. On the contrary, they have spent years claiming the speech they host is *not* their own in any way. Indeed, their notorious "Section 230" liability shield (47 U.S.C. § 230(c)(1)) depends on this claim. This shield has protected the Platforms from billions in liability for third-party content, including even defamatory content and content that aids terrorists. But the Platforms would not be eligible for this shield if they behaved like newspapers or parades, because the shield explicitly does not apply to a party who plays any role in developing the underlying speech. For that reason, the Platforms have repeatedly told courts that they are mere "conduits" for third-party speech who apply "neutral" tools to help speakers reach their intended audience.

*See infra* at 22-23. That forecloses the newspaper/parade analogy. Multiple other dispositive distinctions foreclose it too. *See infra* at 23-24. And the Platforms are in all events subject to common carrier regulation just like the old telegraph and telephone companies—the Platforms' technological ancestors. HB 20's anti-discrimination rule is just *one* item from the menu of regulations that a state can impose on the Platforms under this historic, well-grounded common carriage framework.

The district court also wrongly enjoined HB 20's sunlight provisions. Disclosure rules that require commercial enterprises to convey truthful information to the public about their products almost never offend the First Amendment. We live surrounded by the upshot of that reality everyday—with calorie counts, warning labels, SEC disclosures, and the like. And there is no dispute that HB 20 requires the Platforms to disclose only truthful information. The district court nevertheless enjoined this part of the law because compliance would "unduly burden" the Platforms. That is incorrect as a matter of fact and law, and if upheld it would privilege the Platforms with a carveout from sunlight provisions that is completely alien to well-developed disclosure law.

The preliminary injunction also got the equities wrong. HB 20 does not harm the Platforms in any legally cognizable way. Instead, the anti-discrimination requirement just forces them to live up to representations they have made in Section 230 litigation and to the public. *See infra* at 6, 14, 22-23. And the disclosure requirements codify many practices the Platforms already claim to perform. The public interest is also not served by permitting the Platforms to shield their discriminatory practices behind the First Amendment. "[I]t is the purpose of the First Amendment to

3

preserve an uninhibited marketplace of ideas in which the truth will ultimately prevail," *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 377 (1984)—not a discriminatory dystopia where large corporations punish speakers with idiosyncratic views. The Platforms' loudest champions have open contempt for the First Amendment, and cheer the Platforms' discrimination as a way to outmaneuver the First Amendment's protections. There is also no conceivable interest in allowing the Platforms to continue operating this way without providing truthful explanations to the public.

The preliminary injunction should be reversed.

## STATEMENT OF JURISDICTION

The district court entered a preliminary injunction on December 1, 2021. ROA.2600. The Attorney General timely filed his notice of appeal on December 6, 2021. ROA.2620. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1. Whether the Platforms have a First Amendment right to censor third-party user speech in their spaces on the basis of viewpoint.

2. Whether the Platforms have a First Amendment right not to disclose factual and uncontroversial information about how they moderate third-party speech in their spaces.

## A. The Platforms' Evolution into Internet Censors

The Platforms are the gatekeepers of a digital "modern public square." *Packingham*, 137 S. Ct. at 1737. They have "enormous influence over the distribution of news." *Tah v. Glob. Witness Publ'g*, 991 F.3d 231, 255 (D.C. Cir. 2021) (Silberman, J., dissenting). And they "provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham*, 137 S. Ct. at 1737. Although other social media entities play important roles in our public life, this appeal concerns only YouTube, Twitter, and Facebook because HB 20 is limited to platforms with more than 50 million U.S. users.[2]

The Platforms are open to the general public and provide a space for private individuals to communicate with one another. ROA.345-46. YouTube is an "online video hosting platform," where users can upload videos for others to view. *Daniels v. Alphabet Inc.*, No. 20-CV-04687, 2021 WL 1222166, at *1 (N.D. Cal. Mar. 31, 2021). Twitter is a space where users "write short messages, or Tweets, of up to 280 characters . . . and can include photos, videos, and links to other Internet content in their Tweets." *In re PGS Home Co. Ltd*, No. 19-MC-80139, 2019 WL 6311407, at *1 (N.D. Cal. Nov. 25, 2019). And Facebook offers a hybrid where users "can post content on others' Facebook pages, reshare each other's content, and send messages to one another." *Force v. Facebook, Inc.*, 934 F.3d 53, 58 (2d Cir. 2019).

---

[2] The district court suggested HB 20 might cover other entities. *See* ROA.2572. But the Platforms could not identify other entities that would be covered. ROA.1306.

From their inception until quite recently, the Platforms publicly vowed to be neutral transmitters of third-party content. *See, e.g.*, Evelyn Douek, *Governing Online Speech: From 'Posts-as-Trumps' to Proportionality and Probability*, 121 Colum. L. Rev. 759, 769 (2021) ("For the first decade or so, online intermediaries were avowedly laissez faire about user-generated content."). Twitter, for example, originally promised it would "not censor user content," except in "limited circumstances" to "comply with legal requirements."[3] And it boasted that it was "the free speech wing of the free speech party."[4] The Platforms also disclaimed any interest in editing or otherwise taking responsibility for the content that others posted to their spaces. As Facebook put it in 2014: "We try to explicitly view ourselves as not editors . . . We don't want to have editorial judgment over the content [users see]."[5]

But these early promises were a "bait and switch." *See* Fox News, *AG Barr on Tech Companies Censoring Viewpoints: 'There's Something Very Disturbing About What's Going On'* (June 21, 2020).[6] Once the Platforms achieved digital dominance, they changed their tune and began to discriminate based on viewpoint. There are

---

[3] *See* The Internet Archive Wayback Machine, Twitter, The Twitter Rules (Jan. 18, 2009), https://bit.ly/31UlaJx (archived version of old Twitter rules).

[4] Josh Halliday, *Twitter's Tony Wang: 'We are the free speech wing of the free speech party'*, The Guardian (Mar. 22, 2012), https://bit.ly/3dKjXHx.

[5] Ravi Somaiya, *How Facebook Is Changing the Way Its Users Consume Journalism*, The New York Times (Oct. 27, 2014), https://nyti.ms/3ommZXb.

[6] https://fxn.ws/3pFB0Qx.

countless, well-publicized examples, but a few specific ones warrant particular attention.[7]

*First*, the Platforms often discriminate against Americans and in favor of foreign adversaries. For example, for over a year Facebook censored Americans who suggested the COVID-19 pandemic originated in China's Wuhan laboratory.[8] Meanwhile, the Platforms allowed Chinese Communist Party officials to claim that *America* started the virus.[9] The Supreme Leader of Iran has also received preferential treatment, even though he uses the Platforms to advocate genocide against Israel. When the Platforms censored U.S. politicians from their services, onlookers were astonished that Iran's leader was not treated the same. But Twitter rationalized that

---

[7] News sources are used in limited portions of the background for this brief. The Attorney General cites news sources instead of record material because the district court sharply limited discovery before issuing the preliminary injunction. ROA.621. At "the preliminary injunction stage," however, the court may consider "otherwise inadmissible evidence." *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993). The veracity of the examples cited below is also not subject to any reasonable dispute. Indeed, the Attorney General cited several of these examples in his motion for stay pending appeal (at 5-6), and the Platforms' opposition did not dispute their veracity.

[8] *See, e.g.*, Thomas Barrabi, *Facebook Ends Ban on Posts Claiming COVID-19 is Man-made*, Fox Business (May 26, 2021), https://fxn.ws/3y0L8qD.

