No. 21-51178

# In the United States Court of Appeals for the Fifth Circuit

NETCHOICE, L.L.C., A 501(C)(6) DISTRICT OF COLUMBIA ORGANIZATION DOING BUSINESS AS NETCHOICE; COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, A 501(C)(6) NON-STOCK VIRGINIA CORPORATION DOING BUSINESS AS CCIA,

*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## RECORD EXCERPTS FOR APPELLANT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

JUDD E. STONE II
Solicitor General

RYAN S. BAASCH
Assistant Solicitor General
Ryan.Baasch@oag.texas.gov

Counsel for Defendant-Appellant Ken
Paxton, Attorney General of Texas

# TABLE OF CONTENTS

1. Docket Sheet (ROA.2657-2671) ....................................................... Tab 1
2. Texas's Notice of Appeal (ROA.2620-2622) ................................. Tab 2
3. Order Granting Preliminary Injunction (ROA.2571-2600) .............. Tab 3
4. House Bill 20 (ROA.66-82) ........................................................... Tab 4

**Tab 1: Docket Sheet (ROA.2657-2671)**

INTAPP,SH

# U.S. District Court [LIVE]
## Western District of Texas (Austin)
## CIVIL DOCKET FOR CASE #: 1:21-cv-00840-RP

NetChoice LLC et al v. Paxton
Assigned to: Judge Robert Pitman
Case in other court:  USCA 5th Circuit, 21-51178
Cause: 42:1983 Civil Rights Act

Date Filed: 09/22/2021
Jury Demand: None
Nature of Suit: 950 Constitutional - State Statute
Jurisdiction: Federal Question

**Plaintiff**

**NetChoice LLC**
*a 501(c)(6) District of Columbia organization*
*doing business as*
NetChoice

represented by **Gabriela Gonzalez-Araiza**
Lebotsky Keller LLP
200 Massachusetts Avenue Nw
Washington, DC 20001
(512) 693-8350
Email: gabriela@lehotskykeller.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremy Evan Maltz**
Lehotsky Keller LLP
200 Massachusetts Ave. NW
Washington, DC 20001
(202) 365-2509
Fax: (833) 233-2202
Email: jeremy@lehotskykeller.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan D. Urick**
Lehotsky Keller LLP
200 Massachusetts Ave Nw
Washington, DC 20001
(512) 693-8350
Email: jon@lehotskykeller.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Hamilton Frederick**
Lehotsky Keller LLP
919 Congress Ave.
Ste. 1100
Austin, TX 78701
(512) 693-8350
Fax: (833) 233-2202
Email: matt@lehotskykeller.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

21-51178.2657

**Scott A. Keller**
Lehotsky Keller LLP
919 Congress Ave., Ste. 1100
Austin, TX 78701
5126938350
Email: scott@lehotskykeller.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven P. Lehotsky**
Lehotsky Keller LLP
200 Massachusetts Avenue, Nw
Washington, DC 20001
(512) 693-8350
Fax: 202-463-5346
Email: steve@lehotskykeller.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd Lawrence Disher**
Lehotsky Keller L.L.P.
919 Congress Ave., Ste. 1100
Austin, TX 78701
(512) 693-8350
Email: todd@lehotskykeller.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Computer & Communications Industry Association**<br>*a 501(c)(6) non-stock Virginia Corporation doing business as*<br>CCIA | represented by | **Gabriela Gonzalez-Araiza**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Jeremy Evan Maltz**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Jonathan D. Urick**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Matthew Hamilton Frederick**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Scott A. Keller**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Steven P. Lehotsky**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd Lawrence Disher**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Ken Paxton**
*in his official capacity as Attorney General*
*of Texas*

represented by **Benjamin S. Lyles**
Office of the Attorney General
P O Box 12548
Capitol Station
Austin, TX 78711
512-463-2120
Fax: 512-320-0667
Email: benjamin.lyles@oag.texas.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin S. Walton**
Office of the Attorney General
P.O. Box 12548
CAPITOL STATION
Austin, TX 78711
512-463-0447
Fax: 512-320-0667
Email: benjamin.walton@oag.texas.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Hilton**
Office of the Attorney General of Texas
P O Box 12548
Capital Station
Austin, TX 78701
512-463-2120
Fax: 512-320-0667
Email: christopher.hilton@oag.texas.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Courtney Brooke Corbello**
Office of the Attorney General - Law
Enforcement Defense
MCO-012 PO Box 12548
Austin, TX 78701
512-475-3586
Email: courtney.corbello@oag.texas.gov

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Chamber of Progress**                    represented by    **William Reid Wittliff**
                                                             Wittliff Cutter P.L.L.C.
                                                             1209 Nueces St
                                                             Austin, TX 78701
                                                             United Sta
                                                             (512) 960-4866
                                                             Fax: (512) 960-4869
                                                             Email: reid@wittliffcutter.com
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**The Reporters Committee for Freedom**    represented by    **Catherine Lewis Robb**
**of the Press**                                             Haynes & Boone, LLP
                                                             600 Congress Avenue
                                                             Suite 1300
                                                             Austin, TX 78701
                                                             (512) 867-8421
                                                             Fax: (512) 48867-8611
                                                             Email: Catherine.Robb@haynesboone.com
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Laura Lee Prather**
                                                             Haynes and Boone, LLP
                                                             600 Congress Ave - Ste 1300
                                                             Austin, TX 78701-3285
                                                             (512) 867-8476
                                                             Fax: (512) 867-8609
                                                             Email: laura.prather@haynesboone.com
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**The American Civil Liberties Union**     represented by    **Catherine Lewis Robb**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Laura Lee Prather**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**The Center for Democracy & Technology**  represented by    **Catherine Lewis Robb**
                                                             (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Lee Prather**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**The Media Law Resource Center**    represented by    **Catherine Lewis Robb**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Lee Prather**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**American Civil Liberties Union of Texas**    represented by    **Catherine Lewis Robb**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura Lee Prather**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Connected Commerce Council**    represented by    **William Reid Wittliff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**CTA**    represented by    **William Reid Wittliff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Engine Advocacy**    represented by    **William Reid Wittliff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

represented by

| | | |
|---|---|---|
| **Information Technology & Innovation Foundation** | | **William Reid Wittliff** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **National Black Justice Coalition** | represented by | **William Reid Wittliff** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Progressive Policy Institute** | represented by | **William Reid Wittliff** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Technet** | represented by | **William Reid Wittliff** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Washington Center for Technology Policy** | represented by | **William Reid Wittliff** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Hispanic Technology and Telecommunications Partnership** | represented by | **William Reid Wittliff** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **TechFreedom** | represented by | **Corbin K. Barthold** TechFreedom 110 Maryland Ave Ne, Suite 205 Washington, DC 20002 (925) 788-6847 Email: cbarthold@techfreedom.org *LEAD ATTORNEY* *PRO HAC VICE* *ATTORNEY TO BE NOTICED* |
| | | **Jason A. Cairns** Reid Collins & Tsai LLP 1301 S Capital of Texas Hwy Suite C300 |

Austin, TX 78746
512-647-6100
Fax: 512-647-6129
Email: jcairns@rctlegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Electronic Frontier Foundation**                    represented by **David Greene**
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
Fax: (415) 436-9993
Email: davidg@eff.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mukund Rathi**
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
Fax: (415) 436-9993
Email: mukund@eff.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas S. Leatherbury**
Vinson & Elkins LLP
2001 Ross Avenue
Suite 3900
Dallas, TX 75201
United Sta
(214) 220-7792
Fax: 214/999-7792
Email: tleatherbury@velaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**The Babylon Bee**                    represented by **Evan Miles Goldberg**
Evan Miles Goldberg, PLLC
400 East 57th Street, Ste. 8f
New York, NY 10022
(212) 888-6497
Fax: (646) 751-7938
Email: egoldberg@emglawfirm.com
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**W. Scott McCollough**
Attorney at Law
2290 Gatlin Creek Rd.
Dripping Springs, TX 78620
(512) 633-3498
Fax: 512/692-2522
Email: wsmc@dotlaw.biz
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Not the Bee**                              represented by  **Evan Miles Goldberg**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *PRO HAC VICE*
                                             *ATTORNEY TO BE NOTICED*

                                             **W. Scott McCollough**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**Giganews, Inc.**                           represented by  **Evan Miles Goldberg**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *PRO HAC VICE*
                                             *ATTORNEY TO BE NOTICED*

                                             **W. Scott McCollough**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

**Amicus**

**Golden Frog, Inc.**                        represented by  **Evan Miles Goldberg**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *PRO HAC VICE*
                                             *ATTORNEY TO BE NOTICED*

                                             **W. Scott McCollough**
                                             (See above for address)
                                             *LEAD ATTORNEY*
                                             *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 09/22/2021 | 1 | |

| | | |
|---|---:|---|
| | | COMPLAINT ( Filing fee $ 402 receipt number 0542-15251569), filed by NetChoice LLC, Computer & Communications Industry Association. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet)(Disher, Todd) (Entered: 09/22/2021) |
| 09/22/2021 | 2 | REQUEST FOR ISSUANCE OF SUMMONS by Computer & Communications Industry Association, NetChoice LLC. (Disher, Todd) (Entered: 09/22/2021) |
| 09/22/2021 | 3 | RULE 7 DISCLOSURE STATEMENT filed by NetChoice LLC. (Disher, Todd) (Entered: 09/22/2021) |
| 09/22/2021 | 4 | RULE 7 DISCLOSURE STATEMENT filed by Computer & Communications Industry Association. (Disher, Todd) (Entered: 09/22/2021) |
| 09/22/2021 | | Case assigned to Judge Robert Pitman. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (cj) (Entered: 09/22/2021) |
| 09/22/2021 | | If ordered by the court, all referrals and consents in this case will be assigned to Magistrate Judge Hightower (cj) (Entered: 09/22/2021) |
| 09/22/2021 | 5 | Pro Hac Vice Letters mailed to Gabriela Gonzalez-Araiza, Steven P. Lehotsky, and Jonathan D. Urick re: non-admitted status. (cj) (Entered: 09/22/2021) |
| 09/22/2021 | 6 | Summons Issued as to Ken Paxton. (cj) (Entered: 09/22/2021) |
| 09/23/2021 | 7 | SUMMONS Returned Executed by NetChoice LLC, Computer & Communications Industry Association. All Defendants. (Disher, Todd) (Entered: 09/23/2021) |
| 09/30/2021 | 8 | Unopposed MOTION for Leave to Exceed Page Limitation by Computer & Communications Industry Association, NetChoice LLC. (Attachments: # 1 Proposed Order Granting Leave, # 2 Brief re: Motion for Preliminary Injunction, # 3 Exhibit A to Mot. for PI, # 4 Exhibit B to Mot. for PI, # 5 Exhibit C to Mot. for PI, # 6 Exhibit D to Mot. for PI, # 7 Exhibit E to Mot. for PI, # 8 Exhibit F to Mot. for PI, # 9 Exhibit G to Mot. for PI)(Disher, Todd) (Entered: 09/30/2021) |
| 10/01/2021 | 9 | MOTION to Appear Pro Hac Vice by Jeremy Evan Maltz *on behalf of Steven P. Lehotsky* ( Filing fee $ 100 receipt number 0542-15288326) by on behalf of Computer & Communications Industry Association, NetChoice LLC. (Maltz, Jeremy) (Entered: 10/01/2021) |
| 10/01/2021 | 10 | MOTION to Appear Pro Hac Vice by Jeremy Evan Maltz *on behalf of Jonathan D. Urick* ( Filing fee $ 100 receipt number 0542-15288351) by on behalf of Computer & Communications Industry Association, NetChoice LLC. (Maltz, Jeremy) (Entered: 10/01/2021) |
| 10/01/2021 | | Text Order GRANTING 8 Unopposed Motion for Leave to File Excess Pages entered by Judge Robert Pitman. IT IS ORDERED that the Clerk of the Court shall file Plaintiffs' motion for preliminary injunction and accompanying exhibits. (This is a text-only entry generated by the court. There is no document associated with this entry.) (sh) (Entered: 10/01/2021) |
| 10/01/2021 | 11 | MOTION to Appear Pro Hac Vice by Jeremy Evan Maltz *on behalf of Gabriela Gonzalez Araiza* ( Filing fee $ 100 receipt number 0542-15288571) by on behalf of Computer & Communications Industry Association, NetChoice LLC. (Maltz, Jeremy) (Entered: 10/01/2021) |

