**No. 21-51178**

# In the United States Court of Appeals
## for the
# Fifth Circuit

NetChoice, L.L.C., a 501(c)(6) District of Columbia organization doing business as NetChoice; Computer & Communications Industry Association, a 501(c) (6) non-stock Virginia Corporation doing business as CCIA,

*Plaintiffs-Appellees,*

*v.*

Ken Paxton,
in his official capacity as Attorney General of Texas,

*Defendant-Appellant.*

———————

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
Civil Action No. 1:21-cv-00840-RP

———————

**BRIEF OF *AMICUS CURIAE* PROFESSOR PHILIP HAMBURGER
IN SUPPORT OF DEFENDANT-APPELLANT**

Kyle Singhal
HOPWOOD & SINGHAL, PLLC
1701 Pennsylvania Ave., N.W.
Washington, DC 20006
Tel: (817) 212-9041
kyle@hopwoodsinghal.com

*Counsel for Prof. Philip Hamburger*

## STATEMENT OF IDENTITY AND INTEREST
## AND CORPORATE DISCLOSURES

Pursuant to the applicable provisions in Fed. R. App. P. 26.1, 27, 29 and 32 and this Court's local rules, *amicus* provides this Supplemental Statement of Identity and Interest and Corporate Disclosure.

*Amicus Curiae* Professor Philip Hamburger authored this brief in its entirety. No party's counsel authored this brief, in whole or in part, or contributed money intended to fund the preparation or submission of this brief. No person other than *amicus* or his counsel contributed money to fund preparation or submission of this brief.

Counsel for all parties have consented to the filing of this brief.

*Amicus* writes this brief not only to express his views on his own behalf but also on behalf of all Texans who depend upon social media platforms to communicate about politics, art, culture, religion, science, civic life, school, family, and business. The internet is, as the Supreme Court has recognized, the "modern public square." *Packingham v. North Carolina,* 137 S. Ct. 1730, 1737 (2017).

Nonetheless, censorious gatekeepers circumscribe this square, eliminating and silencing views with which they disagree. As a result, voters receive inadequate information, minority religious and cultural views are suppressed, and vital scientific data and dissenting scientific opinion cannot be disseminated. Not only are nonconforming views scrubbed, but often those who take such perspectives are

permanently deplatformed—in effect, depersoned for purposes of effective public speech. The State of Texas has a profound interest in protecting vibrant political, religious, cultural, and scientific debate. HB 20 protects that interest—to which *amicus* is dedicated.

*Amicus* is a scholar of constitutional law and its history at Columbia Law School. He received his bachelor's degree from Princeton University and his J.D. from Yale Law School. Before coming to Columbia, he was the John P. Wilson Professor at the University of Chicago Law School. He also taught at George Washington University Law School, Northwestern Law School, University of Virginia Law School, and the University of Connecticut Law School. Professor Hamburger's contributions are unrivaled by any U.S. legal scholar in driving the national conversations on the First Amendment and the separation of church and state and on administrative power. He has written on the history of the freedom of the press, on current censorship of scientific inquiry and publication, and on the federal privatization of censorship. His work on has been celebrated by organizations like the American Society for Legal History, the Manhattan Institute, and the Bradley Foundation, among others, and he has been elected a member of the American Academy of Arts and Sciences.

While *Amicus* generally opposes excessive and unlawful government regulation, he believes that the State of Texas has an appropriate and lawful role in

protecting against discrimination and preserving vibrant political, scientific, religious, and cultural discourse. From the beginning of the Republic, state governments have had the power to require certain industries to serve the public without discrimination. HB 20 relies upon this power, which courts have accepted for centuries, to protect the open exchange of expression by regulating the dominant social media platforms that most clearly are common carriers.

*Amicus* has a direct interest in the outcome of this case because he relies upon social media as a primary avenue for learning and for his own communication. So, he looks to the Texas social media law to preserve at least one jurisdiction that is free from viewpoint discrimination by the major social media platforms.

The above-stated interests and issues are relevant to this court's resolution of this appeal. Therefore, *Amicus* hereby respectfully submits the attached *amicus curiae* brief to aid this court in its review of the district court's decision and in support of Appellant's appeal.

 Respectfully submitted,

/s/ Kyle Singhal
Kyle Singhal
HOPWOOD & SINGHAL, PLLC
1701 Pennsylvania Ave., N.W.
Washington, DC 20006
Tel: (817) 212-9041
kyle@hopwoodsinghal.com
*Counsel for Prof. Philip Hamburger*

# TABLE OF CONTENTS

Table of Contents ................................................................................. i

Index of Authorities ........................................................................... ii

Summary of Argument ........................................................................ 1

Argument ............................................................................................. 3

    I.  The Platforms Are Common Carriers and Can Be Regulated Without Violating the First Amendment ......................................................... 3

        A. Social Media Platforms May Lawfully Be Designated Common Carriers ............................................................................................. 4

        B. Texas's Regulation of the Platforms as Common Carriers Complies with the First Amendment ................................................................ 10

        C. Existing Discrimination Is No Excuse for Violating Common Carrier Nondiscrimination Duties ...................................................... 14

    II.  Texas Has a Compelling Interest in Preventing Viewpoint Discrimination, Whereas the Platforms Have No Corresponding Speech Interest ............................................................................................... 17

        A. The State Has a Compelling Interest in Preventing Viewpoint Discrimination, and HB 20 Is a Narrowly Tailored Regulation ......... 18

        B. Common Carriers Have No Speech Interest in Suppressing the Views of Others Conveyed in Their Conduits .................................... 20

