# In the United States Court of Appeals for the Fifth Circuit

NETCHOICE, L.L.C., A 501(C)(6) DISTRICT OF COLUMBIA ORGANIZATION DOING BUSINESS AS NETCHOICE; COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, A 501(C) (6) NON-STOCK VIRGINIA CORPORATION DOING BUSINESS AS CCIA,

*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
Civil Action No. 1:21-cv-00840-RP

## BRIEF OF APPELLEES

Steven P. Lehotsky
Gabriela Gonzalez-Araiza
Jeremy Evan Maltz
LEHOTSKY KELLER LLP
200 Massachusetts Avenue, NW
Washington, DC 20001

Scott A. Keller
Matthew H. Frederick
Todd Disher
LEHOTSKY KELLER LLP
919 Congress Ave.
Austin, TX 78701
scott@lehotskykeller.com
(512) 693-8350
*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF INTERESTED PERSONS

No. 21-51178

NetChoice, L.L.C., a 501(c)(6) District of Columbia organization doing business as NetChoice; Computer & Communications Industry Association, a 501(c) (6) non-stock Virginia Corporation doing business as CCIA,
*Plaintiffs-Appellees*,

*v.*

Ken Paxton, in his official capacity as Attorney General of Texas,
*Defendant-Appellant.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. Plaintiffs-Appellees NetChoice and CCIA have no parent corporations and no publicly held corporation owns 10% or more of their respective stock. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees:**

NetChoice, L.L.C., a 501(c)(6) District of Columbia organization doing business as NetChoice; and Computer & Communications Industry Association, a 501(c)(6) non-stock Virginia Corporation doing business as CCIA

**Counsel for Plaintiffs-Appellees:**

Scott A. Keller (lead counsel)
Steven P. Lehotsky
Matthew H. Frederick

Todd Disher
Jonathan D. Urick
Gabriela Gonzalez-Araiza
Jeremy Evan Maltz
LEHOTSKY KELLER LLP

**Defendant-Appellant:**
Ken Paxton, in his official capacity as Attorney General of Texas

**Counsel for Defendant-Appellant:**
Ken Paxton
Brent Webster
Judd Edward Stone II
Ryan Baasch
Benjamin S. Lyles
Benjamin S. Walton
Christopher D. Hilton
Courtney Brooke Corbello
OFFICE OF THE ATTORNEY GENERAL

DISTRICT COURT AMICI

**Amici in Support of Plaintiffs-Appellees:**
Chamber of Progress; Connected Commerce Council; CTA; Engine Advocacy; Information Technology & Innovation Foundation; National Black Justice Coalition; Progressive Policy Institute; TechNet; Washington Center for Technology Policy; Hispanic Technology and Telecommunications Partnership

**Counsel for Chamber of Progress, et al.:**
William Reid Wittliff
WITTLIFF CUTTER P.L.L.C.

**Amici in Support of Plaintiffs-Appellees:**
The Reporters Committee for Freedom of the Press; The American Civil Liberties Union; The Center for Democracy & Technology; The Media Law Resource Center; and American Civil Liberties Union of Texas

**Counsel for The Reporters Committee for Freedom of the Press, et al.:**
Catherine Lewis Robb
Laura Lee Prather
HAYNES AND BOONE, LLP

**Amicus in Support of Plaintiffs-Appellees:**
TechFreedom

**Counsel for TechFreedom:**
Corbin K. Barthold
TECHFREEDOM

**Amicus in Support of Plaintiffs-Appellees:**
Electronic Frontier Foundation

**Counsel for Electronic Frontier Foundation:**
David Greene
Mukund Rathi
ELECTRONIC FRONTIER FOUNDATION

Thomas S. Leatherbury
VINSON & ELKINS LLP

**Amici in Support of Defendant-Appellant:**
The Babylon Bee; Not the Bee; Giganews, Inc.; and Golden Frog, Inc.

**Counsel for The Babylon Bee, et al.:**
W. Scott McCollough
MCCOLLOUGH LAW FIRM, P.C.

Evan Miles Goldberg
EVAN MILES GOLDBERG, PLLC

AMICI FILING IN SUPPORT OF DEFENDANT'S MOTION TO STAY PENDING APPEAL

**Amici in Support of Defendant-Appellant:**
Texas Public Policy Foundation; The Babylon Bee; Not the Bee; Giganews, Inc.; and Golden Frog, Inc.

**Counsel for Texas Public Policy Foundation, et al.:**
W. Scott McCollough
MCCOLLOUGH LAW FIRM, P.C.

Evan Miles Goldberg
EVAN MILES GOLDBERG, PLLC

Robert Henneke
TEXAS PUBLIC POLICY FOUNDATION

COURT OF APPEALS AMICI

**Amicus in Support of Defendant-Appellant:**
Professor Philip Hamburger

**Counsel for Professor Philip Hamburger:**
Kyle Singhal
HOPWOOD & SINGHAL, PLLC

**Amici in Support of Defendant-Appellant:**
Moms for Liberty and Institute for Free Speech

**Counsel for Moms for Liberty, et al.:**
Endel Kolde
Alan Gura
INSTITUTE FOR FREE SPEECH

**Amici in Support of Defendant-Appellant:**
Heartland Institute and American Principles Project

**Counsel for Heartland Institute, et al.:**
Joseph D. Sibley, IV
CAMARA & SIBLEY, L.L.P.

**Amicus in Support of Defendant-Appellant:**
Leonid Goldstein, *pro se*

**Amici in Support of Defendant-Appellant:**
Center for Renewing America, Incorporated; and The Claremont Institute's
Center for Constitutional Jurisprudence

**Counsel for Center for Renewing America, Incorporated, et al.:**
Andrei D. Popovici
LAW OFFICE OF ANDREI D. POPOVICI, P.C.

John C. Eastman
Anthony T. Caso
CONSTITUTIONAL COUNSEL GROUP

**Amicus in Support of Defendant-Appellant:**
David Mamet

**Counsel for David Mamet:**
Sarah Rogers
BREWER, ATTORNEYS & COUNSELORS

**Amicus in Support of Defendant-Appellant:**
Donald W. Landry, M.D.

**Counsel for Donald W. Landry, M.D.:**
James R. Lawrence, III
ENVISAGE LAW PARTNERSHIP

**Amicus in Support of Defendant-Appellant:**
iTexasPolitics, L.L.C., doing business as The Texan

**Counsel for iTexas Politics:**
Matthew R. Miller, Esq.
TEXAS PUBLIC POLICY FOUNDATION

**Amici in Support of Defendant-Appellant:**
The States of Florida, Alabama, Alaska, Arizona, Arkansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, and South Carolina

**Counsel for State of Florida, et al.:**
Ashley Moody
Henry C. Whitaker
Daniel W. Bell
Evan Ezray
OFFICE OF THE FLORIDA ATTORNEY GENERAL

Steve Marshall
ATTORNEY GENERAL OF ALABAMA

Jeff Landry
<span style="font-variant: small-caps;">Attorney General of Louisiana</span>

Treg Taylor
<span style="font-variant: small-caps;">Attorney General of Alaska</span>

Lynn Fitch
<span style="font-variant: small-caps;">Attorney General of Mississippi</span>

Mark Brnovich
<span style="font-variant: small-caps;">Attorney General of Arizona</span>

Eric Schmitt
<span style="font-variant: small-caps;">Attorney General of Missouri</span>

Leslie Rutledge
<span style="font-variant: small-caps;">Attorney General of Arkansas</span>

Austin Knudsen
<span style="font-variant: small-caps;">Attorney General of Montana</span>

Daniel Cameron
<span style="font-variant: small-caps;">Attorney General of Kentucky</span>

Alan Wilson
<span style="font-variant: small-caps;">Attorney General of South Carolina</span>

**Amicus in Support of Defendant-Appellant:**
Students at Columbia Against Censorship

**Counsel for Students at Columbia Against Censorship:**
John Clay Sullivan
SL Law, P.L.L.C.

*/s/ Scott A. Keller*
Scott A. Keller
*Counsel of Record for*
*Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

This Court on March 28, 2022, calendared oral argument for Monday, May 9, 2022.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ............................................................................i

Statement Regarding Oral Argument ................................................................ ix

Table of Authorities ............................................................................................ xii

Introduction ............................................................................................................1

Issues Presented .....................................................................................................5

Statement ................................................................................................................5

    A. Social media platforms exercise editorial discretion over what content they publish and how such content is displayed to users. ...........................................................................................................5

    B. HB20 is a content-, viewpoint-, and speaker-based law that would eviscerate editorial discretion and impermissibly compel and chill speech by targeted, disfavored "social media platforms." ..................................................................................8

    C. The district court preliminarily enjoined HB20 ...................................13

Summary of the Argument .................................................................................13

Argument ..............................................................................................................17

    I. HB20 Section 7's prohibition on viewpoint-based editorial discretion violates the First Amendment ............................................17

        A. The First Amendment guarantees privately-owned publishers' right to exercise editorial discretion ........................17

            1. Under *Tornillo*, *PG&E*, and *Hurley*, government may not infringe editorial judgment by compelling privately-owned companies to disseminate others' speech. ................................................................................17

            2. Defendant's "hosting" theory was rejected in *USAID* and has no support in *FAIR* and *PruneYard*. .........................26

3.  47 U.S.C. §230 does not strip websites of constitutional rights. ..........................................................................32

4.  Platforms are not common carriers, and the First Amendment analysis would not change if they were. ........34

B.  HB20 discriminates based on viewpoint, content, and speaker.............................................................................40

C.  HB20 fails any level of heightened scrutiny. .................................43

1.  Defendant lacks a sufficient governmental interest. ............44

2.  HB20 is not properly tailored..................................................47

II.  HB20 Section 2's disclosure and operational requirements violate the First Amendment. .................................................49

III.  The other preliminary-injunction factors all favor preserving the platforms' First Amendment rights. .............................56

Conclusion....................................................................................................58

Certificate of Service .................................................................................59

Certificate of Compliance .........................................................................59

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agency for Int'l Dev.v. All. for Open Soc'y Int'l, Inc.,*
  140 S. Ct. 2082 (2020)....................................................................3, 14, 26, 27

*Ams. for Prosperity Found. v. Bonta,*
  141 S. Ct. 2373 (2021)....................................................................43, 44, 47, 50

*Ariz. Free Enter. Club v. Bennett,*
  564 U.S. 721 (2011)........................................................................44

*Ark. Educ. Television Comm'n v. Forbes,*
  523 U.S. 666 (1998)........................................................................17, 46

*Ark. Writers' Project, Inc. v. Ragland,*
  481 U.S. 221 (1987)........................................................................41

*Associated Press v. United States,*
  326 U.S. 1 (1945)............................................................................39

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963)..........................................................................28

*Barr v. Am. Ass'n of Political Consultants,*
  140 S. Ct. 2335 (2020)....................................................................43

*Bartnicki v. Vopper,*
  532 U.S. 514 (2001)........................................................................28

*Batzel v. Smith,*
  333 F.3d 1018 (9th Cir. 2003).........................................................33

*Biden v. Knight First Amendment Inst.,*
  141 S. Ct. 1220 (2021)....................................................................40, 46

*Brown v. Entm't Merchs. Ass'n*,
    564 U.S. 786 (2011)................................................26, 28, 52

*Buckley v. Valeo*,
    424 U.S. 1 (1976) (per curiam) .............................................44, 50

*Cablevision Sys. Corp. v. FCC*,
    597 F.3d 1306 (D.C. Cir. 2010).........................................36

*Chaplinsky v. New Hampshire*,
    315 U.S. 568 (1942)................................................32

*Citizens United v. FEC*,
    558 U.S. 310 (2010)................................................41

*City of L.A. v. Patel*,
    576 U.S. 409 (2015)................................................44

*City of Lakewood v. Plain Dealer Publ'g Co.*,
    486 U.S. 750 (1988)................................................28

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
    6 F.4th 1247 (11th Cir. 2021)................................................24

*Davison v. Facebook, Inc.*,
    370 F. Supp. 3d 621 (E.D. Va. 2019), *aff'd*, 774 F. App'x 162
    (4th Cir. 2019)................................................20

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
    518 U.S. 727 (1996)................................................*passim*

