**No. 21-51178**

# In the United States Court of Appeals
# for the Fifth Circuit

NETCHOICE, L.L.C., A 501(C)(6) DISTRICT OF COLUMBIA ORGANIZATION DOING BUSINESS AS NETCHOICE; COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, A 501(C)(6) NON-STOCK VIRGINIA CORPORATION DOING BUSINESS AS CCIA,

*Plaintiffs-Appellees,*

*v.*

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## REPLY BRIEF FOR APPELLANT

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

JUDD E. STONE II
Solicitor General

RYAN S. BAASCH
Assistant Solicitor General
Ryan.Baasch@oag.texas.gov

Counsel for Defendant-Appellant
Ken Paxton, Attorney General
of Texas

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................ ii

Introduction ........................................................................................................... 1

Argument ............................................................................................................... 3

I.  HB 20's Hosting Rule Regulates the Platforms' Conduct, But
    Satisfies First Amendment Scrutiny Even if Interpreted to
    Regulate Their Speech. ........................................................................... 3

   A.  The Hosting Rule falls outside the First Amendment. ...................... 3

      1.  The Hosting Rule regulates the Platforms' conduct. ................... 3

      2.  HB 20 does not interfere with "editorial discretion." ................. 4

      3.  The Platforms' Section 230 positions foreclose their
          "editorial discretion" argument here. .......................................... 9

      4.  The Platforms' three core cases are demonstrably
          inapposite. .................................................................................. 12

   B.  Even if the Hosting Rule were subject to First Amendment
       scrutiny, it survives as a historically grounded common-
       carrier regulation. ......................................................................... 17

II.  HB 20's Disclosure Requirements Are Factual, Uncontroversial,
     and Do Not Burden the Platforms' Speech. ......................................... 23

III.  The Equitable Factors Demonstrably Favor Texas. ................................ 25

Conclusion .......................................................................................................... 26

Certificate of Service .......................................................................................... 27

Certificate of Compliance ................................................................................... 27

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*ACA Connects v. Bonta*,
  24 F.4th 1233 (9th Cir. 2022) ........................................................ 18

*Agency for Int'l Dev. v. All. for Open Soc'y*,
  140 S.Ct. 2082 (2020) ........................................................ 3, 4, 14

*Am. Hosp. Ass'n v. Azar*,
  983 F.3d 528 (D.C. Cir. 2020) ........................................................24

*Americans for Prosperity v. Bonta*,
  141 S.Ct. 2373, 2387 (2021) ........................................................8

*Ark. Educ. Television Comm'n v. Forbes*,
  523 U.S. 666 (1998)........................................................5

*Associated Press v. NLRB*,
  301 U.S. 103 (1937) ........................................................4

*Biden v. Knight First Amend. Inst.*,
  141 S.Ct. 1220 (2021) ........................................................ 15, 19

*Brown v. EMA*,
  564 U.S. 786 (2011)........................................................ 19

*Carlin Commc'ns, Inc. v. Mountain States Tel.*,
  827 F.2d 1291 (9th Cir. 1987) ........................................................ 11

*Cedar Point Nursery v. Hassid*,
  141 S.Ct. 2063 (2021) ........................................................12

*Cellco P'ship v. FCC*,
  700 F.3d 534 (D.C. Cir. 2012) ........................................................ 17

*Citizens United v. FEC*,
  558 U.S. 310 (2010)........................................................12

*Crosby v. Twitter*,
  No. 2:16-cv-14406 (E.D. Mich. 2017)........................................................9

*Denver Area Educ. Telecomms. v. FCC*,
  518 U.S 727 (1996) ........................................................ 19

*Doe v. MySpace, Inc.*,
  528 F.3d 413 (5th Cir. 2008) ........................................................12

*Force v. Facebook*,
  No. 1:16-cv-05158 (E.D.N.Y. 2018)........................................................10

*Force v. Facebook*,
 No. 18-397 (2d Cir. 2018) .................................................................. 10

*Gonzalez v. Twitter*,
 No. 4:16-cv-03282 (N.D. Cal. 2017) ........................................ 9, 10, 15

*Green v. Youtube*,
 No. 1:18-cv-00203 (D.N.H. 2018) ...................................................... 10

*Hepp v. Facebook*,
 No. 2:19-cv-04034 (E.D. Pa. 2020) ................................................... 10

*Herbert v. Lando*,
 441 U.S. 153 (1979) ............................................................................ 23

*Horton v. City of Houston*,
 179 F.3d 188 (5th Cir. 1999) ................................................................ 5

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
 515 U.S. 557 (1995) ............................................................... 12, 13, 14

*Hustler Mag., Inc. v. Falwell*,
 485 U.S. 46 (1988) .............................................................................. 26

*Jefferson v. Zukerberg*,
 No. 1:17-cv-03299 (D. Md. 2018) ...................................................... 10

*Landry's v. Ins. Co.*,
 4 F.4th 366 (5th Cir. 2021) ................................................................... 4

*Lincoln Fed. Lab. Union v. Nw. Iron & Metal Co.*,
 335 U.S. 525 (1949) ............................................................................ 18

*Malwarebytes, Inc. v. Enigma Software Grp.*,
 141 S.Ct. 13 (2020) ............................................................................ 12

*Miami Herald v. Tornillo*,
 418 U.S. 241 (1974) ........................................................... 5, 12, 15, 16

*Morales v. TWA*,
 504 U.S. 374 (1992) .............................................................................. 8

*Netchoice v. Moody*,
 546 F.Supp.3d 1082 (N.D. Fla. 2021) ........................................... 5, 6, 7

*NIFLA v. Becerra*,
 138 S.Ct. 2361 (2018) ......................................................................... 23

*Ohralik v. Ohio State Bar Ass'n*,
 436 U.S. 447 (1978) ............................................................................ 24

*PG&E v. Pub. Utils. Comm'n of Cal.*,
 475 U.S. 1 (1986) ............................................... 12, 13, 15, 16, 20, 23

