Cite as: 596 U. S. ____ (2022)   1

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 21A720

NETCHOICE, LLC, DBA NETCHOICE, ET AL. *v.* KEN PAXTON, ATTORNEY GENERAL OF TEXAS

ON APPLICATION TO VACATE STAY

[May 31, 2022]

The application to vacate stay presented to JUSTICE ALITO and by him referred to the Court is granted. The May 11, 2022 order of the United States Court of Appeals for the Fifth Circuit staying the district court's preliminary injunction is vacated.

JUSTICE KAGAN would deny the application to vacate stay.

JUSTICE ALITO, with whom JUSTICE THOMAS and JUSTICE GORSUCH join, dissenting from grant of application to vacate stay.

This application concerns issues of great importance that will plainly merit this Court's review. Social media platforms have transformed the way people communicate with each other and obtain news.[1] At issue is a ground-breaking Texas law that addresses the power of dominant social media corporations to shape public discussion of the important issues of the day.

The law in question, HB20, regulates "social media platform[s]" that are "open to the public;" that "enabl[e] users to communicate with other users for the primary purpose of posting information, comments, messages, or images;" and

---

[1] See, *e.g.*, E. Shearer, Pew Research Center, More Than Eight-in-Ten Americans Get News From Digital Devices (Jan. 12, 2021), https://www.pewresearch.org/fact-tank/2021/01/12/more-than-eight-in-ten-americans-get-news-from-digital-devices.

that have at least "50 million active users in the United States in a calendar month." App. to Application 39a–41a (App.). Section 7 of HB20 prohibits these platforms from "censor[ing]" users based on viewpoint, and §2 requires covered platforms to disclose certain information about their business practices, including an "acceptable use policy" and "a biannual transparency report." *Id.,* at 39a–46a, 48a–52a. These platforms must also establish procedures by which users can appeal a platform's decision to "remove content posted by the user." *Id.,* at 44a.

Applicants are two trade associations that represent major social media platforms covered by the statute. They challenged the constitutionality of HB20 in the United States District Court for the Western District of Texas, contending, among other things, that the law is facially unconstitutional under the First Amendment. The court agreed, and it preliminarily enjoined the Texas attorney general from enforcing the statute. The United States Court of Appeals for the Fifth Circuit—after full briefing and oral argument—stayed that preliminary injunction. Applicants now ask this Court to vacate that stay while the Fifth Circuit resolves the appeal of the underlying preliminary injunction, and the Court grants that extraordinary relief.

I cannot agree with the Court's disposition. To be entitled to vacatur of the stay, applicants must show, among other things, a "substantial likelihood of success on the merits." *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. ___, ___ (2021) (*per curiam*) (slip op., at 5). Members of this Court have argued that a determination regarding an applicant's likelihood of success must be made under "existing law," *Merrill* v. *Milligan*, 595 U. S. ___, ___ (2022) (ROBERTS, C. J., dissenting) (slip op., at 1); *Wisconsin Legislature* v. *Wisconsin Elections Commission*, 595 U. S. ___, ___ (2022) (SOTOMAYOR, J., dissenting) (slip op., at 1) ("existing precedent"). And whether applicants are likely to succeed under existing law is quite unclear.

The law before us is novel, as are applicants' business models. Applicants claim that §7 of HB20 interferes with their exercise of "editorial discretion," and they maintain that this interference violates their right "not to disseminate speech generated by others." Application 19. Under some circumstances, we have recognized the right of organizations to refuse to host the speech of others. See *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557 (1995) (parade organizer); *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241 (1974) (newspaper). But we have rejected such claims in other circumstances. For example, in *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74 (1980), we rejected the argument that the owner of a shopping mall had "a First Amendment right not to be forced by the State to use his property as a forum for the speech of others." *Id.,* at 85. And in *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622 (1994), we declined to apply strict scrutiny to rules that "interfere[d] with cable operators' editorial discretion by compelling them to offer carriage to a certain minimum number of broadcast stations." *Id.,* at 643–644; see generally E. Volokh, Treating Social Media Platforms Like Common Carriers? 1 J. Free Speech Law 377 (2021).