[9] *See, e.g.*, Marisa Fernandez, *Twitter Fact-Checks Chinese Official's Claims that Coronavirus Originated in U.S.*, Axios (May 28, 2020), https://bit.ly/3lFWfjM (explaining that Twitter allowed these claims to fester for months and then merely appended a "fact-check" to the claim instead of removing it).

his genocide advocacy was mere "foreign policy saber rattling" and acceptable "commentary on political issues of the day."[10]

*Second*, the Platforms offer transparently pretextual explanations for their conduct. For example, in early 2021 an independent journalism organization published a video of themselves seeking comment from a Facebook executive outside his home on a story the journalists were running about Facebook's censorship. Twitter banned the organization for violating Twitter's "private information policy" (*i.e.*, appearing at the Facebook executive's home).[11] At the same time, however, Twitter allowed a materially similar CNN video to remain on its platform. CNN's video shows one of its reporters approaching a purely private citizen at home to ask if she was aware that she had interacted with "Russian disinformation" on Facebook. CNN's video presents the woman's full name, and even shows her house number (even though this served no conceivable news purpose).[12] That private citizen now receives death threats.[13] Nevertheless—and in spite of Twitter's ostensible "private information

---

[10] *See* Raphael Ahren, *Twitter to MKs: Unlike Trump Tweets, Khamanei's 'Eliminate Israel' Posts Are OK*, Times of Israel (July 30, 2020), https://bit.ly/336th6V; John Hendel, *Twitter CEO: Iranian Leader's 'Saber Rattling' Doesn't Violate Our Policies*, Politico (Oct. 28, 2020), https://politi.co/3GzTdpG.

[11] Joseph A. Wulfsohn, *Twitter says it permanently suspended Project Veritas, locked founder James O'Keefe out of his account,* Fox News (Feb. 11, 2021), https://fxn.ws/3BVBojq.

[12] Brian Flood, *Trump supporter, 76, blames 'fake news' CNN for threats following reporter ambush*, Fox News (Feb. 24, 2018), https://fxn.ws/3HpqB23.

[13] *Id.*

policy"—as of this filing, CNN's video remains live on Twitter and has been viewed over two million times.[14]

*Third*, the Platforms disallow viewpoints on certain topics that could undermine federal bureaucrats. As an example, during COVID-19 federal health officials have repudiated the practice of prescribing drugs "off-label" (*i.e.*, prescribing an FDA-approved drug to treat a condition other than the condition on its labeling).[15] This stance is in deep tension with federal *law*, which *permits* physicians to use their medical judgment to prescribe drugs off-label. *See, e.g.*, *United States v. Caronia*, 703 F.3d 149, 153 (2d Cir. 2012). The Platforms have nevertheless aided the federal bureaucrats with censorship. YouTube, for example, proudly boasts that it censors material "that contradicts . . . health authorities" (it defines this as "misinformation").[16] Indeed, YouTube even censored a *congressional hearing* that discussed off-label

---

[14] CNN Tweet (Feb. 20, 2018), archived at perma.cc/VL7Q-6VBF (as of Feb. 23, 2022).

[15] *See, e.g.*, CDC Health Advisory (Aug. 26, 2021), https://emergency.cdc.gov/han/2021/pdf/CDC_HAN_449.pdf (warning against off-label use of the drug ivermectin to treat COVID-19); *but see* Bryant et al., *Ivermectin for Prevention and Treatment of COVID-19 Infection*, 28 Am. J. Therapeutics 434 (2021) (meta-analysis of ivermectin usage finding "moderate-certainty evidence . . . that large reductions in COVID-19 deaths are possible using ivermectin"), https://bit.ly/3I7yEl4. The Attorney General does not take a position here on whether ivermectin is effective to treat COVID-19; rather, this shows how the Platforms discriminate by viewpoint and foreclose debate.

[16] YouTube "Covid-19 Medical Misinformation Policy," https://perma.cc/9ZUK-T2E6 (as of Feb. 28, 2022).

prescriptions.[17] The stakes for blindly censoring anything "that contradicts" health bureaucrats is high. As just one example, public records now reveal that senior federal health bureaucrats sought to silence the COVID lab leak hypothesis *not* because it was necessarily false, but because its revelation could be politically damaging.[18]

These inconsistently applied and sometimes outright misrepresented moderation policies are abusive on their own. But they have taken on particular importance recently because the Platforms have become willing partners to federal officials who seek to suppress speech. The White House, for example, admitted in July 2021 that it is "in regular touch with these social media platforms" and that it "flag[s] problematic posts for Facebook" to censor. White House, *Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy* (July 15, 2021). On the following day, the White House was asked if it found "sufficient" the fact that Facebook had "removed 18 million pieces of COVID misinformation." The White House responded: "Clearly not"; *i.e.*, that the Platforms had not censored *enough*. White House, *Press Briefing by Press Secretary Jen Psaki* (July 16, 2021).

---

[17] Ron Johnson, *YouTube Cancels the U.S. Senate*, Wall St. J. (Feb. 2, 2021), https://on.wsj.com/303Il3E.

[18] Letter from Ranking Members on Committee on Oversight and Reform to Xavier Becerra at App'x. 4 (Jan. 11, 2022), https://republicans-oversight.house.gov/wp-content/uploads/2022/01/Letter-Re.-Feb-1-Emails-011122.pdf (National Institutes of Health Director privately fearing that lab leak hypothesis could "do[] great potential harm to science and international harmony").

## B. HB 20

Texas has a "fundamental interest in protecting the free exchange of ideas and information in [Texas]." ROA.66 (HB 20 text). Accordingly, Texas passed HB 20 in 2021 to regulate the Platforms and combat the abuses described *supra* at 6-10.

HB 20 narrowly defines the entities subject to its reach. It covers only "social media platform[s]" with 50 million U.S. users. Tex. Bus. & Com. Code § 120.002. A "social media platform" is an Internet website or application that permits all persons to join and primarily facilitates users sharing content with others. *Id.* § 120.001. The definition does not include dissimilar companies like Internet service providers, email providers, or websites that primarily disseminate news that is not generated by users. *Id.* Texas has statutorily deemed covered entities to be "common carriers." ROA.66.

Substantively, HB 20 does two main things. First, the Act contains a modest anti-discrimination provision. Specifically, the Platforms must host speakers on equal terms; they may not "censor" based on user "viewpoint" or user location in Texas. Tex. Civ. Prac. & Rem. Code § 143A.002 (the "Hosting Rule"). "Censor" includes total removal of content, and also other manipulations that can have a comparable effect. *Id.* § 143A.001(a). HB 20 does not, however, prohibit removal of entire categories of "*content*." So, for example, the Platforms may decide to eliminate pornography without violating HB 20. HB 20 also does not affect whether the Platforms can continue to discriminate in certain narrow, confined spaces, specifically regarding: (a) content federal law specifically authorizes censorship of; (b) unlawful content; (c) content concerning sexual exploitation of children, or harassment of

sexual abuse survivors; and (d) content that incites criminal activity or violence in various ways. *Id.* § 143A.006(a). The Platforms are also permitted to censor anything that a user wishes to be censored from that user's *own* account. *Id.* § 143A.006(b). Users and the Attorney General can enforce the Hosting Rule but cannot seek damages. *Id.* §§ 143A.007(a), 143A.008.

Second, the Act requires various purely factual disclosures. The Platforms must (1) describe how they moderate and manage content, Tex. Bus. & Com. Code § 120.051, (2) publish an "acceptable use policy" informing users what content is permitted and how content is policed, *id.* § 120.052, and (3) publish a biannual transparency report documenting certain facts about how the Platform managed content during a specific time period, *id.* § 120.053. HB 20 also requires the Platforms to maintain a mechanism that allows users to make the Platforms live up to their disclosures: specifically, Platforms must maintain a complaint-and-appeal system for users who believe action contrary to the disclosures has taken place, *id.* § 120.101-104. The Attorney General can enforce these requirements but cannot seek damages. *Id.* § 120.151.

Finally, HB 20 has a robust severability provision. ROA.79-81.

## C.  Section 230

HB 20 is Texas's answer to the problems described *supra* at 6-10. Section 230, 47 U.S.C. § 230, however, is the leading *federal* law governing the Platforms, and it is also highly relevant to this case. Section 230 provides the Platforms with an important legal shield, and the Platforms' use of that shield provides critical context for their challenge to HB 20.