| | | |
|---|---|---|
| 10/01/2021 | 12 | MOTION for Preliminary Injunction by Computer & Communications Industry Association, NetChoice LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(dm) (Entered: 10/01/2021) |
| 10/06/2021 | | Text Order GRANTING 9 Motion to Appear Pro Hac Vice by attorney Steven P. Lehotsky. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jg) (Entered: 10/06/2021) |
| 10/06/2021 | | Text Order GRANTING 10 Motion to Appear Pro Hac Vice by attorney Jonathan D. Urick. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jg) (Entered: 10/06/2021) |
| 10/06/2021 | | Text Order GRANTING 11 Motion to Appear Pro Hac Vice by attorney Gabriela Gonzalez Araiza. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jg) (Entered: 10/06/2021) |
| 10/07/2021 | 13 | MOTION for Leave to File Amicus Brief by W. Reid Wittliff. by Chamber of Progress. (Attachments: # 1 Brief, # 2 Proposed Order)(Wittliff, William) (Entered: 10/07/2021) |
| 10/07/2021 | 14 | MOTION for Leave to File Amicus Brief by Laura Lee Prather. by The Reporters Committee for Freedom of the Press, The American Civil Liberties Union, The Center for Democracy & Technology, The Media Law Resource Center, American Civil Liberties Union of Texas. (Attachments: # 1 Proposed Order, # 2 Brief of the The Reporters Committee for Freedom of the Press, The American Civil Liberties Union, The American Civil Liberties Union of Texas, The Center for Democracy and Technology and The Media Law Resource Center)(Prather, Laura) (Entered: 10/07/2021) |
| 10/08/2021 | 15 | MOTION to Appear Pro Hac Vice by Jason A. Cairns *on behalf of Corbin K. Barthold* ( Filing fee $ 100 receipt number 0542-15314243) by on behalf of TechFreedom. (Cairns, Jason) (Entered: 10/08/2021) |
| 10/08/2021 | 16 | MOTION for Leave to File Amicus Brief by Jason A. Cairns and Corbin K. Barthold. by TechFreedom. (Attachments: # 1 Proposed Order, # 2 Brief)(Cairns, Jason) (Entered: 10/08/2021) |
| 10/08/2021 | 17 | MOTION to Appear Pro Hac Vice by Thomas S. Leatherbury *on behalf of David Greene* ( Filing fee $ 100 receipt number 0542-15315772) by on behalf of Electronic Frontier Foundation. (Attachments: # 1 Proposed Order)(Leatherbury, Thomas) (Entered: 10/08/2021) |
| 10/08/2021 | 18 | MOTION to Appear Pro Hac Vice by Thomas S. Leatherbury *on behalf of Mukund Rathi* ( Filing fee $ 100 receipt number 0542-15315829) by on behalf of Electronic Frontier Foundation. (Attachments: # 1 Proposed Order)(Leatherbury, Thomas) (Entered: 10/08/2021) |

| 10/08/2021 | 19 | MOTION for Leave to File Amicus Brief by Thomas S. Leatherbury. by Electronic Frontier Foundation. (Attachments: # 1 Proposed Order, # 2 Brief of Amicus Curiae Electronic Frontier Foundation in Support of Plaintiffs' Motion for Preliminary Injunction)(Leatherbury, Thomas) (Entered: 10/08/2021) |
|---|---|---|
| 10/11/2021 | 20 | Opposed MOTION to Expedite *Discovery* by Ken Paxton. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Proposed Order)(Corbello, Courtney) (Entered: 10/11/2021) |
| 10/11/2021 | 21 | Opposed MOTION for Extension of Time to File Response/Reply as to 12 MOTION for Preliminary Injunction by Ken Paxton. (Attachments: # 1 Proposed Order)(Corbello, Courtney) (Entered: 10/11/2021) |
| 10/13/2021 | 22 | Response in Opposition to Motion, filed by Computer & Communications Industry Association, NetChoice LLC, re 21 Opposed MOTION for Extension of Time to File Response/Reply as to 12 MOTION for Preliminary Injunction filed by Defendant Ken Paxton, 20 Opposed MOTION to Expedite *Discovery* filed by Defendant Ken Paxton (Attachments: # 1 Exhibit A, # 2 Proposed Order)(Disher, Todd) (Entered: 10/13/2021) |
| 10/14/2021 | 23 | MOTION to Dismiss for Lack of Jurisdiction by Ken Paxton. (Corbello, Courtney) (Entered: 10/14/2021) |
| 10/14/2021 | 24 | REPLY to Response to Motion, filed by Ken Paxton, re 20 Opposed MOTION to Expedite *Discovery* filed by Defendant Ken Paxton (Corbello, Courtney) (Entered: 10/14/2021) |
| 10/15/2021 | | Text Order GRANTING IN PART AND DENYING IN PART 21 Motion for Extension of Time to File Response/Reply entered by Judge Robert Pitman. In light of Plaintiffs' lack of opposition to a seven-day extension, IT IS ORDERED that Defendant shall file a response to the preliminary injunction motion on or before October 22, 2021. The Court intends to expeditiously rule on Defendant's motion for expedited discovery, the outcome of which may impact Defendant's response deadline. (This is a text-only entry generated by the court. There is no document associated with this entry.) (sh) (Entered: 10/15/2021) |
| 10/22/2021 | 25 | ORDER GRANTING IN PART AND DENYING IN PART 20 Opposed MOTION to Expedite Discovery Signed by Judge Robert Pitman. (cc3) (Entered: 10/22/2021) |
| 10/26/2021 | 26 | ORDER SETTING PRELIMINARY INJUNCTION HEARING for 12/10/2021 at 09:00 AM before Judge Robert Pitman. Signed by Judge Robert Pitman. (cc3) (Entered: 10/26/2021) |
| 10/28/2021 | 27 | ORDER RESETTING PRELIMINARY INJUNCTION HEARING for 11/29/2021 at 09:00 AM before Judge Robert Pitman Signed by Judge Robert Pitman. (cc3) (Entered: 10/28/2021) |
| 10/28/2021 | 28 | Response in Opposition to Motion, filed by Computer & Communications Industry Association, NetChoice LLC, re 23 MOTION to Dismiss for Lack of Jurisdiction filed by Defendant Ken Paxton (Disher, Todd) (Entered: 10/28/2021) |
| 10/28/2021 | 29 | Opposed MOTION for Protective Order by Computer & Communications Industry Association, NetChoice LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Proposed Order)(Disher, Todd) (Entered: 10/28/2021) |

| | | |
|---|---|---|
| 10/29/2021 | | Text Order GRANTING 13 Motion for Leave to File Amicus Brief entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (sh) (Entered: 10/29/2021) |
| 10/29/2021 | | Text Order GRANTING 14 Motion for Leave to File Amicus Brief entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (sh) (Entered: 10/29/2021) |
| 10/29/2021 | | Text Order GRANTING 16 Motion for Leave to File Amicus Brief entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (sh) (Entered: 10/29/2021) |
| 10/29/2021 | | Text Order GRANTING 19 Motion for Leave to File Amicus Brief entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (sh) (Entered: 10/29/2021) |
| 10/29/2021 | 30 | BRIEF by CHAMBER OF PROGRESS(cc3) (Entered: 10/29/2021) |
| 10/29/2021 | 31 | BRIEF by The Reporters Committee for Freedom of the Press, The American Civil Liberties Union, The Center for Democracy & Technology, The Media Law Resource Center, American Civil Liberties Union of Texas.(cc3) (Entered: 10/29/2021) |
| 10/29/2021 | 32 | BRIEF by TechFreedom. (cc3) (Entered: 10/29/2021) |
| 10/29/2021 | 33 | BRIEF by Electronic Frontier Foundation. (cc3) (Entered: 10/29/2021) |
| 11/01/2021 | 34 | RESPONSE to Motion, filed by Ken Paxton, re 29 Opposed MOTION for Protective Order filed by Plaintiff Computer & Communications Industry Association, Plaintiff NetChoice LLC (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Corbello, Courtney) (Entered: 11/01/2021) |
| 11/01/2021 | 35 | REPLY to Response to Motion, filed by Computer & Communications Industry Association, NetChoice LLC, re 29 Opposed MOTION for Protective Order filed by Plaintiff Computer & Communications Industry Association, Plaintiff NetChoice LLC (Attachments: # 1 Exhibit J)(Disher, Todd) (Entered: 11/01/2021) |
| 11/02/2021 | | Text Order GRANTING 15 Motion to Appear Pro Hac Vice by attorney Corbin K. Barthold. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jg) (Entered: 11/02/2021) |
| 11/02/2021 | | Text Order GRANTING 17 Motion to Appear Pro Hac Vice by attorney David Greene. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jg) (Entered: 11/02/2021) |
| 11/02/2021 | | Text Order GRANTING 18 Motion to Appear Pro Hac Vice by attorney Mukund Rathi. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Robert |

| | | |
|---|---|---|
| | | Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jg) (Entered: 11/02/2021) |
| 11/02/2021 | 36 | ORDER GRANTING 29 Plaintiff's Motion for Protective Order Signed by Judge Robert Pitman. (cc3) (Entered: 11/02/2021) |
| 11/04/2021 | 37 | REPLY in Support, filed by Ken Paxton, re 23 MOTION to Dismiss for Lack of Jurisdiction filed by Defendant Ken Paxton (Corbello, Courtney) Modified on 11/5/2021 (cc3). (Entered: 11/04/2021) |
| 11/22/2021 | 38 | Unopposed MOTION for Leave to Exceed Page Limitation *in Response to Plaintiffs' Motion for Preliminary Injunction* by Ken Paxton. (Attachments: # 1 Proposed Order, # 2 Exhibit A)(Corbello, Courtney) (Entered: 11/22/2021) |
| 11/22/2021 | 39 | Response in Opposition to Motion, filed by Ken Paxton, re 12 MOTION for Preliminary Injunction filed by Plaintiff Computer & Communications Industry Association, Plaintiff NetChoice LLC (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Corbello, Courtney) (Entered: 11/22/2021) |
| 11/22/2021 | 40 | MOTION for Leave to File Amicus Brief by W. Scott McCollough. by The Babylon Bee, Not the Bee, Giganews, Inc., Golden Frog, Inc.. (Attachments: # 1 Brief Proposed Amicus)(McCollough, W.) (Entered: 11/22/2021) |
| 11/22/2021 | 41 | MOTION to Appear Pro Hac Vice by W. Scott McCollough *for Evan Goldberg* ( Filing fee $ 100 receipt number 0542-15467980) by on behalf of Giganews, Inc., Golden Frog, Inc., Not the Bee, The Babylon Bee. (Attachments: # 1 Proposed Order)(McCollough, W.) (Entered: 11/22/2021) |
| 11/23/2021 | | Text Order GRANTING 38 Motion for Leave to File Excess Pages entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (sh) (Entered: 11/23/2021) |
| 11/23/2021 | | Text Order GRANTING 40 Unopposed Motion for Leave to File Amicus Brief entered by Judge Robert Pitman. IT IS ORDERED that the Clerk of the Court shall file the amicus brief. (This is a text-only entry generated by the court. There is no document associated with this entry.) (sh) (Entered: 11/23/2021) |
| 11/23/2021 | 42 | BRIEF OF AMICI CURIAE THE BABYLON BEE, LLC, NOT THE BEE, LLC, GIGANEWS, INC. AND GOLDEN FROG GmbH IN OPPOSITION TO PLAINTIFFS MOTION FOR PRELIMINARY INJUNCTIO (cc3) (Entered: 11/23/2021) |
| 11/24/2021 | 43 | Opposed MOTION to Strike *Report of Adam Candeub* by Computer & Communications Industry Association, NetChoice LLC. (Disher, Todd) (Entered: 11/24/2021) |
| 11/24/2021 | 44 | Unopposed MOTION for Leave to Exceed Page Limitation by Computer & Communications Industry Association, NetChoice LLC. (Attachments: # 1 Brief re: Reply ISO Motion for PI, # 2 Exhibit H, # 3 Exhibit I, # 4 Proposed Order)(Disher, Todd) (Entered: 11/24/2021) |
| 11/28/2021 | 45 | Exhibit List *for 11.29.21 Preliminary Injunction Hearing* by Ken Paxton.. (Corbello, Courtney) (Entered: 11/28/2021) |
| 11/28/2021 | | Text Order GRANTING 44 Unopposed Motion for Leave to File Excess Pages entered by Judge Robert Pitman. (This is a text-only entry generated by the court. |