        C. The Platforms Have No Speech Interest in Carrying Out Privatized Government Censorship .................................................................... 21

    III.  HB 20 Does Not Conflict with Section 230(c)(2) .................................. 23

        A. Whereas Section 230(c)(2) Protects Platforms for Content Discrimination, HB 20 Merely Bars Viewpoint Discrimination ........ 24

        B. Whereas Section 230(c)(2) Protects Against Actions for Damages, HB 20 Provides Only Non-Damages Remedies ................................. 26

Conclusion ........................................................................................... 27

Certificate of Service ........................................................................... 28

Certificate of Compliance .................................................................... 30

i

# INDEX OF AUTHORITIES

## Cases

*Biden v. Knight First Amend. Inst. at Columbia Univ*., 141 S. Ct. 1220 (2021).......8

*Cir. City Stores, Inc. v. Adams*, 532 U.S. 105 (2001)...............................................24

*Denver Area Ed. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727 (1966) ........14

*Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964)........................6

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995)
...........................................................................................................................20

*Katzenbach v. McClung*, 379 U.S. 294 (1964) ...........................................................6

*Lane v. Cotton* [1700] 88 Eng. Rep. 1458 ...............................................................16

*Marsh v. Alabama*, 326 U.S. 501 (1946) ...................................................................4

*Messenger v. Pa. R.R. Co.*, 36 N.J.L. 407 (1873).......................................................8

*Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974)................................ 12, 20

*Missouri Pac. Ry. v. Larabee Flour Mills Co.*, 211 U.S. 612 (1909).......................10

*Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 525 F.2d 630 (D.C. Cir. 1976) ......5, 8

*NetChoice, LLC v. Paxton*, No. 21-cv-840-RP, 2021 WL 5755120 (W.D. Tex.
Nov. 22, 2021) ....................................................................................................15

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117 (1991).........24

*Packingham v. North Carolina,* 137 S. Ct. 1730 (2017) ...........................................8

*Primrose v. W. Union Tel. Co.*, 154 U.S. 1 (1894)...................................................11

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992)...................................................................25

*Rollins v. Home Depot USA*, 8 F.4th 393 (5th Cir. 2021) ........................17

*Scofield v. Lake Shore & Mich. S. Ry.*, 3 N.E. 907 (Ohio 1885)............................10

*State ex rel. Webster v. Neb. Tel. Co.*, 22 N.W. 237 (Neb. 1885) ..........................11

*The Civil Rights Cases*, 109 U.S. 3 (1883) ..................6

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ...........................12

*United States v. Lopez*, 514 U.S. 1995 (1995)..............................23

*United States v. Morrison*, 529 U.S. 598 (2000) .......................23

*U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016)....................12

*Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014)............................7

*W. Union Tel. Co. v. Call Publ'g Co.*, 181 U.S. 92 (1901) ....................11

*Williamson v. Lee Optical, Inc.*, 348 U.S. 483 (1955)..........................9

**Statutes**

18 U.S.C. § 2339b ...........................21

47 U.S.C. § 151 ...........................9

47 U.S.C. § 153 ...........................6

47 U.S.C. § 201 ...........................15

47 U.S.C. § 230 ........................... *passim*

Tex. H.B. 20 ........................... *passim*

**Other Authorities**

Adam Candeub & Eugene Volokh, *Interpreting 47 U.S.C. § 230(c)(2)*, 1 J. Free
    Speech L. 175 (2021)..........................24

Charles K. Burdick, *The Origin of the Peculiar Duties of Public Service Companies*, 11 Colum. L. Rev. 514 (1911) ........................................................................ 8, 16

Charles M. Haar & Daniel Wm. Fessler, *The Wrong Side of the Tracks: A Revolutionary Rediscovery of the Common Law Tradition of Fairness in the Struggle Against Inequality* (1986)........................................................................5

Federal Rule of Civil Procedure 26(a)(2)(B) Expert Witness Report of Adam Candeub, *NetChoice, LLC v. Paxton*, No. 21-cv-00840-RP (W.D. Tex. Nov. 22, 2021).............................................................................................................................5

Fred H. Cate, *Telephone Companies, the First Amendment, and Technological Convergence*, 45 DePaul L. Rev. 1035 (1996).....................................................10

Genevieve Lakier, "The Non-First Amendment Law of Freedom of Speech," 134 Harv. L. Rev. 2299 (2021) ....................................................................................12

John Stuart Mill, *On Liberty* (London, John W. Parker & Son 1859)................ 3, 19

Philip Hamburger, *The Constitution Can Crack Section 230*, Wall St. J. (Jan. 29, 2021)......................................................................................25

Philip Hamburger, "The Development of the Law of Seditious Libel and the Control of the Press," 37 Stan. L. Rev. 661 (1985) ...........................................................22

*Tech CEOs Senate Testimony Transcript Oct. 28, 2020* (Oct. 28, 2020)..................7

Tim Wu, Brookings Inst., Is Filtering Censorship? The Second Free Speech Tradition 2 (2010), at https://www.brookings.edu/ research/is-filtering-censorship-the-second-free-speech-tradition........................................................12

# SUMMARY OF ARGUMENT

HB 20 is constitutional. The arguments to the contrary misapply existing precedent or bypass relevant legal principles.

First, common carrier regulation of the sort adopted by the statute is entirely consistent with the First Amendment. Under centuries-old precedent that no court has ever questioned, Texas has the power to regulate the social media platforms covered by H.B. 20 ("the Platforms") as common carriers.