*Doe v. MySpace, Inc.*,
    528 F.3d 413 (5th Cir. 2008)........................................20, 25, 32, 33

*e-ventures Worldwide, LLC v. Google, Inc.*,
    2017 WL 2210029 (M.D. Fla. Feb. 8, 2017) ................................................20

*Edenfield v. Fane,*
    507 U.S. 761 (1993)...............................................................41

*Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Pro. Eng'rs
    & Surveyors,*
    916 F.3d 483 (5th Cir. 2019) ...............................................51

*FCC v. League of Women Voters of Cal.,*
    468 U.S. 364 (1984)...............................................................36

*FCC v. Midwest Video Corp.,*
    440 U.S. 689 (1979)...............................................................35

*FEC v. Wis. Right to Life, Inc.,*
    551 U.S. 449 (2007)...............................................................31

*Fla. Star v. B.J.F.,*
    491 U.S. 524 (1989)...............................................................41

*Force v. Facebook, Inc.,*
    934 F.3d 53 (2d Cir. 2019) ...................................................33

*Herbert v. Lando,*
    441 U.S. 153 (1979)...............................................................50

*Horton v. City of Houston,*
    179 F.3d 188 (5th Cir. 1999).............................25, 38, 39, 45

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
    515 U.S. 557 (1995)..............................................*passim*

*Isaac v. Twitter,*
    2021 WL 3860654 (S.D. Fla. Aug. 30, 2021)....................20

*Janus v. AFSCME,*
    138 S. Ct. 2448 (2018)..........................................................31

*Kinderstart.com LLC v. Google, Inc.*,
    2006 WL 3246596 (N.D. Cal. July 13, 2006)..................................35

*La'Tiejira v. Facebook, Inc.*,
    272 F. Supp. 3d 981 (S.D. Tex. 2017) ............................................20

*Landry's, Inc. v. Ins. Co. of the State of Pa.*,
    4 F.4th 366 (5th Cir. 2021)...........................................................20

*Langdon v. Google, Inc.*,
    474 F. Supp. 2d 622 (D. Del. 2007) ...............................................20

*Lovell v. City of Griffin*,
    303 U.S. 444 (1938)......................................................................22

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019).............................................................18, 46

*Marshall's Locksmith Serv. Inc. v. Google, LLC*,
    925 F.3d 1263 (D.C. Cir. 2019).....................................................34

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
    138 S. Ct. 1719 (2018).....................................................20, 28, 30

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974)..............................................................*passim*

*Millan v. Facebook, Inc.*,
    2021 WL 1149937 (Cal. Ct. App. Mar. 25, 2021).........................35

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
    460 U.S. 575 (1983)......................................................................40

*Muir v. Ala. Educ. TV Comm'n*,
    656 F.2d 1012 (5th Cir. 1981)......................................................28

*NARUC v. FCC*,
    533 F.2d 601 (D.C. Cir. 1976)......................................................35

*Nat'l Ass'n of Mfrs. v. SEC*,
   800 F.3d 518 (D.C. Cir. 2015) ........................................................55

*Nebbia v. New York*,
   291 U.S. 502 (1934) ........................................................................36

*NetChoice, LLC v. Moody*,
   546 F. Supp. 3d 1082 (N.D. Fla. June 30, 2021), *appeal pending*,
   11th Cir. No. 21-12355 ..............................................................*passim*

*NIFLA v. Becerra*,
   138 S. Ct. 2361 (2018) ................................................................*passim*

*O'Handley v. Padilla*,
   2022 WL 93625 (N.D. Cal. Jan. 10, 2022) ....................................20

*Packingham v. North Carolina*,
   137 S. Ct. 1730 (2017) ............................................................44, 46

*PG&E v. PUC of California*,
   475 U.S. 1 (1986) ......................................................................*passim*

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
   413 U.S. 376 (1973) ........................................................................23

*Prager Univ. v. Google LLC*,
   951 F.3d 991 (9th Cir. 2020) ...................................................46, 51

*Prison Legal News v. Livingston*,
   683 F.3d 201 (5th Cir. 2012) ........................................................28

*PruneYard Shopping Center v. Robins*,
   447 U.S. 74 (1980) .................................................................3, 30, 31

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) ........................................................................10

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015)......................................................40, 41, 42, 43

*Reno v. ACLU*,
   521 U.S. 844 (1997)......................................................26, 38, 39, 44

*Robinson v. Hunt Cty.*,
   921 F.3d 440 (5th Cir. 2019).............................................................10

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2020) (per curiam) ................................................56

*Rumsfeld v. FAIR*,
   547 U.S. 47 (2006)..............................................................*passim*

*SEC v. McGoff*,
   647 F.2d 185 (D.C. Cir. 1981)........................................................55

*Smith v. California*,
   361 U.S. 147 (1959).......................................................................28

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011).......................................................................28

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
   732 F.3d 535 (5th Cir. 2013).....................................................17, 56

*Time Warner Cable, Inc. (TWC) v. Hudson*,
   667 F.3d 630 (5th Cir. 2012)..............................................*passim*

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994)..................................................37, 38, 39, 48

*Turner v. Driver*,
   848 F.3d 678 (5th Cir. 2017).........................................................28

*Twitter, Inc. v. Paxton*,
   2022 WL 610352 (9th Cir. Mar. 2, 2022).........................................51

*United States v. Hunter*,
459 F.2d 205 (4th Cir. 1972)........................................................23

*United States v. Playboy Entm't Grp., Inc.*,
529 U.S. 803 (2000)..................................................................49

*USTA v. FCC*,
855 F.3d 381 (D.C. Cir. 2017) (per curiam) ..............................4, 34

*Veterans of Foreign Wars v. Tex. Lottery Comm'n*,
760 F.3d 427 (5th Cir. 2014) .........................................................44

*Washington Post v. McManus*,
944 F.3d 506 (4th Cir. 2019) ...............................................3, 50, 51

*Wooley v. Maynard*,
430 U.S. 705 (1977).............................................................22, 48

*Zauderer v. Office of Disciplinary Counsel*,
471 U.S. 626 (1985).......................................................................52

*Zhang v. Baidu.com, Inc.*,
10 F. Supp. 3d 433 (S.D.N.Y. 2014) .............................................20

## Statutes

47 U.S.C. § 223 ..............................................................................35

47 U.S.C. § 230 .......................................................................*passim*

Tex. Bus. & Com. Code § 120.001 ..................................................9

Tex. Bus. & Com. Code § 120.002 ..................................................9

Tex. Bus. & Com. Code § 120.051 ................................12, 53, 54

Tex. Bus. & Com. Code § 120.052 ........................................12, 54

Tex. Bus. & Com. Code § 120.053 ........................................13, 54

Tex. Bus. & Com. Code § 120.101 ...................................................11, 53

Tex. Bus. & Com. Code § 120.102 ...................................................11, 53

Tex. Bus. & Com. Code § 120.103 ...................................................11, 53

Tex. Bus. & Com. Code § 120.104 ...................................................11, 53

Tex. Bus. & Com. Code § 120.151 .......................................................13

Tex. Civ. Prac. & Rem. Code § 143A.001 ......................................10, 26

Tex. Civ. Prac. & Rem. Code § 143A.002 ............................................10

Tex. Civ. Prac. & Rem. Code § 143A.006 ......................................10, 43

Tex. Civ. Prac. & Rem. Code § 143A.008 ............................................13

**Other Authorities**

Brief for Appellees, *Klayman v. Zuckerberg*, 2013 WL 5371995
(D.C. Cir. Sept. 25, 2013)....................................................................33

Brief of State of Texas et al. as Amici Curiae, *303 Creative, LLC v.
Elenis*, 2020 WL 525392 (10th Cir. Jan. 29, 2020) ...........................23

Brief of State of Texas et al. as Amici Curiae, *Masterpiece
Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 2017 WL 4023111
(U.S. Sept. 7, 2017)...............................................................................23

Christopher S. Yoo, *The First Amendment, Common Carriers, and
Public Accommodations*, 1 J. Free Speech L. 463 (2021)...................35

Motion to Dismiss, *Colon v. Twitter, et al.*, 2019 WL 2417279
(M.D. Fla. Apr. 29, 2019) .....................................................................33

Motion to Dismiss, *Fields v. Twitter*, 2016 WL 2586923 (N.D. Cal.
Apr. 6, 2016) ..........................................................................................33

NetChoice, *By The Numbers*,
   https://bit.ly/3Gn54Hj ......................................................................25

Office of the Governor Greg Abbott, Facebook (Sept. 9, 2021),
   https://bit.ly/3z0Ysub ........................................................................8

Paresh Dave, *YouTube blocks Russian state-funded media channels*
   *globally*, Reuters (Mar. 11, 2022), https://reut.rs/3JbnyMU .........................2

Tex. H.R. Journal, 87th Leg., 2d Spec. Sess.,
   https://bit.ly/2Y2YGEp ....................................................................49

Tex. Sen. Journal, 87th Leg.,
   https://bit.ly/3Cq663o ......................................................................42

TikTok, Thanks a Billion (Sept. 27, 2021), https://bit.ly/36IunqA .................45

The Twitter Rules, Twitter, https://bit.ly/3ICc5ok (last visited
   Apr. 1, 2022) ......................................................................................6

Texas House Bill 20 ("HB20") is an extraordinary assertion of government power to substitute the government's editorial preferences for those of private publishers. The Supreme Court has repeatedly recognized that "private companies that use editorial judgment to choose whether to publish content . . . cannot be compelled by the government to publish other content." ROA.2584 (citing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 581 (1995); *PG&E v. PUC of California*, 475 U.S. 1, 12 (1986) (plurality op.);[1] *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974)). HB20 violates this principle. It is a content-, viewpoint-, and speaker-based law that would eviscerate editorial discretion, impermissibly compel and chill speech, and impose onerous disclosures on select disfavored "social-media platforms."[2] The district court preliminarily enjoined HB20's Sections 2 and 7 for violating the First Amendment. That ruling should be affirmed.

First, HB20's Section 7 prohibits platforms from engaging in editorial discretion based on "viewpoint." HB20 therefore unconstitutionally compels platforms to publish, display, and even recommend all sorts of speech that they deem objectionable and contrary to policies governing their services—including pro-Nazi speech, terrorist propaganda, Holocaust denial, and

---

[1] All citations to *PG&E* are to the plurality opinion. *See Hurley*, 515 U.S. at 573, 575-76, 580 (recognizing *PG&E*'s plurality opinion is case's holding).

[2] This brief refers to HB20-covered "social media platforms" as "platforms."

misinformation. Defendant does not dispute this. Appellant's Br. ("Br.") 36. In fact, HB20 would prohibit YouTube's recent decisions to stop publishing speech from Russian state media amid the invasion of Ukraine.[3] No American government may force private companies to disseminate the propaganda of a foreign power.

Second, HB20's Section 2 infringes editorial discretion and compels speech through a slew of burdensome disclosure and operational requirements. It unconstitutionally requires platforms to provide notice *every time* they remove speech—and provide a complaint-and-appeal process subject to short deadlines. The burden of these requirements is hard to overstate: In just three months in 2020, YouTube removed 9 million videos and *1.16 billion comments*. ROA.2591. Over a similar period in 2021, Facebook removed over 40 million pieces of bullying, harassing, and hateful content alone. ROA.2591. Section 2 further compels platforms to publish a "biannual transparency report" and an "acceptable use policy," which would grant Defendant the authority to investigate and sue based on platforms' exercise of their editorial policies. HB20 also requires platforms to "publicly disclose" their "content management, data management, and business practices"—broad categories covering everything platforms do, while piercing trade secrets and First-Amendment-protected editorial discretion. The district court

_____

[3] Paresh Dave, *YouTube blocks Russian state-funded media channels globally*, Reuters (Mar. 11, 2022), https://reut.rs/3JbnyMU.

correctly enjoined these provisions as well. ROA.2592 (citing *NIFLA v. Becerra*, 138 S. Ct. 2361, 2372 (2018); *Washington Post v. McManus*, 944 F.3d 506, 514 (4th Cir. 2019)).