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
    413 U.S. 376 (1973) ........................................................................ 4, 16

*Promotions v. Conrad*,
    420 U.S. 546 (1975) ................................................................................ 6

*PruneYard Shopping Ctr. v. Robins*,
    447 U.S. 74 (1980) ........................................... 2, 12, 13, 14, 20, 21, 22

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ............................................................................. 25

*Rosenberger v. Rector & Visitors of UVA*,
    515 U.S. 819 (1995) ............................................................................. 15

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2006) ................................................ 2, 3, 8, 14, 15, 20

*Sinclair v. Twitter*,
    No. 4:17-cv-5710 (N.D. Cal. 2017) .................................................... 9

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ............................................................................... 3

*Stratton Oakmont*,
    1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) .......................... 10, 11

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ....................................................................*passim*

*Tyson & Bro.-United Theatre Ticket v. Banton*,
    273 U.S. 418 (1927) ........................................................................ 18, 19

*U.S. Telecom Ass'n v. FCC*,
    825 F.3d 674 (D.C. Cir. 2016) ..................................................... 17, 20

*U.S. Telecom v. FCC*,
    855 F.3d 381 (D.C. Cir. 2017) ......................................................... 20

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ........................................................................... 14

*Washington Post v. McManus*,
    944 F.3d 506, (4th Cir. 2019) .......................................................... 23

*Woods v. Holy Cross Hosp.*,
    591 F.2d 1164 (5th Cir. 1979) ......................................................... 18

**Statutes and Rules:**
47 U.S.C.:
    § 152 ...................................................................................................... 18

§ 223(e)(6) ............................................................................. 18
§ 230 .......................................................... 3, 9, 10, 11, 12
§ 230(a)(3) ............................................................................. 11
§ 230(c)(1) ............................................................................. 11
§ 230(c)(2) ............................................................................. 11
§ 230(f)(3) ............................................................................. 11
Tex. Bus. & Com. Code § 120.001(1) ....................... 11, 12, 21
Tex. Civ. Prac. & Rem. Code
§ 143A.001(1) ......................................................................... 8
§ 143A.002 ......................................................................... 7, 8
§ 143A.006 ........................................................................... 25
§ 143A.007 ........................................................................... 25
Restatement (Second) of Torts § 581 ..................................... 5

**Other Authorities:**

Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*,
134 HARV. L. REV. 2299 (2021) .......................................... 17
TWITTER, Terms of Service: 3. Content on the Services,
https://perma.cc/34B3-2VDD ............................................... 6
YOUTUBE, Terms of Service: Content on the Service,
https://perma.cc/8SQD-HCA2 .............................................. 6

# Introduction

The Platforms do not dispute many significant components of this case. They do not dispute that they control the modern public square. They do not dispute that this is where private citizens are best able to exercise their core First Amendment right to freely exchange information. And they do not dispute that they use their control to limit the exchange of factual information, block genuine debate, and remove information that displeases censorious bureaucrats or foreign adversaries. *See* Appellant's Br.4-10. The Platforms say instead that the First Amendment gives them an absolute right to operate this abusive way.

Not so. The Supreme Court has squarely held that the First Amendment "does not disable the government from taking steps to ensure that private interests not restrict, through physical control of a critical pathway of communication, the free flow of information and ideas." *Turner Broad. Sys.*, *Inc. v. FCC*, 512 U.S. 622, 657 (1994). Texas's HB 20 takes only modest "steps" to preserve that "free flow of information and ideas," in the form of a narrow anti-discrimination requirement (the Hosting Rule) barring viewpoint-based censorship.[1] The Hosting Rule does not bar the Platforms from saying anything. It does not make them say anything. And it does not stop them from manipulating their spaces in a variety of ways unrelated to viewpoint. *See infra* 25-26. Yet the Platforms say that even this goes too far and that Texas's sole option is to "create[] its own, government-run social-media platform."

---

[1] The Hosting Rule also prohibits censorship that is based on user location in Texas. For simplicity, and because the Platforms do not independently attack that prohibition, the Attorney General focuses on viewpoint discrimination.

Platforms Br.49. In other words, the Platforms say Texas is constitutionally unable to regulate the Platforms' abusive business practices *at all*. Tellingly, the Platforms expressly turn for support to the *Lochner* doctrine's discredited method of constitutional interpretation. *See* Platforms Br.36 (favorably citing Justice McReynolds' *dissenting* protest of *Lochner*'s repudiation in *Nebbia v. New York*). Modern doctrine, on the other hand, is fatal for the Platforms. *See PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980); *Rumsfeld v. FAIR*, 547 U.S. 47 (2006); *Turner*, 512 U.S. 622. The Platforms attempt to distinguish these cases on their supposedly "unique facts about the television industry" (*Turner*) or about "a shopping mall" (*PruneYard*), or about "employment recruiting on law school campuses" (*FAIR*). Platforms Br.28, 30, 38. But the Platforms recognize (at 25-26) that "technological advances [do not] dilute First Amendment protections." Unfortunately for them, technological advances also do not create *new* protections.

HB 20's disclosure requirements are also constitutional. The Platforms' core objection to these requirements is that they are "unduly burdensome" for imposing (allegedly) cumbersome administrative chores. But, to prevail on a challenge to factual disclosure requirements, a plaintiff must demonstrate a burden on *speech*. The Platforms cannot make that showing here.

And the equities demonstrably favor allowing HB 20 to take effect. The district court's preliminary injunction should be reversed.

2

# Argument

## I. The Hosting Rule Regulates the Platforms' Conduct, and Satisfies First Amendment Scrutiny Even if Interpreted to Regulate Their Speech.

The Hosting Rule is constitutional because it falls outside the First Amendment as a regulation of the Platforms' conduct, not their speech. The Platforms' claim that it regulates their protected editorial discretion is wrong and is belied by what they have repeatedly represented in Section 230 litigation. And the Platforms' authority is inapposite. But even if the Court were to disagree on all of that, the Hosting Rule would satisfy First Amendment scrutiny as a historically grounded common-carrier regulation.