It is not at all obvious how our existing precedents, which predate the age of the internet, should apply to large social media companies, but Texas argues that its law is permissible under our case law. First, Texas contends that §7 does not require social media platforms to host any particular message but only to refrain from discrimination against a user's speech on the basis of "viewpoint," App. 49a, and in this respect the statute may be a permissible attempt to prevent "repression of [the freedom of speech] by private interests," *Associated Press* v. *United States*, 326 U. S. 1, 20 (1945). Second, Texas argues that HB20 applies only to platforms that hold themselves out as "open to the public,"

App. 40a, and as neutral forums for the speech of others.[2] These representations suggest that the covered social media platforms—like the cable operators in *Turner*—do not generally "'convey ideas or messages [that they have] endorsed.'" *Hurley*, 515 U. S., at 576.  Third, since HB20 is limited to companies with "50 million active users in the United States," App. 41a, Texas argues that the law applies to only those entities that possess some measure of common carrier-like market power and that this power gives them an "opportunity to shut out [disfavored] speakers."  515 U. S*.,* at 577; see also *Biden* v. *Knight First Amendment Institute at Columbia Univ.*, 593 U. S. ___, ___–___ (2021) (THOMAS, J., concurring) (slip op., at 6–7).

If anything, Texas submits, its arguments regarding the constitutionality of §2's disclosure requirements are even stronger.  The State notes that we have upheld laws requiring that businesses disclose "purely factual and uncontroversial information about the terms under which [their] services will be available," so long as those requirements are not "unjustified or unduly burdensome." *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U. S. 626, 651 (1985).  If we were to agree with the applicants'

———————

[2] Texas also suggests that applicants' position in this litigation is in conflict or tension with the positions of its members in cases regarding the interpretation of §230 of the Communications Decency Act of 1996, 47 U. S. C. §230.  That statute directs, among other things, that "[n]o provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  §230(c)(1).  Texas claims that "[w]hen the platforms resort to section 230's protections . . . they are relying on Congress's determinations that they are not the 'publisher' of their users' content, 47 U. S. C. §230(c)(1), and that they are not 'responsible' for that content in any respect, *id.* §230(f )(3)."  Response 36.  And Texas suggests that, given that many of applicants' members have emphasized their "'neutral[ity]'" and their function as "'conduits'" for the speech of their users (see *id.,* at 37–38, and nn. 11–18), the Court should view their assertions of a First Amendment right to engage in "'editorial discretion'" with some skepticism.

arguments, the decision could have widespread implications with regard to other disclosures required by federal and state law.

The procedural posture of this case also counsels against vacatur of the stay. Applicants sought pre-enforcement review of the statute in federal court, so it is not clear how state courts would interpret this statute if it were applied to applicants' businesses; nor has it been resolved which platforms are covered by the law. Compare Respondent's Opposition to Application to Vacate Stay 1, n. 1 (Response), with Application 11. The statute also includes a broad severability provision, see App. 52a–54a, so vacating the stay requires a determination that applicants are likely to be able to show that *every* provision of HB20 is unconstitutional. What is more, the attorney general's enforcement power is limited to *prospective* relief. See *id.*, at 52a (authorizing the attorney general to seek "injunctive relief" and, if granted, "costs," "reasonable attorney's fees," and "reasonable investigative costs"). In this respect, this statute is quite different from one that authorizes imprisonment or severe monetary penalties for those who refuse to comply. See, *e.g., Ex parte Young*, 209 U. S. 123, 127, 131 (1908) (noting that a law's "penalties" were "so drastic" that no one could test the law's constitutionality "except at the risk of confiscation of its property, and the imprisonment for long terms in jails and penitentiaries"). Should the attorney general bring an enforcement action for injunctive relief, applicants would then have an opportunity to argue that the statute violates the First Amendment, whether facially or as applied to them.

I reiterate that I have not formed a definitive view on the novel legal questions that arise from Texas's decision to address the "changing social and economic" conditions it perceives. *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting). But precisely because of that, I am not comfortable intervening at this point in the

proceedings. While I can understand the Court's apparent desire to delay enforcement of HB20 while the appeal is pending, the preliminary injunction entered by the District Court was itself a significant intrusion on state sovereignty, and Texas should not be required to seek preclearance from the federal courts before its laws go into effect. The Court of Appeals, after briefing and oral argument, concluded that the District Court's order should be stayed, and a decision on the merits can be expected in the near future. I would not disturb the Court of Appeals' informed judgment about applicants' entitlement to a stay.

For these reasons, I respectfully dissent.