Section 230 was enacted in the Internet's early days against the backdrop of two cases that raised difficult questions about Internet platform liability for hosted content. *See Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (describing the history). *Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135 (S.D.N.Y. 1991), held that an Internet platform was not liable for transmitting a third party's defamatory speech. But then *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), held that an Internet platform *could* be liable for transmitting defamatory third-party speech where, unlike with *Cubby*, the platform filters some third-party speech. Together these cases created a Hobson's choice: "[O]nline service providers that voluntarily filter some messages become liable for all messages transmitted, whereas providers that bury their heads in the sand and ignore problematic posts altogether escape liability." *Roommates.Com*, 521 F.3d at 1163. A perverse consequence resulted: It is too hard to filter all content, so, given this choice, Internet platforms would have to filter none of it—including pornographic or arguably even illegal content.

This Hobson's choice was a "serious obstacle[] to the important federal policy of empowering parents to determine the content of communications their children receive" online. H.R. Conf. Rep. No. 104-458, at 194 (1996). Internet platforms literally could not safely filter pornography away from child users without potentially running into the *Stratton Oakmont* problem, where they become liable for everything they *fail* to filter. In 1996, Congress responded with Section 230. First, Congress codified *Cubby* by establishing a default rule that Internet entities cannot be "treated as the publisher or speaker of any information provided by another." 47 U.S.C.

§ 230(c)(1). Second, Congress overrode *Stratton Oakmont* and provided that the default rule does not change simply because a platform filters certain kinds of odious content, so long as that filtering is done "in good faith." *Id.* § 230(c)(2). Third, Congress confirmed that an Internet platform "remains liable for its own speech," *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007), including when it has any role in the formation of another's speech, *see* 47 U.S.C. § 230(f)(3) (platform liable for content it creates or develops "in whole or in part").

The Platforms have aggressively leveraged the Section 230 shield. For example, they successfully raised the shield against claims for aiding Hamas and ISIS terrorists notwithstanding that those terror groups openly use the Platforms to advance their deadly missions. *See, e.g., Force*, 934 F.3d at 65-66; *Gonzalez v. Google LLC*, 2 F.4th 871, 882 (9th Cir. 2021). Necessarily, in these actions the Platforms must take the position that they themselves have no role in the "creation or development" of the terrorists' content. *See, e.g.*, Brief for Facebook as Defendants-Appellees at 1, *Klayman v. Zuckerberg*, No. 13-7017, 2013 WL 5371995 (D.C. Cir. Sept. 25, 2013) (Facebook arguing Section 230 protects it as a "conduit[] for others' speech"). If, by contrast, they were the editors of the terrorist content, they would indisputably be liable. *See* 47 U.S.C. § 230(f)(3); *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 408 (6th Cir. 2014) ("[I]f a website operator is in part responsible for the . . . content, then it is . . . not immune from claims predicated on it.").

## D. Procedural History

On September 22, 2021, in a dramatic reversal from this position, the Platforms sued the Texas Attorney General under the First Amendment to enjoin HB 20's

enforcement, principally on the grounds that it interferes with their editorial control of the speech third parties post to their spaces.

On December 1 the district court entered a preliminary injunction. The district court concluded that HB 20's Hosting Rule likely violates the First Amendment by infringing the Platforms' ability to "exercise editorial discretion over their platform's content." ROA.2586. And the court deemed the disclosure requirements "inordinately burdensome." ROA.2591. The court also concluded the law was problematic on additional grounds such as that the Hosting Rule contains exemptions, and because it does not apply to smaller Internet entities. ROA.2597-98. Finally, the court concluded that HB 20 was not properly tailored because "the State could have created its own unmoderated platform." ROA.2598.

On December 15, 2021, the Attorney General filed a motion to stay the preliminary injunction pending appeal. That motion remains pending as of this filing.

## Standard of Review

"A preliminary injunction is an extraordinary remedy. In addition to proving a likelihood of prevailing on the merits, the movant must demonstrate a substantial threat of irreparable injury if the injunction is not granted; the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted, and the injunction will not disserve the public interest." *Atchafalaya Basinkeeper v. U.S. Army Corps of Engineers*, 894 F.3d 692, 696 (5th Cir. 2018). "A grant of a preliminary injunction is reviewed for abuse of discretion," with "legal conclusions" "reviewed de novo." *Id.*

## Summary of Argument

I.　The Platforms are unlikely to succeed on the merits of their claim that HB 20's Hosting Rule violates the First Amendment. Laws requiring commercial entities to neutrally host speakers generally do not even implicate the First Amendment because they do not regulate the host's speech at all—they regulate its conduct. The Platforms tip their hand by resisting the Hosting Rule with only outlier precedent about newspapers and parades, forcing the Platforms to compare themselves to entities they are materially unlike. Among many other dispositive distinctions, the Platforms enjoy Section 230 protection for their users' speech under the premise that the Platforms are mere conduits for that speech with no responsibility for its content. That is irreconcilable with their claim that they should enjoy the separate privileges afforded to newspapers, who *are* legally responsible for the content they print. And even if the Platforms could invoke some legitimate First Amendment right to discriminate among speakers, the Hosting Rule is a common carriage regulation that can abrogate that right, and is subject to at most intermediate scrutiny which it survives.

II.　The Platforms are also unlikely to succeed on their argument that HB 20's disclosure requirements violate the First Amendment. HB 20 requires the Platforms to disclose only purely factual information about their products. And it is well-established that the government may require commercial entities to issue factual and uncontroversial disclosures in these circumstances provided that the disclosures would not be "unduly burdensome." *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985). The district court erred because it concluded

that the sheer volume of information the Platforms may have to disclose under HB 20 rendered the requirements unduly burdensome. That was wrong, and if upheld it would call into question countless long-operative disclosure requirements (such as SEC reporting requirements) that even the Platforms are not bold enough to question. The district court's conclusion was also wrong because it overlooked that the Platforms have repeatedly *advocated* for the type of disclosure framework that HB 20 imposes—so it cannot plausibly "unduly burden" them.

III.　The equities also disfavor the Platforms. Texas suffers irreparable harm as a matter of law while HB 20 is enjoined. Meanwhile, HB 20's implementation would not impose any legitimate harm on the Platforms. The law forces them to operate in ways materially similar to how they did in the past, and to honor promises they have made to the public and the judiciary in Section 230 litigation. They also suffer no genuine First Amendment harm. Instead, the Platforms seek to use the First Amendment to subvert the First Amendment's core guarantee. Finally, the public interest demonstrably favors reversal because the "widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *Turner Broad. Sys., Inc., v. FCC*, 520 U.S. 180, 189 (1997).

## Argument

## I.　The Platforms Are Unlikely to Succeed on the Merits of Their Claim that the Hosting Rule Violates the First Amendment.

### A.　The Hosting Rule does not implicate the First Amendment.

HB 20's Hosting Rule is constitutional. The Supreme Court has repeatedly affirmed that "[r]equiring someone to host another person's speech is often a perfectly

legitimate thing for the Government to do." *Agency for Int'l Dev.*, 140 S.Ct. at 2098 (three-Justice dissent making undisputed assertion). That is because hosting is a form of "conduct, not speech." *FAIR*, 547 U.S. at 60. This rule applies with full force to the Platforms.

**1.** The Supreme Court's canonical *PruneYard* decision demonstrates why the Platforms have no First Amendment defense to the Hosting Rule. *PruneYard* involved a large California shopping mall that barred visitors from engaging in expressive activity not "directly related to [the mall's] commercial purposes." 447 U.S. at 77. The mall applied this policy against students pamphleteering regarding a highly charged subject: Zionism. *Id.* But California law forced shopping malls to play host to political speech, and to generally honor the public's "speech and petition" rights. *Id.* at 78. The relevant question presented to the Supreme Court, then, was whether California's law violated any "First Amendment right not to be forced by the State to use [private] property as a forum for the speech of others." *Id.* at 85.