| | | |
|---|---|---|
| | | There is no document associated with this entry.) (sh) (Entered: 11/28/2021) |
| 11/28/2021 | 46 | Exhibit List *for 11.29.2021 Preliminary Injunction Hearing* by Computer & Communications Industry Association, NetChoice LLC.. (Disher, Todd) (Entered: 11/28/2021) |
| 11/29/2021 | | Text Order GRANTING 41 Motion to Appear Pro Hac Vice by attorney Evan Goldberg. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. entered by Judge Robert Pitman. (This is a text-only entry generated by the court. There is no document associated with this entry.) (jg) (Entered: 11/29/2021) |
| 11/29/2021 | 47 | Minute Entry for proceedings held before Judge Robert Pitman: Preliminary Injunction Hearing held on 11/29/2021. Written order forthcoming. (Minute entry documents are not available electronically) (Court Reporter LilyReznik.)(cc3) (Entered: 11/29/2021) |
| 11/29/2021 | 48 | Plaintiffs' REPLY BRIEF in Support of Motion for Preliminary Injunction. (cc3) (Additional attachment(s) added on 11/30/2021: # 1 Exhibit H, # 2 Exhibit I) (cc3). (Entered: 11/29/2021) |
| 11/29/2021 | 49 | EXHIBITS from Preliminary Injunction Hearing(cc3) (Additional attachment(s) added on 11/29/2021: # 1 Exhibit Plaintiff 1-8, # 2 Exhibit Defendants 1-7) (cc3). (Entered: 11/29/2021) |
| 11/30/2021 | 50 | Response in Opposition to Motion, filed by Ken Paxton, re 43 Opposed MOTION to Strike *Report of Adam Candeub* filed by Plaintiff Computer & Communications Industry Association, Plaintiff NetChoice LLC (Corbello, Courtney) (Entered: 11/30/2021) |
| 12/01/2021 | 51 | ORDER GRANTING 12 Motion for Preliminary Injunction; DENYING 23 Motion to Dismiss; and DENYING WITHOUT PREJUDICE AS MOOT 43 Motion to Strike. Signed by Judge Robert Pitman. (jg3) (Entered: 12/01/2021) |
| 12/02/2021 | 52 | BOND in the amount of $ 1,000.00 posted by Plaintiff(Receipt# 100040570) (cc3) (Entered: 12/02/2021) |
| 12/06/2021 | 53 | Opposed MOTION to Stay *Preliminary Injunction* by Ken Paxton. (Attachments: # 1 Proposed Order)(Corbello, Courtney) (Entered: 12/06/2021) |
| 12/06/2021 | 54 | Appeal of Order entered by District Judge 51 by Ken Paxton. ( Filing fee $ 505 receipt number 0542-15506481) (Corbello, Courtney) (Entered: 12/06/2021) |
| 12/06/2021 | | NOTICE OF INTERLOCUTORY APPEAL as to 51 Order on Motion to Dismiss/Lack of Jurisdiction, Order on Motion to Strike, Order on Motion for Preliminary Injunction by Ken Paxton. Filing fee $ 505, receipt number 0542-15506481. Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a transcript, the appellant should fill out (Transcript Order) and follow the instructions set out on the form. This form is available in the Clerk's Office or by clicking the hyperlink above. (dm) (Entered: 12/07/2021) |
| 12/07/2021 | 55 | Opposed MOTION to Stay Case *Pending Appeal* by Computer & Communications Industry Association, NetChoice LLC. (Attachments: # 1 Proposed Order)(Disher, Todd) (Entered: 12/07/2021) |

| 12/09/2021 | <u>56</u> | TRANSCRIPT REQUEST by Ken Paxton for dates of 11/29/2021. Proceedings Transcribed: Preliminary Injunction. Court Reporter: Lily Reznik.. (Corbello, Courtney) (Entered: 12/09/2021) |
|---|---|---|
| 12/09/2021 | <u>57</u> | ORDER DENYING <u>53</u> Opposed MOTION to Stay Preliminary Injunction and GRANTING IN PART AND DENYING IN PART <u>55</u> Opposed MOTION to Stay Case Pending Appeal. Signed by Judge Robert Pitman. (cc3) (Entered: 12/09/2021) |
| 12/15/2021 | | Certification of the Electronic Record on Appeal has been accepted by the 5th Circuit re Notice of Appeal - Interlocutory. Attorneys are advised that they may now download the EROA from the Fifth Circuit CM/ECF site by following these instructions <u>here</u> (klw) (Entered: 12/16/2021) |
| 01/16/2022 | <u>58</u><br>(p.2672) | Transcript filed of Proceedings held on November 29, 2021, Proceedings Transcribed: Preliminary Injunction Hearing. Court Reporter/Transcriber: Lily I. Reznik, Telephone number: 512-391-8792 or Lily_Reznik@txwd.uscourts.gov. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 2/7/2022, Redacted Transcript Deadline set for 2/16/2022, Release of Transcript Restriction set for 4/18/2022, Appeal Record due by 1/31/2022, (lr) (Entered: 01/16/2022) |

**TAB 2: TEXAS'S NOTICE OF APPEAL (ROA.2620-2622)**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

NETCHOICE, LLC, et al.,
     *Plaintiffs*,

v.

KEN PAXTON, in his official capacity as
Attorney General of Texas,
     *Defendant*.

Civil Action No. 1:21-cv-00840-RP

## DEFENDANT'S NOTICE OF APPEAL

Pursuant to Federal Rules of Appellate Procedure 3(a)(1) and 4(a)(1)(A), Defendant Ken Paxton gives this notice of appeal to the United States Court of Appeals for the Fifth Circuit from the order granting the plaintiff's motion for a preliminary injunction and denying Defendant's Motion to Dismiss for lack of Article III standing entered in this case on December 1, 2021. Dkt. 51.

Respectfully Submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Division Chief
General Litigation Division

21-51178.2620

/s/ Courtney Corbello
**COURTNEY CORBELLO**
Attorney-in-Charge
Assistant Attorney General
Texas State Bar No. 24097533
*courtney.corbello@oag.texas.gov*

**CHRISTOPHER D. HILTON**
Counsel of Record
Assistant Attorney General
Texas State Bar No. 24087727
christopher.hilton@oag.texas.gov

**BENJAMIN STOREY LYLES**
Counsel of Record
Assistant Attorney General
Texas State Bar No. 24094808
*benjamin.lyles@oag.texas.gov*

**BENJAMIN S. WALTON**
Counsel of Record
Assistant Attorney General
Texas State Bar No. 24075241
*benjamin.walton@oag.texas.gov*

General Litigation Division
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2120 / Fax (512) 936-2109
**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I certify that on December 6, 2021 the foregoing was filed electronically via the Court's

CM/ECF system, causing electronic service upon all counsel of record.

/s/ Courtney Corbello
**COURTNEY CORBELLO**
Assistant Attorney General

21-51178.2621

Case 1:21-cv-00840-RP Document 13 Filed 12/06/21 Page 3 of 3

NOTICE OF ELECTRONIC FILING

I certify that I have electronically submitted a true and correct copy of the above for filing in accordance with the Electronic Case Files system of the United States District Court for the Western District of Texas, on December 6, 2021.

/s/ Courtney Corbello
COURTNEY CORBELLO
Assistant Attorney General

21-51178.2622

Tab 3: Order Granting Preliminary
Injunction (ROA.2571-2600)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**FILED**

December 01, 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____Julie Golden_____

DEPUTY

| | |
|---|---|
| NETCHOICE, LLC d/b/a NETCHOICE, *a 501(c)(6) District of Columbia organization,* and COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, *a 501(c)(6) non-stock Virginia Corporation,* | § § § § § § |
| Plaintiffs, | § § |
| v. | § § 1:21-CV-840-RP |
| KEN PAXTON, *in his official capacity as Attorney General of Texas,* | § § § |
| Defendant. | § § |

## ORDER

Before the Court is Plaintiffs NetChoice, LLC d/b/a NetChoice ("NetChoice"), a 501(c)(6)

District of Columbia organization, and Computer & Communications Industry Association d/b/a

CCIA ("CCIA"), a 501(c)(6) non-stock Virginia corporation's ("Plaintiffs") Motion for Preliminary

Injunction, (Dkt. 12), Defendant Texas Attorney General Ken Paxton's (the "State") response in

opposition, (Dkt. 39), and Plaintiffs' reply, (Dkt. 48). The Court held the preliminary injunction

hearing on November 29, 2021. (Dkt. 47). After considering the parties' briefs and arguments, the

record, and the relevant law, the Court denies the motion to dismiss and grants the preliminary

injunction.

## I. BACKGROUND

### A. The Challenged Legislation: HB 20

In the most recent legislative session, the State sought to pass a bill that would "allow

Texans to participate on the virtual public square free from Silicon Valley censorship." Senator

Bryan Hughes (@SenBryanHughes), TWITTER (Mar. 5, 2021, 10:48 PM), https://twitter.com/

SenBryanHughes/status/1368061021609463812. Governor Greg Abbott voiced his support,
tweeting "[s]ilencing conservative views is un-American, it's un-Texan[,] and it's about to be illegal in
Texas." Greg Abbott (@GregAbbott_TX), TWITTER (Mar. 5, 2021, 8:35 PM),
https://t.co/JsPam2XyqD. After a bill failed to pass during the regular session or the first special
session, Governor Abbott called a special second legislative session directing the Legislature to
consider and act on legislation "protecting social-media and email users from being censored."
(Proclamation by the Governor of the State of Texas (Aug. 5, 2021), https://gov.texas.gov/uploads
/files/press/PROC_second_called_session_87th_legislature_IMAGE_08-05-21.pdf. The
Legislature passed House Bill 20 ("HB 20"), and Governor Abbott signed it into law on September
9, 2021. (Prelim. Inj. Mot., Dkt. 12, at 16).

     HB 20 prohibits large social media platforms from "censor[ing]" a user based on the user's
"viewpoint." Tex. Civ. Prac. & Rem. Code § 143A.002 ("Section 7"). Specifically, Section 7 makes it
unlawful for a "social media platform" to "censor a user, a user's expression, or a user's ability to
receive the expression of another person based on: (1) the viewpoint of the user or another person;
(2) the viewpoint represented in the user's expression; or (3) a user's geographic location in this state
or any part of this state." *Id.* § 143A.002(a)(1)-(3). The State defines social media platforms as any
website or app (1) with more than 50 million active users in the United States in a calendar month,
(2) that is open to the public, (3) allows users to create an account, and (4) enables users to
communicate with each other "for the primary purpose of posting information, comments,
messages, or images." Tex. Bus. & Com. Code §§ 120.001(1), 120.002(b); Tex. Civ. Prac. & Rem.
Code § 143A.003(c). HB 20 applies to sites and apps like Facebook, Instagram, Pinterest, TikTok,
Twitter, Vimeo, WhatsApp, and YouTube. (Prelim. Inj. Mot., Dkt. 12, at 11); (*see* CCIA Decl., Dkt.
12-1, at 3–4; NetChoice Decl., Dkt. 12-2, at 3–4). HB 20 excludes certain companies like Internet
service providers, email providers, and sites and apps that "consist[] primarily of news, sports,

21-51178.2572

entertainment, or other information or content that is not user generated but is preselected by the provider" and user comments are "incidental to" the content. Tex. Bus. & Com. Code § 120.001(1)(A)–(C). HB 20 carves out two content-based exceptions to Section 7's broad prohibition: (1) platforms may moderate content that "is the subject of a referral or request from an organization with the purpose of preventing the sexual exploitation of children and protecting survivors of sexual abuse from ongoing harassment," and (2) platforms may moderate content that "directly incites criminal activity or consists of specific threats of violence targeted against a person or group because of their race, color, disability, religion, national origin or ancestry, age, sex, or status as a peace officer or judge." Tex. Civ. Prac. & Rem. Code § 143A.006(a)(2)–(3).

HB 20 also requires social media platforms to meet disclosure and operational requirements. Tex. Bus. & Com. Code § 120.051, 120.101–.104 ("Section 2"). Section 2 requires platforms to publish "acceptable use policies," set up an "easily accessible" complaint system, produce a "biannual transparency report," and "publicly disclose accurate information regarding its content management, data management, and business practices, including specific information regarding how the social media platform: (i) curates and targets content to users; (ii) places and promotes content, services, and products, including its own content, services, and products; (iii) moderates content; (iv) uses search, ranking, or other algorithms or procedures that determine results on the platform; and (v) provides users' performance data on the use of the platform and its products and services." *Id.* § 120.051(a).

If a user believes a platform has improperly "censored" their viewpoint under Section 7, the user can sue the platform, which may be enjoined, and obtain attorney's fees. Tex. Civ. Prac. & Rem. Code § 143A.007(a), (b). Lawsuits can be brought by any Texan and anyone doing business in the state or who "shares or receives expression in this state." *Id.* §§ 143A.002(a), 143A.004(a), 143A.007. In addition, the Attorney General of Texas may "bring an action to enjoin a violation or a potential

3

21-51178.2573

violation" of HB 20 and recover their attorney's fees. *Id.* § 143A.008. Failure to comply with Section

2's requirement also subjects social media platforms to suit. The Texas Attorney General may seek

injunctive relief and collect attorney's fees and "reasonable investigative costs" if successful in

obtaining injunctive relief. Tex. Bus. & Com. Code § 120.151.

Finally, HB 20 contains a severability clause. Tex. Civ. Prac. & Rem. Code § 143A.008(a). "If

any application of any provision in this Act to any person, group of persons, or circumstances is

found by a court to be invalid or unconstitutional, the remaining applications of that provision to all

other persons and circumstances shall be severed and may not be affected." *Id.* § 143A.008(b).

HB 20 goes into effect on December 2, 2021. *Id.* § 143A.003–143A.008 (noting that the

effective date is December 2, 2021).

Plaintiffs recently challenged a similar Florida law in the Northern District of Florida in

*NetChoice v. Moody*, successfully obtaining a preliminary injunction to halt the enforcement of that

law. The district court in that case described the Florida legislation as "an effort to rein in social-

media providers deemed too large and too liberal." No. 4:21CV220-RH-MAF, 2021 WL 2690876, at

*12 (N.D. Fla. June 30, 2021). The Florida court concluded that

> Balancing the exchange of ideas among private speakers is not a legitimate
> governmental interest. And even aside from the actual motivation for this legislation,
> it is plainly content-based and subject to strict scrutiny. It is also subject to strict
> scrutiny because it discriminates on its face among otherwise-identical speakers:
> between social-media providers that do or do not meet the legislation's size
> requirements and are or are not under common ownership with a theme park. The
> legislation does not survive strict scrutiny. Parts also are expressly preempted by
> federal law.

*Id.* The court's preliminary injunction has been appealed to the Eleventh Circuit.