Second, Texas has a compelling interest in protecting the free exchange of expression, and HB 20 is narrowly tailored to that interest. Such an interest, however, is unnecessary to defend HB 20, because the Platforms have little or no speech interest here. They are affected only in their role as common carriers or conduits for other people's speech, not their own speech. Moreover, to the extent the Platforms enjoy section 230 immunity for silencing speech on their conduits, *see* 47 U.S.C. § 230, they are censoring the speech under color of federal law. They have no free speech interest in this *federally* privatized censorship, and, even if they had such an interest, it would be of no avail against the *state's* compelling interest in protecting free expression.

Third, HB 20 does not conflict with 47 U.S.C. § 230(c)(2). That federal section protects platforms from liability, in the sense of damages, for restricting

material that falls into specified categories of content. But HB 20 bars only viewpoint discrimination, not content discrimination, and it provides for declaratory and injunctive relief, not damages. It thus is entirely consistent with section 230.

## ARGUMENT

### I.    The Platforms Are Common Carriers and Can Be Regulated Without Violating the First Amendment

John Stuart Mill, in his *On Liberty* (1859), observed that the tyranny of government was often matched by the tyranny of the majority. A majority, or those who act in its name, can threaten free speech not only through government but also, even more effectively, through the private efforts of those in the society who demand conformity:

> Like other tyrannies, the tyranny of the majority was at first, and is still vulgarly, held in dread, chiefly as operating through the acts of the public authorities. But reflecting persons perceived that when society is itself the tyrant—society collectively, over the separate individuals who compose it—its means of tyrannizing are not restricted to the acts which it may do by the hands of its political functionaries.

John Stuart Mill, *On Liberty* 13 (London, John W. Parker & Son 1859). Therefore, quite apart from any limits on government censorship, society needed limits on nongovernmental suppression:

> Protection, therefore, against the tyranny of the magistrate is not enough: there needs protection also against the tyranny of the prevailing opinion and feeling; against the tendency of society to impose, by other means than civil penalties, its own ideas and practices as rules of conduct on those who dissent from them . . . . There is a limit to the legitimate interference of collective opinion with individual independence: and to find that limit, and maintain it against encroachment, is as indispensable to a good condition of human affairs, as protection against political despotism.

*Id.* at 13-14. Like Mill, this Court faces the difficulty of discerning the limits on

private assaults on private freedom—in this case, the statutory limits on private suppression of private speech. Unlike Mill, this Court does not face the difficulty as a philosophical problem. Rather, the question must be solved more concretely as a matter of law, and for that the law supplies valuable tools, such as the doctrine on common carriers.

Common carrier law has always existed in America. As applied to communications carriers, it recognizes that some firms offer conduits for expression that must be nondiscriminatory. Although the firms are private, their conduits are open to the public and serve a public function, and for these and other reasons must be offered without discrimination. The anti-discrimination requirement is compatible with the First Amendment because, far from limiting the speech of the companies, it protects the openness of their conduits for the speech of others. This old and conventional common carrier doctrine clearly justifies HB 20's common carrier regulation of the Platforms.[1]

### A. Social Media Platforms May Lawfully Be Designated Common Carriers

The Platforms are the sort of enterprises that can be subjected to common carrier regulation, including anti-discrimination requirements. This is evident from

---

[1] Quite apart from common carrier doctrine, the Supreme Court has held that private companies can be public forums. *See Marsh v. Alabama*, 326 U.S. 501, 509–10 (1946) (holding a company town to be a public forum). But because the Platforms are common carriers, there is no need to decide that they are public forums.

both the history and the logic of common carrier doctrine.

Since medieval times, common carriers and public accommodations have been barred from discriminating—as Professor Adam Candeub, the leading scholar on the history of common carriage, described in his expert opinion in the district court. *See* Federal Rule of Civil Procedure 26(a)(2)(B) Expert Witness Report of Adam Candeub 3–8, *NetChoice, LLC v. Paxton*, No. 21-cv-00840-RP (W.D. Tex. Nov. 22, 2021). Common carriage law was the beginning of anti-discrimination law. Indeed, common carrier regulation inspired and formed the foundation of modern civil rights laws. *See* Charles M. Haar & Daniel Wm. Fessler, *The Wrong Side of the Tracks: A Revolutionary Rediscovery of the Common Law Tradition of Fairness in the Struggle Against Inequality* 15 (1986).

Common carriers have been defined narrowly or broadly, depending on the extent of the regulation. For purposes of rate setting and other relatively intrusive regulation, common carriers have been defined relatively narrowly, often focusing on essential industries with market dominance. *See, e.g.*, *Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 525 F.2d 630, 641–45 (D.C. Cir. 1976) (defining common carrier status for telephones). But for anti-discrimination purposes, common carriers (and the associated category of public accommodations) have been defined more broadly—by function, not dominance—to include all conveyances and accommodations that serve the public, for example, innkeepers and restaurants. *See,*

*e.g.*, *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 284 (1964) ("[I]nnkeepers, 'by the laws of all the States, so far as we are aware, are bound, to the extent of their facilities, to furnish proper accommodation to all unobjectionable persons who in good faith apply for them.'" (quoting *The Civil Rights Cases*, 109 U.S. 3, 25 (1883)); *Katzenbach v. McClung*, 379 U.S. 294, 302–05 (1964) (regarding restaurants).

Here, because only the dominant social media platforms are covered—not to mention that communications networks have been regulated for centuries as common carriers—the affected Platforms are well within even narrow conceptions of common carriers. There consequently is no question that Texas has legislative power to impose the mild informational and nondiscrimination requirements found in HB 20.

No one doubts that social media companies are communications firms that carry expression, and communications companies have long been regulated as common carriers. By way of illustration, the Communications Act of 1934, which established the Federal Communications Commission, contains this definition: "The term 'common carrier' or 'carrier' means any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission . . . ." 47 U.S.C. § 153(11).