Trying to defend this unprecedented attack on private editorial freedom, Defendant advances a view of the First Amendment that is inimical to American law. Defendant claims that bedrock constitutional protections for editorial discretion are mere "narrow exceptions" (Br.1) to a purported general rule that government can compel "hosting" of speech against the will of private parties that do not wish to be conscripted. And while HB20 is not merely a "hosting" law, the label "host" makes no difference under the First Amendment: The Supreme Court recognized that the constitutional violations in *Hurley* and *PG&E* arose precisely "because the State forced one speaker to *host* another speaker's speech." *Agency for Int'l Dev. (USAID) v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2088 (2020) (emphasis added).

Regardless, platforms do far more than blindly "host" expression. They disseminate speech to their particular communities of users and engage in a wide range of expressive editorial choices about how to present and arrange the speech they publish. In contrast, the two cases cited by Defendant— *Rumsfeld v. FAIR*, 547 U.S. 47 (2006), and *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980)—considered laws requiring access to physical property, not infringements on editorial discretion over publishers of speech.

The absurd consequence of Defendant's "hosting" theory would give government complete power over what and how various entities

disseminate speech—like bookstores, book publishers, essay-compilation editors, theaters, art galleries, community bulletin-boards, and comedy clubs. Perhaps that is why Defendant admits HB20 would "*create* constitutional problems if the law were broader and targeted smaller platforms"—those with fewer than 50-million monthly users. Br.32. But these constitutional infirmities do not disappear just because HB20 selectively disfavors larger platforms. "Big Tech" is not a label that allows the State to conscript private companies into its preferred editorial program.

Further, Defendant's attempts to label platforms as "common carriers" is both factually and legally incorrect. Platforms are not common carriers because they use editorial judgment in selecting what content to publish and how to present it. And labeling something "a common carrier scheme has no real First Amendment consequences." *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 825 (1996) (Thomas, J., concurring in part).

Simply put, the government "may not . . . tell Twitter or YouTube what videos to post; or tell Facebook or Google what content to favor." *USTA v. FCC*, 855 F.3d 381, 392 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of reh'g en banc). The district court correctly preliminarily enjoined HB20's Sections 2 and 7—just as Florida's similar law has been preliminarily enjoined. *NetChoice, LLC v. Moody*, 546 F. Supp. 3d 1082, 1096 (N.D. Fla. June 30, 2021), *appeal pending*, 11th Cir. No. 21-12355. This Court should affirm.

## ISSUES PRESENTED

Whether the district court abused its discretion by preliminarily enjoining HB20's Sections 2 and 7.

## STATEMENT

### A. Social media platforms exercise editorial discretion over what content they publish and how such content is displayed to users.

Platforms compile, curate, and disseminate a combination of user-submitted expression, platform-authored expression, and advertisements on each platform's distinctive user interface. ROA.176; ROA.184-87; ROA.378-79; ROA.2584.

In short, platforms "publish" speech, ROA.2583, but they do not publish *all* speech or treat all speech equally. Instead, each platform has its own rules about what speech is acceptable for its particular service and community. ROA.359; ROA.383; ROA.1664-1721. As unrebutted record evidence shows, platforms exercise editorial discretion by controlling who can access their platforms, what kinds of content is available, and how that content is presented to users. ROA.2586. Platforms all have hate-speech policies, for example. ROA.2586; ROA.1771-1826. But there are also differences among platforms. YouTube, for example, supports a "community that fosters self-expression on an array of topics as diverse as its user base," while prohibiting "harmful, offensive, and unlawful material" like "pornography, terrorist incitement, [and] false propaganda spread by hostile foreign governments."

ROA.194, 197. Twitter allows a wider range of violent and adult content.[4] Non-member social media platforms—including websites that tout less-moderated communities—also have similar policies. ROA.327, 345.

Platforms require users to abide by these policies, and platforms disseminate policy-compliant speech. ROA.359; ROA.383; ROA.1664-1721. All content on a given platform, therefore, is subject to review for compliance with that platform's policies. ROA.2586; ROA.1771-1826.

These editorial choices are expressive, reflect platforms' values, and convey a message about the platforms and the communities they hope to foster. ROA.205. After all, a platform with policies against glorifying Nazis or promoting terrorist propaganda would be a very different platform if forced to disseminate that content.

Platforms thus routinely remove spam, pornography, hate speech, and other content they consider objectionable. For instance, during 6 months in 2018, Facebook, Google, and Twitter took action on over 5 billion accounts or submissions—"including 3 billion cases of spam, 57 million cases of pornography, 17 million cases of content implicating child safety, and 12 million cases of extremism, hate speech, and terrorist speech." ROA.2592.

Platforms also prioritize, arrange, and recommend content according to what content users would like to see, how users would like to see it, and

_____

[4] The Twitter Rules, Twitter, https://bit.ly/3ICc5ok (last visited Apr. 1, 2022); ROA.1921-22.

what content reflects accurate information (rather than disinformation). ROA.2586. At a minimum, platforms determine what shows up at the top of users' "feeds" and search results. ROA.211. Platforms also recommend or otherwise prioritize content they consider authoritative or most useful. ROA.198.

Finally, platforms author their own speech through warning labels, disclaimers, links to related sources, and other commentary platforms deem important. ROA.2585-86. Among other things, YouTube provides "information panels" that inform users with (1) notice that videos are from "a news publisher that is funded by a government"; (2) "context on content relating to topics and news prone to misinformation"; and (3) suicide prevention information "in response to search queries for terms related to suicide." ROA.198-99.

Platforms' policy enforcement is critical to the distinctive experiences that platforms provide their users—and to ensuring that they remain hospitable and useful services.[5] Without these policies, platforms would offer a fundamentally different experience that does not reflect the platforms' values and the communities they wish to foster. ROA.2585-86. Users would be flooded with hate speech and misinformation—not to mention content that

---

[5] Contrary to Defendant's unsupported suggestion (Br.6), platforms have always enforced such policies. ROA.200-01; 220-21. Although policies have evolved as the platforms have evolved, there has never been a time where platforms allowed all content without any regulation or editorial discretion.

is less informative, entertaining, and relevant to their interests. The record confirms that when platforms have failed to remove harmful content, their users and advertisers have sought to hold platforms accountable—including through boycotts. ROA.176; ROA.184-87; ROA.378-79; ROA.395.

**B. HB20 is a content-, viewpoint-, and speaker-based law that would eviscerate editorial discretion and impermissibly compel and chill speech by targeted, disfavored "social media platforms."**

**1.** HB20 seeks to prohibit the vital editorial choices just discussed. As numerous statements in the record reflect, the State targeted certain disfavored "social media platforms" for exercising their editorial judgment in a manner the State dislikes. ROA.115-16; 2571-72, 2586-87, 2598. The Governor's official signing statement explained HB20 targets platforms to protect "conservative speech": "It is now law that conservative viewpoints in Texas cannot be banned on social media." Office of the Governor Greg Abbott, Facebook (Sept. 9, 2021), https://bit.ly/3z0Ysub.

**2.** HB20 applies to a "social media platform," defined to cover only a few social media platforms.[6] This definition is expressly content- and speaker-

---

[6] This definition may cover more platforms operated by Plaintiffs' members than Defendant asserts (Br.1.n.1), including at a minimum: Facebook, Instagram, Pinterest, TikTok, Twitter, Vimeo, and YouTube. ROA.232; ROA.2243; ROA.2572 (deposition cited by Defendant).

based, and it furthers HB20's impermissible viewpoint-based purpose. ROA.2594.

HB20's definition of a covered "social media platform" includes any "website or application" that (1) "functionally has more than 50 million [monthly] active users in the United States"; is (2) "open to the public"; (3) "allows a user to create an account"; and (4) "enables users to communicate with other users[.]" Tex. Bus. & Com. Code §§ 120.001(1), .002(b). This definition also contains an overt content-based exclusion: services that "consist[] primarily of *news, sports,* [or] *entertainment*[.]" *Id.* § 120.001(1)(A)-(C) (emphasis added).

By targeting platforms with 50-million-monthly U.S. users, HB20 arbitrarily singles out a few websites. ROA.2593. This threshold excludes smaller social media platforms that purport to appeal to more politically conservative users. ROA.345; ROA.2593. And the monthly-user figure is a fluctuating and difficult-to-calculate number. ROA.1362.

**3.** HB20 imposes two sets of requirements that require staggering changes to platforms.

**a.** Section 7 restricts platforms' editorial discretion by compelling them to publish speech that they consider objectionable and present that speech in particular ways. Specifically, platforms:

> may not censor [block, ban, remove, deplatform, demonetize, deboost, restrict, deny equal access or visibility to, or otherwise discriminate against expression] a user, a user's expression, or a user's ability to receive the expression of another person based

on: (1) the viewpoint of the user or another person; (2) the viewpoint represented in the user's expression or another person's expression; or (3) a user's geographic location in this state[.]

Tex. Civ. Prac. & Rem. Code §§ 143A.001(1), .002. This is not just a compelled hosting requirement, although that would be bad enough. The broad definition of "censor" overrides virtually any effort platforms make to curate content and boost or recommend content they consider more useful or valuable, whether for some or all users.

From this broad prohibition, HB20 carves out two content-based exceptions for content (1) that involves threats or incitement directed at a few protected classes; and (2) flagged by a handful of state-selected organizations. *Id*. § 143A.006(a)(2)-(3). And this prohibition purportedly does not apply if the platform "is specifically authorized to censor by federal law." *Id*. § 143A.006(a)(1).[7] Because HB20 covers both submitting and "receiv[ing]" expression, HB20 regulates all expression on platforms world-wide. *Id*. § 143A.002(a).

By generally banning editorial discretion based on viewpoint, Section 7 compels the publication of odious speech. For instance, platforms' hate-speech policies treat hateful "viewpoints" differently from non-hateful viewpoints. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391-92 (1992); *Robinson v.*

---

[7] Defendant does not argue that platforms' editorial discretion is authorized under this provision. Regardless, a purported savings clause like this cannot insulate a law from judicial review. ROA.1928 (briefing below).

*Hunt Cty.*, 921 F.3d 440, 447 (5th Cir. 2019) ("subjective judgment that the content of protected speech is offensive or inappropriate" is based on "viewpoint"). For example, if platforms permit discussion of Nazis, they must disseminate pro-Nazi expression on equal terms as Holocaust remembrance. Similarly, although Defendant criticizes platforms for disseminating speech from foreign leaders (Br.7), HB20 would *compel* platforms to disseminate such expression. HB20 thus forbids platforms from removing or in any way restricting Russian government propaganda about its invasion of Ukraine.

**b.** Section 2 imposes onerous disclosure and operational requirements that compel speech and burden platforms' enforcement of their policies.

*First*, platforms must provide users with complaint and notice-and-appeal procedures, overseeing every time platforms exercise editorial discretion.

Platforms must provide a "complaint system to enable a user to submit a complaint" regarding violative content and "decision[s] made by the social media platform to remove content posted by the user." Tex. Bus. & Com. Code § 120.101. For illegal-content reports, platforms must "make a good faith effort to evaluate" the content's "legality" "within 48 [business] hours of receiving the notice." *Id.* § 120.102.

Platforms must then offer a notice-and-appeal procedure for any content that platforms remove, including: (1) notice of the removal; (2) opportunity to appeal; and (3) written explanation of the decision on appeal. *Id.* § 120.103. Platforms must decide the appeal within 14 business days. *Id.* § 120.104.

*Second*, platforms must provide "public disclosures" about their entire business: "content management, data management, and business practices." *Id.* § 120.051(a). These disclosures must be "sufficient to enable users to make an informed choice regarding" use of the platform. *Id.* § 120.051(b). HB20 identifies a non-exhaustive list of information, including how each platform: "(1) curates and targets content to users; (2) places and promotes content, services, and products, including its own content, services, and products; (3) moderates content; [and] (4) uses search, ranking, or other algorithms or procedures that determine results on the platform[.]" *Id.* § 120.051(a)(1)-(4).

*Third*, platforms must "publish an acceptable use policy" that explains what content platforms will allow, how platforms will ensure compliance, and how users can report content. *Id.* § 120.052.

*Fourth*, platforms must publish a "biannual transparency report," which requires extensive data collection far beyond platforms' current transparency efforts:

- "total number of instances in which the social media platform was alerted to" violative content and by what means;
- how often the platform "took action" on such content including "content removal," "content demonetization," "content deprioritization," "addition of an assessment to content," "account suspension," "account removal," and "any other action," "categorized by" "the rule violated" and "the source for the alert";
- "country of the user who provided the content for each instance";
- "number of coordinated campaigns" (an unexplained term);
- "number of instances in which a user appealed";
- "percentage of appeals . . . that resulted in the restoration of content";

- "a description of each tool, practice, action, or technique used in enforcing the [policy]."