### A. The Hosting Rule falls outside the First Amendment.

#### 1. The Hosting Rule regulates the Platforms' conduct.

The Hosting Rule does not implicate the First Amendment because it is a regulation of *conduct*, and it is well established that "the First Amendment does not prevent restrictions directed at . . . conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). An enterprise's speech rights, by contrast, are implicated when it speaks its own message. But, as the Attorney General explained (Appellant's Br.17-20), an enterprise is engaged in "conduct, not speech" when it discriminates against *another's* message. *FAIR*, 547 U.S. at 60. An enterprise's complaints about who it hosts only incidentally implicate speech, and generally do not offend the First Amendment. *See id.* at 62; *see also Agency for Int'l Dev. v. All. for Open Soc'y*, 140 S.Ct. 2082, 2098 (2020) ("*USAID*") (Breyer,

J., dissenting) (summarizing precedent as: "[r]equiring someone to host another person's speech is often a perfectly legitimate thing for the Government to do").[2]

### 2.   The Hosting Rule does not interfere with "editorial discretion."

The Platforms' principal response (at 17-26) is that, instead of just regulating conduct, the Hosting Rule interferes with their alleged First Amendment right to exercise "editorial discretion" over messages others transmit in their spaces. That is wrong both as a matter of law and fact, and is irreconcilable with the Platforms' own descriptions of their conduct.

**a.**   Although the Platforms rely heavily on the concept of "editorial discretion," they conspicuously fail to define that term.[3] First Amendment protected "editorial discretion," however, has never reached as far as the Platforms would stretch it here.

As a matter of common English usage and judicial precedent an entity that exercises "editorial discretion" over content at a minimum accepts legal and reputational responsibility for that content. *See, e.g.*, *Associated Press v. NLRB*, 301 U.S. 103, 127 (1937) ("editors" are "responsible" for content they deem "appropriate" to reproduce). *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 386 (1973) (legal responsibility). That in turn requires, at a bare minimum, that

---

[2] The Platforms say (at 14) the *USAID* majority concluded hosting rules are *not* constitutional. But the *USAID* quotation the Platforms feature is just a factual description of other cases—hosting was not even at issue in that case.

[3] The closest they come (at 20) is a citation to *Landry's v. Ins. Co.*, 4 F.4th 366, 369 (5th Cir. 2021)—a case with no First Amendment valence that simply concerned the contract term "oral or written publication."

the entity perform *ex ante* "selection and presentation" of the content. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998). A television broadcaster exercises "editorial discretion" when it affirmatively selects the content it will air. *Id.* And a newspaper exercises editorial discretion when it affirmatively selects the "choice of material" it will print. *Miami Herald v. Tornillo*, 418 U.S. 241, 258 (1974). "Nothing makes it into the [broadcast or] paper without substantive, discretionary review." *Netchoice v. Moody*, 546 F.Supp.3d 1082, 1091 (N.D. Fla. 2021); The Texan Br.3-7; Hamburger Br.13-14. That is why it is proper to hold them legally liable for tortious content they present. Restatement (Second) of Torts § 581. But an enterprise that blindly transmits content without exercising discretion over the content *ex ante* is not responsible for the content in any meaningful sense. *See id.* cmt. f. And so that kind of enterprise is not engaged in, and is not entitled to the protections afforded by doctrines related to, "editorial discretion."

Tellingly, the Platforms have only one case (at 25) that they claim upholds an intermediary's First Amendment right to control third-party content that it does not "pre-screen." *Horton v. City of Houston*, 179 F.3d 188 (5th Cir. 1999). But the party that did not "pre-screen" material there was the manager of a "*government-owned* designated public forum." *Id.* at 192 (emphasis added). Far from recognizing any constitutional rights of that entity, that case concerned the First Amendment rights of a separate party seeking *access* to the forum.

**b.**   The Platforms do not exercise "editorial discretion" over almost all content they host because they exercise no discretion *ex ante* over it.[4] Instead, the Platforms blindly transmit "well north of 99%" of user content in their spaces, *Moody*, 546 F.Supp.3d at 1092. The Platforms tell the public that they "cannot take responsibility for [this] Content," TWITTER, Terms of Service: 3. Content on the Services, https://perma.cc/34B3-2VDD, and that it is instead "the responsibility of the person or entity that provides it," YOUTUBE, Terms of Service: Content on the Service, https://perma.cc/8SQD-HCA2. That is understandable, because they let "billions of users" submit this content that then automatically appears in their spaces. ROA.28. Television broadcasters and newspapers do not do that. That is fatal to the Platforms, because they cannot borrow legal privileges from materially dissimilar entities. *Se. Promotions v. Conrad*, 420 U.S. 546, 557 (1975) ("Each medium of expression . . . must be assessed for First Amendment purposes by standards suited to it.").

The Platforms claim that the *Moody* court recognized that the Platforms do at least "*screen* all content," Platforms Br.25 (emphasis altered), based on their use of "algorithms" which perform some opaque automated assessment. 546 F.Supp.3d at 1092. But the Platforms have vigorously resisted discovery into their algorithm codes, *see, e.g.*, ROA.578; ROA.1896-97, and have not explained how their algorithms could functionally perform the same role as true editors. If the Platforms

---

[4] The small amount of content they arguably select and present is discussed *infra* at 7-8.

intend to argue that their algorithms perform a bona fide "editorial discretion," function they can do that below on remand after subjecting their algorithms to discovery.[5]

**c.**    To the small extent that the Platforms arguably exercise "editorial discretion," the Hosting Rule does not regulate them. The Platforms claim that, in addition to requiring them to host content "they deem objectionable" (Platforms Br.13), the Hosting Rule also interferes with "effort[s] platforms make to curate content and boost or recommend content" of their choice (Platforms Br.10). That is inaccurate and cannot save their challenge for multiple reasons.