The Court concluded that California's hosting requirement presented no First Amendment problem, for three specific reasons. First, the shopping center was "open to the public to come and go as they please"—for this reason, no onlooker would associate a pamphleteer's views with those of the mall owner. *Id.* at 87. Second, California was not mandating that the mall host a "*specific* message"; instead, the State protection applied equally to all speakers. *Id.* (emphasis added). Third, the mall remained free to "expressly disavow any connection with" a disfavored message. *Id.*; *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 579-80 (1995) (explaining the *PruneYard* outcome on these grounds). Every Justice

agreed—some concurred merely to say that small retail establishments might be different. *PruneYard*, 447 U.S. at 96-97 (Powell, J., concurring).

In all legally relevant respects, the Platforms here are like the mall in *PruneYard*. First, the Platforms concede they are open to all comers. *See* ROA.345-46. Second, HB 20 does not dictate any specific message that the Platforms must host—instead, it requires them to stop discriminating based on viewpoint across the board. *See supra* at 11-12. And third, the Platforms remain free under HB 20 to expressly disavow any connection with disfavored messages—indeed, they already do this frequently. *See, e.g.*, Facebook, Terms of Service § 4.3, https://perma.cc/HK4X-QPL8 (as of Dec. 13, 2021) ("We do not control or direct what people and others do or say, and we are not responsible for their actions or conduct . . . or any content they share."); Twitter, Terms of Service § 3, https://perma.cc/2QCU-VLW4 (as of Dec. 13, 2021) (similar); *see also, e.g.*, Twitter, Updating Our Approach to Misleading Information (May 11, 2020), https://perma.cc/K8CT-NQHZ (Twitter explaining it appends its own messages to content it deems "misleading," or "harmful").

The Supreme Court's *FAIR* decision unanimously re-affirmed *PruneYard* and clarified that a speech-hosting requirement generally regulates the host's "conduct, not speech." 547 U.S. at 60. In *FAIR*, Congress required universities to host military recruiters on the same terms as they hosted nonmilitary recruiters. 547 U.S. 47. Some law schools sharply "object[ed]" to the military's policy on sexual orientation. *Id.* at 52. Nevertheless, the Court concluded this conduct regulation "does not sufficiently interfere with any message of [a] school" to trigger First Amendment scrutiny. *Id.* at 64. That was because the hosting obligation only "affect[ed] what law

schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* at 60. So it is here: the Hosting Rule affects only what the Platforms "must do"—refrain from engaging in viewpoint discrimination—"not what they may or may not say." *Id.*

**2.** The district court relied on inapposite precedent to conclude that this generally applicable hosting doctrine does not apply to the Platforms and that instead "the First Amendment guarantees social media platforms the right to exercise editorial discretion" over third-party content. ROA.2582. The district court claimed that "[t]hree Supreme Court cases" command this conclusion. ROA.2582; *see also* ROA.272 (Platforms featuring same three cases). That was wrong.

The Platforms' flagship case is one about the rights of newspapers. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974). There, a Florida statute forced newspapers to give politicians "equal space to reply to criticism and attacks" that the newspaper prints. *Id.* at 243. The Florida Attorney General had never defended the statute, *id.* at 247 n.7, but a politician sought to use it to compel a newspaper to print his message verbatim in response to critical editorials, *id.* at 243-44. The Supreme Court concluded the statute was unconstitutional. The First Amendment's "free press clause" protects the "choice of material to go into a newspaper." *Id.* at 254 n.20, 258. That is because newspapers function as "more than a passive receptable or conduit for news, comment, and advertising." *Id.* at 258. So it was unconstitutional for Florida to tell newspapers that they had to print a specific speaker's speech.

*Tornillo* is inapposite right from the start because the Hosting Rule is nothing like Florida's right-of-reply statute. The Hosting Rule is a generally applicable anti-

discrimination requirement—not a special privilege available only for politicians, as in *Tornillo*. *See PruneYard*, 447 U.S. at 87 (upholding California requirement that malls host speakers because the requirement was neutral and generally applicable). Even a newspaper's "choice of material" to print, *Tornillo*, 418 U.S. at 258, does not override general anti-discrimination law. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973) (upholding against First Amendment challenge a rule that newspapers not carry "help-wanted" advertisements in a way that discriminated on the basis of sex). The Platforms have in the past revealed they are laboring under a severe misimpression; they think newspapers (and, by extension under their logic, the Platforms themselves) can discriminate against *anyone*, for *any* reason. *See Taylor v. Twitter, Inc.*, Tr. Hr'g, No. CGC-18-564460 (Cal. Super. Ct. S.F. Cnty., June 14, 2018) (Twitter counsel: "[T]he First Amendment would give Twitter the right, just like it would give a newspaper the right, to choose not to run an op-ed page from someone because she happens to be a woman.").[19] But they are wrong; "application of [anti-discrimination law] to newspapers does not contravene freedom of press protected by the First Amendment." *United States v. Hunter*, 459 F.2d 205, 213 (4th Cir. 1972).

In addition, the Platforms are not entitled to the same treatment as newspapers because they differ from newspapers in at least three dispositive respects.

---

[19] The Court pressed counsel whether that was truly Twitter's position. Court: "[Y]our position is absolutist; that Twitter has an absolute First Amendment right to remove anybody from its platform, even if doing so would be discriminatory on the basis of religion, gender[?]" Twitter's counsel responded unequivocally: "Yes."

*First,* unlike newspapers, the Platforms *are* "a conduit for news, comment, and advertising." *Cf. Tornillo*, 418 U.S. at 258. Their Section 230 protection depends on it. To use Section 230's shield the Platforms must not "develop[]" the underlying content, not even merely "in part." 47 U.S.C. § 230(c)(1), (f)(3). Thus, while they are not liable for purely third-party speech, they *are* "liable for [their] own speech," *Universal Commc'n Sys.*, 478 F.3d at 419, *including* "speech that is properly attributed to them," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009). That is why they repeatedly tell courts in Section 230 litigation that they are mere "conduits for others' speech" with no responsibility for its content. Appellees' Br. at 1, *Klayman*, 2013 WL 5371995; *see also* Twitter Motion to Dismiss, *Fields v. Twitter, Inc.*, No. 3:16-cv-00213, 2016 WL 2586923 n.5 (N.D. Cal. Apr. 6, 2016) (Twitter arguing it should be treated akin to "conduit for huge quantities of third-party speech"); Motion to Dismiss Reply, *Colon v. Twitter, Google, and Facebook*, No. 6:18-CV-00515, 2019 WL 7835413 (M.D. Fla. Dec. 20, 2019) (all three Platforms asserting they use "neutral tools [to] filter or arrange third-party content" and they do not "creat[e]" or "develop[]" any third-party content). Courts have taken them at their word. *See, e.g.*, *Force*, 934 F.3d at 70 (Facebook not liable for terrorist content because it was mere "neutral intermediary" for the content); *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1270 (D.C. Cir. 2019) (Garland, J.) (YouTube's parent not liable for advertising conspiracy where its "neutral algorithm" produced the violative content). Newspapers, by contrast, can "not defend a [tort] suit on the ground that the [tortious] statements are not its own." *Pittsburgh Press*, 413 U.S. at 386; *see also Tornillo*, 418 U.S. at 261 (White, J., concurring)

("[A]lthough a newspaper may publish without government censorship, it has never been entirely free from liability for what it chooses to print."). That should take *Tornillo* and the newspaper analogy off the table entirely.