**B. Procedural Background**

Plaintiffs are two trade associations with members that operate social media platforms that

would be affected by HB 20. (Compl., Dkt. 1, at 1–2); (Prelim. Inj. Mot., Dkt. 12, at 11). Plaintiffs

filed their lawsuit on September 22, 2021, challenging HB 20 because it violates the First

21-51178.2574

Amendment; is void for vagueness; violates the commerce clause, full faith and credit clause, and the Fourteenth Amendment's due process clause; is preempted under the supremacy clause by the Communications Decency Act, 47 U.S.C. § 230; and violates the equal protection clause of the Fourteenth Amendment. (Compl., Dkt. 1, at 31, 35, 38, 41, 44). In their motion for preliminary injunction, Plaintiffs request that this Court preliminarily enjoin the Texas Attorney General from enforcing Sections 2 and 7 of HB 20 against Plaintiffs and their members. (Dkt. 12, at 54).

In response to the motion for preliminary injunction, the State requested expedited discovery, (Mot. Discovery, Dkt. 20), which Plaintiffs opposed, (Dkt. 22). The Court granted the State's request, in part, permitting "narrowly-tailored, expedited discovery" before the State would be required to respond to the preliminary injunction motion. (Order, Dkt. 25, at 3). The Court expressed its confidence in the State to "significantly tailor its discovery requests . . . to obtain precise information without burdening Plaintiffs' members." (Id. at 4). Several days later, Plaintiffs filed a motion for protective order, (Dkt. 29), which the Court granted, (Order, Dkt. 36). In that Order, the Court allowed the State to depose Plaintiffs' declarants, request documents relied on by those declarants, and serve interrogatories directed to Plaintiffs. (Id. at 2).

Additionally, the State filed a motion to dismiss about to two weeks after Plaintiffs filed their motion for preliminary injunction. (Mot. Dismiss, Dkt. 23). The State argues that Plaintiffs lack associational or organizational standing. (Id.). Plaintiffs respond that they have associational standing to represent their members covered by HB 20 and also have organizational standing. (Resp. Mot. Dismiss, Dkt. 28).

Finally, Plaintiffs filed a motion to strike the expert report of Adam Candeub, which was attached to the State's opposition to the preliminary injunction motion. (Mot. Strike, Dkt. 43). Plaintiffs challenge the report by Candeub, who is a law professor at Michigan State University, for being a "second legal brief" that offers "nothing more than (incorrect) legal conclusions." (Id. at 2).

5

Plaintiffs argue that it is well-established that an expert may not render conclusions of law. (*Id.*). They also argue that his "methodology" is unreliable because his tests are simply legal standards. (*Id.* at 4–5). Immediately before this Court issued this opinion, the State filed an opposition brief. (Dkt. 50). Because the Court does not rely on Candeub's report, the Court will dismiss Plaintiffs' motion to strike without prejudice as moot.

## II. LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject-matter jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited subject matter jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v.*

21-51178.2576

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

## III. DISCUSSION

### A. Plaintiffs Have Standing To Bring This Suit

In its motion to dismiss, the State asserts that Plaintiffs lack associational and organizational standing and their complaint should be dismissed. (Dkt. 23). Under Article III of the Constitution, federal court jurisdiction is limited to cases and controversies. U.S. Const. art. III, 2, cl. 1; *Raines v. Byrd*, 521 U.S. 811, 818 (1997). A key element of the case-or-controversy requirement is that a plaintiff must establish standing to sue. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To establish Article III standing, a plaintiff must demonstrate that she has "(1) suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* at 560–61. "[W]hen standing is challenged on the basis of the pleadings, we 'accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party.'" *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

### 1. Plaintiffs Have Associational Standing

"Associations may assert the standing of their own members." *Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021). An association must meet three elements to establish associational standing: (1) "its members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* Plaintiffs easily meet these requirements for associational standing. The Court steps through each of the three requirements below.

7

21-51178.2577

### a. Plaintiffs' Members Have Standing to Sue in Their Own Right

Plaintiffs' members include social media platforms like "Facebook, Google, YouTube, [and] Twitter," as recognized by the State, (Mot. Dismiss, Dkt. 23, at 3), that would be subject to regulation by the State through HB 20. Despite the State's contention otherwise, (Mot. Dismiss, Dkt. 23, at 3–4), Plaintiffs show that their members would suffer an injury-in-fact if HB 20 goes into effect. "[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). In their complaint, Plaintiffs allege that their members are "directly subject to and regulated by H.B. 20 because they qualify as 'social media platforms' within H.B. 20's definition of the term," "exercise editorial judgments that are prohibited by H.B. 20," and will "face serious legal consequences for failing to comply with" HB 20. (Compl, Dkt. 1, at 5–6). Plaintiffs state that some of its members, like Facebook and YouTube, would be compelled to publish content that violates their policies and otherwise would be removed through their exercise of editorial judgment. (Compl., Dkt. 1, at 6). Plaintiffs' members do not resemble "'passive receptacle[s]' where users are free to share their speech without review or rebuke unless unlawful," as the State claims. (Mot. Dismiss, Dkt. 23, at 5). Plaintiffs also allege that "Paxton has given every indication that he intends to use all legally available enforcement tools against Plaintiffs' members" and support that allegation with Paxton's press releases and posts. (*Id.* at 10) ("In a January 9, 2021, tweet criticizing Twitter, Facebook, and Google for allegedly targeting 'conservative' speech, Defendant Paxton vowed, 'As AG, I will fight them with all I've got.'").

Additionally, Plaintiffs have alleged that HB 20 threatens their members with classic economic harms. "[E]conomic injury is a quintessential injury upon which to base standing." *Tex.*

*Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006). In their Complaint, Plaintiffs allege that their members "will incur significant costs to comply with the provisions in Sections 2 and 7 of H.B. 20. The statute will force members to substantially modify the design and operation of their platforms. The necessary modifications will impose onerous burdens upon members' respective platforms and services, interfering with their business models and making it more difficult for them to provide high quality services to their users." (Compl., Dkt. 1, at 7). Furthermore, Plaintiffs allege their members will suffer damage to their brands and goodwill, (*id.* at 8), and their members will be forced to disclose technical information that will cost them competitive advantage and make it harder to block content, (*id.* at 7–8). Based on these detailed allegations, the complaint sufficiently alleges the injuries to Plaintiffs' members caused by HB 20.

### b. The Interests at Stake Are Germane to the Members' Purpose

The State does not dispute this prong of the standing analysis. As Plaintiffs note in their opposition brief: "Defendant does not dispute Plaintiffs satisfy the second prong. Nor could he. H.B. 20's intrusion on the rights of Internet websites and applications is germane to Plaintiffs' respective interests." (Resp. Mot. Dismiss, Dkt. 28, at 11 n.3).

### c. This Lawsuit Does Not Require the Participation of Plaintiffs' Members

The State argues that Plaintiffs' claims require the participation of Plaintiffs' members. (Mot. Dismiss, Dkt. 23, at 14). Plaintiffs seek to block the State's enforcement of the provisions of HB 20 that are facially unconstitutional. A facial challenge generally is not fact intensive and does not require individual members to participate. *Nat'l Press Photographers Ass'n v. McCraw*, 504 F. Supp. 3d 568, 580 (W.D. Tex. 2020) (recognizing associational standing to bring "facial" "content-based," "vagueness," "overbreadth," and "preemption" challenges). Plaintiffs assert facial challenges "based on the doctrines of compelled speech, infringing editorial discretion, a 'content-based' and speaker-based law, 'vagueness, 'overbreadth,' 'preemption,' and extraterritorial regulation." (Resp. Mot.

Dismiss, Dkt. 28, at 21). Each doctrine forms the basis for finding HB 20 facially invalid. (*See id.*) (citing *Nat'l Press*, 504 F. Supp. 3d at 580; *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (sustaining content-based facial challenge based on compelled speech); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (sustaining content-based facial challenge based on infringing editorial discretion); *Ass'n for Accessible Medicines v. Frosh*, 887 F.3d 664, 668 (4th Cir. 2018) (a "state law violates the extraterritoriality principle if it [] expressly applies to out-of-state commerce") (emphasis added); *Garza v. Wyeth LLC*, 2015 WL 364286, at *4 (S.D. Tex. Jan. 27, 2015) ("The preemption decision is not evidence-based but is rather a question of law.")). While the State argues the Court cannot determine whether Plaintiffs' members are common carriers, which the State argues is a crucial step in this Court's First Amendment analysis, without the participation of Plaintiffs' members, (Mot. Dismiss, Dkt. 23, at 15), the Court finds that it can determine, if necessary, whether Plaintiffs' members are common carriers. Likewise, the Court can rule on Plaintiffs' other facial challenges, like their commerce clause claim, and conduct the proper level of scrutiny analysis on Plaintiffs' First Amendment claim. Additionally, Plaintiffs' requested relief—enjoining Paxton from enforcing Sections 2 and 7 of HB 20 against them and their members—is a proper and tailored remedy that would not necessarily require the individual participation of their members. "Injunctive relief 'does not make the individual participation of each injured party indispensable to proper resolution[.]'" *Texas Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 505 (5th Cir. 2021) (quoting *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977)).

### 2.    Plaintiffs Have Organizational Standing

Independent of their associational standing on behalf of their members, Plaintiffs have organizational standing to challenge HB 20. In their complaint, Plaintiffs allege the "already incurred costs and will continue to divert their finite resources—money, staff, and time and attention—away from other pressing issues facing their members to address compliance with and the implications of

H.B. 20 for Internet companies." (Compl., Dkt. 1, at 5). Plaintiffs continue that they would "no longer divert those finite resources to address H.B. 20" if it were declared unlawful and enjoined. (*Id.*). Plaintiffs' injury as an organization need not be "large" or "substantial." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) ("[I]t need not measure more than an 'identifiable trifle.' This is because 'the injury in fact requirement under Article III is qualitative, not quantitative, in nature.'") (quoting *Ass'n of Cmty. Organizations for Reform Now v. Fowler*, 178 F.3d 350, 357 (5th Cir. 1999)). Plaintiffs sufficiently allege that they have diverted resources and incurred expenses as an organization to prepare for HB 20's effects on Plaintiffs' members. *See id.* at 611–14.

Having considered the State's arguments and having found that Plaintiffs have both associational standing to challenge HB 20 on behalf of their members and organizational standing to challenge it based on their own alleged injuries, the Court denies the State's motion to dismiss. This Court's ruling is supported by the fact that the Northern District of Florida enjoined a similar Florida law that was challenged by these same exact Plaintiffs, and there was no dispute in that case—in which the State of Texas filed an amicus brief—that Plaintiffs lacked standing to assert the rights of their members to challenge that state law.

### B. Plaintiffs Have Shown Likelihood of Success on the Merits

Plaintiffs bring several claims against the State, and the Court focuses on Plaintiffs' claim that HB 20 violates the First Amendment.[1] To succeed on their motion for a preliminary injunction, then, Plaintiffs must show that HB 20 compels private social media platforms to "disseminate third-party content and interferes with their editorial discretion over their platforms."[2] (Prelim. Inj. Mot., Dkt. 12, at 23).

---

[1] The Court need not and does not reach the issues of whether HB 20 is void for vagueness, preempted by the Communications Decency Act, or violates the Commerce Clause.

[2] Findings and conclusions about the merits of this case should be understood only as statements about Plaintiffs' likelihood of success based on the record and law currently before this Court.

1.      **Social Media Platforms Exercise Editorial Discretion Protected by the First Amendment**

The parties dispute whether social media platforms are more akin to newspapers that engage in substantial editorial discretion—and therefore are entitled to a higher level of protection for their speech—or a common carrier that acts as a passive conduit for content posted by users—and therefore are entitled to a lower level of protection, if any. Plaintiffs urge the Court to view social media platforms as having editorial discretion to moderate content, and the State advocates that social media platforms act as common carriers that may be compelled by the government to publish speech that is objectionable. Before the Court attempts to settle that debate, the Court evaluates whether the First Amendment guarantees social media platforms the right to exercise editorial discretion.

More than twenty years ago, the Supreme Court recognized that "content on the Internet is as diverse as human thought," allowing almost any person to "become a town crier with a voice that resonates farther than it could from any soapbox." *Reno v. Am. C.L. Union*, 521 U.S. 844, 870 (1997). The *Reno* Court concluded that its "cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." *Id.* Disseminating information is "speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (citing *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct.")) (cleaned up).