In section 230, Congress recognized that the Platforms and other social media

firms function as common carriers of communications. Passed as part of the Telecommunications Act of 1996, section 230 protects social media platforms from being treated as "the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The section recognizes that the Platforms act as conduits for "information" provided by others. And as with common carriers, the section exempts the Platforms from liability for carrying unlawful information on behalf of their users. The Platforms have vigorously pursued this common-carriage liability exemption in the courts and have assiduously urged Congress not to ditch it. *See, e.g.*, *Tech CEOs Senate Testimony Transcript Oct. 28, 2020*, at 19:11 (Oct. 28, 2020), https://www.rev.com/blog/transcripts/tech-ceos-senate-testimony-transcript-october-28 (statement of Jack Dorsey); *id.* at 32:52–34:32, 2:44:39 (statements of Mark Zuckerberg).

Beyond bearing an unmistakable similarity to other types of communications providers that are regulated as common carriers, such as telegraph and telephone companies, social media firms easily satisfy the explicit common carrier tests set forth by the courts. When a company serves a public function and offers its services to the public, it can qualify as a common carrier merely on this account—so even a small bus company can be treated as a common carrier. This test involves only "[t]he common law requirement of holding oneself out to serve the public indiscriminately." *Verizon v. FCC*, 740 F.3d 623, 651 (D.C. Cir. 2014) (quoting

*Nat'l Ass'n of Regul. Util. Comm'rs*, 525 F.2d at 642). Another test is market dominance, which exists when the services of one or a few companies are so prevalent as to leave the public with little alternative.

The Platforms meet both definitions. First, they serve a public function, providing the communications conduit for the information age, and they offer their services to anyone who opens an account. The internet is the "modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017).

Second, the Platforms enjoy sufficient market dominance to be recognized as common carriers. *See Biden v. Knight First Amend. Inst. at Columbia Univ*., 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring) (noting that, like utilities, "today's dominant digital platforms derive much of their value from network size").

Yet another way of thinking about what makes a common carrier is that it receives numerous government privileges—with the expectation that it will serve the public. A government franchise or other similar privilege comes with corresponding duties. As put over 100 years ago, "In the use of such franchises all citizens have an equal interest and equal rights, and all must, under the same circumstances, be treated alike." Charles K. Burdick, *The Origin of the Peculiar Duties of Public Service Companies*, 11 Colum. L. Rev. 514, 531 (1911) (quoting *Messenger v. Pa. R.R. Co*., 36 N.J.L. 407, 413 (1873)). In this instance, the Platforms have benefited profoundly from government, most notably from section 230(c),

which gives them an immunity not enjoyed by those who engage in communication through print or in person. So great a privilege, like a franchise, subjects the Platforms to common carrier duties.[2]

For any and all of these reasons—the Platforms' function, market dominance, and privileged status—the Platforms undoubtedly qualify as common carriers and can be regulated as such. Indeed, HB 20 begins with legislative findings that "social media platforms function . . . as common carriers . . . and have enjoyed governmental support in the United States," and that the "social media platforms with the largest number of users are common carriers by virtue of their market dominance." HB 20 § 1(3)–(4). This statutory recognition that they are common carriers, who can be barred from discriminating, cannot simply be ignored by a district court.

Nonetheless, that is what the district court did. It declared that "HB 20's pronouncement that social media platforms are common carriers . . . does not impact this Court's legal analysis." Dist Ct. Op, 15. This is astonishing, for courts must uphold the legislature's determination, unless the statutory determination is so arbitrary and capricious as to be without a rational basis. *See Williamson v. Lee*

---

[2] Another of their privileges is unprecedented special tax treatment. The Internet Tax Freedom Act (ITFA). Pub. L. No. 105-277, 112 Stat. 2681-719 (1998). ITFA prohibits states from taxing "internet access." Because ITFA's definition of "internet access" encompasses most online platforms, 47 U.S.C. § 151, ITFA shields social media platforms from most state taxation on the services they provide.

*Optical, Inc.*, 348 U.S. 483, 491 (1955). As has been seen, this legislative determination is far from being without rational basis. Indeed, it is eminently justified by the platforms' function, market dominance, and privileged status.

### B. Texas's Regulation of the Platforms as Common Carriers Complies with the First Amendment

HB 20 is consistent with the First Amendment's speech and press guarantee because the Platforms are in fact common carriers. Not only as determined by the legislature but also in reality, the Platforms serve as conduits for the speech of others. So, in barring the Platforms from discriminating in those conduits on the basis of viewpoint, HB 20 does not restrict their speech.

Barring discrimination in such conduits is the most basic purpose of common carrier doctrine, and it is clearly and unequivocally constitutional for a state civil rights statute to forbid viewpoint discrimination by communications common carriers. *See* Fred H. Cate, *Telephone Companies, the First Amendment, and Technological Convergence*, 45 DePaul L. Rev. 1035, 1037 & n.14 (1996) (first citing *Missouri Pac. Ry. v. Larabee Flour Mills Co.*, 211 U.S. 612, 619 (1909) ("This lies at the foundation of the law of common carriers. Whenever one engages in that business, the obligation of equal service to all arises, and that obligation . . . can be enforced by the courts."); then citing *Scofield v. Lake Shore & Mich. S. Ry.*, 3 N.E. 907, 919 (Ohio 1885) ("The duty to receive *and* carry was due to every member of the community, and in an equal measure to each.")).