*Id.* §120.053(a)(1)-(7), (b). These requirements apply to potentially *billions* of pieces of content. ROA.2591.

**4.** Sections 2 and 7 are enforceable by Defendant, who is entitled to fee-shifting and "reasonable investigative costs." Tex. Bus. & Com. Code §120.151; Tex. Civ. Prac. & Rem. Code §143A.008(b).

## C.  The district court preliminarily enjoined HB20.

Plaintiffs sued on September 22, 2021, and moved for a preliminary injunction on September 30, alleging violations of the First Amendment and the Commerce Clause, as well as preemption under 47 U.S.C. §230. ROA.2574-75. After a discovery period, the district court issued a comprehensive ruling preliminarily enjoining Defendant's enforcement of HB20's Sections 2 and 7 (based on First Amendment violations) on December 1.

## SUMMARY OF THE ARGUMENT

**I.** HB20 Section 7's broad prohibition on viewpoint-based editorial discretion violates the First Amendment.

**A.1.** Government cannot infringe publishers' editorial-discretion rights or compel platforms to present expression they deem objectionable. This fundamental First Amendment principle is exemplified by *Tornillo*, *PG&E*, and *Hurley*, which protected the rights of private entities (a newspaper, a public utility, and parade organizers) not to disseminate speech generated by others (candidates, customers, and parade participants).

The purported factual distinctions Defendant seeks to draw between this case and *Tornillo*, *PG&E*, and *Hurley* either are inaccurate or ignore the First Amendment holdings established by these cases and their progeny.

**2.** Defendant's main argument is that "hosting" speech generated by others is "conduct" unprotected by the First Amendment. This argument doubly fails. First, HB20 goes far beyond requiring "hosting" of content: It is a frontal attack on a range of editorial choices by private parties, including how to display, curate, and arrange content. Second, there is no "hosting" exception to the First Amendment. To the contrary, the Supreme Court in *USAID* rejected this argument, explaining that the constitutional defect in *Hurley* and *PG&E* arose precisely because those laws required private entities to "host" others' speech. 140 S. Ct. at 2088.

Under Defendant's theory, government may compel (or block) speech publication by entities disseminating speech authored by others, as long the government calls it "hosting." That theory is wrong, contrary to settled law, and exactly why the First Amendment does not "require a speaker to generate, as an original matter, each item featured in the communication." *Hurley*, 515 U.S. at 570. Removing, arranging, recommending, sorting, and disseminating speech generated by others is protected by the First Amendment. Those editorial functions are highly expressive, reflecting value-laden choices about a variety of issues. Under the First Amendment, the government does not get to substitute its own judgments about how those private choices should be made.

Neither *PruneYard* nor *FAIR* suggest otherwise. Those cases considered access to physical property and did not address, much less endorse, intrusions on editorial control over speech publications. The requirements upheld in those cases are not remotely akin to HB20's frontal attack on core publication freedoms.

**3.** Citing no authority, Defendant asserts that platforms deserve no First Amendment protection if they rely on 47 U.S.C. §230. Defendant misunderstands §230, which was enacted to *promote* websites' editorial discretion—not constrain it. Moreover, a statute cannot change or override platforms' constitutional rights, and private entities (like platforms here) are protected by both statute and the Constitution in myriad contexts.

**4.** Finally, Defendant argues that government may regulate platforms' editorial discretion by calling platforms "common carriers." But platforms are not common carriers under decades of precedent, and it is well settled that the common-carrier label does not make the First Amendment disappear.

**B.** Beyond its infringement of editorial discretion, HB20 is also a content-, viewpoint-, and speaker-based law subject to strict scrutiny.

HB20's central "social-media-platform" definition is (1) content-based, because it excludes other websites based on content like news, sports, and entertainment; (2) speaker-based because it applies to only a subset of social media platforms; and (3) viewpoint-based because HB20's enactment history shows HB20 targets disfavored speakers. In addition, Section 7

prohibits platforms from making editorial choices depending on the content and viewpoint of the material at issue, forces platforms to disseminate viewpoints they find objectionable, and excludes certain content from its restrictions.

**C.** HB20 fails heightened First Amendment scrutiny. There is no governmental purpose that could justify HB20's commandeering private platforms to publish or enhance others' speech. And HB20 runs afoul of the core First Amendment principle that the government may not override the speech rights of some parties in the name of "balance" or "fairness." Nor is HB20 properly tailored: It covers only an arbitrary subset of websites, arbitrarily excludes certain content from its regulation, and imposes a blunderbuss set of prohibitions.

**II.** The district court also correctly concluded that government cannot infringe editorial discretion and compel speech through disclosure and operational requirements. Section 2's requirements are also subject to strict scrutiny: They unconstitutionally intrude on protected editorial discretion and are content- and speaker-based. Nor can they be saved under the (inapposite) commercial-speech doctrine or the limited *Zauderer* doctrine, which applies only to non-burdensome, purely factual commercial advertising disclosure requirements.

**III.** The remaining factors weigh in favor of preserving platforms' First Amendment rights and preventing these onerous—and sometimes, impossible—requirements to take effect.

**ARGUMENT**

The district court correctly concluded all four preliminary-injunction factors favor Plaintiffs. *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536 (5th Cir. 2013).

## I. HB20 Section 7's prohibition on viewpoint-based editorial discretion violates the First Amendment.

Section 7 unconstitutionally infringes editorial discretion and is also impermissibly content-, viewpoint-, and speaker-based.

### A. The First Amendment guarantees privately-owned publishers' right to exercise editorial discretion.

#### 1. Under *Tornillo*, *PG&E*, and *Hurley*, government may not infringe editorial judgment by compelling privately-owned companies to disseminate others' speech.

The First Amendment prohibits government from restricting private entities' editorial discretion over what speech to publish. Any "compulsion to publish that which 'reason tells them should not be published' is unconstitutional." *Tornillo*, 418 U.S. at 256. *Tornillo*'s key insight is that "the editorial function itself is an aspect of 'speech.'" *Denver*, 518 U.S. at 737-38 (plurality op.). After *Tornillo*, the Supreme Court repeatedly vindicated private entities' editorial discretion. *Hurley*, 515 U.S. at 572-73; *PG&E*, 475 U.S. at 9.

**a.** *Tornillo* and its progeny confirm that when an entity "exercises editorial discretion in the selection and presentation" of published expression, "it engages in [protected] speech activity." *Ark. Educ. TV Comm'n v. Forbes*, 523 U.S. 666, 674 (1998). The Supreme Court has consistently recognized private

entities' right to "exercise editorial discretion over [ ] speech and speakers" —
including when they "provide[ ] a forum for speech" generated by others.
*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019). Those
"who open their property for speech" retain "the ability to exercise what
they deem to be appropriate editorial discretion." *Id.* at 1930-31. Otherwise,
they would face the unconstitutional "choice of allowing all comers or clos-
ing . . . altogether." *Id.* at 1931.

While *Tornillo* concerned a traditional newspaper, this doctrine is not
"restricted to the press." *Hurley*, 515 U.S. at 574. On the contrary, it applies
equally to "business corporations generally," as well as "ordinary people en-
gaged in unsophisticated expression." *Id. Tornillo*'s doctrinal progression il-
lustrates the point.

The statute in *Tornillo* required newspapers to give political candidates
"equal space to reply to criticism and attacks," and (like HB20) was thus con-
stitutionally indistinguishable from a law "forbidding [a newspaper] to pub-
lish specified matter." 418 U.S. at 243, 256. The Court invalidated the statute
because "the choice of material . . . and the decisions made as to limitations
on the size and content . . . and treatment of public issues and public offi-
cials — whether fair or unfair — constitute the exercise of editorial control and
judgment" protected by the First Amendment. *Id.* at 258. The statute's "in-
trusion into the function of editors" violated the First Amendment, *id.*, be-
cause the requirement to publish expression "infringed the newspaper

editors' freedom of speech by altering the message the paper wished to express." *FAIR*, 547 U.S. at 64.

*PG&E* applied *Tornillo* to a public utility's newsletter, holding "[c]ompelled access . . . both penalizes the expression of particular points of view and forces speakers to alter their speech to conform with an agenda they do not set." 475 U.S. at 9. The Court reiterated "the choice to speak includes within it the choice of what not to say." *Id.* at 16. So government may not "compel[] a private corporation to provide a forum for views other than its own." *Id.* at 9.

*Hurley* then "extended *Tornillo* to a parade." Br.24. *Hurley* held private entities do not need to present a "particularized message" to garner constitutional protection. 515 U.S. at 569. Nor must they adopt as their own or even agree with expression to retain First Amendment protection: A "private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech," *even if* it is "rather lenient in admitting participants." *Id.* at 569-70.

The First Amendment thus protects a private entity's right to choose whether to publish expression *generated by others*, as the Constitution does not "require a speaker to generate, as an original matter, each item featured in the communication." *Id.* at 570. So, for example, government cannot "force the editor of a collection of essays to print other essays on the same subject." *Denver*, 518 U.S. at 816 (Thomas, J., concurring in part). Nor can government

force a private cake designer to create a cake expressing a message he disapproves. *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1743-44 (2018) (Thomas, J., concurring in part).

At core, platforms publish speech: "[P]ublish[ing]" includes to "make publicly or generally known; to declare or report openly or publicly; to announce; to tell or noise abroad; also, to propagate, disseminate." *Landry's, Inc. v. Ins. Co. of the State of Pa.*, 4 F.4th 366, 369 (5th Cir. 2021). On the Internet specifically, this Court has held that "monitoring, screening, and deletion of content" are all "actions quintessentially related to a publisher's role." *Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008) (citation omitted).

Accordingly, courts across the country recognize that requiring a platform to publish content that it does not wish to publish violates the First Amendment. *E.g.*, *O'Handley v. Padilla*, 2022 WL 93625, at *15 (N.D. Cal. Jan. 10, 2022); *NetChoice*, 546 F. Supp. 3d at 1095; *Isaac v. Twitter*, 2021 WL 3860654, at *7 (S.D. Fla. Aug. 30, 2021); *Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621, 629 (E.D. Va. 2019), *aff'd*, 774 F. App'x 162 (4th Cir. 2019); *e-ventures Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991 (S.D. Tex. 2017); *Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433, 437, 440 (S.D.N.Y. 2014); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-30 (D. Del. 2007).

For good reason: As the record in this case reflects, a platform's decision about what content to publish—and how to arrange, display, and curate published content—is expressive and conveys a message about the type of

content that the platform finds acceptable. *Supra* pp.5-8. Forcing a platform to disseminate speech it finds objectionable requires the platform to "alter the expressive content of" its message, which flouts the First Amendment's core rule "that a speaker has the autonomy to choose the content of his own message." *Hurley*, 515 U.S. at 572-73.

Defendant all but concedes these principles when it notes HB20 "may *create* constitutional problems if the law were broader and targeted smaller platforms." Br.32. But size is irrelevant. HB20 creates constitutional problems when it infringes *any* platforms' editorial discretion. The First Amendment's protections do not dissipate once a platform goes from 49.9- to 50.0-million-monthly U.S. users—nor at any of the other arbitrary thresholds the Legislature considered. ROA.2593. And none of the authorities Defendant cites turned on the size of the entities targeted by the law. Nor do constitutional protections turn on notions of market power. Indeed, the newspaper in *Tornillo* had market power, yet the state could not force it to publish editorials that it did not wish to publish. 418 U.S. at 250-51.

**b.** Ignoring the bedrock principles established by *Tornillo* and its progeny, Defendant attempts to limit the cases to their facts or otherwise artificially limit their reach. That effort fails.

*First*, *Tornillo* cannot be limited to only "newspapers." Br.20.[8] The doctrinal progression from *Tornillo*'s newspaper to *PG&E*'s public-utility newsletter to *Hurley*'s parade demonstrates this. *PG&E*'s holding was not limited to a company being required to disseminate speech *disparaging the company*, as Defendant argues. Br.24. After all, the compelled speech in *Wooley v. Maynard*, was unconstitutional even though no one would think "Live Free or Die" disparaged New Hampshire residents. 430 U.S. 705, 717 (1977). Similarly, *Hurley* was not a case about simply "speech misattribution." Br.24. No one would think a politician's editorial in *Tornillo*—that the newspaper was *forced* to carry—was the newspaper's own speech. 418 U.S. at 243.