Most significantly, the Hosting Rule does not regulate the Platforms' *own* speech—it regulates only specific actions the Platforms may take against "*user*" speech. Tex. Civ. Prac. & Rem. Code (TCPRC) § 143A.002. When the Platforms affirmatively "curate" a piece of user content (*i.e.*, substantively modify it), or "recommend" it (*i.e.*, tell other users the content is high-quality), that curation or recommendation is the Platforms *own* speech, beyond the Hosting Rule's scope. *Cf. Moody*, 549 F.Supp.3d at 1093 (enjoined Florida bill "explicitly forbid[s] social media platforms from appending their own statements to posts").

---

[5] What is apparent about their algorithms, though, appears to undercut this argument. The Platforms have repeatedly represented that the algorithms are "neutral" tools used to "connect users" and not "create or alter" content. *See infra* at 10. That may explain why, notwithstanding the algorithms, the Platforms nevertheless host *and even recommend* ample content that violates their own policies. ROA.1239-40; ROA.1846 n.56: ROA.1246; *see also Moody*, 549 F.Supp.3d at 1092 (notwithstanding algorithms, content still functionally "invisible to" the Platforms).

The Platforms seem to claim (at 14) that sometimes they engage in activity that is (a) not their own speech but nevertheless (b) something more than hosting, and so arguably protected by the First Amendment (such as "arranging" third-party content). But here the Hosting Rule only prevents the Platforms from "deny[ing] equal access or visibility to," or similarly discriminating against, user speech based on viewpoint. TCPRC §§ 143A.001(1), 143A.002. That is a statutory fail-safe to ensure that the Platforms cannot discriminate by subterfuge, *e.g.*, burying speech instead of removing it altogether. A hosting rule with this kind of equal treatment requirement is plainly constitutional under *FAIR*, where Congress not only required law schools to host military recruiters, but also to "send e-mails or post notices on bulletin boards on" the military's behalf if they did the same "for other recruiters." *See FAIR*, 547 U.S. at 61.

In all events, the Platforms' challenge is "facial," *see, e.g.*, ROA.2579; ROA.572, meaning they had to show at a bare minimum that it is unconstitutional in a "substantial number of its applications." *Americans for Prosperity v. Bonta*, 141 S.Ct. 2373, 2387 (2021). Hypothetical scenarios about what the Platforms do on the fringe with very small amounts of content are a subject for a future, as-applied case. *Cf. Morales v. TWA*, 504 U.S. 374, 382 (1992) ("federal courts" should not "determine the constitutionality of state laws in hypothetical situations where it is not even clear the State itself would consider its law applicable").

### 3. The Platforms' Section 230 positions foreclose their "editorial discretion" argument here.

The Platforms have also (successfully) taken positions in Section 230 litigation that foreclose their "editorial discretion" argument. Their use of Section 230's shield from liability for third-party content is logically incompatible with their current use of "editorial discretion" as a sword against the Hosting Rule. Appellant's Br.22-23.

**a.** As the Attorney General explained (Appellant's Br.22-23), the Platforms' specific representations in Section 230 litigation confirm they are a conduit for third-party content—not an entity engaged in First Amendment protected "editorial discretion." The Platforms protest (at 33) that these examples were taken out of context. That is inaccurate, and there are *far more* such examples. Specifically, the Platforms have represented:

- They provide "neutral means for users to share information, ideas, and other content." *Crosby v. Twitter*, No. 2:16-cv-14406 (E.D. Mich. 2017) (MTD 34, Doc.29);

- They are legally akin to "scores of other types of service providers, *including wireless carriers and utilities*." *Id.* (emphasis added);

- They "merely provid[e] a neutral forum on which some actors engage in offensive or hateful speech." *Gonzalez v. Twitter*, No. 4:16-cv-03282 (N.D. Cal. 2017) (MTD 19, Doc.61);

- They "passively offer[] to the public routine, generally available services." *Sinclair v. Twitter*, No. 4:17-cv-5710 (N.D. Cal. 2017) (MTD Reply 3, Doc.58);

- They are a "platform for third-party generated content . . . analogous to the prototypical online messaging board." *Green v. Youtube*, No. 1:18-cv-00203 (D.N.H. 2018) (MTD Mem. 12, Doc.48-1); *Jefferson v. Zukerberg*, No. 1:17-cv-03299 (D. Md. 2018) (MTD 8, Doc.4) (same);

- They operate like a "passive distributor." *Hepp v. Facebook*, No. 2:19-cv-04034 (E.D. Pa. 2020) (MTD Mem. 15, Doc.56-1);

- They provide "a neutral forum for the sharing of information, ideas, and other content." *Gonzalez*, *supra* (MTD 25, Doc.36);

- Their algorithms are "neutral" tools that "connect users on the platform." *Force v. Facebook*, No. 1:16-cv-05158 (E.D.N.Y. 2018), (Mem. in Opp. to Motion to Vacate 11, Doc.75); and

- Their algorithms "operate solely in conjunction with content that third parties choose to publish," and "do not themselves create or alter content." *Force v. Facebook*, No. 18-397 (2d Cir. 2018) (Appellee Br. 22-23, Doc.129).

This is not the way an entity engaged in editorial discretion describes itself. *See* American Heartland Br.16-23 (making case for judicial estoppel).

**b.**   The Platforms insist (at 32-33) that the Section 230 Congress nonetheless recognized that Internet platforms *do* exercise editorial discretion just like traditional "publishers." But that is wrong: Section 230's shield tells courts *not* to treat an

Internet platform as the "publisher" of "information provided by another." 47 U.S.C. § 230(c)(1); *see also id.* § 230(a)(3). The reason Congress did this is because the *Stratton Oakmont* court had just (improperly) treated an Internet platform *as* a publisher of information provided by another. 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995); Appellant's Br.13. The court did that on the erroneous premise that Internet platforms that filter some content become more than a "passive receptable or conduit" for that content "with the same responsibilities as a newspaper." 1995 WL 323710, *3, 5. Section 230 established as a default that this is wrong, and treatment as a "publisher" is inappropriate. 47 U.S.C. § 230(c)(1), (2). After all, telephone companies have historically conducted some baseline filtering and have nevertheless been regulated as a "public utility"—not a publisher. *See, e.g.*, *Carlin Commc'ns, Inc. v. Mountain States Tel.*, 827 F.2d 1291, 1292 (9th Cir. 1987).[6] But Section 230 also provided that when a Platform *actually* operates like a traditional publisher—that is, when it uses editorial discretion by taking "responsib[ility]," even if just "in part" for the content—the shield falls away. 47 U.S.C. § 230(f)(3); Appellant's Br.13-14. The Platforms get around that in Section 230 (as shown above) by telling courts they are *not* operating like a traditional publisher—*i.e.*, they do *not* take any responsibility for the content at issue.