*Second*, "unlike newspapers," the Platforms "hold themselves out as organizations that focus on distributing the speech of the broader public." *Biden v. Knight First Amend. Inst.*, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring). That is the whole reason they were created. *See* Testimony of Facebook CEO Mark Zuckerberg before the United States Senate Committee on Commerce, Science, and Transportation (Oct. 28, 2020), https://bit.ly/3LjY8Ot ("Facebook was built to enable people to express themselves and share."). This feature makes the Platforms even more of a host than the *PruneYard* shopping mall, which was "open to the public to come and go as they please," but not built for the *specific purpose* of hosting speech. 447 U.S. at 87. Relatedly, the Platforms do not pre-screen content before they disseminate it. Indeed, "[s]omething well north of 99%" of the third-party speech the Platforms disseminate "never gets reviewed" even *after* dissemination. *NetChoice, LLC v. Moody*, 546 F. Supp.3d 1082 (N.D. Fla. 2021). A newspaper could not operate this way because it would risk substantial defamation and other liability. And for this reason, among others, no reasonable viewer would associate the content third-parties post with the Platforms themselves. *FAIR*, 547 U.S. at 65 (no First Amendment problem with hosting rule where there is "little likelihood" that third-party speech "would be identified with the owner").

*Third*, unlike newspapers, the "space constraints on digital platforms are practically nonexistent." *Biden*, 141 S. Ct. at 1224 (Thomas, J., concurring); *see also*

*FAIR*, 547 U.S. at 64 (distinguishing *Tornillo* because "compelled printing of a reply takes up space that could be devoted to other material" (cleaned up)); *cf. Tornillo*, 418 U.S. at 257 (reasoning that newspapers cannot "proceed to infinite expansion of its column space to accommodate" unwanted speech). So, whereas a newspaper must by necessity curate what appears on its pages, no similar practical impediment exists for the Platforms. As a result, they host the speech of billions of users worldwide.

**3.** Plaintiffs' two other main cases—*Hurley*, 515 U.S. 557, and *Pacific Gas & Electric Company v. Public Utilities Commission of California*, 475 U.S. 1 (1986) ("*PG&E*")—are not even in the ballpark. *Hurley* merely extended *Tornillo* to a parade. A parade could not be compelled to include unwelcome marchers because a parade is "inherent[ly] expressive[]"—unwelcome marchers would "alter the expressive content of the[] parade," and viewers would likely assume the parade organizers endorsed the rogue marchers. 515 U.S. at 568, 572-73, 575; *see Agency for Int'l Dev.*, 140 S. Ct. at 2088 (explaining that *Hurley* was decided on "speech misattribution" grounds). *Hurley* distinguished the *PruneYard* shopping mall on terms that apply with equal force to the Platforms: unlike the parade, the mall was open to all comers, would not be associated with third-party speech, and could "disavow any connection with the [unwanted] message." 515 U.S. at 579-80.

And in *PG&E*, the Court merely held that a California regulator could not order an electric utility to add a specific advocacy group's messages to the utility's customer newsletter, where the advocacy group's messages would disparage the electric company. *See* 475 U.S. at 12 ("The [California agency] order does not simply award

access to the public at large; rather, it discriminates on the basis of the viewpoints of the selected speakers.") (plurality op.). The electric company was also markedly different than the mall in *PruneYard* (and the Platforms here) because it had not opened itself—much less its customer mailings—to the world at large. *Id.* at 12 n.8 (plurality op.).

## B. The Hosting Rule is also a historically-grounded common carriage regulation, and is subject to at most intermediate scrutiny which it survives.

Even if the Platforms enjoy a First Amendment right to discriminate based on user viewpoint (they do not), the Hosting Rule is nevertheless a permissible form of common carrier regulation. Texas has a demonstrable interest in preserving its residents' ability to communicate and receive information on these modern-day equivalents of yesteryear's communications common carriers. The Hosting Rule is also subject, at most, to intermediate scrutiny which it survives.

1. A "common carrier has a duty to serve." *Refrigerated Transp. Co. v. ICC*, 616 F.2d 748, 753 n.9 (5th Cir. 1980) (per curiam). What this customarily means is that the carrier "can make no discrimination between persons," and is "bound to accept all goods offered within the course of his employment." *York Co. v. Cent. R.R.*, 70 U.S. 107, 112 (1865) (stating the common law rule); *VIA Metro. Transit v. Meck*, 620 S.W.3d 356, 360 (Tex. 2020) (Texas adopts "common law" treatment of common carriers). For communications providers, this means that the carrier must, "to the extent of capacity," "transmit" all messages "upon reasonable terms." *Primrose v. W. Union Tel. Co.*, 154 U.S. 1, 14 (1894); *see also W. Union Tel. Co. v.*

*James*, 162 U.S. 650, 651 (1896) (affirming enforcement of state law that required "telegraph compan[ies]" to "transmit and deliver [messages] with impartiality and good faith"). This settled understanding has governed for over 100 years—no court has adopted the argument that the First Amendment swallows common carrier principles for this entire industry just because speech is in play. *Cf. e.g.*, 47 U.S.C. §§ 201-202 (codified version of common carriage requirements for communications providers).

Common carrier treatment is fully applicable here. The Texas Legislature has defined the Platforms as "common carriers." ROA.66. That was plainly proper under the term's common law meaning. The touchstone trait of a common carrier is "a holding out on the part of the operator . . . a willingness to carry on the same terms and conditions any and all groups no matter who they might be." *Semon v. Royal Indem. Co.*, 279 F.2d 737, 739 (5th Cir. 1960); *see also NARUC v. FCC*, 525 F.2d 630, 641 (D.C. Cir. 1976) (common carrier is one who does not "make individualized decisions, in particular cases, whether and on what terms to deal"). That is how the Platforms have held themselves out to the public. ROA.346 (Platforms concededly willing to accept any user who agrees to their boilerplate terms of service); ROA.1227 (users can open account immediately upon accepting generic terms of service). Historically, courts have considered some other factually sensitive factors about whether an entity is properly considered a common carrier—such as whether their business implicates a "public interest." *See Biden*, 141 S. Ct. at 1222-23 (Thomas, J., concurring). But these factors also overwhelmingly point in the direction that the Platforms are properly considered common carriers. *See id.* at 1224 (Thomas, J.,

concurring) ("There is a fair argument that some digital platforms are sufficiently akin to common carriers."); ROA.1114-16 (expert report explaining why the Platforms are akin to historical common carriers). And the Hosting Rule imposes a classic common carrier obligation on the Platforms: no discrimination.

**2.** The district court concluded that the Platforms are not common carriers by confusing (1) the traditional *definition* of a common carrier with (2) the traditional *obligations* of a common carrier. Specifically, the district court concluded that the Platforms are not common carriers because they "screen[] and sometimes moderate[] or curate[]" user content. ROA.2585. But that has nothing to do with whether they fit the traditional definition of a common carrier; all it says is that the Platforms violate the traditional obligations of a common carrier. The touchstone trait of a common carrier is the holding out of oneself as willing to deal with all comers on equal terms without individualized bargaining. *See supra* at 26. That plainly describes the Platforms. *Cf. Fla. Power & Light Co. v. FERC*, 660 F.2d 668, 674 (5th Cir. 1981) ("A carrier will not be a common carrier where its practice is to make individualized decisions in particular cases as to whether and on what terms to serve."); *Harper v. Agency Rent-A-Car, Inc.*, 905 F.2d 71, 73 (5th Cir. 1990) (car rental company not a common carrier where it "merely sought to accommodate a *particular* customer's needs" by offering one of its employees to drive the particular customer (emphasis added)). The district court's conclusion makes the common carrier test circular: it would allow entities to circumvent common carrier rules simply by violating those rules. That is wrong; otherwise telephone companies could have skirted their longstanding common carriage obligations, *see* 47 U.S.C. §§ 201-202, simply by

combing their records for disfavored speakers and then terminating those speakers' phone service. No one has ever thought the telephone companies had a constitutional right to operate in that abusive way.

**3.** Regardless, however, of whether the Platforms are properly considered common carriers, the Supreme Court's decisions in the *Turner Broadcasting* saga demonstrate that common carriage *treatment* may be imposed on them, *even if* it affects some of their First Amendment rights (it does not). *See Turner Broad. Sys. v. FCC*, 512 U.S. 622 (1994) ("*Turner I*"); *Turner Broad. Sys., v. FCC*, 520 U.S. 180 (1997) ("*Turner II*").