Social media platforms have a First Amendment right to moderate content disseminated on their platforms. *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019) (recognizing that "certain private entities[] have rights to exercise editorial control over speech and speakers on their properties or platforms"). Three Supreme Court cases provide guidance. First, in *Tornillo*, the Court struck down a Florida statute that required newspapers to print a candidate's reply if a

newspaper assailed her character or official record, a "right of reply" statute. 418 U.S. at 243. In 1974, when the opinion was released, the Court noted there had been a "communications revolution" including that "[n]ewspapers have become big business . . . [with] [c]hains of newspapers, national newspapers, national wire and news services, and one-newspaper towns [being] the dominant features of a press that has become noncompetitive and enormously powerful and influential in its capacity to manipulate popular opinion and change the course of events." *Id.* at 248–49. Those concerns echo today with social media platforms and "Big Tech" all the while newspapers are further consolidating and, often, dying out. Back to 1974, when newspapers were viewed with monopolistic suspicion, the Supreme Court concluded that newspapers exercised "editorial control and judgment" by selecting the "material to go into a newspaper," deciding the "limitations on the size and content of the paper," and deciding how to treat "public issues and public officials—whether fair or unfair." *Id.* at 258. "It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time." *Id.*

In *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, the Supreme Court held that a private parade association had the right to exclude a gay rights group from having their own float in their planned parade without being compelled by a state statute to do otherwise. 515 U.S. 557, 572–73 (1995). The Massachusetts law at issue—which prohibited discrimination in any public place of "public accommodation, resort[,] or amusement"— did not "target speech or discriminate on the basis of its content, the focal point of its prohibition being rather on the act of discriminating against individuals." *Id.* at 572. The Court reasoned that the state's equal-access law "alter[ed] the expressive content" of the private organization. *Id.* "[T]his use of the State's power violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.* at 573. The Court clarified: "Indeed this general rule, that the

21-51178.2583

speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Id.*

Finally, the Supreme Court ruled that California could not require a private utility company to include a third party's newsletters when it sent bills to customers in *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 20–21 (1986). There, for decades, the private utility company sent a newsletter to its customers with monthly bills, and California required it to include the third-party newsletter, a newsletter the private utility company disagreed with. *Id.* at 4–5. Relying on *Tornillo*, the Court analogized that "[j]ust as the State is not free to tell a newspaper in advance what it can print and what it cannot, the State is not free either to restrict [the private utility company's] speech to certain topics or views or to force [it] to respond to views that others may hold." *Id.* at 11 (internal quotation marks and citations omitted). "[A] forced access rule that would accomplish these purposes indirectly is similarly forbidden." *Id.* The private utility company had the "right to be free from government restrictions that abridge its own rights in order to enhance the relative voice of its opponents." *Id.* at 14 (internal quotation marks omitted). That was because a corporation has the "choice of what not to say" and cannot be compelled to "propound political messages with which they disagree." *Id.* at 16.

The Supreme Court's holdings in *Tornillo*, *Hurley*, and *PG&E*, stand for the general proposition that private companies that use editorial judgment to choose whether to publish content—and, if they do publish content, use editorial judgment to choose what they want to publish—cannot be compelled by the government to publish other content. That proposition has repeatedly been recognized by courts. (*See* Prelim. Inj. Mot., Dkt. 12, at 26) (collecting cases). Satisfied that such editorial discretion is protected from government-compelled speech, the Court turns to whether social media platforms engage in protectable editorial discretion.

14

This Court starts from the premise that social media platforms are not common carriers.[3] "Equal access obligations . . . have long been imposed on telephone companies, railroads, and postal services, without raising any First Amendment issue." *United States Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 740 (D.C. Cir. 2016). Little First Amendment concern exists because common carriers "merely facilitate the transmission of speech of others." *Id.* at 741. In *United States Telecom*, the Court added broadband providers to its list of common carriers. *Id.* Unlike broadband providers and telephone companies, social media platforms "are not engaged in indiscriminate, neutral transmission of any and all users' speech." *Id.* at 742. User-generated content on social media platforms is screened and sometimes moderated or curated. The State balks that the screening is done by an algorithm, not a person, but whatever the method, social media platforms are not mere conduits. According to the State, our inquiry could end here, with Plaintiffs not needing to prove more to show they engage in protected editorial discretion. During the hearing, the Court asked the State, "[T]o what extent does a finding that these entities are common carriers, to what extent is that important from your perspective in the bill's ability to survive a First Amendment challenge?" (*See* Minute Entry, Dkt. 47). Counsel for the State responded, "[T]he common carriage doctrine is essential to the First Amendment challenge. It's why it's the threshold issue that we've briefed . . . . It dictates the rest of this suit in terms of the First Amendment inquiry." (*Id.*). As appealing as the State's invitation is to stop the analysis here, the Court continues in order to make a determination about whether social media platforms exercise editorial discretion or occupy a purgatory between common carrier and editor.

Social media platforms "routinely manage . . . content, allowing most, banning some, arranging content in ways intended to make it more useful or desirable for users, sometimes adding

---

[3] HB 20's pronouncement that social media platforms are common carriers, Tex. H.B. No. 20, 87th Leg., 2nd Sess. § 1(4) (2021), does not impact this Court's legal analysis.

21-51178.2585

their own content." *NetChoice*, 2021 WL 2690876, at *7. Making those decisions entails some level of editorial discretion, *id.*, even if portions of those tasks are carried out by software code. While this Court acknowledges that a social media platform's editorial discretion does not fit neatly with our 20th Century vision of a newspaper editor hand-selecting an article to publish, focusing on whether a human or AI makes those decisions is a distraction. It is indeed new and exciting—or frightening, depending on who you ask—that algorithms do some of the work that a newspaper publisher previously did, but the core question is still whether a private company exercises editorial discretion over the dissemination of content, not the exact process used. Plaintiffs' members also push back on the idea that content moderation does not involve judgment. For example, Facebook states that it makes decisions about "billions of pieces of content" and "[a]ll such decisions are unique and context-specific[] and involve some measure of judgment." (Facebook Decl., Dkt. 12-4, at 9).

This Court is convinced that social media platforms, or at least those covered by HB 20, curate both users and content to convey a message about the type of community the platform seeks to foster and, as such, exercise editorial discretion over their platform's content. Indeed, the text of HB 20 itself points to social media platforms doing more than transmitting communication. In Section 2, HB 20 recognizes that social media platforms "(1) curate[] and target[] content to users, (2) place[] and promote[] content, services, and products, including its own content, services, and products, (3) moderate[] content, and (4) use[] search, ranking, or other algorithms or procedures that determine results on the platform." Tex. Bus. & Com. Code § 120.051(a)(1)–(4). Finally, the State's own basis for enacting HB 20 acknowledges that social media platforms exercise editorial discretion. "[T]here is a dangerous movement by social media companies to silence conservative viewpoints and ideas." *Governor Abbott Signs Law Protecting Texans from Wrongful Social Media Censorship*, OFFICE OF THE TEX. GOVERNOR (Sept. 9, 2021), https://gov.texas.gov/news/post/governor-abbott-signs-law-protecting-texans-from-wrongful-social-media-censorship. "Texans must be able to

speak without being censored by West Coast oligarchs." Bryan Hughes (@SenBryanHughes),

TWITTER (Aug. 9, 2021, 4:34 PM), https://twitter.com/SenBryanHughes/status/

1424846466183487492 Just like the Florida law, a "constant theme of [Texas] legislators, as well as

the Governor . . . , was that the [platforms'] decisions on what to leave in or take out and how to

present the surviving material are ideologically biased and need to be reined in." *NetChoice*, 2021 WL

2690876, at *7. Without editorial discretion, social media platforms could not skew their platforms

ideologically, as the State accuses of them of doing. Taking it all together, case law, HB 20's text, and

the Governor and state legislators' own statements all acknowledge that social media platforms

exercise some form of editorial discretion, whether or not the State agrees with how that discretion

is exercised.

### 2. HB 20 Violates Plaintiffs' Members' First Amendment Rights

#### a. HB 20 Compels Social Media Platforms to Disseminate Objectionable Content and Impermissibly Restricts Their Editorial Discretion

HB 20 prohibits social media platforms from moderating content based on "viewpoint."

Tex. Civ. Prac. & Rem. Code §§ 143A.001(1), 143A.002. The State emphasizes that HB 20 "does not

prohibit content moderation. That is clear from the fact that [HB 20] has an entire provision

dictating that the companies should create acceptable use policies . . . [a]nd then moderate their

content accordingly." (*See* Minute Entry, Dkt. 47). The State claims that social media platforms

could prohibit content categories "such as 'terrorist speech,' 'pornography,' 'spam,' or 'racism'" to

prevent those content categories from flooding their platforms. (Resp. Prelim. Inj. Mot., Dkt. 39, at

21). During the hearing, the State explained that a social media platform "can't discriminate against

users who post Nazi speech . . . and [not] discriminate against users who post speech about the anti-

white or something like that." (*See* Minute Entry, Dkt. 47). Plaintiffs point out the fallacy in the

State's assertion with an example: a video of Adolf Hitler making a speech, in one context the

viewpoint is promoting Nazism, and a platform should be able to moderate that content, and in

another context the viewpoint is pointing out the atrocities of the Holocaust, and a platform should be able to disseminate that content. (*See id.*). HB 20 seems to place social media platforms in the untenable position of choosing, for example, to promote Nazism against its wishes or ban Nazism as a content category. (Prelim. Inj. Mot., Dkt. 12, at 29). As YouTube put it, "YouTube will face an impossible choice between (1) risking liability by moderating content identified to violate its standards or (2) subjecting YouTube's community to harm by allowing violative content to remain on the site." (YouTube Decl., Dkt. 12-3, at 22).

HB 20's prohibitions on "censorship" and constraints on how social media platforms disseminate content violate the First Amendment. The platforms have policies against content that express a viewpoint and disallowing them from applying their policies requires platforms to "alter the expressive content of their [message]." *Hurley*, 515 U.S. at 572–73. HB 20's restrictions on actions that "de-boost" and "deny equal access or visibility to or otherwise discriminate against expression" impede platforms' ability to place "post[s] in the proper feeds." Tex. Civ. Prac. & Rem. Code § 143A.001(1); *NetChoice*, 2021 WL 2690876, at *3. Social media platforms "must determine how and where users see those different viewpoints, and some posts will necessarily have places of prominence. *See NetChoice*, 2021 WL 2690876, at *3. HB 20 compels social media platforms to significantly alter and distort their products. Moreover, "the targets of the statutes at issue are the editorial judgments themselves" and the "announced purpose of balancing the discussion—reining in the ideology of the large social-media providers—is precisely the kind of state action held unconstitutional in *Tornillo*, *Hurley*, and *PG&E*." *Id.* HB 20 also impermissibly burdens social media platforms' own speech. *Id.* at *9 ("[T]he statutes compel the platforms to change their own speech in other respects, including, for example, by dictating how the platforms may arrange speech on their sites."). For example, if a platform appends its own speech to label a post as misinformation, the platform may be discriminating against that user's viewpoint by adding its own disclaimer. HB 20

21-51178.2588

restricts social media platforms' First Amendment right to engage in expression when they disagree with or object to content.[4]

Furthermore, the threat of lawsuits for violating Section 7 of HB 20 chills the social media platforms' speech rights. HB 20 broadly prohibits content moderation based on "viewpoint," authorizing the Texas Attorney General to sue for violations—and even "potential" violations—of Section 7's "censorship" restrictions. Tex. Civ. Prac. & Rem Code §§ 143A.002; 143A.008. In response to the State's interrogatories, NetChoice explained that the "threat of myriad lawsuits based on individual examples of content moderation threaten and chill the broad application of those [content moderation] policies, and thus H.B. 20's anti-moderation provisions interfere with Plaintiff's members' policies and practices. . . . Using YouTube as an example, hate speech is necessarily 'viewpoint'-based, as abhorrent as those viewpoints may be. And removing such hate speech and assessing penalties against users for submitting that content is 'censor[ship]' as defined by H.B. 20." (NetChoice Interrogatory Responses, Dkt. 44-3, at 25).

### b. HB 20's Disclosure and Operational Requirements Burden Social Media Platforms' Editorial Discretion

HB 20 additionally violates Plaintiffs' members' First Amendment rights with its Section 2 requirements. First, under Section 2, a social media platform must provide "public disclosures" about how the platform operates in a manner "sufficient to enable users to make an informed

---

[4] The Court notes that two other Supreme Court cases address this topic, but neither applies here. *PruneYard Shopping Center v. Robins* is distinguishable from the facts of this case. 447 U.S. 74 (1980). In *PruneYard*, the Supreme Court upheld a California law that required a shopping mall to host people collecting petition signatures, concluding there was no "intrusion into the function of editors" since the shopping mall's operation of its business lacked an editorial function. *Id.* at 88. Critically, the shopping mall did not engage in expression and "the [mall] owner did not even allege that he objected to the content of the [speech]; nor was the access right content based." *PG&E*, 475 U.S. at 12. Similarly, *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.* has no bearing on this Court's holding because it did not involve government restrictions on editorial functions. 547 U.S. 47 (2006). The challenged law required schools that allowed employment recruiters on campus to also allow military employment recruiters on campus—a restriction on "conduct, not speech." *Id.* at 62, 65. As the Supreme Court explained, "accommodating the military's message does not affect the law schools' speech, because the schools are not speaking when the host interviews and recruiting receptions." *Id.* at 64.

choice regarding the purchase of or use of access to or services from the platform." Tex. Bus. & Com. Code § 120.051(b). HB 20 states that each platform must disclose how it "(1) curates and targets content to users; (2) places and promotes content, services, and products, including its own content, services, and products; (3) moderates content; [and] (4) uses search, ranking, or other algorithms or procedures that determine results on the platform[.]" *Id.* § 120.051(a)(1)–(4). Second, a social media platform must "publish an acceptable use policy" that explains what content the platform will allow, how the platform will ensure compliance with the policy, and how users can inform the platform about noncompliant content. *Id.* § 120.052. Third, a social media platform must publish a "biannual transparency report" that requires information about the platform's enforcement of their policies. *Id.* § 120.053(a).