Each new communications technology has been subject to common carrier non-discrimination regulation without violating the First Amendment. This was true of the telegraph. *Primrose v. W. Union Tel. Co.*, 154 U.S. 1, 14 (1894) (holding that telegraphs, because they "resemble[d] railroad companies and other common carriers," were "bound to serve all customers alike, without discrimination"). It was true of the telephone. *W. Union Tel. Co. v. Call Publ'g Co.*, 181 U.S. 92, 100 (1901) ("As a consequence of [public service], all individuals have equal rights both in respect to service and charges."); *State ex rel. Webster v. Neb. Tel. Co.*, 22 N.W. 237, 239 (Neb. 1885) (holding that a telephone company, as a common carrier, must provide service to all customers without discrimination). Today, it is true of social media platforms.

Whenever common carrier status was applied to a new communications technology, the affected companies protested that they were different and so should not be considered common carriers. Here, the social media firms are doing the same. But the Platforms clearly qualify and so can be barred from discriminating without violating the First Amendment. (If they not are not common carriers and so are not subject to anti-discrimination regulation, then that also must be true for telephones, radio, and other information conduits.)

Far from threatening the First Amendment, the application of common carrier laws to communications companies is understood to have created a "second free

speech tradition." Tim Wu, Brookings Inst., Is Filtering Censorship? The Second Free Speech Tradition 2 (2010), at https://www.brookings.edu/ research/is-filtering-censorship-the-second-free-speech-tradition. To be precise, "a rich body of common carrier and quasi–common carrier law prevented many of these companies from engaging in viewpoint discrimination or otherwise threatening the interests that the First Amendment protects." Genevieve Lakier, "The Non-First Amendment Law of Freedom of Speech," 134 Harv. L. Rev. 2299, 2319 (2021).

The underlying reasoning why anti-discrimination laws do not violate the First Amendment rights of common carriers is that the companies serve as conduits for the speech of others. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 629 (1994); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (both regarding "conduit"). Because common carriers carry the speech of others, "Equal access obligations . . . have long been imposed on telephone companies, railroads, and postal services, without raising any First Amendment issue." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 740 (D.C. Cir. 2016) (citations omitted). Little First Amendment concern exists because common carriers "merely facilitate the transmission of speech of others." *Id.* at 741.

Indeed, the Platforms themselves repeatedly assert that they carry only the speech of others. Section 230(c)(1) protects the Platforms from being treated as the "publisher or speaker of any information provided by another." 47 U.S.C.

§ 230(c)(1). Relying on this provision to insist that the speech they carry is not their speech, the Platforms have secured extensive protection from being held liable.

The Platforms want to have their cake and eat it too. They cannot claim that they convey only third-party speech for section 230 immunity and then claim that speech as their own for First Amendment purposes.

Not merely their position, this is federal law. Section 230(c)(1) states that they shall not be "treated" as "the publisher or speaker of any information provided by another information content provider" 47 U.S.C. §230(c)(1). So this Court cannot treat them as publishers unless that section is unconstitutional. But that isn't what the Plaintiffs are arguing.

The mistake in is assuming that the Platforms are being barred from expressing themselves in their own speech. In fact, they are being prohibited from discriminating against the speech of others that runs through the Platforms' open conduits. Newspapers select and publish their articles; their articles pages are not open to the public to post their own articles. So a newspaper is speaking for itself when it makes editorial decisions about letters and other outside contributions. In contrast, the Platforms open up their conduits to members of the public to convey their speech. Only after (in many instances, long after) individuals say something "objectionable" do the Platforms kick some of them off.

Put differently, a publisher's editorial discretion comes before anyone can

publish in their publications. This prior editing is jealously guarded because what a newspaper or other publisher publishes under its name is its expression. The Platforms do the opposite. They broadly allow members of the public to express themselves on their platforms, and only later do the Platforms remove some individuals' posts. That is not editing the Platforms' speech but excluding the speech of others.[3]

The social media companies themselves say they offer "platforms," not "publications." A platform is a place to be occupied by the public, a publication ordinarily is not.

So, when Texas forbids the Platforms from discriminating against speech on grounds of viewpoint, it is protecting the public's speech, not limiting the speech of the Platforms.[4]

### C. Existing Discrimination Is No Excuse for Violating Common Carrier Nondiscrimination Duties

The district court and Plaintiffs brush aside the common carrier argument by claiming that social media engage in discriminatory "editorializing" and, therefore,

---

[3] Similarly, a private club with selective membership can discriminate, but a store that allows members of the public to enter the premises can be barred from discriminating.

[4] Of course, if a Platform chooses to convey only limited types of content, it can have a First Amendment right against being forced to carry other content. *See Denver Area Ed. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727 (1996) (regarding indecent content). But that is not the question here, where the Platforms are open for wide ranging content and are merely being barred from discriminating against persons and their expression on the basis of their viewpoint.

cannot be treated as common carriers. The district court opined that it "starts from the premise that social media platforms are not common carriers" and justifies this startling and conclusory claim with the assertion that "social media platforms 'are not engaged in indiscriminate, neutral transmission of any and all users' speech.'" *NetChoice, LLC*, 2021 WL 5755120, at *8 (citing *U.S. Telecom Ass'n*, 825 F.3d at 742). (The quotation is puzzling, as it comes from a case that upheld the FCC's network neutrality rule issued pursuant to its authority to regulate common carriers under 47 U.S.C. § 201 and does not even mention social media platforms.)

But a company's existing discrimination does not mean that it cannot be barred from discriminating as a common carrier. If that strange standard were to prevail, then states could never bar racial, sexual, or viewpoint discrimination by common carriers. Such as a result defies both common sense and the law.