*Second*, Defendant suggests that *Tornillo*'s right-of-reply law would have been constitutional if it had applied more broadly, instead of just benefiting politicians. Br.20-21. But nothing in *Tornillo* turns on that fact. 418 U.S. at 258. And expanding that statute would have exacerbated the constitutional problem by "requir[ing] the newspaper to disseminate" *more* "message[s] with which [it] disagreed." *PG&E*, 475 U.S. at 18.

*Third*, Defendant argues that both newspapers and platforms are subject to employment antidiscrimination laws. Br.21. That is irrelevant. Of course,

---

[8] Defendant's reference to the Press Clause implies that *Tornillo* applies only to journalists. Br.20. *Hurley* refuted that. *See* 515 U.S. at 574. And the Press Clause is not limited to journalists. *See Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) ("liberty of the press . . . comprehends every sort of publication which affords a vehicle of information and opinion").

publishers are not immune from generally applicable employment antidiscrimination laws. *FAIR*, 547 U.S. at 62; *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389 (1973); *United States v. Hunter*, 459 F.2d 205, 213 (4th Cir. 1972). But HB20 does not target employment discrimination or even the publication of speech that advertises such discrimination. Rather, HB20 forces platforms to publish all viewpoints, even if they are objectionable. Restrictions on publication warrant strict First Amendment treatment, as Defendant's own case recognizes. *Hunter*, 459 F.2d at 211 (upholding law "not in relation to the dissemination of ideas").

*Hurley* held that "forbidding acts of discrimination" *among expressive viewpoints* is "a decidedly fatal objective" for the First Amendment's "free speech commands." 515 U.S. at 578-79. In fact, the State agrees that an otherwise-legitimate public-accommodation law is unconstitutional under the First Amendment "when it would have the effect of declaring 'speech itself to be the public accommodation.'" Brief of State of Texas et al. as Amici Curiae, *303 Creative, LLC v. Elenis*, 2020 WL 525392, at *11-12 (10th Cir. Jan. 29, 2020) (quoting *Hurley*, 515 U.S. at 573); Brief of State of Texas et al. as Amici Curiae, *Masterpiece Cakeshop*, 2017 WL 4023111, at *21 (U.S. Sept. 7, 2017) (similar). Defending HB20 as necessary to prevent political-viewpoint discrimination in private publishers' editorial choices only underscores the First Amendment problem. Courts have recognized that treating websites engaging in expression as public accommodations—compelling them to carry, promote, or support certain content—would violate the First

Amendment. *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1255 (11th Cir. 2021).

*Fourth*, Defendant argues that platforms are mere "conduits" for "news, comment, and advertising." Br.20, 22 (citation omitted). That is incorrect and contradicted by unrebutted record evidence. Platforms are not "dumb pipes"; they offer curated expression to their users in distinct ways that accord with platforms' policies—which the district court found "is an important way that online services express themselves." ROA.2599. Indeed, HB20 presupposes that platforms are not indifferent to content on their services, but instead remove and prioritize certain content. The First Amendment forbids restricting this.

*Fifth*, for all the reasons explained above at pp.19-20, it is immaterial that platforms disseminate user-submitted speech. Br.23.

*Sixth*, even if the First Amendment's protections turned on the risk of attribution of expression to private companies (they do not), unrebutted record evidence demonstrates that platform users, advertisers, and the public often attribute to platforms—and hold platforms responsible for—expression on the platforms. ROA.291-92; ROA.315; ROA.395; ROA.1846; ROA.1858-59. People understand that platforms disseminating speech of others conveys that such speech may be "worthy of presentation." *Hurley*, 515 U.S. at 575.

Contrary to Defendant's argument (Br.23), platforms necessarily must evaluate content when deciding how it is presented to users (if at all), and

platforms often moderate certain policy-violating content before users see it. ROA.360-71; ROA.382-85; NetChoice, *By The Numbers* 5-6, https://bit.ly/3Gn54Hj. Defendant's quotation from the ruling enjoining Florida's similar law is not to the contrary. Br.23. The Northern District of Florida recognized that platforms "*screen all content* for unacceptable material"—after which, much of the content "never gets reviewed *further*." *NetChoice*, 546 F. Supp. 3d at 1091-92 (emphases added).

Defendant's factual premise is not only wrong, it is constitutionally irrelevant at what point in time platforms exercise editorial discretion. Removal of content *ex post* is just as much an editorial choice as refusing to publish content in the first place. *Doe*, 528 F.3d at 420. And government cannot compel *continued publication* any more than it can compel initial dissemination. The choice of *when* and how to exercise editorial discretion is itself protected by the First Amendment. *E.g.*, *Horton v. City of Houston*, 179 F.3d 188, 189-90 (5th Cir. 1999) (recognizing "First Amendment rights" for organizations that "do not pre-screen submitted programs").

*Seventh*, contrary to Defendant's suggestion (Br.20), constitutional protections for publishers and editors are not conditioned on limited space. *See Tornillo*, 418 U.S. at 258 (right-of-reply statute unconstitutional "[e]ven if a newspaper . . . would not be forced to forgo publication . . . by the inclusion of a reply"). If true, newspapers could be forced to publish anything on *their* websites, where space is all but infinite. The Supreme Court has repeatedly rejected the idea that technological advances dilute First Amendment

protections. *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011); *Reno v. ACLU*, 521 U.S. 844, 870 (1997). The rise of online news did not make *Tornillo* a dead letter. And in any event, platforms *are* limited in what expression shows up at the top of users' "feeds," search results, and recommendations—which are directly regulated by HB20's prohibition on curating, displaying, and organizing expression based on viewpoint.

### 2. Defendant's "hosting" theory was rejected in *USAID* and has no support in *FAIR* and *PruneYard*.

Defendant relies on *FAIR* and *PruneYard* to argue that the First Amendment provides no protection against government compelling private companies to disseminate speech, if the government calls it a "hosting" requirement. Br.18-20. This argument fails. HB20 does not merely require "hosting." Regardless, Defendant's effort to distort the statute cannot save it. *USAID* rejected this argument.[9] And *FAIR* and *PruneYard* involved laws requiring access to physical property—*not* intrusions on private editorial decisions based on government's disapproval of those editorial decisions.

**a.** HB20 requires that platforms do much more than "host" expression they find objectionable: Section 7 forbids any effort to "demonetize, deboost, restrict, deny equal access or visibility to, or otherwise discriminate against expression." Tex. Civ. Prac. & Rem. Code §143A.001(1). These

---

[9] Defendant's "hosting" theory is based on one sentence in the *USAID* dissent intending to summarize *FAIR* and *PruneYard*. Br.17-18 (quoting *USAID*, 140 S. Ct. at 2098 (Breyer, J., dissenting)).

restrictions override virtually any editorial choice platforms make, and require platforms to, for instance, present Holocaust denial expression on equal terms in search results and recommendations as factual accounts of World War II. Furthermore, Holocaust denial expression must be eligible for "monetization." Thus, Defendant incorrectly asserts that HB20 only bans editorial practices with a "comparable effect" to "total removal of content." Br.11. By only defending HB20's "hosting" requirement, Defendant all but concedes the remainder of HB20 is insupportable.

**b.** Even if HB20 were just a hosting law, it would still violate the First Amendment. *USAID* rejected Defendant's theory that government can evade First Amendment scrutiny by recharacterizing publication or editorial decision-making as the unprotected "conduct" of "hosting." The Court noted that government-compelled "hosting" is often precisely the constitutional violation: "[T]he constitutional issue in [*PG&E* and *Hurley*] arose because the State forced one speaker to *host* another speaker's speech." 140 S. Ct. at 2088 (emphasis added).

Defendant's unsupported "hosting" theory is akin to defending censorship as regulating the "conduct" of writing. But whatever "conduct" platforms engage in is intertwined with editorial discretion and the expression embodied in such editorial choices. Just because expression "can be reduced to [its] constituent acts, and thus described as conduct," the "end product" cannot be "disconnect[ed] . . . from the act of creation." *Turner v. Driver*, 848 F.3d 678, 689 (5th Cir. 2017) (citation omitted). For instance, the "creation of

custom wedding cakes is expressive"—notwithstanding the "conduct" of purchasing ingredients, baking, and decorating—because the end result is expressive. *Masterpiece*, 138 S. Ct. at 1743 (Thomas, J., concurring in part).

Defendant's argument would grant government unfettered power to control the dissemination of speech. Because both "publishing" and "dissemination" of information are protected "speech," myriad entities enjoy First Amendment protection when they disseminate expression authored by others. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *accord Brown*, 564 U.S. at 792 n.1 ("distributing"); *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("disclosing and publishing information") (cleaned up); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 768 (1988) ("Liberty of circulating is as essential to freedom of expression as liberty of publishing") (cleaned up); *Smith v. California*, 361 U.S. 147, 150 (1959) ("free publication and dissemination of books and other forms of the printed word"); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963) ("circulation of books"); *Prison Legal News v. Livingston*, 683 F.3d 201, 212 (5th Cir. 2012) (same); *Muir v. Ala. Educ. TV Comm'n*, 656 F.2d 1012, 1016 (5th Cir. 1981) ("speaking, book publishing, theatre presentations, pamphleteering").

**c.** Nor does *FAIR* suggest otherwise because it did not concern editorial choices about what speech to publish. It was about employment recruiting on law school campuses.

*FAIR*'s "equal access" law conditioned funding on schools granting military employment recruiters equal "recruiting assistance" as provided to

other recruiters—which "is not inherently expressive." 547 U.S. at 64-65. Because the school was not publishing or engaging in expression when it "host[ed] interviews and recruiting receptions," "accommodating the military's message" did "not affect the law schools' speech." *Id.* at 63-64. "A law school's recruiting services lack the expressive quality of a parade, a newsletter, or the editorial page of a newspaper." *Id.* at 64. In other words, while the University of Chicago could be required to "host" military recruiters by providing them access to interview students for employment opportunities, the University of Chicago Law Review (and its online component) cannot be compelled to "host" articles that do not meet its editorial standards.

Here, because HB20 "dictate[s] the content" on platforms, it imposes more than a permissible "incidental" burden on platforms' expression. *Id.* at 62. HB20's "compelled-speech violation . . . result[s] from the fact that the complaining speaker's own message [is] affected by the speech it [is] forced to accommodate." *Id.* at 63. In addition to compelling speech, HB20 "dictat[es] how the platforms may arrange speech on their sites"—which is a "far greater burden on the platforms' own speech than was involved in *FAIR* or *PruneYard*." *NetChoice*, 546 F. Supp. 3d at 1093.

Defendant's responses fail. *First*, Defendant claims that First Amendment protections dissipate because platforms are "open to all comers." Br.19. But platforms are not open to all comers—they are open to those that agree to abide by the platforms' terms and conditions regarding acceptable content. *Supra* pp.5-6; ROA.1664-1721. Regardless, the varying stringency of

platforms' acceptable-use policies reflects expressive editorial choices that convey messages about the platforms. ROA.345.