    **c.**   The Platforms cite no authority upholding the illogical proposition that they can both (a) be not "responsible" for content, and so enjoy Section 230's shield, while also (b) exercise First Amendment protected "editorial discretion" over that

---

[6] The Hosting Rule allows the Platforms to do the same. *See infra* 25-26.

same content. *This* Court's one case squarely addressing Section 230's coverage plainly never concluded that because the plaintiff there waived all argument about whether the platform was "responsible" for the relevant content. *Doe v. MySpace, Inc.*, 528 F.3d 413, 422 (5th Cir. 2008). And atmospheric *dicta* from other courts are built on "nontextual arguments" that have generated "questionable" results. *Malwarebytes, Inc. v. Enigma Software Grp.*, 141 S.Ct. 13, 14 (2020) (Statement of Thomas, J.). After all, an asymmetrical shield for Internet platforms versus traditional publishers would be constitutionally suspect if the two were, as the Platforms claim, materially similar. *Citizens United v. FEC*, 558 U.S. 310, 340 (2010) ("[T]he government may commit a constitutional wrong when by law it identifies certain preferred speakers.").

### 4. The Platforms' three core cases are demonstrably inapposite.

The Platforms' three core cases (Platforms Br.17-19) also do not help them. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557 (1995); *Tornillo*, 418 U.S. 241; *PG&E v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1 (1986).

**a.** These cases are categorically inapposite because in each one the putative host was not "open to the public to come and go as they please." *PruneYard*, 447 U.S. at 87; Tex. Bus. & Com. Code (TBCC) § 120.001(1) (Hosting Rule applies only to platforms "open to the public"). That is critical under *PruneYard*, because "[l]imitations on how a business generally open to the public may treat individuals on the premises are readily distinguishable from regulations granting a right to invade property closed to the public." *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063, 2077 (2021); *PG&E*, 475 U.S. at 26 (Marshall, J., concurring). The newspaper in *Tornillo*

and the newsletter in *PG&E* were not open at all. *See, e.g.*, *id.* at 12 n.8. And the parade organizer in *Hurley* "*select[ed]* the expressive units of the parade from *potential* participants." 515 U.S. at 575 (emphases added). Granted, the parade organizer was relatively "lenient" about admitting units, but it nevertheless made admission decisions *ex ante. Id.* at 569. The Platforms are not like that. Appellant's Br.22-23.

The Platforms respond (at 29-30) that they are "not open" to the public because users must affirm they will comply with "acceptable-use policies" (AUP) before creating an account. Their customers might be surprised to hear this convenient bit of litigation posturing. Far from telling consumers that their AUPs make them "not open," the Platforms routinely insist they "*are* open to the public (*subject to* their [AUPs])." ROA.184 (emphases added). After all, they "strive to make [their spaces] as open as possible." ROA.194. And they claim to "give *everyone* the power to create and *share* ideas and information instantly *without barriers*." ROA.591. Thus, the public is told that "almost anyone can create an account and post content." ROA.163. All a potential user has to do is provide a name, email and birthday and affirm Scout's Honor that he will comply with the Platforms' boilerplate terms. ROA.1226-27. The Platforms' complete openness is the only explanation for how "billions of users" use their services. ROA.28, 194.

The Platforms' AUPs do not make them "not open" for at least two additional reasons. *First*, the public can enter significant portions of the Platforms' digital spaces *without* creating an account. ROA.1228. *Second*, *PruneYard* shows that an AUP is irrelevant to the openness inquiry. *See* 447 U.S. at 77 (mall had "policy not to permit any visitor or tenant to engage in any publicly expressive activity"). For an

enterprise not to be open to the public in a relevant sense it must at least perform some bona fide *ex ante* review of who it admits. Like the *PruneYard* mall, the Platforms do not do that.

**b**.   The Platforms' cases are also inapposite on more specific grounds. All three stand for the proposition that compelled hosting can implicate an enterprise's speech rights if the hosted speech inextricably and unavoidably affects the enterprise's *own* speech; *i.e.*, the host's "own message [would be] affected by the speech it [i]s forced to accommodate." *See FAIR*, 547 U.S. at 63 (describing all three cases). But the Hosting Rule does not "affect" the Platforms' "own message."

*First*, in *Hurley* the host parade organizer's own message would have been affected by the unwelcome parade unit because the public would likely "misattribut[e]" the unwelcome unit's speech to the organizer. *See Hurley*, 515 U.S. at 577; Appellant's Br.24. The Court reached that conclusion based on common sense precepts about how parades operate and are interpreted by viewers. *Hurley*, 515 U.S. at 568-59, 576-77. But no reasonable observer would misattribute a user's speech on the Platforms to the Platforms. *See FAIR*, 547 U.S. at 65 (possibility of misattribution must be reasonable). The Platforms nakedly assert (at 22) that "*Hurley* was not a case about simply 'speech misattribution.'" But they are wrong. *See USAID*, 140 S.Ct. at 2088 (*Hurley* was a "speech misattribution" case); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 457 n.9 (2008).