The *Turner* cases involved the Cable Act's requirement that cable television operators reserve over one third of their channels for specific speakers—local broadcasters—at the expense of other cable programmers that the cable operators wanted to host. *Turner I*, 512 U.S. at 630-32. The Court concluded that the requirement implicated the First Amendment in "two respects" because (unlike here) it "reduce[d] the number of channels over which cable operators exercise unfettered control" and had "render[ed] it more difficult for cable programmers to compete for carriage on the limited channels" not reserved for local broadcasters. *Id.* at 637; *see also id.* at 679 (O'Connor, J., dissenting in part) (remaining four Justices likewise concluding "[t]he controversial judgment at the heart of the statute is . . . that broadcasters should be preferred over cable programmers"). Nevertheless, the Court concluded that the requirement was subject only to "intermediate scrutiny," which it survived because it properly advanced the government's interest in the "widest possible dissemination of information from diverse and antagonistic sources." *Turner II*, 520

U.S. at 189, 192 (concluding this dissemination is "essential to the welfare of the public").

Four Justices, including Justice Thomas, dissented on the view that the Cable Act requirement went too far. *Turner I*, 512 U.S. at 684-85 (O'Connor, J., dissenting in part). The dissenters' specific problem was that Congress "preferr[ed] one speaker" (the local broadcasters) "to another" (the cable programmers competing for the same cable space). *Id.* Forcing a carrier to play favorites goes beyond traditional common carriage regulation. *But even these dissenters explicitly recognized that traditional common carriage treatment was likely appropriate*: "[I]t stands to reason that if Congress may demand that telephone companies operate as common carriers, it can ask the same of cable companies." *Id.*

**4.**　　There is no need to apply even *Turner*'s intermediate scrutiny here because HB 20's Hosting Rule does not infringe speech rights in any respect (it does not, for example, pit one group of speakers against another, as in *Turner*). But even if intermediate scrutiny applied, the Hosting Rule would easily survive.

Like the Cable Act in *Turner*, the Hosting Rule's operation "does not depend upon the content of the [regulated party's]" speech. *See Turner I*, 512 U.S. at 643-44. For that reason, intermediate scrutiny (at most) is appropriate. That means the Hosting Rule survives if (1) "it advances important governmental interests," that (2) are "unrelated to the suppression of free speech," and (3) "do[] not burden substantially more speech than necessary." *Turner II*, 520 U.S. at 189. The Hosting Rule easily passes this test. *See, e.g.*, *Biden*, 141 S. Ct. at 1222-26 (Thomas, J., concurring)

(lone remaining *Turner* dissenter concluding that this type of social media regulation is likely constitutional).

*First*, the Hosting Rule advances Texas's demonstrably compelling "interest in protecting the free exchange of ideas and information." HB 20 § 1(2); *Turner II*, 520 U.S. at 192 ("widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public").

*Second*, the Hosting Rule is plainly unrelated to the suppression of free expression, *see Turner I*, 512 U.S. at 662, since the bill aims to enable more speech than what the Platforms prefer under the status quo.

*Third*, the Hosting Rule does not burden substantially more speech than necessary. To the extent it burdens the Platforms at all, that burden "is congruent to the benefits it affords" to Platform users. *Turner II*, 520 U.S. at 215. Indeed, under *Turner* Texas could have gone substantially further. HB 20 applies only to the largest social media platforms—those with 50 million or more U.S. users. By contrast, the law in *Turner* applied to all cable operators with more than 12 channels, and even those with 12 or fewer channels were still subject to some obligations. *See Turner I*, 512 U.S. at 630-32. The Platforms subject to HB 20 also have shown an overwhelming tendency to censor. *See supra* at 6-10. The *Turner* cable operators by contrast would still host "the vast majority" of traditional broadcasters even "in the absence of any legal obligation to do so." *Turner II*, 520 U.S. at 215.

## C. The District Court's and the Platforms' alternative bases to enjoin the Hosting Rule fail.

The district court's and the Platforms' other asserted grounds for the injunction are likewise fatally flawed.

### 1. The District Court's alternative First Amendment grounds were error.

The district court wrongly concluded that HB 20 "discriminates based on content and speaker" because it contains minor carveouts that let the Platforms continue to viewpoint-censor in a few limited areas. ROA.2592-93. Most of the carveouts are for illegal content, or where the Platforms can invoke a federal censorship right. *See supra* at 11-12. And the carveouts present no First Amendment problem because the mere allowance for *Platforms* to keep restricting speech (in limited areas) does not mean the law *itself* restricts any speech. The Court blessed the same structure in *Turner*—the cable companies continued to exercise almost complete control over the majority of their channels, and, even for the channels the Cable Act regulated, Congress permitted the cable companies to discriminate in their "discretion" between local broadcasters. *Turner II*, 520 U.S. at 216. So the cable companies still had ample ability to discriminate based on content. But that did not mean the *Cable Act* was content-based. *See Turner I*, 512 U.S. at 643-44 (intermediate scrutiny appropriate because Congress's "interference does not depend upon the content of the cable operators' programming"). Likewise here, HB 20's limited carveouts permitting the Platforms to keep censoring among certain content does not mean *HB 20* censors that content. In any event, if these carveouts are problematic, they are fully severable. *See* HB 20 § 8 (explicit severability provision); *Barr v. Am. Ass'n of*

*Political Consultants, Inc.*, 140 S. Ct. 2335, 2352-55 (2020) (severing "unconstitutional discriminatory exception" to otherwise valid statute under First Amendment).

The district court also concluded that the law has an impermissible purpose because it targets only big tech companies while leaving untouched smaller websites that individual Texas legislators allegedly liked. ROA.2593-94. There are multiple fatal problems with this conclusion. First, it is completely unfounded: The District Court's conclusion was based principally on a news article that does not even purport to present the views of a single Texas legislator. ROA.2593. The article instead simply asserted that some social media entities that did not meet HB 20's 50 million U.S. user threshold are generally more liked by free speech advocates than the Platforms. The district court impermissibly leaped from this newspaper assertion to the conclusion that Texas's legislators deliberately opted to give these smaller entities preferential treatment. Second, the district court's conclusion completely ignores that HB 20 applies to the Platforms and not smaller entities because the Platforms present the most salient problem. These are the largest social media enterprises in the world, and they demonstrably engage in rampant viewpoint-based censorship. *See supra* at 5-10. It may *create* constitutional problems if the law were broader and targeted smaller platforms (many of whom may not even discriminate based on user viewpoint). *PruneYard*, 447 U.S. at 96-97 (Powell, J., concurring) (expressing doubt whether hosting rules could be applied to small establishments). Third, even if the district court had identified legitimate evidence that an individual legislator was motivated to exempt their favored speakers, that would not affect HB 20's validity. *See*

*United States v. O'Brien*, 391 U.S. 367, 383-84 (1968) (courts do not "void a statute that is . . . constitutional on its face, on the basis of what [some] Congressmen said about it").