Specifically, social media platforms must provide:

- "the total number of instances in which the social media platform was alerted to illegal content, illegal activity, or potentially policy-violating content" and by what means (i.e., by users, employees, or automated processes);

- how often the platform "took action" with regard to such content including "content removal," "content demonetization," "content deprioritization," "the addition of an assessment to content," "account suspension," "account removal," and "any other action" that accords with the acceptable use policy, "categorized by" "the rule violated" and "the source for the alert";

- "the country of the user who provided the content for each instance described" above;

- "the number of coordinated campaigns;"

- "the number of instances in which a user appealed the decision to remove the user's potentially policy-violating content;"

- "the percentage of appeals . . . that resulted in the restoration of content;" and

- "a description of each tool, practice, action, or technique used in enforcing the acceptable use policy."

*Id.* § 120.053(a)(1)–(7), (b).

Fourth, a social media platform must provide a "complaint system to enable a user to submit a complaint in good faith and track the status of the complaint" regarding either a report of violative content or "a decision made by the social media platform to remove content posted by the user." *Id.* § 120.101. For reports of illegal content, the covered platform must "make a good faith effort to evaluate the legality of the content or activity within 48 hours of receiving the notice," excluding weekends. *Id.* § 120.102.

Fifth, a social media platform must offer a notice and appeal system for any content that it decides to remove. Subject to limited exceptions, every time a covered platform "removes" content, it must give the user (1) a notice of the removal; (2) an opportunity to appeal; and (3) a written explanation of the decision on appeal, including an explanation for any reversal. *Id.* § 120.103. During the appeal process, a social media platform must "review the [removed] content," "determine whether the content adheres to the platform's acceptable use policy," and "take appropriate steps" within 14 days (excluding weekends). *Id.* § 120.104.

To pass constitutional muster, disclosure requirements like these must require only "factual and noncontroversial information" and cannot be "unjustified or unduly burdensome." *NIFLA*, 138 S. Ct. at 2372. Section 2's disclosure and operational provisions are inordinately burdensome given the unfathomably large numbers of posts on these sites and apps. For example, in three months in 2021, Facebook removed 8.8 million pieces of "bullying and harassment content," 9.8 million pieces of "organized hate content," and 25.2 million pieces of "hate speech content." (CCIA Decl., Dkt. 12-1, at 15). During the last three months of 2020, YouTube removed just over 2 million channels and over 9 million videos because they violated its policies. (*Id.* at 16). While some of those removals are subject to an existing appeals process, many removals are not. For example, in a three-month-period in 2021, YouTube removed 1.16 billion comments. (YouTube Decl., Dkt. 12-3, at 23–24). Those 1.16 billion removals were not appealable, but, under HB 20, they would have to be. (*Id.*).

Over the span of six months in 2018, Facebook, Google, and Twitter took action on over 5 billion accounts or user submissions—including 3 billion cases of spam, 57 million cases of pornography, 17 million cases of content regarding child safety, and 12 million cases of extremism, hate speech, and terrorist speech. (NetChoice Decl., Dkt. 12-2, at 8). During the State's deposition of Neil Christopher Potts ("Potts"), who is Facebook's Vice President of Trust and Safety Policy, Potts stated that it would be "impossible" for Facebook "to comply with anything by December 1, [2021]. . . [W]e would not be able to change systems in that nature. . . . I don't see a way that we would actually be able to go forward with compliance in a meaningful way." (Potts Depo., Dkt. 39-2, at 2, 46). Plaintiffs also express a concern that revealing "algorithms or procedures that determine results on the platform" may reveal trade secrets or confidential and competitively-sensitive information. (*Id.* at 34) (quoting Tex. Bus. & Com. Code § 120.051(a)(4)).

The Section 2 requirements burden First Amendment expression by "forc[ing] elements of civil society to speak when they otherwise would have refrained." *Washington Post v. McManus*, 944 F.3d 506, 514 (4th Cir. 2019). "It is the presence of compulsion from the state itself that compromises the First Amendment." *Id.* at 515. The provisions also impose unduly burdensome disclosure requirements on social media platforms "that will chill their protected speech." *NIFLA*, 138 S. Ct. at 2378. The consequences of noncompliance also chill the social media platforms' speech and application of their content moderation policies and user agreements. Noncompliance can subject social media platforms to serious consequences. The Texas Attorney General may seek injunctive relief and collect attorney's fees and "reasonable investigative costs" if successful in obtaining injunctive relief. *Id.* § 120.151.

### 3. HB 20 Discriminates Based on Content and Speaker

HB 20 additionally suffers from constitutional defects because it discriminates based on content and speaker. First, HB 20 excludes two types of content from its prohibition on content

21-51178.2592

moderation and permits social media platforms to moderate content: (1) that "is the subject of a referral or request from an organization with the purpose of preventing the sexual exploitation of children and protecting survivors of sexual abuse from ongoing harassment," and (2) that "directly incites criminal activity or consists of specific threats of violence targeted against a person or group because of their race, color, disability, religion, national origin or ancestry, age, sex, or status as a peace officer or judge." Tex. Civ. Prac. & Rem. Code § 143A.006(a)(2)–(3). When considering a city ordinance that applied to "'fighting words' that . . . provoke violence[] 'on the basis of race, color, creed, religion[,] or gender,'" the Supreme Court noted that those "who wish to use 'fighting words' in connection with other ideas—to express hostility, for example, on the basis of political affiliation, union membership, or []sexuality—are not covered." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 391 (1992). As Plaintiffs argue, the State has "no legitimate reason to allow the platforms to enforce their policies over threats based only on . . . favored criteria but not" other criteria like sexual orientation, military service, or union membership. (Prelim. Inj. Mot., Dkt. 12, at 35–36); *see id.*

HB 20 applies only to social media platforms of a certain size: platforms with 50 million monthly active users in the United States. Tex. Bus. & Com. Code § 120.002(b). HB 20 excludes social media platforms such as Parler and sports and news websites. (*See* Prelim. Inj. Mot., Dkt. 12, at 17). During the regular legislative session, a state senator unsuccessfully proposed lowering the threshold to 25 million monthly users in an effort to include sites like "Parler and Gab, which are popular among conservatives." Shawn Mulcahy, *Texas Senate approves bill to stop social media companies from banning Texans for political views*, TEX. TRIBUNE (Mar. 30, 2021), https://www.texas tribune.org/2021/03/30/texas-social-media-censorship/. "[D]iscrimination between speakers is often a tell for content discrimination." *NetChoice*, 2021 WL 2690876, at *10. The discrimination between speakers has special significance in the context of media because "[r]egulations that discriminate among media, or among different speakers within a single medium, often present

23

serious First Amendment concerns." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 659 (1994). The record in this case confirms that the Legislature intended to target large social media platforms perceived as being biased against conservative views and the State's disagreement with the social media platforms' editorial discretion over their platforms. The evidence thus suggests that the State discriminated between social media platforms (or speakers) for reasons that do not stand up to scrutiny.

### 4.    HB 20 Is Unconstitutionally Vague

Plaintiffs argue that HB 20 contains many vague terms, some of which the Court agrees are prohibitively vague. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way. When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–54 (internal citation omitted).

First, Plaintiffs take issue with HB 20's definition for "censor:" "block, ban, remove, deplatform, demonetize, de-boost, restrict, deny equal access or visibility to, or otherwise discriminate against expression." Tex. Civ. Prac. & Rem. Code § 143A.001(1). Plaintiffs argue that requiring social media platforms to require "equal access or visibility to" content is "hopelessly indeterminate." (Prelim. Inj. Mot., Dkt. 12, at 37) (quoting *id.*). The Court agrees. A social media platform is not static snapshot in time like a hard copy newspaper. It strikes the Court as nearly impossible for a social media platform—that has at least 50 million users—to determine whether any single piece of content has "equal access or visibility" versus another piece of content given the

24

huge numbers of users and content. Moreover, this requirement could "prohibit[] a social media platform from" displaying content "in the proper feeds" *NetChoice*, 2021 WL 2690876, at *3.

Second, Plaintiffs argue that the definition of "social media platform" is unclear. Under HB 20, social media platform means an "Internet website or application that is open to the public, allows a user to create an account, and enables users to communicate with other users for the primary purpose of posting information, comments, messages, or images." Tex. Bus. & Com. Code § 120.001(1). Plaintiffs argue that it is unclear which websites and applications "enable[] users to communicate with other users for the primary purpose of posting information, comments, messages, or images." *Id.* Without more, the Court is not persuaded that that phrase is impermissibly vague.

The definition for "social media platform" excludes "an online service, application, or website: (i) that consists primarily of news, sports, entertainment, or other information or content that is not user generated but is preselected by the provider; and (ii) for which any chat, comments, or interactive functionality is incidental to, directly related to, or dependent on the provision of the content described by Subparagraph (i)." *Id.* § 120.001(1)(C)(i), (ii). Plaintiffs object to the word "primarily" used to define excluded companies whose sites "primarily" consist of "news, sports, entertainment . . . ." § 120.001(1)(C)(i). "Even if 'primarily' means 'greater than 50%,' a person of ordinary intelligence would have no idea what 'primarily' refers to as the relevant denominator." (Prelim. Inj. Mot., Dkt. 12, at 38). In this context, "primarily" is too indeterminate to enable companies with a website, application, or online service to determine whether they are subject to HB 20's prohibitions and requirements. Plaintiffs also contend that "[o]rdinary people would further have no idea what makes a chat or comment section 'incidental to, directly related to, or dependent on' a platform's preselected content." (Prelim. Inj. Mot., Dkt. 12, at 38) (quoting Tex. Bus. & Com.

Code § 120.001(1)(C)(ii). Plaintiffs have not established that that terminology is impermissibly vague.

Third, HB 20 empowers the Texas Attorney General to seek an injunction not just against violations of the statute but also "potential violations." Tex. Civ. Prac. & Rem. Code § 143A.008. Unlike other statutes that specify that the potential violation must be imminent, HB 20 includes no such qualification. *See, e.g.*, Tex. Occ. Code § 1101.752(a) (authorizing the attorney general to seek injunctive relief to abate a potential violation "if the commission determines that a person has violated or is about to violate this chapter"). Subjecting social media platforms to suit for potential violations, without a qualification, reaches almost all content moderation decisions platforms might make, further chilling their First Amendment rights. (Prelim. Inj. Mot., Dkt. 12, at 39).

Fourth, Plaintiffs contend that Section 2's disclosure and operational requirements are overbroad and vague. "For instance, H.B. 20's non-exhaustive list of disclosure requirements grants the Attorney General substantial discretion to sue based on a covered platform's failure to include unenumerated information." (*Id.*). While the Court agrees that these provisions may suffer from infirmities, the Court cannot at this time find them unconstitutionally vague on their face.

**5.      HB 20 Fails Strict Scrutiny and Intermediate Scrutiny**

HB 20 imposes content-based, viewpoint-based, and speaker-based restrictions that trigger strict scrutiny. Strict scrutiny is satisfied only if a state has adopted "'the least restrictive means of achieving a compelling state interest.'" *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383, 210 L. Ed. 2d 716 (2021) (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)). Even under the less rigorous intermediate scrutiny, the State must prove that HB 20 is "'narrowly tailed to serve a significant government interest.'" *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017) (quoting *McCullen*, 573 U.S. at 477). The proclaimed government interests here fall short under both standards.

21-51178.2596

The State offers two interests served by HB 20: (1) the "free and unobstructed use of public forums and of the information conduits provided by common carriers" and (2) "providing individual citizens effective protection against discriminatory practices, including discriminatory practices by common carriers." (Resp. Prelim. Inj. Mot., Dkt. 39, at 33–34) (internal quotation marks and brackets omitted). The State's first interest fails on several accounts. First, social media platforms are privately owned platforms, not public forums. Second, this Court has found that the covered social media platforms are not common carriers. Even if they were, the State provides no convincing support for recognizing a governmental interest in the free and unobstructed use of common carriers' information conduits.[5] Third, the Supreme Court rejected an identical government interest in *Tornillo*. In *Tornillo*, Florida argued that "government has an obligation to ensure that a wide variety of views reach the public." *Tornillo*, 418 U.S. at 247–48. After detailing the "problems related to government-enforced access," the Court held that the state could not commandeer private companies to facilitate that access, even in the name of reducing the "abuses of bias and manipulative reportage [that] are . . . said to be the result of the vast accumulations of unreviewable power in the modern media empires." *Id.* at 250, 254. The State's second interest—preventing "discrimination" by social media platforms—has been rejected by the Supreme Court. Even given a state's general interest in anti-discrimination laws, "forbidding acts of discrimination" is "a decidedly fatal objective" for the First Amendment's "free speech commands." *Hurley*, 515 U.S. at 578–79.

---

[5] In *PG&E*, the Supreme Court did not recognize such a governmental interest; rather, it held that a private utility company retained editorial discretion and could not be compelled to disseminate a third-party's speech. 475 U.S. at 16–18. The Supreme Court's narrow reasoning in *Turner* does not alter this Court's analysis. There, the Court applied "heightened First Amendment scrutiny" because the law at issue "impose[d] special obligations upon cable operators and special burdens upon cable programmers." *Turner Broad. Sys., Inc.*, 512 U.S. at 641. The law, on its face, imposed burdens without reference to the content of speech, yet "interfere[d] with cable operators' editorial discretion" by requiring them to carry some broadcast stations. *Id.* at 643–44, 662. When it held that cable operators must abide by the law and carry some broadcast channels, the Court's rationale turned on preventing "40 percent of Americans without cable" from losing "access to free television programming." *Id.* at 646. The analysis applied to the regulation of broadcast television has no bearing on the analysis of Internet First Amendment protections. *See Reno*, 521 U.S. at 870.