Common carriers have long been said to be companies that hold themselves out to the public for business. The Platforms absurdly twist this legal proposition, arguing that because they kick users off their platforms or otherwise discriminate against them, they cannot be holding themselves out to the public. But the holding-out standard for determining whether a company can be considered a common carrier is not the same as the duty of common carriers not to discriminate, and the two shouldn't be conflated.

To hold out oneself out to the public merely means to offer one's services to

the public, even if not all the public. It was in this sense that the Heart of Atlanta Motel held itself out to the public and so could be regulated as a public accommodation. Similarly, railways, bus companies, and communications carriers can be regulated as common carriers. The point isn't that they don't discriminate, but that they offer services to the public and so can be barred from discriminating.

The Platforms also attempt to escape their common carrier status on the theory that their services are particularized. But so are the services of a railway company. Members of the public can select particular routes, times, and classes of car and even can rent their own car. But the offer of such services to the public means that the company can be considered a common carrier.

As put long ago by Burdick, "a person, by holding himself out to serve the public generally, assumed two obligations," one of which was "to serve all who applied." Burdick, *supra*, at 518. Even earlier, Lord Chief Justice Holt explained that "one engaged in a common calling" has taken "upon himself a public trust for the benefit of the rest of his fellow-subjects" and has "made profession of a trade which is for the public good"—that he has "made profession of a public employment." *Lane v. Cotton* [1700] 88 Eng. Rep. 1458, 1464–65. Thus, "If an innkeeper refuse to entertain a guest where his house is not full, an action will lie against him, and so against a carrier, if his horses be not loaded, and he refuse to take a packet proper to be sent by a carrier . . . ." *Id.* This was an anti-discrimination duty imposed by law,

regardless of the previous propensity of a carrier to discriminate.

* * * *

For all the reasons recited above, the Platforms are common carriers, and being conduits for the speech of others, they can constitutionally be barred from engaging in viewpoint discrimination. Far from interfering with the Platforms' own speech, HB 20 requires them not to discriminate against other people's speech in conduits that the Platforms open to the public. This is well within established common carrier doctrine—a doctrine that has long been applied to communications carriers without violating the First Amendment.

## II.    Texas Has a Compelling Interest in Preventing Viewpoint Discrimination, Whereas the Platforms Have No Corresponding Speech Interest

Government has a central role in defending civil liberties, including a profound interest in protecting the open exchange of expression. HB 20 itself declares that "this state has a fundamental interest in protecting the free exchange of ideas and information in this state." HB 20, § 1(2).[5] This openness in sharing ideas and information is the essential foundation of political freedom, scientific progress,

---

[5] Plaintiffs suggest, on the basis of *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021), that the compelling government interest argument was not raised in the district court and so has been forfeited. But even if the point had not been raised the district court, it would not be forfeited. The logic of *Rollins* does not apply to the accelerated proceedings for preliminary injunctions. Moreover, the compelling interest was asserted by the statute itself, so a court must take notice of that interest in evaluating the statute.

artistic and cultural excellence, and much else that is invaluable. So, Texas has an interest of the highest order in adopting this statute.

But such an interest, although compelling, is not needed to justify HB 20. On the contrary, as discussed below, the compelling government interest test is inapplicable, because communications common carriers do not have a constitutional interest in the speech they carry for others, and because the Platforms are acting under color of federal law, sometimes even at the behest of government officials, when they silence disfavored viewpoints.

## A. The State Has a Compelling Interest in Preventing Viewpoint Discrimination, and HB 20 Is a Narrowly Tailored Regulation

Protecting freedom of debate is one of the most fundamental state interests, and HB 20 is narrowly tailored to protect that interest. All that is valuable depends on open inquiry and exchange of opinion. Free and unfettered discussion is essential for political knowledge and accountability, for religious inquiry, and for cultural and scientific progress. Without freedom of speech, government itself would lose its legitimacy. So, when much of the nation's political, religious, cultural, and scientific debate has ended up on the Platforms, the states have a deep, even existential, interest in barring viewpoint discrimination.

This is especially clear because section 230 privileges social media (over print media and in-person communication) to censor Americans and the content they produce, "whether or not such material is constitutionally protected."

47 U.S.C. § 230(c)(2)(A). This is *federally* privatized censorship. It therefore is crucial to recognize the *state* interests in protecting speech.

That states have a compelling interest in barring privatized censorship is familiar from John Stuart Mill's great book *On Liberty*. Worried primarily about private penalties on opinion (as noted at the top of this argument), Mill explained how such penalties ground down individuality and deprived society of the freedom that was the source of its moral and other progress. Such penalties dampened not only the efforts of "great thinkers" but also the mental advancement of "average human beings." Mill, *supra*, at 62. Especially in a nation such as ours, in which we aspire to govern ourselves, all of us need freedom of inquiry and debate.

HB 20 is narrowly tailored to this overriding interest. The statute merely seeks disclosure and bars viewpoint discrimination. *See* HB 20 §§ 120.051, 143A.002. It doesn't bar content discrimination. It doesn't indulge in rate setting or other severe common carrier regulations. It affects only those platforms that most clearly are common carriers—those that qualify by both function and dominance. *See id.* §§ 120.001–.002. And it permits only injunctive and declaratory relief, not damages or penalties. *Id.* § 143A.007(b). It thus fits the state's existential interest very tightly.

### B. Common Carriers Have No Speech Interest in Suppressing the Views of Others Conveyed in Their Conduits

Notwithstanding that there is a compelling government interest in protecting open debate, a compelling interest is more than is needed to defend HB 20. The reason is that the Platforms' speech interests here are at best minimal. This may initially seem surprising, but it follows from the intersecting logic of the First Amendment and common carrier doctrine.