*Second*, HB20 *does* require platforms to disseminate "viewpoints" that violate those policies (Br.19); HB20's whole purpose is to force platforms to publish certain viewpoints, like hate speech and foreign state propaganda that platforms would otherwise not allow. *Third*, it does not matter whether HB20 "allows" platforms to disapprove of certain messages. Br.19. Requiring a speaker to "dissociate" itself from forced speech by "simply post[ing] a disclaimer" would "justify any law compelling speech," *Masterpiece*, 138 S. Ct. at 1745 (Thomas, J., concurring)—including the laws invalidated in *Tornillo*, *PG&E*, *Hurley*, and *Wooley*. If anything, a platform's desire to disavow association compounds the constitutional problem by compelling platforms to speak.[10]

**d.** *PruneYard*, like *FAIR*, does not help Defendant. That case concerned a shopping mall, not a publisher of speech or an entity that made editorial judgments. That is why the Supreme Court held *PruneYard* involved no "intrusion into the function of editors." 447 U.S. at 88. The state law required a

---

[10] *FAIR* also held that military recruiters could have equal access to school "e-mails" or "bulletin boards" as other recruiters, because such "compelled speech" was only "incidental" to the "conduct" of on-campus recruiting. 547 U.S. at 61-62. That holding depended on *FAIR*'s holding that employment "recruit[ment] assistance" is not expressive. *Id.* at 61. *FAIR* does not suggest that government could require private law school message boards to be "viewpoint neutral"—to require them to publish pro-Nazi messages.

mall—which never engaged in expression and simply forbade all speech on its property—to grant physical access to people collecting petition signatures. *Id.* at 78. And even that access could be conditioned on compliance with reasonable regulations. *Id.* Importantly, the mall's "owner did not even allege that he objected to the content of the [speech]; nor was the access right content based." *PG&E*, 475 U.S. at 12. Thus, requiring the mall to "host" individuals engaged in expression had no impact on the mall's (nonexistent) expression. *PruneYard*, 447 U.S. at 88.

While platforms here are nothing like the mall in *PruneYard*, Defendant nevertheless argues (Br.18) that *PruneYard* establishes "factors" that determine whether other private companies can be forced to "host" speech. If that were true, the newspaper, parade, and utility publication from *Tornillo*, *Hurley*, and *PG&E* would have been subject to a multi-factor test—they were not. Regardless, the First Amendment must "eschew 'the open-ended rough-and-tumble of factors.'" *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 469 (2007) (controlling op. of Roberts, C.J.).

Here, HB20 imposes "viewpoint-neutrality" on expressive publications. That threatens the core principle of "speaker's autonomy," which was not implicated in *PruneYard*. *Hurley*, 515 U.S. at 580. Likewise, "*PruneYard* [] does not undercut the proposition that forced associations that burden protected speech are impermissible." *PG&E*, 475 U.S. at 12. And HB20 will eviscerate platforms' right to "eschew association for expressive purposes." *Janus v. AFSCME*, 138 S. Ct. 2448, 2463 (2018).

### 3. 47 U.S.C. §230 does not strip websites of constitutional rights.

The district court did not address Plaintiffs' argument that HB20's Section 7 is preempted by 47 U.S.C. §230, so there is no need for this Court to address §230 here. Briefly, HB20 is preempted by §230 for the reasons stated in this Court's decision in *Doe*, 528 F.3d at 420, and for the reasons offered in briefing below. ROA.308-10; ROA.1655-58.

Defendant nevertheless insists that HB20 cannot violate the Constitution because platforms simultaneously assert §230's protection. Br.12-14, 33-35. But no statute can override constitutional rights. And Defendant cites no authority for the proposition that parties cannot avail themselves of both constitutional and statutory protections.

Defendant baselessly suggests there is tension between platforms' reliance on both the Constitution and §230. As discussed above at pp.17-20, 28, the First Amendment protects "publishing" speech. But there are limited circumstances when government can constitutionally punish speech publication (*e.g.*, defamation). *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942). For purposes of that liability, Congress in §230 provided that websites cannot be "*treated as* the publisher or speaker" of user-generated speech and thus are generally protected from legal claims arising from user-generated content. 47 U.S.C. §230(c)(1) (emphasis added). In other words, while such websites *in fact* publish others' expression, Congress preempted liability for websites resulting from the publication of that expression. In fact, §230(c)(1)

makes sense *only if* websites "publish" speech; otherwise, §230(c)(1) would be pointless. That is why this Court held that §230's protections apply where websites take actions "quintessentially related to a publisher's role" like "monitoring, screening, and deletion of content from its network." *Doe*, 528 F.3d at 420 (citation omitted). Far from being in tension with the First Amendment, §230 confirms and codifies the underlying First Amendment right of platforms to make editorial choices about what to publish, and not to publish, free from government interference. *E.g.*, *Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003) (§230 "sought to further First Amendment . . . interests on the Internet").

Nor is there any tension with platforms' prior briefs about §230. Br.22. In each brief Defendant identifies, platforms argued they should be protected from liability under §230 *precisely because* they exercised editorial functions. Motion to Dismiss, *Fields v. Twitter*, 2016 WL 2586923 (N.D. Cal. Apr. 6, 2016) (invoking protections for "exercise of traditional editorial functions, 'such as deciding whether to publish, withdraw, postpone, or alter content'"); Brief for Appellees, *Klayman v. Zuckerberg*, 2013 WL 5371995 (D.C. Cir. Sept. 25, 2013) ("Whether and when to remove or exclude content posted by a third-party user falls at the very core of a publisher's traditional editorial function."); *see also* Motion to Dismiss, *Colon v. Twitter, et al.*, 2019 WL 2417279 (M.D. Fla. Apr. 29, 2019) (similar).

Likewise, as the cases that Defendant cites (Br.22) recognized, §230 does not require websites to be passive, indifferent conduits. *Force v. Facebook, Inc.*,

934 F.3d 53, 66 (2d Cir. 2019) ("immunity for the editorial decisions"); *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1271 (D.C. Cir. 2019) ("automated editorial acts of search engines are generally immunized") (cleaned up); *accord* 47 U.S.C. §230(f)(4). And that is neither what platforms are nor what they claim to be. In short, §230 only underscores that HB20's effort to hold online platforms liable for their editorial judgments is impermissible.

### 4. Platforms are not common carriers, and the First Amendment analysis would not change if they were.

**a.** Defendant's common carrier argument fares no better, as the district court correctly recognized. ROA.2585-87. HB20-covered platforms like "Facebook, Google, Twitter, and YouTube . . . are not considered common carriers that hold themselves out as affording neutral, indiscriminate access to their platform without any editorial filtering." *USTA*, 855 F.3d at 392 (Srinivasan & Tatel, JJ., concurring in the denial of reh'g en banc).[11] This is

---

[11] Defendant cites a purported "expert report" it submitted to the district court, which Plaintiffs moved to strike. Br.27. But the district court did not consider this so-called report (which was more amicus brief than expert report). ROA.2575-76. This Court also should not consider it, and in any event, the report's legal arguments are incorrect for all the reasons expressed herein.

consistent with the uniform conclusions of other courts.[12] If an entity does not furnish transmission services—which platforms inarguably do not—it is not a common carrier. Defendant's branding of platforms as "common carriers" would rip up decades of precedent. *E.g.*, *NARUC v. FCC*, 533 F.2d 601, 609 (D.C. Cir. 1976) ("prerequisite of common carrier status" is to "transmit intelligence").

"A common carrier does not 'make individualized decisions, in particular cases, whether and on what terms to deal.'" *FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 (1979). But unrebutted evidence establishes that platforms do just that, providing unique experiences to each user and limiting both who may access their platforms and how they may use the platforms, as discussed above at pp.5-6. Platforms simply "exercise too much discretion over the content they host to be regarded as common carriers or public accommodations." Christopher S. Yoo, *The First Amendment, Common Carriers, and Public Accommodations*, 1 J. Free Speech L. 463, 504 (2021).

Any effort to treat platforms as common carriers is contrary to federal law. Congress protected platforms' rights to exclude speakers and speech in §230(c), and further disclaimed any intent that they be treated "as common carriers," 47 U.S.C. §223(e)(6). Congress *wanted* websites to remove content

---

[12] *E.g.*, *Millan v. Facebook, Inc.*, 2021 WL 1149937, at *3 (Cal. Ct. App. Mar. 25, 2021); *Kinderstart.com LLC v. Google, Inc.*, 2006 WL 3246596, at *10-11 (N.D. Cal. July 13, 2006).

they "consider[]" objectionable, *id.* § 230(c)(2)(A), without fear of liability—exactly the opposite of requiring them to indifferently carry all users and expression.

Defendant nevertheless argues that government may regulate platforms as common carriers because platforms generally apply their acceptable-use policies to the subset of the public that agree to those policies. Br.25-26. But that is wholly circular: It uses the existence of the platforms' editorial policies as justification for overriding them. That platforms have detailed rules about what speech is and is not acceptable does not give the State license to sweep those rules aside in favor of ones it prefers. To the contrary, the Supreme Court has held that government may not convert First Amendment protected publishers into common carriers. *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 379 (1984) (compelled speech unlawful because it "would tend to transform broadcasters into common carriers and would intrude unnecessarily upon [] editorial discretion"); *Nebbia v. New York*, 291 U.S. 502, 555 (1934) ("a state may not by legislative fiat convert a private business into a public utility") (citations omitted); *Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306, 1321-22 (D.C. Cir. 2010) (Kavanaugh, J., dissenting) ("Government cannot compel video programming distributors to operate like 'dumb pipes' or 'common carriers' that exercise no editorial control").

**b.** In all events, common carriers retain the "right to be free from state regulation that burdens" speech publication. *PG&E*, 475 U.S. at 17-18 & n.14. So HB20's label as "a common carrier scheme has no real First Amendment

consequences," because "impos[ing] a form of common carrier obligation" cannot justify a law that "burdens the constitutionally protected speech rights" of platforms "to expand the speaking opportunities" of others. *Denver*, 518 U.S. at 824-26 (Thomas, J., concurring in part).

The Supreme Court has repeatedly made that clear. *PG&E* held that a public utility retained editorial discretion and could not be compelled to disseminate others' speech. 475 U.S. at 17-18 n.14. *Denver* recognized that cable operators retain editorial discretion over the "freedom to pick and to choose programming." 518 U.S. at 738 (plurality op.). It further observed that common carriers more generally retain First Amendment rights. *Id.* (collecting cases). And *Turner* held that cable companies "engage in and transmit speech" protected by the First Amendment. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636-37 (1994) (cleaned up). That speech includes "exercising editorial discretion over which stations or programs to include"—through which cable operators "communicate messages on a wide variety of topics and in a wide variety of formats." *Id.*; *accord Time Warner Cable, Inc. (TWC) v. Hudson*, 667 F.3d 630, 638 (5th Cir. 2012). In no case has the Supreme Court ever suggested that the common-carrier label is a talisman that makes the First Amendment rights of private companies disappear.

**c.** Defendant relies on *Turner* (Br.28-30), but that case only confirms that the First Amendment does not allow HB20's sweeping attack on private editorial discretion.

*Reno* held that *Turner*'s broadcast-television-specific analysis has no place in evaluating First Amendment rights on the "Internet." 521 U.S. at 870; *id.* at 868-69 ("special justifications for regulation of the broadcast media [] are not applicable to other speakers," like "forums of the Internet"). After all, *Turner*'s narrow holding involved a content-neutral law and unique facts about the television industry not present here. *Turner* considered a federal statute requiring cable operators to carry traditional broadcast channels. That content-neutral regulation was only upheld because of "the unique physical characteristics of cable [television] transmission"—physical cable lines running into houses—which provided cable companies a physical "bottleneck, or gatekeeper, control over most (if not all) of the television programming that is channeled into the subscriber's home." *Turner*, 512 U.S. at 639, 656; *id.* at 661; *accord TWC*, 667 F.3d at 640 (explaining and distinguishing special circumstances in *Turner*); *Horton*, 179 F.3d at 192 (law in *Turner* "further[ed] the non-speech-related goals of protecting local broadcasters and *assuring free TV access to citizens who lack cable connections*") (emphasis added).

In that unique context, *Turner* recognized "the widest possible dissemination of information from diverse and antagonistic sources is essential to

the welfare of the public." 512 U.S. at 646 (cleaned up).[13] In other words, the continued existence of broadcast television depended on the must-carry regulation. That is not remotely the situation here.

"[T]his case differs from *Turner* because there are no similar characteristics of the cable medium that would justify" HB20's Internet restrictions. *TWC*, 667 F.3d at 640. No social media platform has a natural monopoly over physical infrastructure. No platform controls a *physical bottleneck* that would "*destroy*[]" an entire speech medium. *Hurley*, 515 U.S. at 577 (emphasis added; discussing *Turner*). As *Reno* already held, "the Internet can hardly be considered a 'scarce' expressive commodity." 521 U.S. at 870.[14]

Defendant also cites (Br.23, 26, 29, 33) a certiorari-stage statement by Justice Thomas, which did not address the constitutional arguments presented

---

[13] This language originally comes from an antitrust case—not as a compelling governmental interest under strict scrutiny. *Associated Press v. United States*, 326 U.S. 1, 20 (1945).