The Platforms also claim (at 24) that people "often attribute to platforms—and hold platforms responsible for—expression on the platforms." But elsewhere they have admitted that misattribution, to the extent it occurs, is not reasonable. *See*

*Gonzalez*, *supra* (MTD 23, Doc.61) (Platforms asserting that even though they host terrorist content, "objective observer[s] would [not] conclude" that they "promote terrorism"); *FAIR*, 547 U.S. at 64-65 (misattribution fear must be reasonable). For good reason: it is well-established that, without more, it is not "plausible" that viewers will misattribute speech based entirely on rules providing neutral access to a forum. *See, e.g.*, *Rosenberger v. Rector & Visitors of UVA*, 515 U.S. 819, 841 (1995).

*Second*, in *Tornillo* the host newspaper's own message would have been affected by the hosted speech in two ways: (1) the newspaper would have to devote finite space to that speech that it could have "devoted to other material that" it "preferred to print." *Tornillo*, 418 U.S. at 256; *FAIR*, 547 U.S. at 64. And (2), the hosting obligation sprung into effect only when the newspaper made specific messages of its own—thereby penalizing the newspaper for its "choice of material." *Tornillo*, 418 U.S. at 258; *Turner*, 512 U.S. at 654. Neither problem is present here because the Platforms have essentially infinite space, *see Biden v. Knight First Amend. Inst.*, 141 S.Ct. 1220, 1224 (2021) (Thomas, J., concurring), and the Hosting Rule operates independently of any speech the Platforms themselves make.

*Third*, *PG&E* was essentially a rehash of the first *Tornillo* problem. *FAIR*, 547 U.S. at 64. A state regulator allowed one of PG&E's adversaries to appropriate PG&E's customer newsletters and prevent PG&E from fully using the newsletters. *PG&E*, 475 U.S. at 9 (PG&E was only "free to mail its own newsletter [outside] the four months in which [its opponent was] given access"); *id.* at 24 (Marshall, J., concurring) (expanding on the appropriation problem). In addition, this could have coerced PG&E into speaking to prevent its consumers from making a misattribution.

*Id.* at 15-16. That made sense in *PG&E* (but does not here) because a PG&E customer would likely have been confused about why *only* this one other entity was privileged to speak through PG&E's newsletter.

**c.**  *Tornillo* and *PG&E* are also inapposite because they involved content-based rules privileging specific forms of speech proffered by specific speakers. *PG&E*, 475 U.S. at 13 (*Tornillo* statute was "content based in two senses"); *id.* at 12 (access right in *PG&E* was "content based"). "This kind of favoritism [went] well beyond" what the constitution allows. *Id.* at 14-15. "[U]nlike the access rules struck down in those cases, the [Hosting Rule is] content neutral in application" and so cannot be controlled by those two cases. *Turner*, 512 U.S. at 654. The Hosting Rule imposes a non-discrimination requirement that applies across the board.

The Platforms concede that they are subject to "*employment* antidiscrimination" laws but say that anti-discrimination "restrictions on *publication* warrant strict" scrutiny. Platforms Br.23 (emphases added). That is consistent with their history of arguing that they can discriminate in their host capacity for any reason, even against sex or religion. *See* Appellant's Br.21. But it is wrong. *See Pittsburgh Press*, 413 U.S. at 389 (upholding antidiscrimination requirement as applied to newspaper's choice of advertising); Renewing America Br.10 (anti-discrimination laws upheld against First Amendment challenge).

### B. Even if the Hosting Rule were subject to First Amendment scrutiny, it survives as a historically grounded common-carrier regulation.

Even if the Hosting Rule implicates the Platforms' speech rights (it does not), their challenge still fails. That is because the Platforms are analogous to common carriers, and the Hosting Rule subjects them to just one, very modest, form of common carrier regulation. *See* Appellant's Br.25-26.

**1.** "For centuries, common carriage principles have structured the transportation and communications industries." *Cellco P'ship v. FCC*, 700 F.3d 534, 545 (D.C. Cir. 2012). Communications common carriers have long "been subject to nondiscrimination and equal access obligations . . . without raising any First Amendment question." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 740 (D.C. Cir. 2016). Like the Platforms, the old telegraph and telephone companies sought to engage in censorship, *see* Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*, 134 HARV. L. REV. 2299, 2321-22 (2021), but nevertheless were barred from discriminating among messages. Appellant's Br.25-27. The Hosting Rule is just a 21st Century common-carriage rule for a 21st Century common carrier.

**2.** The Platforms have four responses. None have merit.

*First*, the Platforms contend (at 35) that they are unlike common carriers because they make "individualized decisions . . . whether and on what terms to deal." But when asked whether they "treat all of [their] users equally in terms of applying [their] policies and terms and conditions," their answer was an unqualified "Yes." ROA.1140. That is obviously not "individualized" decisionmaking. *Cf.* Appellant's Br.27. If what the Platform are instead arguing is that they make users abide by their

AUP, that is something common carriers have always done. *See ,e.g.*, ROA.1116-17 & nn.40-45. It has never precluded common carriage regulation.

*Second*, the Platforms argue (at 35) that federal law preempts common-carriage regulation. But the federal Communications Act section they cite says only that the Platforms shall not be treated as common carriers *under federal law*. 47 U.S.C. § 223(e)(6) ("Nothing in *this section* shall be construed to treat [them] as common carriers." (emphasis added)). It "prevent[s] [only] the FCC,[] and not the states, from imposing common carrier regulations." *ACA Connects v. Bonta*, 24 F.4th 1233, 1245 (9th Cir. 2022) (addressing materially similar provisions in Communications Act governing Internet service providers); *see also* 47 U.S.C. § 152 note (Communications Act savings clause preserving state law).

*Third*, the Platforms invoke *Lochner* doctrine to say that Texas cannot "convert[] [them] into common carriers." Platforms Br.36 (citing Justice McReynolds' dissenting protestations in *Nebbia v. New York*—where the majority began repudiating *Lochner*[7]). In the *Lochner* era, a different constitutional provision was indeed read to "strait jacket" the States and prevent regulation of business "conditions which [States] regard as offensive to the public welfare." *Lincoln Fed. Lab. Union v. Nw. Iron & Metal Co.*, 335 U.S. 525, 536-37 (1949). Even then, however, certain "kinds of business" were nevertheless regulable if they were "affected with a public interest." *Tyson & Bro.-United Theatre Ticket v. Banton*, 273 U.S. 418, 430 (1927). This "obviously include[d]" "common carriers, telegraph, and telephone companies." *Id.*

---

[7] *Woods v. Holy Cross Hosp.*, 591 F.2d 1164, 1176 (5th Cir. 1979).