The district court also suggested that HB 20 is not properly tailored because "the State could have created its own unmoderated platform" instead. ROA.2598. That cannot possibly be the law. For decades Congress has imposed common carriage regulation on wide swaths of the communications industry, including telephony, 47 U.S.C. §§ 201-202, and not once was this called into question on the basis that Congress instead could have created its own national communications network. There is a fortune waiting for any company that creates a successful alternative to the Platforms. *See Biden*, 141 S. Ct. at 1224 (Thomas, J., concurring). It is quite telling that none have yet succeeded. *Id.* And it makes no sense to force the government to try to compete with the Platforms when even private, profit-motivated industry cannot figure out how.[20]

**2.** The Platforms cannot seek shelter in Section 230.

As explained *supra* at 13-14, Section 230(c)(1) provides that Internet platforms cannot be held liable for users' speech. Because the Platforms deploy that legal shield as a matter of course, they cannot at the same time claim the same rights as

---

[20] The court also issued conflicting findings regarding vagueness. It first expressed that it would "not reach the issue[] of whether HB 20 is void for vagueness," ROA.2581 n.1, then concluded HB 20 is "[u]nconstitutionally [v]ague," ROA.2594, but then explained correctly that most provisions of the law are not vague (none are), ROA.2594-96.

newspapers and parades. *See supra* at 22-23. Section 230, however, contains another important provision here; specifically, Section 230(c)(2) provides that the shield still holds even if an Internet platform removes some user speech. *See supra* at 14 (explaining how this provision was designed to overrule *Stratton Oakmont*, which held an Internet platform liable for all hosted speech on the basis that it filtered some). The Platforms argued below that Section 230(c)(2) additionally confers a freestanding censorship privilege that defeats independent legal duties having nothing to do with liability for user speech—including anti-discrimination laws like HB 20. That is wrong for multiple reasons.

*First*, history and text show that Section 230(c)(2) does not protect Internet platforms from independent legal duties, like anti-discrimination laws. After all, 230(c)(2) merely overrode *Stratton Oakmont*'s error of treating an Internet platform that removed *some* content as the speaker of *all* third-party content. *See supra* at 14. HB 20 does not do that. Indeed, HB 20 does not hold the Platforms liable for *any* third-party content. And that is the only problem 230(c)(2) addressed. Section 230(c)(2)'s text confirms this because it protects Internet platforms only from being "held liable *on account of*" censoring content. 47 U.S.C. § 230(c)(2) (emphasis added). When a Platform is subject to an anti-discrimination law it is not being held liable "*on account of*" censorship—the Platform is liable if it commits the legally distinct wrong of discrimination. It would strain credulity to say Section 230 protects Platforms when they censor speakers based on race. Likewise here, Section 230 does not protect them for censoring based on speaker viewpoint.

*Second*, Section 230(c)(2) is altogether inapplicable unless the removal is done "in good faith." 47 U.S.C. § 230(c)(2). Viewpoint-based censorship is almost never "in good faith," and at a bare minimum presents a highly fact-dependent question that cannot be resolved in this pre-enforcement challenge. *See supra* at 6-10 (documenting egregious different treatment).

*Third*, Section 230(c)(2) does not cover all removals—only removal of content considered "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." 47 U.S.C. § 230(c)(2). The catch-all "otherwise objectionable" must be interpreted with reference to the "words immediately surrounding" it. *See Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality op.). But the Platforms censor substantial speech that does not plausibly fit any of these buckets. *See, e.g.*, *supra* at 6-10.

*Fourth*, grave First Amendment problems would emerge if the Court reads Section 230(c)(2) to protect the Platforms from *any* form of State law liability for censorship. HB 20 is designed to promote freedom of speech. If Section 230 is interpreted to preempt HB 20, then it would constitute an "abridg[ement]" of "freedom of speech" under First Amendment. U.S. Const. amend. I. Granted, HB 20 protects "freedom of speech" to a greater extent than the First Amendment, because it restricts private actors and not just the government. But that does not mean Congress may permissibly abrogate it. *See Ry. Emps.' Dep't v. Hanson*, 351 U.S. 225, 231-32 (1956) (applying First Amendment scrutiny to federal preemption of state law that advanced associational rights).

**3.** A final overarching theme warrants attention. The Platforms profess to censor only reprehensible or false speech. ROA.272. If that were true, their policies might be more publicly palatable, but it would score them no legal points. "Our political system and cultural life rest upon th[e] ideal" that "each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner I*, 512 U.S. at 641. "[S]peech cannot be restricted simply because it is upsetting or arouses contempt." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011); *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (this is a "bedrock principle"). Indeed, it is "startling and dangerous" even to suggest as much. *United States v. Stevens*, 559 U.S. 460, 470 (2010). The First Amendment simply does not create different rules for fringe or even reprehensible speech. *See Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43 (1977) (per curiam). (The Attorney General recognizes that the First Amendment does not itself force the Platforms, as private parties, to cease censoring on viewpoint—that is what the Hosting Rule does. The First Amendment, however, embodies broader societal values that have force regardless of whether government or private party is performing the censorship).

But the Platforms do not just restrict uniformly condemned or false information. They are razing free speech's foundation. Far from policing "misinformation," the Platforms censor factual debates on hotly disputed matters of tremendous, *bona fide* public interest. *See, e.g.*, *supra* at 7-10 (describing the Platforms' censorship of information regarding COVID-19's origin and potential treatment). They even prohibit speech simply because it contradicts government bureaucrats. *See supra* at 9-10; *cf.* George Orwell, *Nineteen Eighty-Four* (Harcourt, Brace & Co. ed., 1949). And they

do not even consistently remove reprehensible speech; after all, they let internationally prominent anti-Semites loudly advocate for Israel's extermination. *See supra* at 6-7. The Platforms are forcing the once unthinkable question whether the First Amendment protects the destruction of free speech. For all of the reasons explained *supra*, the answer is no.

## II. The Platforms Are Unlikely to Succeed on the Merits of Their Claim that HB 20's Disclosure Rules Violate the First Amendment.

The District Court also erred by preliminarily enjoining HB 20's disclosure provisions.

**A.** As explained *supra* at 12, HB 20 imposes sunlight on the Platforms through multiple, fine-tuned disclosure requirements. The Platforms must:

(1) Describe how they moderate and manage content, Tex. Bus. & Com. Code § 120.051;

(2) Publish an "acceptable use policy" informing users what content is permitted and how content is policed, *id.* § 120.052;

(3) Publish a biannual transparency report documenting certain facts about how the Platform managed content during a specific time period, *id.* § 120.053; and

(4) Permit users to seek redress for action the Platforms take that does not seem to square with their disclosures about their spaces, specifically by maintaining a complaint-and-appeal system for users who believe action contrary to the disclosures has taken place, *id.* §§ 120.101-104.

The Platforms' challenges to these provisions fail under established law. It is well-established that government can require commercial enterprises to disclose

"purely factual and uncontroversial information about" their services, so long as the disclosure would not be "unduly burdensome." *Zauderer*, 471 U.S. at 651. That is why a host of well-accepted disclosure rules are constitutional, including disclosures of "calorie content," *N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114, 136 (2d Cir. 2009) ("*NYSRA*"); radiation levels, *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 850-52 (9th Cir. 2019); and a product's country of origin, *Am. Meat Inst. v. USDA*, 760 F.3d 18, 27 (D.C. Cir. 2014). HB 20 comfortably fits within this world of accepted disclosure laws.

The district court, however, concluded the law was "inordinately burdensome" because it could require the Platforms to individually report "billion[s]" of decisions documenting all of their many censorship and related actions. ROA.2591. This was wrong in multiple material respects.

**B.**   For starters, the Platforms' public representations foreclose the argument that HB 20's disclosure provisions are "unduly burdensome." In very recent Congressional testimony, at least some of the Platforms have announced that they would *embrace* these requirements. Twitter's CEO said that "[c]ontent moderation rules and their potential effects, as well as the process used to enforce those rules, should be simply explained and understandable by anyone." Testimony of Jack Dorsey before the United States Senate Committee on Commerce, Science, and Transportation at 2 (Oct. 28, 2020), https://bit.ly/3Jnbyrj ("Twitter Testimony"). That is what HB 20 requires. Tex. Bus. & Com. Code § 120.052. Twitter also said that they "believe that companies like Twitter should publish their moderation process." Twitter Testimony at 2. HB 20 requires that, too. Tex. Bus. & Com. Code § 120.051.