Even if the State's purported interests were compelling and significant, HB 20 is not narrowly tailored. Sections 2 and 7 contain broad provisions with far-reaching, serious consequences. When reviewing the similar statute passed in Florida, the Northern District of Florida found that that statute was not narrowly tailored "like prior First Amendment restrictions." *NetChoice*, 2021 WL 2690876, at *11 (citing *Reno*, 521 U.S. at 882; *Sable Comm'n of Cal., Inc. v. FCC*, 492 U.S. 115, 131 (1989)). Rather, the court colorfully described it as "an instance of burning the house to roast a pig." *Id.* This Court could not do better in describing HB 20.

Plaintiffs point out that the State could have created its own unmoderated platform but likely did not because the State's true interest is divulged by statements made by legislators and Governor Abbott: the State is concerned with "West Coast oligarchs" and the "dangerous movement by social media companies to silence conservative viewpoints and ideas." Bryan Hughes (@SenBryanHughes), TWITTER (Aug. 9, 2021, 4:34 PM), https://twitter.com/SenBryanHughes/status/1424846466183487492; *Governor Abbott Signs Law Protecting Texans from Wrongful Social Media Censorship*, OFFICE OF THE TEX. GOVERNOR (Sept. 9, 2021), https://gov.texas.gov/news/post/governor-abbott-signs-law-protecting-texans-from-wrongful-social-media-censorship; (*see* Reply, Dkt. 48, at 27) ("H.B. 20's true interest is in promoting conservative speech on platforms that legislators perceive as 'liberal.'"). In the State's opposition brief, the State describes the social media platforms as "skewed," saying social media platforms' "current censorship practices" lead to "a skewed exchange of ideas in the Platforms that prevents such a search for the truth." (Resp. Prelim. Inj. Mot., Dkt. 39, at 30).

### 6. HB 20's Severability Clause

HB 20's severability clause does not save HB 20 from facial invalidation. This Court has found Sections 2 and 7 to be unlawful. Both sections are replete with constitutional defects, including unconstitutional content- and speaker-based infringement on editorial discretion and

onerously burdensome disclosure and operational requirements. Like the Florida statute, "[t]here is nothing that could be severed and survive." *NetChoice*, 2021 WL 2690876, at *11.

## C. Remaining Factors Favor a Preliminary Injunction

The remaining factors all weigh in favor of granting Plaintiffs' request for a preliminary injunction. "There can be no question that the challenged restrictions, if enforced, will cause irreparable harm. 'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)). Absent an injunction, HB 20 would "radically upset how platforms work and the core value that they provide to users." (Prelim. Inj. Mot., Dkt. 12, at 52). HB 20 prohibits virtually all content moderation, the very tool that social medial platforms employ to make their platforms safe, useful, and enjoyable for users. (*See, e.g.*, CCIA Decl., Dkt. 12-1, at 9, 13) ("[M]any services would be flooded with abusive, objectionable, and in some cases unlawful material, drowning out the good content and making their services far less enjoyable, useful, and safe.") ("Content moderation serves at least three distinct vital functions. First, it is an important way that online services express themselves and effectuate their community standards, thereby delivering on commitments that they have made to their communities. . . . Second, content moderation is often a matter of ensuring online safety. . . . Third, content moderation facilitates the organization of content, rendering an online service more useful."). In addition, social media platforms would lose users and advertisers, resulting in irreparable injury. (Prelim. Inj. Mot., Dkt. 12, at 53–54); (*see, e.g.*, NetChoice Decl., Dkt. 12-2, at 5–6 ("Not only does the Bill impose immediate financial harm to online businesses, it risks permanent, irreparable harm should any of those users or advertisers decide never to return to our members' sites based on their past experience or the detrimental feedback they have heard from others.").

21-51178.2599

The irreparable harm to Plaintiffs' members outweighs any harm to the State from a preliminary injunction. *NetChoice*, 2021 WL 2690876, at \*11. Since the State lacks a compelling state interest for HB 20, the State will not be harmed. *See Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). Finally, courts have found that "'injunctions protecting First Amendment freedoms are always in the public interest.'" *Id.* at 539 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)). In this case, content moderation and curation will benefit users and the public by reducing harmful content and providing a safe, useful service. (*See, e.g.*, CCIA Decl., Dkt. 12-1, at 9, 13). Here, an "injunction will serve, not be adverse to, the public interest." *NetChoice*, 2021 WL 2690876, at \*11.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that the State's motion to dismiss, (Dkt. 23), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for preliminary injunction, (Dkt. 12), is **GRANTED**. Until the Court enters judgment in this case, the Texas Attorney General is **ENJOINED** from enforcing Section 2 and Section 7 of HB 20 against Plaintiffs and their members. Pursuant to Federal Rule of Civil Procedure 65(c), Plaintiffs are required to post a $1,000.00 bond.

**IT IS FINALLY ORDERED** that Plaintiffs' motion to strike, (Dkt. 43), is **DISMISSED WITHOUT PREJUDICE AS MOOT**.

**SIGNED** on December 1, 2021.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

Tab 4: Texas House Bill 20 (ROA.66-82)

Chapter 3

1                              AN ACT

2  relating  to  censorship  of  or  certain  other  interference  with

3  digital  expression,  including  expression  on  social  media  platforms

4  or  through  electronic  mail  messages.

5      BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

6      SECTION 1.   The legislature finds that:

7          (1)  each  person  in  this  state  has  a  fundamental

8  interest  in  the  free  exchange  of  ideas  and  information,  including

9  the freedom of others to share and receive ideas and information;

10         (2)  this  state  has  a  fundamental  interest  in

11  protecting  the  free  exchange  of  ideas  and  information  in  this

12  state;

13         (3)  social  media  platforms  function  as  common

14  carriers,  are  affected  with  a  public  interest,  are  central  public

15  forums for public debate, and have enjoyed governmental support in

16  the United States; and

17         (4)  social media platforms with the largest number of

18  users are common carriers by virtue of their market dominance.

19     SECTION 2.   Subtitle C, Title 5, Business & Commerce Code, is

20  amended by adding Chapter 120 to read as follows:

21              CHAPTER 120.  SOCIAL MEDIA PLATFORMS

22                SUBCHAPTER A.  GENERAL PROVISIONS

23     Sec. 120.001.  DEFINITIONS.  In this chapter:

24         (1)  "Social media platform" means an Internet website

H.B. No. 20

1   or application that is open to the public, allows a user to create

2   an account, and enables users to communicate with other users for

3   the primary purpose of posting information, comments, messages, or

4   images.  The term does not include:

5               (A)  an Internet service provider as defined by

6   Section 324.055;

7               (B)  electronic mail; or

8               (C)  an online service, application, or website:

9                    (i)  that consists primarily of news,

10  sports, entertainment, or other information or content that is not

11  user generated but is preselected by the provider; and

12                   (ii)  for which any chat, comments, or

13  interactive functionality is incidental to, directly related to, or

14  dependent on the provision of the content described by Subparagraph

15  (i).

16              (2)  "User" means a person who posts, uploads,

17  transmits, shares, or otherwise publishes or receives content

18  through a social media platform.  The term includes a person who has

19  a social media platform account that the social media platform has

20  disabled or locked.

21      Sec. 120.002.  APPLICABILITY OF CHAPTER.  (a)  This chapter

22  applies only to a user who:

23              (1)  resides in this state;

24              (2)  does business in this state; or

25              (3)  shares or receives content on a social media

26  platform in this state.

27      (b)  This chapter applies only to a social media platform

2

H.B. No. 20

1 that functionally has more than 50 million active users in the

2 United States in a calendar month.

3      Sec. 120.003.  CONSTRUCTION OF CHAPTER.  This chapter may

4 not be construed to limit or expand intellectual property law.

5             SUBCHAPTER B.  DISCLOSURE REQUIREMENTS

6      Sec. 120.051.  PUBLIC DISCLOSURES.  (a)  A social media

7 platform shall, in accordance with this subchapter, publicly

8 disclose accurate information regarding its content management,

9 data management, and business practices, including specific

10 information regarding the manner in which the social media

11 platform:

12           (1)  curates and targets content to users;

13           (2)  places and promotes content, services, and

14 products, including its own content, services, and products;

15           (3)  moderates content;

16           (4)  uses search, ranking, or other algorithms or

17 procedures that determine results on the platform; and

18           (5)  provides users' performance data on the use of the

19 platform and its products and services.

20      (b)  The disclosure required by Subsection (a) must be

21 sufficient to enable users to make an informed choice regarding the

22 purchase of or use of access to or services from the platform.

23      (c)  A social media platform shall publish the disclosure

24 required by Subsection (a) on an Internet website that is easily

25 accessible by the public.

26      Sec. 120.052.  ACCEPTABLE USE POLICY.  (a)  A social media

27 platform shall publish an acceptable use policy in a location that

3

1  is easily accessible to a user.

2      (b)  A social media platform's acceptable use policy must:

3          (1)  reasonably inform users about the types of content

4  allowed on the social media platform;

5          (2)  explain the steps the social media platform will

6  take to ensure content complies with the policy;

7          (3)  explain the means by which users can notify the

8  social media platform of content that potentially violates the

9  acceptable use policy, illegal content, or illegal activity, which

10 includes:

11              (A)  an e-mail address or relevant complaint

12 intake mechanism to handle user complaints; and

13              (B)  a complaint system described by Subchapter C;

14 and

15          (4)  include publication of a biannual transparency

16 report outlining actions taken to enforce the policy.

17     Sec. 120.053.  BIANNUAL TRANSPARENCY REPORT.  (a) As part of

18 a social media platform's acceptable use policy under Section

19 120.052, the social media platform shall publish a biannual

20 transparency report that includes, with respect to the preceding

21 six-month period:

22          (1)  the total number of instances in which the social

23 media platform was alerted to illegal content, illegal activity, or

24 potentially policy-violating content by:

25              (A)  a user complaint;

26              (B)  an employee of or person contracting with the

27 social media platform; or

4

1              (C)   an internal automated detection tool;

2              (2)   subject to Subsection (b), the number of instances

3    in which the social media platform took action with respect to

4    illegal content, illegal activity, or potentially policy-violating

5    content known to the platform due to the nature of the content as

6    illegal content, illegal activity, or potentially policy-violating

7    content, including:

8                        (A)   content removal;

9                        (B)   content demonetization;

10                       (C)   content deprioritization;

11                       (D)   the addition of an assessment to content;

12                       (E)   account suspension;

13                       (F)   account removal; or

14                       (G)   any other action taken in accordance with the

15   platform's acceptable use policy;

16             (3)   the country of the user who provided the content

17   for each instance described by Subdivision (2);

18             (4)   the   number   of   coordinated   campaigns,   if

19   applicable;

20             (5)   the number of instances in which a user appealed

21   the decision to remove the user's potentially policy-violating

22   content;

23             (6)   the percentage of appeals described by Subdivision

24   (5) that resulted in the restoration of content; and

25             (7)   a description of each tool, practice, action, or

26   technique used in enforcing the acceptable use policy.

27        (b)   The information described by Subsection (a)(2) must be

5

H.B. No. 20

1  categorized by:

2          (1)  the rule violated; and

3          (2)  the source for the alert of illegal content,

4  illegal activity, or potentially policy-violating content,

5  including:

6              (A)  a government;

7              (B)  a user;

8              (C)  an internal automated detection tool;

9              (D)  coordination with other social media

10  platforms; or

11              (E)  persons employed by or contracting with the

12  platform.

13      (c)  A social media platform shall publish the information

14  described by Subsection (a) with an open license, in a

15  machine-readable and open format, and in a location that is easily

16  accessible to users.

17          SUBCHAPTER C.  COMPLAINT PROCEDURES

18      Sec. 120.101.  COMPLAINT SYSTEM.  A social media platform

19  shall provide an easily accessible complaint system to enable a

20  user to submit a complaint in good faith and track the status of the

21  complaint, including a complaint regarding:

22          (1)  illegal content or activity; or

23          (2)  a decision made by the social media platform to

24  remove content posted by the user.

25      Sec. 120.102.  PROCESSING OF COMPLAINTS.  A social media

26  platform that receives notice of illegal content or illegal

27  activity on the social media platform shall make a good faith effort

21-51178.71

1   to evaluate the legality of the content or activity within 48 hours

2   of receiving the notice, excluding hours during a Saturday or

3   Sunday and subject to reasonable exceptions based on concerns about

4   the legitimacy of the notice.

5       Sec. 120.103.   REMOVAL OF CONTENT; EXCEPTIONS. (a)   Except

6   as provided by Subsection (b), if a social media platform removes

7   content based on a violation of the platform's acceptable use

8   policy under Section 120.052, the social media platform shall,

9   concurrently with the removal:

10          (1)   notify the user who provided the content of the

11   removal and explain the reason the content was removed;

12          (2)   allow the user to appeal the decision to remove the

13   content to the platform; and

14          (3)   provide written notice to the user who provided

15   the content of:

16              (A)   the determination regarding an appeal

17   requested under Subdivision (2); and

18              (B)   in the case of a reversal of the social media

19   platform's decision to remove the content, the reason for the

20   reversal.