The Platforms have little or no First Amendment speech interest here because (as already suggested) they are affected only in their role as conduits for other people's speech, not their own speech. Of course, they may have a personal or economic interest in suppressing some views and permitting others. But because the speech they suppress is not theirs, they do not have a constitutionally recognized interest in it as their own speech. So they cannot have a speech interest in discriminating against minority or otherwise objectionable viewpoints.

The government interest in protecting speech cannot defeat the right of newspapers or private parade organizers to choose what or whom they will include. *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 257–58 (1974) (newspapers); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 572–73 (1995) (private parade organizers). But common carriers, being conduits for the speech of others, have no speech right in excluding the speech of others. They therefore can be barred from such misconduct without even getting to the question

20

of a compelling government interest.

The Platforms say the statute's ban on viewpoint discrimination will bar them from taking down all sort of bad speech, including pornography, terrorist propaganda, and Holocaust denial. But the Platforms protest too much. They widely permit pornography while barring the speech of public officials and witnesses in congressional hearings. When it comes to terrorist speech, federal law already prohibits the Platforms from providing material support for terrorist organizations (including hosting their accounts and videos). 18 U.S.C. § 2339b. As for Holocaust denial, although amicus has distinctively personal reasons to consider it regrettable, it is part of free debate and should not be used as a bogey man to excuse what actually is at stake—namely, the suppression of domestic political, religious, and scientific dissent.

HB 20's common carrier approach mimics the First Amendment's barrier to viewpoint discrimination. And in providing conduits, the Platforms cannot have a speech interest in suppressing the speech of others.

### C. The Platforms Have No Speech Interest in Carrying Out Privatized Government Censorship

Accentuating this point—that the Platforms lack any First Amendment speech interest in shutting down speech—is that the federal government is using the Platforms to privatize censorship. Private companies have no First Amendment speech interest in effectuating government suppression.

Seventeenth-century English censorship was run through private entities (the Universities and the Stationers Company), *see generally* Philip Hamburger, "The Development of the Law of Seditious Libel and the Control of the Press," 37 Stan. L. Rev. 661 (1985), and this was the primary example of what was forbidden by the First Amendment's speech and press guarantee. Now, Congress, through section 230, has privileged social media companies from legal recourse when they restrict material in accord with a congressional list of disfavored materials. This doesn't mean the companies are violating the First Amendment. But it does indicate that the federal government, in working through private companies, is abridging the freedom of speech and that the companies are cooperating. Entities that are privileged by government to restrict speech "whether or not such material is constitutionally protected," 47 U.S.C. § 230(c)(2)(a), cannot claim to have a free speech interest in such suppression.

Also relevant is the growing evidence that the Platforms sometimes suppress expression at the behest of state and federal officials. Again, the point is not that the Platforms are violating the First Amendment; they are private actors. But they cannot have a First Amendment speech interest in censoring fellow Americans in response to demands from government.

\* \* \* \*

Texas's interest goes far beyond what is required to uphold its anti-discrimination statute. This is especially clear because the Platforms have no free speech interest in stifling the speech of others or in carrying out privatized government censorship.[6]

## III.    HB 20 Does Not Conflict with Section 230(c)(2)

HB 20 targets viewpoint discrimination, not content discrimination. Also, it provides for declaratory and injunctive relief, not damages. Either ground is a full defense against any conflict with section 230(c)(2).

---

[6] In light of the federal privatization of censorship through section 230, this Brief emphasizes that not only the federal government but also each state has a compelling interest in protecting the unfettered exchange of expression. Relatedly, it must be added that HB 20 doesn't violate the Supreme Court's Dormant Commerce Clause doctrine.

First, that doctrine applies only when the commerce power is actually dormant, not when, as here, Congress has acted under that power in section 230, and in section 230(e)(3) has expressly recited that it shall not be construed to prevent any state from enforcing consistent state law.

Second, the doctrine doesn't apply here because HB 20 does not directly regulate commerce. In a pair of cases—*United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000)—the Supreme Court held that Congress cannot use the commerce power to regulate activities so remote from commerce that their regulation does not directly regulate interstate commerce. Similarly, if the Dormant Commerce Clause doctrine really is an implication of the commerce power, it cannot be used to displace a state law that does not directly regulate interstate commerce. HB 20 merely protects the free exchange of expression; it does not directly regulate interstate commerce. It therefore lies outside the reach of the Dormant Commerce Clause doctrine.

Third, the Plaintiffs' Dormant Commerce Clause claims prove too much, as they would leave social media platforms largely outside the regulatory jurisdiction of any state.

Fourth, the Platforms have already accommodated the demands for censorship made by China, so they should not have undue difficulty meeting Texas's demand for uncensored expression.

## A. Whereas Section 230(c)(2) Protects Platforms for Content Discrimination, HB 20 Merely Bars Viewpoint Discrimination

Section 230(c)(2) protects interactive computer services in restricting various categories of content, but not in restricting viewpoints. Section 230(c)(2) provides immunity for restricting "access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." 47 U.S.C. § 230(2)(A). One might think that the final category—"otherwise objectionable"—could allude to objectionable viewpoints. But it is merely a catchall, and following a list of types of content, it refers only to additional objectionable *content*, not *viewpoints*.

This logical conclusion has formal support in the *ejusdem generis* canon of interpretation. As the Supreme Court has explained, "Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (cleaned up); *see also Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991). At the end of a list of types of content, "otherwise objectionable" means otherwise objectionable content.[7]

---

[7] Incidentally, courts examining section 230 have tended to rely upon *ejusdem generis*. Adam Candeub & Eugene Volokh, *Interpreting 47 U.S.C. § 230(c)(2)*, 1 J. Free Speech L. 175, 179 n.13 (2021).