[14] Defendant wrongly speculates that the *Turner* dissenters would have upheld HB20. Br.29. To begin, they dissented because they concluded the statute was *content-based*—as is HB20. *Horton*, 179 F.3d at 192. Furthermore, the dissenters recognized the Constitution protects those who "[s]elect[] which speech to retransmit"—like "publishing houses, movie theaters, bookstores, and Reader's Digest"—because their activities are "no less communication than is creating the speech in the first place." *Turner*, 512 U.S. at 675 (O'Connor, J., dissenting in part). The same is true of platforms, which "puts this case squarely within the rule of [*PG&E*]" forbidding the compelled publication of speech. *Id.* at 682.

here. *Biden v. Knight First Amendment Inst.*, 141 S. Ct. 1220, 1227 (2021). *Knight* vacated as moot a decision about whether government officials' Twitter accounts could constitute First-Amendment-protected "public forums." *Id.* at 1221. Thus, the *Knight* litigants had not presented (1) Justice Thomas's prior observation that labeling a law "a common carrier scheme has no real First Amendment consequences," *Denver*, 518 U.S. at 825 (Thomas, J., concurring in part); or (2) *Hurley*'s holding that government cannot declare "speech itself to be the public accommodation." 515 U.S. at 573.[15]

## B. HB20 discriminates based on viewpoint, content, and speaker.

HB20 triggers strict scrutiny because it discriminates based on viewpoint, content, and speaker. *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) (content and viewpoint); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 591 (1983) (speaker). Defendant addresses these

---

[15] Regardless, even under the considerations identified in Justice Thomas's statement in *Knight*, platforms are not common carriers. *First*, whether platforms are "of public interest" is "hardly helpful, for most things can be described as 'of public interest.'" *Knight*, 141 S. Ct. at 1223. *Second*, Defendant has disavowed that market power is relevant. *See* Defendant's Reply in Support of Motion to Stay 7 (Dec. 30, 2021) ("'nothing approaching monopoly' is required"). *Third*, Congress "has not imposed . . . nondiscrimination" as a condition of § 230 protection. *Knight*, 141 S. Ct. at 1226. *Fourth*, as addressed above at pp.5-6, 29-30, platforms are not "open to the public" in the sense relevant to the common-carrier inquiry. *Finally*, platforms are not members of the "communications industry" akin to railways, phone providers, or telegraphs. *Supra* pp.24, 37-39. Those businesses do not make editorial judgments, publish expression, or engage in their own expression.

issues in only a conclusory manner (Br.31-32), but the statute plainly fails to meet any form of heightened scrutiny.

**1.** On its face, HB20's "social media platform" definition discriminates based on content, speaker, and viewpoint.

*First*, this definition is content based, because it excludes certain websites based on content—like news, sports, and entertainment. *Supra* p.9; *Reed*, 576 U.S. at 163.

*Second*, the definition is speaker based: "Laws singling out a small number of speakers for onerous treatment are inherently suspect." *TWC*, 667 F.3d at 638; *accord Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (speaker-based restrictions "are all too often simply a means to control content"); *NetChoice*, 546 F. Supp. 3d at 1094 (strict scrutiny applied because law regulated "only a small subset of social-media entities"). That principle applies with special force to entities that publish expression. *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228 (1987).

Far from applying "evenhandedly" to "smalltime" and "giant" speakers, *Fla. Star v. B.J.F.*, 491 U.S. 524, 540-41 (1989), HB20 singles out a select subset of websites: social media platforms with over 50-million-monthly U.S. users. HB20 therefore excludes smaller, favored businesses.

This arbitrary user threshold is unsupported by legislative findings. *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (requiring more than "mere speculation or conjecture"). In fact, the user threshold was amended at various points without any deliberation. ROA.2593. Likewise, the Legislature

rejected lowering the threshold to include other businesses "popular among conservatives." ROA.2593; Tex. Sen. Journal, 87th Leg., at 499, https://bit.ly/3Cq663o.

By discriminating among social media platforms, HB20 raises "serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *NIFLA*, 138 S. Ct. at 2376 (citation omitted). Confirming HB20's viewpoint-based purpose, the "history of [HB20's] passage" demonstrates that HB20's arbitrary user threshold is a proxy for targeting platforms some perceive as disfavoring "conservative" viewpoints. *Id.* at 2379 (Kennedy, J., concurring). The Governor's signing statement and HB20's key legislative proponents expressly stated that HB20 was necessary to stop platforms from "silencing conservative views." ROA.277; *supra* p.8.

Accordingly, HB20's user threshold "cannot be justified without reference to the content of the regulated speech," and it "w[as] adopted by the government because of disagreement with the message the speech conveys." *Reed*, 576 U.S. at 164 (cleaned up).[16]

**2.** Section 7's editorial-discretion prohibition imposes more viewpoint-, content-, and speaker-based distinctions. HB20 requires platforms to publish viewpoints that platforms do not want to publish—while also including

---

[16] Defendant admits severing any portion of this definition would expand HB20's constitutional problems. Br.32.

"carveouts that let the Platforms continue to viewpoint-censor in a few limited areas." Br.31.

The central prohibition on "viewpoint"-based moderation "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163 (collecting cases). Under HB20, platforms are free to remove a video because it is too long but not because it denies that the Holocaust occurred.

HB20 further excludes certain moderation decisions based on content. HB20 permits moderation of "expression that . . . directly incites criminal activity or consists of specific threats of violence targeted against a person or group because of their race, color, disability, religion, national origin or ancestry, age, sex, or status as a peace officer or judge." Tex. Civ. Prac. & Rem. Code § 143A.006(a)(3). Thus, the only way to determine whether an editorial choice is lawful is to review the content at issue. "That is about as content-based as it gets." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2346 (2020).

## C. HB20 fails any level of heightened scrutiny.

HB20 triggers strict scrutiny, and therefore must be "the least restrictive means of achieving a compelling state interest." *Ams. for Prosperity Found. (AFP) v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (citation omitted); *Reed*, 576 U.S.

at 163.[17] Even under "intermediate scrutiny," HB20 must be "narrowly tailored to serve a significant government interest." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017); *AFP*, 141 S. Ct. at 2384 (same, under "exacting scrutiny").[18]

### 1. Defendant lacks a sufficient governmental interest.

HB20 does not advance a compelling governmental interest. Defendant has posited three interests throughout this litigation, but the Supreme Court has rejected all of them.

**a.** Defendant says that HB20 advances the State's interest in "protecting the free exchange of ideas and information." Br.30. But government cannot regulate private speech "to enhance the relative voice of others," *Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976) (per curiam), or to "level the playing field." *Ariz. Free Enter. Club v. Bennett*, 564 U.S. 721, 749-50 (2011). Thus, "no matter

---

[17] Because HB20's coverage definition fails "strict scrutiny," the law is "facially invalid." *Veterans of Foreign Wars v. Tex. Lottery Comm'n*, 760 F.3d 427, 441 (5th Cir. 2014). Furthermore, whenever HB20 applies, it unconstitutionally abridges editorial judgment and compels speech. *City of L.A. v. Patel*, 576 U.S. 409, 418 (2015). The Supreme Court has held that overbroad statutes cannot be saved through severability. *AFP*, 141 S. Ct. at 2387; *Reno*, 521 U.S. at 884-85 n.49.

[18] Among other problems, HB20 fails intermediate scrutiny because it is not "unrelated to the suppression of free expression." *TWC*, 667 F.3d at 641. Contrary to Defendant's emphasis on *users'* expression (Br.30), HB20 curtails *platforms'* expression of what speech is "worthy of presentation," *Hurley*, 515 U.S. at 575.

how praise-worthy the objectives, government may not favor one set of speakers over another." *Horton*, 179 F.3d at 194.

The Supreme Court has repeatedly rejected state attempts to correct perceived imbalances in speech. Indeed, *Tornillo* brushed aside many of the same interests that Defendant offers here. The Court held that government cannot mandate "enforced access," to "enhance[]" speech, promote "fairness," prevent "abuses of bias and manipulative reportage," address purported "vast accumulations of unreviewable power in the modern media empires," or address the contention that "the public has lost any ability to respond or to contribute in a meaningful way to the debate on issues." 418 U.S. at 245, 250-51, 255. *Tornillo* established that even a "noncompetitive and enormously powerful" company with a "monopoly" on the "marketplace of ideas" retains First Amendment protections. *Id.* at 249, 250-51.[19]

*Hurley* similarly explained that the "enviable" "size and success" of platforms does not "support[] a claim that [platforms] enjoy an abiding monopoly of access to spectators." 515 U.S. at 577-78. As the Supreme Court recognized, even if there may be only one St. Patrick's Day parade in South Boston, that does not diminish the parade organizers' First Amendment rights.

---

[19] Here, Plaintiffs' members compete in a highly competitive marketplace. ROA.377; ROA.388-89. For example, TikTok now has over 1 billion active users worldwide after being launched in 2016. TikTok, Thanks a Billion (Sept. 27, 2021), https://bit.ly/36IunqA.

Far from saving HB20, therefore, Defendant's professed interest in leveling the field only confirms that the statute is unconstitutional. The First Amendment does not empower government to mandate private editorial policies—what Defendant calls "protect[ing] the destruction of free speech." Br.37. Defendant's appeal to "free speech" erases "a critical boundary between the government and the individual." *Manhattan*, 139 S. Ct. at 1934. The First Amendment limits state action—it is not license to the government to restrict private speech or editorial freedom. *Id.* Defendant's effort to invert the First Amendment would "expand governmental control while restricting individual liberty and private enterprise." *Id.*

**b.** In the district court, Defendant asserted an interest in "the free and unobstructed use of public forums and of the information conduits provided by common carriers." ROA.2597. But as discussed above at pp.34-36, online platforms are not common carriers. Nor are they "public forums" under the First Amendment, as they are not government property. *Ark. Educ.*, 523 U.S. at 678 (public-forum analysis limited to "historic confines"); *Prager Univ. v. Google LLC*, 951 F.3d 991, 999 (9th Cir. 2020). Justice Thomas's *Knight* statement similarly acknowledged that the idea that platforms are "public forum[s] . . . has problems." 141 S. Ct. at 1225.[20]

---

[20] *Packingham* is not to the contrary. Br.1, 5. That case considered whether *government* can bar sex offenders from social media platforms—not whether *private platforms* have the right to exercise editorial discretion. 137 S. Ct. at 1735; *accord Prager*, 951 F.3d at 996 n.2.

**c.** Defendant's other governmental interest in the district court was preventing platforms' "discrimination" among expression. Br.21. *Hurley* expressly rejected this interest, as addressed above at p.23.

### 2. HB20 is not properly tailored.

HB20 is neither narrowly tailored nor the "least restrictive" means of furthering any governmental interest. *AFP*, 141 S. Ct. at 2383.

As an initial matter, HB20's 50-million-monthly-U.S.-user threshold does not further Defendant's interest in the "free exchange of ideas and information." Br.11, 30. If that were actually the State's purpose, HB20's mandate would need to apply to *all* online services that publish user expression. Plus, it is unclear why this threshold would only account for *United States* users if the goal were disseminating as many ideas and information as possible and making those ideas and information available to Texas users.

Defendant argues HB20 applies only to the "largest social media platforms" that "have shown an overwhelming tendency to censor." Br.30. But there is no evidence in the legislative record supporting HB20's arbitrary 50-million-monthly-user threshold—as compared to a 49-million-user threshold, for instance.

Moreover, Defendant cannot define platforms' viewpoint-based editorial discretion (their alleged "tendency to censor") as the "problem" HB20 addresses. Government may not justify a speech-infringing law on government's disapproval of the speaker's expression—here, platforms' editorial choices. "Disapproval of a private speaker's statement does not legitimize

use of the [government's] power to compel the speaker to alter the message by including one more acceptable to others." *Hurley*, 515 U.S. at 581; *accord Wooley*, 430 U.S. at 717 ("where the State's interest is to disseminate an ideology . . . such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message").