"Beyond these" businesses, the Supreme Court decided case-by-case whether a business was similar enough to warrant similar treatment. *Id.* The Platforms' citation to Justice McReynolds was where he argued to keep this inquiry narrow. But he lost.

The Platforms seek to revive Justice McReynolds' position, except this time under the First Amendment. The upshot of their view is that common-carrier regulation is an irrelevant relic confined only to specific, outdated technologies. But new "technology" does not change the First Amendment's "basic principles." *Brown v. EMA*, 564 U.S. 786, 790 (2011). It has always been a "basic principle" that communications providers can be required to transmit messages without discrimination, even under *Lochner*'s discredited business-slanted doctrine. *See Tyson & Bro.*, 273 U.S. at 430. And, because the Platforms are at least "analogous" to telegraph or telephone companies, those basic principles support regulating the Platforms the same way. *Biden*, 141 S.Ct. at 1223 n.2 (Thomas, J., concurring).

*Fourth*, the Platforms make scattered citations to Justice Thomas and then-Judge Kavanaugh for the point that common carriage treatment is inappropriate here. Their reliance on Justice Thomas is peculiar because they cite his statements (at 4, 19-20, 30, 37) from inapposite settings while contending (at 39-40) that his *Biden* statement—which addressed *exactly* this setting—should be ignored. It is hard to understand how that cherry-picking makes any sense, but Justice Thomas has in any event consistently recognized that "specific statutory prohibition[s]" can abrogate a "common carrier's" First Amendment rights. *Denver Area Educ. Telecomms. v. FCC*, 518 U.S 727, 825 (1996) (concurring); *see also Turner*, 512 U.S. at 684 (joining Justice O'Connor's similar position). And the statement the Platforms feature from

then-Judge Kavanaugh (at 4) did not address *PruneYard* or *FAIR*, and came from a setting without the overwhelming discrimination present here. *See USTelecom*, 825 F.3d at 762 (Williams, J., concurring in part at panel stage). It is also unclear whether then-Judge Kavanaugh was articulating his own First Amendment view, or simply believed himself to be precedent-bound. *See U.S. Telecom v. FCC*, 855 F.3d 381, 434 n.14 (D.C. Cir. 2017) (Kavanaugh, J., dissenting).

**3.**    The actual law, as reflected in the *Turner* cases, proves that analogous en-terprises can be regulated like common carriers of old. The *Turner* dissenters (the Justices who were *more* protective of the cable companies' speech rights), would have allowed Congress to require cable companies to "operate as common carriers" just like "telephone companies." 512 U.S at 684 (O'Connor, J., dissenting in part). And the majority, of course, upheld a law that went even further. Appellant's Br.28-29. That's nine votes against the Platforms' position, and zero in favor. And nothing in *PG&E*—a case addressing when an *energy* carrier can be forced to carry *speech*—changes this. *Contra* Platforms Br.36.

The Platforms insist (at 38-39) that *Turner* is limited to its facts, either because it turned on (1) a "broadcast-television-specific analysis [that] has no place" here or (2) "unique physical characteristics of cable" television. Neither is accurate. *Turner* explicitly did *not* apply the "less rigorous standard of First Amendment scrutiny [for] broadcast [television] regulation." 512 U.S. at 637. And although it recognized that cable's physical characteristics were an "important" distinction between cable and newspapers, *id.* at 656, those characteristics did "not require the alteration of settled principles of our First Amendment jurisprudence." *Id.* at 640.

**4.**   The Platforms' argument (at 41) that the Hosting Rule is subject to strict scrutiny because it is either content- or speaker-based also fails. The Hosting Rule excludes "news, sports, and entertainment" websites as well as smaller platforms because they are fundamentally dissimilar mediums. The news, sports, and entertainment carveout applies only to the extent those entities operate unlike the Platforms by "primarily" presenting content "preselected by the provider" instead of submitted by users. TBCC § 120.001(1). And there is no similar record of publicly open smaller platforms engaging in egregious viewpoint discrimination. Appellant's Br.6-10. "[T]he fact that [the] law singles out a certain medium . . . is insufficient by itself to raise First Amendment concerns," and that is doubly true here where the treatment is "justified by [a] special characteristic" of the Platforms. *Turner*, 512 U.S. at 660-61.

Moreover, adopting the Platforms' argument and applying the Hosting Rule to dissimilar and smaller entities may *raise*, not reduce, constitutional problems. *See* Appellant's Br.32 (citing Justice Powell's *PruneYard* concurrence). The Platforms think the First Amendment is indifferent to size, and that therefore the Attorney General's position on size "all but concedes" that the Hosting Rule is itself unconstitutional. Platforms Br.21. But applying the Hosting Rule to smaller and dissimilar entities may interfere with *property rights*. *PruneYard*, 447 U.S. at 96 (Powell, J., concurring). The California law in *PruneYard* did not unconstitutionally interfere with property rights because the mall was "a large commercial complex" and "open to the public at large." *Id*. at 83. Its reasonable, investment-backed expectations thus were not impaired by a hosting requirement. *Id.* That may not be true with smaller

and dissimilar entities that more carefully exercise their right to exclude. *Prune-Yard*'s logic *also* shows that smaller and dissimilar entities have a stronger First Amendment claim if they are not already open to the public. Additionally, the prospect of misattribution with those smaller and dissimilar businesses is much greater than it is here.