And Twitter said that it "believe[s] that all companies should be required to provide a straightforward process to appeal decisions made by humans or algorithms." Twitter Testimony at 2. Again, that is exactly what HB 20 requires. Tex. Bus. & Com. Code §§ 120.101-.104.[21]

The Platforms have also boasted that they already do much of what HB 20 requires. For example, HB 20 requires the Platforms to publish a biannual transparency report documenting certain facts about how the Platform managed content during a specific time period, Tex. Bus. & Com. Code § 120.053. And the Platforms showed below that they already materially comply with this: "during 6 months in 2018 alone, Facebook, Google [YouTube's parent], and Twitter took action on . . . 3 billion cases of spam, 57 million cases of pornography, 17 million cases of content regarding child safety, and 12 million cases of extremism, hate speech, and terrorist speech." ROA.275. Simply publishing those findings goes a long way toward complying with their transparency report obligation under HB 20. The district court also recognized that the Platforms already perform significant aspects of what HB 20's

---

[21] To the extent Facebook and YouTube have not made public statements as clearly in tension with their current litigating position, they should not be permitted to distance themselves from Twitter's statements in this suit. They decided to allow associational representatives to bring this suit for them instead of doing so in their own right. To establish standing, the associations asserted—as they were required— that the suit "do[es] not require the participation of" the individual companies, and "does not require individualized facts about any particular covered social media platform." ROA.643, ROA.645; *see also Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021) (recognizing these requirements for associational standing). Plaintiffs should not be able to claim now that "individualized facts" differentiate Facebook and YouTube from Twitter.

disclosure rules require. ROA.2634 (denying stay pending appeal). It is impossible to square that reality with the conclusion that requiring these disclosures is "unduly burdensome."

**C.** And, as a matter of law, none of HB 20's disclosure requirements are "unduly burdensome." Courts have struck down purely factual disclosures under the "unduly burdensome" prong in only limited instances—typically where the mandated disclosure would "drown[] out" the party's ability to proffer its preferred speech. *Nat'l Inst. of Fam. and Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018). For example, a government mandate that a disclosure be appended to an advertisement, and occupy "20%" of the advertisement's space, may be "unduly burdensome" by swamping too much of the advertiser's own message. *See Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 756-57 (9th Cir. 2019). But courts do not strike down disclosure rules on the ground that the rules would simply require too much effort, which is essentially what the district court did here. ROA.2591 (district court concluding HB 20 would require "unfathomably large number" of disclosures).

Further, the district court misunderstood how much work HB 20's disclosure rules require.

*First,* the core HB 20 disclosure requirements direct the Platforms to describe how they moderate and manage content, Tex. Bus. & Com. Code § 120.051, and to publish an "acceptable use policy" informing users what content is permitted and how it is policed, *id.* § 120.052. As a matter of law, these requirements can be satisfied with short, uniform documents disseminated to all users equally. There is no

meaningful difference between this and nutritional labeling. *See NYSRA*, 556 F.3d at 134 ("rational basis applies" to this kind of disclosure). Even under the district court's flawed legal premise—that disclosures that require too much effort are unduly burdensome—there is no plausible explanation of how these requirements would be unconstitutional.

*Second*, HB 20 requires that the Platforms publish a biannual transparency report documenting certain facts about how the Platform managed content during a specific time period. Tex. Bus. & Com. Code § 120.053. Contrary to the district court's misimpression, the Platforms can satisfy this reporting requirement without "unfathomably large" specifics about what happens in their spaces. Instead, the statute calls for disclosure of top-line numbers describing certain categories of decisions. *See id.* § 120.053(a)(1) ("total number of instances . . . "); *id.* § 120.053(a)(2) ("number of instances . . . "). As noted, the Platforms *already do this*. *See supra* at 39. Materially similar—and even more demanding—reporting requirements, like the SEC's 10-K and 10-Q forms, are well-established and do not raise any constitutional problem. *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) ("Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities, [and] corporate proxy statements." (citation omitted)).

*Third*, HB 20 requires that the Platforms maintain a complaint-and-appeal process for users seeking to vindicate the aforementioned disclosures. Tex. Bus. & Com. Code §§ 120.101-.104. But this is itself not a disclosure requirement at all—it is standard-fare economic regulation essentially requiring certain minimum standards

for how businesses treat their clients and is not even subject to the low bar for compelled, truthful disclosures. *Cf. Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483 (1955) (rational basis for economic regulations). In essence, it requires the Platforms to maintain a customer service department. Granted, when customer service representatives interact with customers they speak. But HB 20 does not control the words that must be spoken, and there is no authority holding that a requirement to maintain a customer service department is unconstitutional simply because the upshot is that the customer service representatives will have to speak to customers. *Ohralik*, 436 U.S. at 456 ("[T]he State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity.").

## III. The Equitable Factors Favor Lifting the Preliminary Injunction.

All other preliminary injunction factors likewise favor reversal.

The Platforms would not experience material injury from being forced to comply with HB 20, much less an injury that "outweighs" the harm that would fall on Texas and its residents. *See Atchafalaya*, 894 F.3d at 696. For years, the Platforms have materially and voluntarily complied with the framework the Hosting Rule seeks to impose on them. *See, e.g.*, *supra* at 6 (describing the "bait-and-switch" nature of their recent censorship). So there is little doubt that they have the capacity to easily comply again both technologically and as a matter of business economics. Indeed, some claim that they *still do* comply. ROA.1234 (YouTube deponent asserting "[a]ll speakers are treated equally"). The Platforms also have either indicated they *want* to comply, or already *do* comply, with essentially everything the disclosure rules require. *See supra* at 38-39.

42

Texas, on the other hand, experiences harm every day that its law is enjoined. That is true as a matter of law. *See, e.g.*, *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017). But the harm here is far worse than usual. The public interest (which merges here with the government's injury, *see E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021)), is overwhelmingly harmed by the injunction. It is instead a public interest of the "highest order" for persons to have access to a "multiplicity of information sources." *Turner II*, 520 U.S. at 190. And "[i]t is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which the truth will ultimately prevail." *League of Women Voters of Cal.*, 468 U.S. at 377. None of that changes simply because the protected speech is offensive. *See, e.g.*, *Phelps*, 562 U.S. at 458 ("[S]peech cannot be restricted simply because it is upsetting or arouses contempt."); *Vill. of Skokie*, 432 U.S. 43. The public interest also favors truthful disclosures. *See CTIA*, 928 F.3d at 852 ("disclosure" is in the public interest because it "furthers, rather than hinders the efficiency of the marketplace of ideas" (alterations omitted)); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113-14 (2d Cir. 2001) (same).

But there is a deeper public interest issue in play here. The Platforms invoke protections that guarantee free speech. *See* U.S. Const. amend. I (no abridgment of "freedom of speech"); 47 U.S.C. § 230(a)(3) (Section 230 premised on Congress's finding that the Internet "offer[s] a forum for a true diversity of political discourse"). But the Platforms' arbitrary and inconsistently applied moderation policies violate fundamental free speech values. *See supra* at 36-37. And the Platforms' loudest champions do not believe in free speech at all. *See* Mary Anne Franks, *The Free Speech*

*Black Hole: Can the Internet Escape the Gravitational Pull of the First Amendment?*, Knight First Amend. Inst. Columbia Univ. (Aug. 21, 2019), https://perma.cc/HAX8-3RZN (First Amendment professor arguing "the First Amendment presents a problem from its inception" and that the Platforms' attempts to censor speech "should be celebrated"). The public interest is not served by the Platforms' "free speech for me, but not for thee" theory of the public good.

## Conclusion

For the foregoing reasons, the Court should reverse the district court's grant of a preliminary injunction.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Judd E. Stone II
Solicitor General

/s/ Ryan S. Baasch
Ryan S. Baasch
Assistant Solicitor General
Ryan.Baasch@oag.texas.gov

Counsel for Defendant-Appellant Ken Paxton, Attorney General of Texas

## Certificate of Service

On March 2, 2022, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Ryan S. Baasch
Ryan S. Baasch

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,718 words, excluding the parts of the motion exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Ryan S. Baasch
Ryan S. Baasch