21       (b)   A social media platform is not required to provide a

22   user with notice or an opportunity to appeal under Subsection (a) if

23   the social media platform:

24          (1)   is unable to contact the user after taking

25   reasonable steps to make contact; or

26          (2)   knows that the potentially policy-violating

27   content relates to an ongoing law enforcement investigation.

H.B. No. 20

1      Sec. 120.104. APPEAL PROCEDURES. If a social media

2 platform receives a user complaint on the social media platform's

3 removal from the platform of content provided by the user that the

4 user believes was not potentially policy-violating content, the

5 social media platform shall, not later than the 14th day, excluding

6 Saturdays and Sundays, after the date the platform receives the

7 complaint:

8           (1) review the content;

9           (2) determine whether the content adheres to the

10 platform's acceptable use policy;

11           (3) take appropriate steps based on the determination

12 under Subdivision (2); and

13           (4) notify the user regarding the determination made

14 under Subdivision (2) and the steps taken under Subdivision (3).

15              SUBCHAPTER D. ENFORCEMENT

16      Sec. 120.151. ACTION BY ATTORNEY GENERAL. (a) The attorney

17 general may bring an action against a social media platform to

18 enjoin a violation of this chapter.

19      (b) If an injunction is granted in an action brought under

20 Subsection (a), the attorney general may recover costs incurred in

21 bringing the action, including reasonable attorney's fees and

22 reasonable investigative costs.

23      SECTION 3. The heading to Chapter 321, Business & Commerce

24 Code, is amended to read as follows:

25      CHAPTER 321. REGULATION OF [CERTAIN] ELECTRONIC MAIL

26      SECTION 4. Section 321.001, Business & Commerce Code, is

27 amended by adding Subdivision (4-a) to read as follows:

H.B. No. 20

1          (4-a)  "Malicious  computer  code"  means  an  unwanted
2   computer  program  or  other  set  of  instructions  inserted  into  a
3   computer's memory, operating system, or program that:
4               (A)   is specifically constructed with the ability
5   to replicate itself or to affect the other programs or files in the
6   computer by attaching a copy of the unwanted program or other set of
7   instructions to one or more computer programs or files; or
8               (B)  is  intended  to  perform  an  unauthorized
9   process  that  will  adversely  impact  the  confidentiality  of
10  information contained in or the integrity or availability of the
11  computer's memory, operating system, or program.
12      SECTION 5.   Subchapter B, Chapter 321, Business & Commerce
13  Code, is amended by adding Section 321.054 to read as follows:
14      Sec. 321.054.  IMPEDING     ELECTRONIC     MAIL     MESSAGES
15  PROHIBITED.    An  electronic  mail  service  provider  may  not
16  intentionally  impede  the  transmission  of  another  person's
17  electronic mail message based on the content of the message unless:
18              (1)  the  provider  is  authorized  to  block  the
19  transmission under Section 321.114 or other applicable state or
20  federal law; or
21              (2)   the provider has a good faith, reasonable belief
22  that  the  message  contains  malicious  computer  code,  obscene
23  material,  material  depicting  sexual  conduct,  or  material  that
24  violates other law.
25      SECTION 6.   Section 321.105(a), Business & Commerce Code, is
26  amended to read as follows:
27      (a)  In  lieu  of  actual  damages,  a  person  injured  by  a

9

H.B. No. 20

1  violation of this chapter arising from the transmission of an

2  unsolicited or commercial electronic mail message or by a violation

3  of Section 321.054 may recover an amount equal to the lesser of:

4              (1)  $10 for each unlawful message or each message

5  unlawfully impeded, as applicable; or

6              (2)  $25,000 for each day the unlawful message is

7  received or the message is unlawfully impeded, as applicable.

8        SECTION 7.  Title 6, Civil Practice and Remedies Code, is

9  amended by adding Chapter 143A to read as follows:

10       CHAPTER 143A.  DISCOURSE ON SOCIAL MEDIA PLATFORMS

11       Sec. 143A.001.  DEFINITIONS.  In this chapter:

12             (1)  "Censor" means to block, ban, remove, deplatform,

13  demonetize, de-boost, restrict, deny equal access or visibility to,

14  or otherwise discriminate against expression.

15             (2)  "Expression" means any word, music, sound, still

16  or moving image, number, or other perceivable communication.

17             (3)  "Receive," with respect to an expression, means to

18  read, hear, look at, access, or gain access to the expression.

19             (4)  "Social media platform" has the meaning assigned

20  by Section 120.001, Business & Commerce Code.

21             (5)  "Unlawful expression" means an expression that is

22  unlawful under the United States Constitution, federal law, the

23  Texas Constitution, or the laws of this state, including expression

24  that constitutes a tort under the laws of this state or the United

25  States.

26             (6)  "User" means a person who posts, uploads,

27  transmits, shares, or otherwise publishes or receives expression,

H.B. No. 20

1   through a social media platform.  The term includes a person who has

2   a social media platform account that the social media platform has

3   disabled or locked.

4        Sec. 143A.002.  CENSORSHIP PROHIBITED.  (a)  A social media

5   platform may not censor a user, a user's expression, or a user's

6   ability to receive the expression of another person based on:

7             (1)  the viewpoint of the user or another person;

8             (2)  the viewpoint represented in the user's expression

9   or another person's expression; or

10            (3)  a user's geographic location in this state or any

11   part of this state.

12       (b)  This  section  applies  regardless  of  whether  the

13   viewpoint is expressed on a social media platform or through any

14   other medium.

15       Sec. 143A.003.  WAIVER  PROHIBITED.   (a)   A  waiver  or

16   purported waiver of the protections provided by this chapter is

17   void  as  unlawful  and  against  public  policy,  and  a  court  or

18   arbitrator may not enforce or give effect to the waiver, including

19   in an action brought under Section 143A.007, notwithstanding any

20   contract or choice-of-law provision in a contract.

21       (b)  The waiver prohibition described by Subsection (a) is a

22   public-policy limitation on contractual and other waivers of the

23   highest importance and interest to this state, and this state is

24   exercising  and  enforcing  this  limitation  to  the  full  extent

25   permitted by the United States Constitution and Texas Constitution.

26       Sec. 143A.004.  APPLICABILITY OF CHAPTER.  (a)  This chapter

27   applies only to a user who:

H.B. No. 20

1          (1)  resides in this state;

2          (2)  does business in this state; or

3          (3)  shares or receives expression in this state.

4      (b)  This chapter applies only to expression that is shared

5  or received in this state.

6      (c)  This chapter applies only to a social media platform

7  that functionally has more than 50 million active users in the

8  United States in a calendar month.

9      (d)  This chapter applies to the maximum extent permitted by

10 the United States Constitution and the laws of the United States but

11 no further than the maximum extent permitted by the United States

12 Constitution and the laws of the United States.

13     Sec. 143A.005.  LIMITATION ON EFFECT OF CHAPTER.  This

14 chapter does not subject a social media platform to damages or other

15 legal remedies to the extent the social media platform is protected

16 from those remedies under federal law.

17     Sec. 143A.006.  CONSTRUCTION OF CHAPTER.  (a)  This chapter

18 does not prohibit a social media platform from censoring expression

19 that:

20          (1)  the  social  media  platform  is  specifically

21 authorized to censor by federal law;

22          (2)  is the subject of a referral or request from an

23 organization  with  the  purpose  of   preventing  the  sexual

24 exploitation of children and protecting survivors of sexual abuse

25 from ongoing harassment;

26          (3)  directly incites criminal activity or consists of

27 specific threats of violence targeted against a person or group

12

1 because of their race, color, disability, religion, national origin

2 or ancestry, age, sex, or status as a peace officer or judge; or

3          (4)  is unlawful expression.

4     (b)  This chapter may not be construed to prohibit or

5 restrict a social media platform from authorizing or facilitating a

6 user's ability to censor specific expression on the user's platform

7 or page at the request of that user.

8     (c)  This chapter may not be construed to limit or expand

9 intellectual property law.

10     Sec. 143A.007.  USER REMEDIES.  (a)  A user may bring an

11 action against a social media platform that violates this chapter

12 with respect to the user.

13     (b)  If the user proves that the social media platform

14 violated this chapter with respect to the user, the user is entitled

15 to recover:

16          (1)  declaratory relief under Chapter 37, including

17 costs and reasonable and necessary attorney's fees under Section

18 37.009; and

19          (2)  injunctive relief.

20     (c)  If a social media platform fails to promptly comply with

21 a court order in an action brought under this section, the court

22 shall hold the social media platform in contempt and shall use all

23 lawful measures to secure immediate compliance with the order,

24 including daily penalties sufficient to secure immediate

25 compliance.

26     (d)  A user may bring an action under this section regardless

27 of whether another court has enjoined the attorney general from

13

H.B. No. 20

1 enforcing this chapter or declared any provision of this chapter
2 unconstitutional unless that court decision is binding on the court
3 in which the action is brought.

4 (e)  Nonmutual  issue  preclusion  and  nonmutual  claim
5 preclusion  are  not  defenses  to  an  action  brought  under  this
6 section.

7 Sec. 143A.008.  ACTION BY ATTORNEY GENERAL.  (a)  Any person
8 may  notify  the  attorney  general  of  a  violation  or  potential
9 violation of this chapter by a social media platform.

10 (b)  The attorney general may bring an action to enjoin a
11 violation  or  a  potential  violation  of  this  chapter.   If  the
12 injunction is granted, the attorney general may recover costs and
13 reasonable attorney's fees incurred in bringing the action and
14 reasonable investigative costs incurred in relation to the action.

15 SECTION 8.  (a)  Mindful of *Leavitt v. Jane L.*, 518 U.S. 137
16 (1996), in which in the context of determining the severability of a
17 state statute the United States Supreme Court held that an explicit
18 statement of legislative intent is controlling, it is the intent of
19 the  legislature  that  every  provision,  section,  subsection,
20 sentence,  clause,  phrase,  or  word  in  this  Act,  and  every
21 application of the provisions in this Act, are severable from each
22 other.

23 (b)  If any application of any provision in this Act to any
24 person, group of persons, or circumstances is found by a court to be
25 invalid  or  unconstitutional,  the  remaining  applications  of  that
26 provision to all other persons and circumstances shall be severed
27 and may not be affected.  All constitutionally valid applications

14

1  of this Act shall be severed from any applications that a court
2  finds to be invalid, leaving the valid applications in force,
3  because it is the legislature's intent and priority that the valid
4  applications be allowed to stand alone.

5      (c)  If any court declares or finds a provision of this Act
6  facially unconstitutional, when discrete applications of that
7  provision can be enforced against a person, group of persons, or
8  circumstances without violating the United States Constitution and
9  Texas Constitution, those applications shall be severed from all
10  remaining applications of the provision, and the provision shall be
11  interpreted as if the legislature had enacted a provision limited
12  to the persons, group of persons, or circumstances for which the
13  provision's application will not violate the United States
14  Constitution and Texas Constitution.

15      (d)  The legislature further declares that it would have
16  enacted this Act, and each provision, section, subsection,
17  sentence, clause, phrase, or word, and all constitutional
18  applications of this Act, irrespective of the fact that any
19  provision, section, subsection, sentence, clause, phrase, or word,
20  or applications of this Act, were to be declared unconstitutional.

21      (e)  If any provision of this Act is found by any court to be
22  unconstitutionally vague, the applications of that provision that
23  do not present constitutional vagueness problems shall be severed
24  and remain in force.

25      (f)  No court may decline to enforce the severability
26  requirements of Subsections (a), (b), (c), (d), and (e) of this
27  section on the ground that severance would rewrite the statute or

H.B. No. 20

1  involve the court in legislative or lawmaking activity.  A court

2  that declines to enforce or enjoins a state official from enforcing

3  a statutory provision does not rewrite a statute, as the statute

4  continues to contain the same words as before the court's decision.

5  A judicial injunction or declaration of unconstitutionality:

6            (1)  is  nothing  more  than  an  edict  prohibiting

7  enforcement that may subsequently be vacated by a later court if

8  that court has a different understanding of the requirements of the

9  Texas Constitution or United States Constitution;

10            (2)  is not a formal amendment of the language in a

11  statute; and

12            (3)  no more rewrites a statute than a decision by the

13  executive not to enforce a duly enacted statute in a limited and

14  defined set of circumstances.

15       SECTION 9.  Chapter 143A, Civil Practice and Remedies Code,

16  as added by this Act, applies only to a cause of action that accrues

17  on or after the effective date of this Act.

18       SECTION 10.  This Act takes effect on the 91st day after the

19  last day of the legislative session.

21-51178.81

H.B. No. 20

_____          _____
President of the Senate                    Speaker of the House

I certify that H.B. No. 20 was passed by the House on August 30, 2021, by the following vote:  Yeas 77, Nays 49, 1 present, not voting; and that the House concurred in Senate amendments to H.B. No. 20 on September 2, 2021, by the following vote:  Yeas 78, Nays 42, 1 present, not voting.

_____
Chief Clerk of the House

I certify that H.B. No. 20 was passed by the Senate, with amendments, on August 31, 2021, by the following vote:  Yeas 17, Nays 14.

_____
Secretary of the Senate

APPROVED: ___9 - 7 - 21___

Date

_____
Governor

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
7 pm O'CLOCK

SEP 09 2021

_____
Secretary of State

21-51178.82

## CERTIFICATE OF SERVICE

On March 2, 2022, these record excerpts were served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Ryan S. Baasch
RYAN S. BAASCH