Section 230(c)(2)'s focus on protecting content discrimination rather than viewpoint discrimination is confirmed by Supreme Court doctrine distinguishing the two. *See, e.g.*, *R.A.V. v. St. Paul*, 505 U.S. 377, 388 (1992). It is inconceivable that Congress was unfamiliar with this basic distinction when adopting section 230. It is therefore telling that section 230(c)(2) enumerates a list of content, not viewpoints. If that section had protected the Platforms in suppressing categories of viewpoint, it would have provoked insurmountable political and constitutional objections. *See* Philip Hamburger, *The Constitution Can Crack Section 230*, Wall St. J. (Jan. 29, 2021), https://www.wsj.com/articles/the-constitution-can-crack-section-230-11611946851 ("The tech companies can't have it both ways. If the statute is constitutional, it can't be as broad as they claim, and if it is that broad, it can't be constitutional."). For all these reasons, when section 230(c)(2) concludes its list of suppressible content with what is "otherwise objectionable," that phrase cannot be understood to mean objectionable viewpoints.

Plaintiffs protest that viewpoint is part of their "content" (in the colloquial sense of the expression or material carried by the Platforms) and that viewpoint cannot easily be teased apart from content. But HB 20 does not ask the Platforms or courts to disentangle viewpoint from content. Instead, it follows the Supreme Court's distinction between discrimination on the basis of viewpoint and discrimination on the basis of content. What triggers a violation of the statute's anti-

discrimination provisions is merely discrimination by the Platforms on the basis of viewpoint, and being founded on well-established Supreme Court doctrine, this barrier to viewpoint discrimination is relatively clear.

In short, HB 20 prohibits viewpoint discrimination. It therefore does not conflict with section 230(c)(2), which protects the Platforms only when they engage in content discrimination.

## B. Whereas Section 230(c)(2) Protects Against Actions for Damages, HB 20 Provides Only Non-Damages Remedies

Even if HB 20 barred content discrimination, it wouldn't conflict with section 230(c)(2), because it provides for only declaratory and injunctive relief. By not offering damages, HB 20 completely sidesteps section 230(c)(2).

Section 230(c)(2) protects the Platforms from being "held liable" for restricting listed materials. It is widely assumed that the section thereby secures the Platforms from any legal action. But the word "liable" in section 230(c)(2) protects only against damages actions.

In civil suits, there are two distinct questions. First, a court must consider whether the defendant has violated his legal duty or someone else's right and is therefore legally responsible. Second, the court must decide upon a remedy, which can include damages, an injunction, and so forth. At first glance, section 230(c)(2)'s term "held liable" can fall into either category. Perhaps it means the initial decision holding a defendant legally responsible, or perhaps it refers to a decision about a

type of remedy—namely damages.

Section 230(e) clarifies the apparent ambiguity, stating: "No *cause of action* may be brought and no *liability* may be imposed under any State or local law that is inconsistent with this section." (emphasis added) The statute thus distinguishes between a "cause of action" and "liability." From this it is apparent that when section 230(c) provides protection against being "held liable," it does not generally protect against "causes of action." Section 230(c)(2), in other words, merely protects against "liability" in the sense of damages.

Of course, when a Platform is sued for damages, section 230(e) bars not only the imposition of such liability but also the underlying cause of action. But HB 20 permits actions seeking declaratory judgments and injunctions, not damages.

\* \* \* \*

HB 20 targets viewpoint discrimination, not content discrimination. And it authorizes actions for declaratory judgments and injunctions, not for damages. On either ground, it entirely escapes any conflict with Section 230.

## CONCLUSION

Anti-discrimination regulation of communications common carriers is entirely consistent with the First Amendment. Although states have a compelling interest in protecting the free exchange of expression, it is not necessary to show such an interest, because the Platforms have little or no speech interest here. And

HB 20 carefully avoids any conflict with section 230(c)(2). HB 20 is therefore constitutional, and the preliminary injunction cannot be sustained.

The Court therefore should vacate the preliminary injunction insofar as it prevents enforcement or operation of H.B. 20 Section 7.

Dated: March 7, 2022                       Respectfully submitted,

                                           Kyle Singhal
                                           HOPWOOD & SINGHAL, PLLC
                                           1701 Pennsylvania Ave., N.W.
                                           Washington, DC 20006
                                           Tel: (817) 212-9041
                                           kyle@hopwoodsinghal.com

                                           *Counsel for Prof. Philip Hamburger*

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2022, an electronic copy of the foregoing *amicus* brief was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the CM/ECF filing system and that service on counsel of record for all parties will be accomplished via CM/ECF.

/s/ Kyle Singhal
Kyle Singhal
HOPWOOD & SINGHAL, PLLC
1701 Pennsylvania Ave., N.W.
Washington, DC 20006
Tel: (817) 212-9041
kyle@hopwoodsinghal.com
*Counsel for Prof. Philip Hamburger*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this brief was prepared in proportionally spaced typeface using Microsoft Word in 14-point font. This motion complies with the type-volume limitation of Rule 32(g) because it contains 6397 words, excluding the parts exempted under Rule 32(f).

/s/ Kyle Singhal
Kyle Singhal
HOPWOOD & SINGHAL, PLLC
1701 Pennsylvania Ave., N.W.
Washington, DC 20006
Tel: (817) 212-9041
kyle@hopwoodsinghal.com
*Counsel for Prof. Philip Hamburger*