HB20's lack of tailoring extends to the speech HB20 purports to protect. HB20 includes multiple content- and viewpoint-based exceptions, which means that HB20 does not further the "free exchange" of *all* information, but rather only state-approved ideas. Defendant concedes that HB20 permits "removal of entire categories of '*content*.'" Br.11. Likewise, as addressed above at pp.10, 42-43, HB20 allows viewpoint-based moderation on government-disfavored topics, underscoring that HB20 picks and chooses which "ideas and information" are worthy of "free exchange."

Furthermore, HB20 "burden[s] substantially more speech than is necessary to further" the State's interest because HB20 broadly limits the full scope of platforms' editorial tools—and does not merely impose a "hosting" requirement. *Turner*, 512 U.S. at 662 (citation omitted). For instance, Defendant cannot justify why platforms must both publish pro-Nazi expression *and* recommend and monetize such expression on equal terms as non-objectionable expression.

The mismatch between Defendant's invocation of the First Amendment's "broader societal values" (Br.36) and HB20's selective protection of speech is exemplified by Defendant's dismissal of an obvious alternative. If

the State were truly interested in providing a viewpoint-neutral public forum, the State could have created its own, government-run social-media platform. Such a proposal was considered—and rejected—by the Texas Legislature when it adopted HB20. Tex. H.R. Journal, 87th Leg., 2d Spec. Sess., at 234-35, https://bit.ly/2Y2YGEp. That would have advanced the State's purported interest without diminishing any First Amendment rights. But the Legislature chose to commandeer private businesses instead.

That alone is fatal to HB20, but it is also suggestive of the deeper constitutional problem. Based on statements from governmental officials, HB20's true interest is promoting conservative speech on platforms that legislators perceive as "liberal"—not in the "free flow" of all information. *Supra* p.8. The First Amendment has "no more certain antithesis": Government "is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579.

## II. HB20 Section 2's disclosure and operational requirements violate the First Amendment.

**A.** HB20 Section 2's requirements are content-, speaker-, and viewpoint-based, because they depend on the same "social-media-platform" definition as Section 7. *Supra* pp.8-9. These "content-based burdens must satisfy the same rigorous scrutiny as . . . content-based bans." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000); *accord NIFLA*, 138 S. Ct. at 2374

(collecting cases).[21]

Section 2 also unconstitutionally compels speech, burdening and chilling editorial discretion. *Herbert v. Lando*, 441 U.S. 153, 174 (1979) (First Amendment prohibits any "law that subjects the editorial process to private or official examination merely to satisfy curiosity or to serve some general end"). HB20's requirements are like requiring select art galleries to publicly disclose both their art-selection processes and the art they choose not to display, and provide a grievance procedure for artists whose art is rejected. Furthermore, any *perceived* violation invites invasive governmental investigation (and litigation) into platforms' source data and editorial judgments—chilling editorial discretion. ROA.216.

The Fourth Circuit held that Maryland's similar disclosure requirements on "online platforms" "intrud[ed] into the function of editors" and unconstitutionally compelled speech under "exacting scrutiny." *McManus*, 944 F.3d at 518-20. Maryland imposed two requirements: (1) "post certain information about the political ads" "within 48 hours of an ad being purchased"; and (2) maintain records of political ad purchasers for inspection. *Id.* 511-12. Neither requirement included broad data-collection requirements and neither required publication of editorial policies. Yet they were held

---

[21] At minimum, "exacting scrutiny" should apply. *AFP*, 141 S. Ct. at 2383. HB20 fails exacting scrutiny because it does not further acceptable governmental interests. *E.g.*, *Buckley*, 424 U.S. at 66.

impermissible because "[i]t is the presence of compulsion from the state itself that compromises the First Amendment." *Id.* at 515. The Court further noted that "[w]ithout clear limits, the specter of a broad inspection authority, coupled with an expanded disclosure obligation, can chill speech and is a form of state power the Supreme Court would not countenance." *Id.* at 519 (citation omitted).

Furthermore, editorial policies are not subject to the "commercial speech" doctrine, *Prager*, 951 F.3d at 1000, because they are not "expression related solely to the economic interests of the speaker and its audience." *Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 487 n.2 (5th Cir. 2019) (cleaned up).[22] This distinguishes HB20's disclosures from Defendant's commercial-speech disclosure examples. Br.38, 40-41.

Nor can Defendant justify HB20 simply because certain platforms have voluntary transparency efforts—like acceptable-use policies, notice-and-

---

[22] In dismissing on ripeness grounds a pre-enforcement challenge to an investigative subpoena, a Ninth Circuit panel suggested that "making misrepresentations about content moderation policies is not" protected speech. *Twitter, Inc. v. Paxton*, 2022 WL 610352, at *4 (9th Cir. Mar. 2, 2022). But that decision distinguished the *exercise of editorial discretion* from potentially "misleading commercial speech," *id.*, and the panel neither addressed nor approved *government-compelled speech*. *Id. Paxton* is irrelevant here, as HB20 has nothing to do with misrepresentations about platforms' content-moderation practices.

appeal systems, and transparency reports. Br.38-40. The Supreme Court has held that addressing the "gap" between "voluntary" efforts and government mandates "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803. And Defendant has yet to disavow enforcement based on these voluntary efforts.

**B.** This case, therefore, is not governed by the *Zauderer* test for compelled speech in "commercial advertising." *NIFLA*, 138 S. Ct. at 2372 (citing *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985)). But, as the district court concluded, Section 2 cannot be saved even under *Zauderer*. ROA.2591-92.

Section 2 compels more than "purely factual information" (Br.12), and the requirements it imposes on platforms are "unjustified or unduly burdensome." *NIFLA*, 138 S. Ct. at 2372 (cleaned up). In many cases, Section 2's requirements exceed current voluntary disclosure efforts, and far exceed the few lines of text that *NIFLA* concluded "drown[ed] out" speech in that case. *Id.* at 2378. In addition to the harms to HB20-covered platforms, Section 2's requirements can only raise costs—discouraging competition in an industry that Defendant (erroneously) laments (Br.33) lacks competition.

*First*, HB20's notice-and-appeal provisions are burdensome as they require platforms to develop procedures applicable to *billions* of moderation decisions across platforms' international operations. Specifically, HB20 requires (1) a complaint system requiring responses within 48 hours; (2) notice *each time* platforms remove *any* content disclosing "the reason the content

was removed"; and (3) a content-removal appeal process, requiring decisions within 14 days. Tex. Bus. & Com. Code §§ 120.101-4.

The district court noted the vast amounts of content these requirements cover. ROA.2591. For instance, YouTube provides appeals for video but not comment deletions; so "YouTube would have to expand these systems' capacity by over 100—from a volume handling millions of removals to that of over a billion removals . . . within an accelerated response period." ROA.214-215. That is far more than "maintain[ing] a customer service department." Br.42. Because of the volume of content, any complaint system could deluge platforms with requests (including bad-faith requests) to which platforms must respond within a very short period of time.

*Second*, HB20's non-exhaustive list of "public disclosures" into "content management, data management, and business practices" intrusively encompasses *everything* platforms do. Tex. Bus. & Com. Code § 120.051(a). HB20 requires these disclosures to "be sufficient to enable users to make an informed choice," but does not define this standard. *Id.* § 120.051(b). Defendant may sue because a platform's disclosure on enumerated topics is "insufficient" *and* because a platform did not provide *un*enumerated information. Though Defendant says platforms can comply with a "short" and "uniform" document (Br.40), Defendant has yet to say what would make that document satisfactory.

Furthermore, unrebutted evidence demonstrates that these disclosure requirements will enable wrongdoers to evade detection and harm users.

ROA.1437. Platforms deliberately decline to disclose all such information to avoid aiding "unscrupulous users." ROA.215. These disclosures—particularly with respect to "algorithms"—also reveal trade secrets and other competitively sensitive information. Tex. Bus. & Com. Code §120.051(a)(4); ROA.377; ROA.388-89.

*Third*, the "acceptable use policy" that "reasonably inform[s]" and details all "steps" to enforce platform policies (Tex. Bus. & Com. Code §120.052) is impermissible because editorial policies are not "factual, non-controversial information." *NIFLA*, 138 S. Ct. at 2372. This provision is an invitation for lawsuits into platforms' editorial judgment and will make Defendant the ultimate arbiter of how platforms should apply their policies.

*Finally*, the "transparency report" requires platforms to collect voluminous detail, far exceeding platforms' current transparency efforts. Tex. Bus. & Com. Code §120.053. These requirements are so broad they may be technically impossible, ensuring investigation and litigation.

Defendant ignores the voluminous data *collection* and *calculation* necessary to produce the "top-line numbers" it says HB20 requires. Br.41. For example, HB20 requires platforms to track every single "action" they take to, among other things, delete or "deprioritiz[e]" "illegal" or "potentially policy-violating" expression. *Id.* §120.053(a)(2). And it requires platforms to track further information about that content and how it was reported. *Id.* §120.053(a)(3)-(b).

Even if complying with these provisions were feasible, they would still result in significant intrusion. For the State to ensure that platforms' disclosures are accurate, it will demand access to platforms' raw data.

And these requirements are *not* feasible. Facebook and YouTube noted that HB20's disclosure requirements would be incredibly burdensome, and Facebook's declarant expressed skepticism that compliance would even be possible. ROA.215; ROA.2592. As explained above at pp.5-7, platforms make prioritization decisions about *every* piece of content, and thus take "action" countless times a day. ROA.227 ("deprioritization" "happens every time a user loads her or his News Feed"). And though platforms do track *some* of the information that HB20 requires (Br.39-40, 41), they do so at enormous time and expense that HB20 can only magnify.

The burden and technical infeasibility of these disclosures distinguishes them from SEC disclosures—which are also distinguishable on further bases. Br.41. Unlike HB20's speaker-based definition of regulated platforms, SEC disclosures apply equally to all publicly traded companies. *SEC v. McGoff*, 647 F.2d 185, 190 (D.C. Cir. 1981). Moreover, the SEC does not require disclosures into the exercise of editorial discretion—and thus investigations into SEC disclosures does not require investigation into editorial discretion. *Id.* at 191 (SEC investigation unlawful as applied to "editorial policy" and newsgathering). And even the SEC does not have free rein to impose disclosures. *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015) (requirement to disclose "conflict minerals" unconstitutional).

## III. The other preliminary-injunction factors all favor preserving the platforms' First Amendment rights.

The "loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (cleaned up). The district court also found that compliance will be burdensome, if it is possible at all. ROA.2599. HB20 (1) requires platforms to reinvent their operations; (2) prohibits platforms from "mak[ing] their platforms safe, useful, and enjoyable"; and (3) will result in lost users and revenue. ROA.2599. As Facebook's declarant testified, "[W]e would not be able to change systems in that nature. . . . I don't see a way that we would actually be able to go forward with compliance in a meaningful way." ROA.2592.

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Texans*, 732 F.3d at 539 (cleaned up). And Defendant suffers no injury from this unconstitutional law being enjoined. *Id.*

Though Defendant contends that HB20's violations of platforms' rights will further the public interest, that argument inverts the First Amendment's protections. The First Amendment is not a sword the government may wield against disfavored speakers. It is a shield that private entities may use to protect against government-compelled speech. HB20 is a law that penalizes disfavored private entities for exercising their viewpoints—perceived and actual. And a country permitting such a law is the real "discriminatory dystopia" that Defendant accuses private companies of promoting. Br.4.

Allowing such a gross invasion here will only facilitate further government control of private speech. That, assuredly, is not in the public interest.

Accordingly, these factors weigh in favor of maintaining the status quo: an Internet free of government-compelled speech, as it has existed for decades.

## Conclusion

This Court should affirm.

DATED: April 1, 2022

Steven P. Lehotsky
Jeremy Evan Maltz
Gabriela Gonzalez-Araiza
LEHOTSKY KELLER LLP
200 Massachusetts Avenue, NW
Washington, DC 20001

Respectfully submitted,

*/s/ Scott A. Keller*
Scott A. Keller
Matthew H. Frederick
Todd Disher
LEHOTSKY KELLER LLP
919 Congress Ave.
Austin, TX 78701
scott@lehotskykeller.com
(512) 693-8350
*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

On April 1, 2022, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses. No paper copies were filed in accordance with the COVID-19 changes ordered in General Docket No. 2020-3.

*/s/ Scott A. Keller*
Scott A. Keller

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,981 words, excluding the parts of exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ Scott A. Keller*
Scott A. Keller