In combination, because the enterprises excluded from the Hosting Rule are different in kind from those subject to the Hosting Rule, the Platforms' slippery slope hypotheticals about, *e.g.*, bookstores (at 3-4), and online newspapers (at 25), are meritless.[8]

**5.**    The Hosting Rule also survives any level of scrutiny. Government's interest in preserving free exchange of information is an interest of "the highest order." *Turner*, 512 U.S. at 663; States Br.17-19. The Platforms do not dispute they squelch free exchange of information. Appellant's Br.6-10. And the Hosting Rule is a narrowly tailored solution to that problem. Instead of identifying a single regulatory alternative, the Platforms say (at 49) Texas must "create[] its own" "social-media platform." No authority supports that argument.

---

[8] The Platforms are also wrong (at 42-43) that the Hosting Rule's censorship exceptions render the rule viewpoint-based for the reasons the Attorney General already discussed. *See* Appellant's Br.31-32.

## II. HB 20's Disclosure Requirements Are Factual, Uncontroversial, and Do Not Burden the Platforms' Speech.

HB 20's disclosure requirements are also constitutional. "The State, of course, has substantial leeway in determining appropriate information disclosure requirements for business corporations." *PG&E*, 475 U.S. at 15 n.12.

The Platforms' responses fall into three flawed buckets.

*First*, the Platforms say (at 50-51) the lenient *Zauderer* standard of review for compelled factual disclosures is not applicable because two cases allegedly created a special heightened standard for factual disclosure laws that "chill[] editorial discretion," or require publication of "editorial policies." They misread those cases. *Herbert v. Lando* addressed whether a defamation plaintiff could obtain discovery into the editorial processes that defamed him—*the Court held yes*. 441 U.S. 153 (1979). And *Washington Post v. McManus* addressed disclosures only in the *sui generis* political campaign setting. 944 F.3d 506, 513 (4th Cir. 2019) (law "single[d] out one particular topic of speech—campaign related speech"). That is far afield from this setting, as even the Platforms' own amicus recognizes. *See* Knight First Amendment Br.22-26.

The Platforms also say (at 51) a heightened standard applies because HB 20's disclosure requirements do not pertain to "commercial speech." But *Zauderer* review also applies to "commercial *products*" (like the Platforms), along with a great deal more. *NIFLA v. Becerra*, 138 S.Ct. 2361, 2376 (2018) (emphasis added). After all, "health and safety warnings" with no apparent commercial component have "long [been] considered permissible." *Id.*

*Second*, the Platforms say that they win under *Zauderer* because the requirements are "burdensome." Even assuming that the disclosure requirements impose the burdens the Platforms allege, (*but see* Appellant's Br.38-40), *Zauderer*'s "unduly burdensome" prong is concerned only with "burden[s] on *speech*." *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020) (rejecting argument about "excessive financial burdens"). And the Platforms' alleged burdens are "administrative and operational" ones, ROA.227—*not* speech burdens. *See, e.g.*, Platforms Br.52-55 (requirements will allegedly "raise costs," "require platforms to develop procedures," consume "enormous time and expense," and are "infeasible"); *cf.* Appellant's Br.40 (case law on invalid burdens).

If the Platforms' operational burdens could carry the day, then a host of administratively cumbersome disclosure requirements (such as many of the SEC's) would also be unconstitutional. But the Supreme Court has said the opposite. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). The Platforms appear to recognize (at 55) that any argument that would doom the SEC's disclosure rules is meritless. But their distinctions of the SEC's rules—*i.e.*, that HB 20 is "speaker based" and regulates "editorial discretion"—are wrong as explained above.

*Third*, the Platforms nakedly assert (at 53-54) that the disclosures would "reveal trade secrets" and other information that would "enable wrongdoers to evade detection and harm users." The limited record material they cite (ROA.215, ROA.377, ROA.388-89) does not explain how this could be true. The Attorney General submits that this is not a reasonable interpretation of HB 20's requirements, *see* Appellant's Br.40-42, but if hypothetically this problem is presented in the future, the Platforms

can raise these defenses in an as-applied posture. This undeveloped, speculative assertion cannot be the basis for *facial* invalidation here. *See supra* 8.

## III. The Equitable Factors Demonstrably Favor Texas.

The equities demonstrably favor Texas. Appellant's Br.42-44. The Platforms' principal response (at 56-57) is just that if they win on the merits they automatically win on the equities. Nevertheless, the Platforms make scattered, inaccurate assertions of what a loss here would mean for their spaces that warrant correction.

The Hosting Rule does not require the Platforms to host "Russian state media amid the invasion of Ukraine" or even "speech from foreign leaders" generally. *Contra* Platforms Br.2, 11. The Hosting Rule allows them to remove entire categories of content, such as foreign government speech or speech about war. What they cannot do is viewpoint discriminate, such as by treating war boosters differently than war skeptics. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 168 (2015) (explaining distinction between content and viewpoint).

The Hosting Rule also does not prevent removal of some speech even if it would constitute viewpoint discrimination, such as illegal speech, speech federal law permits the Platforms to censor, or speech that directly incites criminality or violence. TCPRC § 143A.006. And the Hosting Rule contains an important exception allowing the Platforms to censor *anything* for a specific user if that specific user so requests. *Id.* § 143A.007; ROA.166 (Platforms give "users tools to decide for themselves what content they wish to avoid"). So the Platforms have ample ability to ensure users find their spaces "hospitable." Platforms Br.7.

Regardless, the Platforms' complaints about "offensive" content are not equitable. "[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 55-56, (1988). That same value controls here.

## Conclusion

For the foregoing reasons, the Court should reverse the district court's grant of a preliminary injunction.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Judd E. Stone II
Solicitor General

Brent Webster
First Assistant Attorney General

/s/ Ryan S. Baasch
Ryan S. Baasch
Assistant Solicitor General
Ryan.Baasch@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Counsel for Defendant-Appellant
Ken Paxton, Attorney General
of Texas

## CERTIFICATE OF SERVICE

On April 22, 2022, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Ryan S. Baasch

RYAN S. BAASCH

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,483 words, excluding the parts of the motion exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Ryan S. Baasch

RYAN S. BAASCH