No. 21-51178

# In the United States Court of Appeals for the Fifth Circuit

NETCHOICE, L.L.C., A 501(C)(6) DISTRICT OF COLUMBIA ORGANIZATION DOING BUSINESS AS NETCHOICE; COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, A 501(C)(6) NON-STOCK VIRGINIA CORPORATION DOING BUSINESS AS CCIA,

*Plaintiffs-Appellees*,

*v.*

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Western District of Texas, Austin Division
Civil Action No. 1:21-cv-00840-RP

**SUPPLEMENTAL BRIEF OF PLAINTIFFS-APPELLEES**

Steven P. Lehotsky
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW
Washington, DC 20001

Scott A. Keller
Matthew H. Frederick
Todd Disher
LEHOTSKY KELLER COHN LLP
408 West 11th Street, 5th Floor
Austin, TX 78701
scott@lkcfirm.com
(512) 693-8350
*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF INTERESTED PERSONS

No. 21-51178

NetChoice, L.L.C., a 501(c)(6) District of Columbia organization doing business as NetChoice; Computer & Communications Industry Association, a 501(c) (6) non-stock Virginia Corporation doing business as CCIA,
*Plaintiffs-Appellees*,

*v.*

Ken Paxton, in his official capacity as Attorney General of Texas,
*Defendant-Appellant*.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. Plaintiffs-Appellees NetChoice and CCIA have no parent corporations and no publicly held corporation owns 10% or more of their respective stock. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees:**
NetChoice, L.L.C., a 501(c)(6) District of Columbia organization doing business as NetChoice; and Computer & Communications Industry Association, a 501(c)(6) non-stock Virginia Corporation doing business as CCIA

**Counsel for Plaintiffs-Appellees:**
Scott A. Keller (lead counsel)
Steven P. Lehotsky
Matthew H. Frederick
Todd Disher
Jeremy Evan Maltz
LEHOTSKY KELLER COHN LLP

i

**Defendant-Appellant:**

Ken Paxton, in his official capacity as Attorney General of Texas

**Counsel for Defendant-Appellant:**

Ken Paxton
Brent Webster
Aaron Lloyd Nielson (lead counsel)
Ryan Baasch
William Francis Cole
OFFICE OF THE ATTORNEY GENERAL

Judd Edward Stone II
STONE HILTON, P.L.L.C.

/s/ *Scott A. Keller*
SCOTT A. KELLER
*Counsel of Record for
Plaintiffs-Appellees*

TABLE OF CONTENTS

Page

Certificate of Interested Persons ..................................................................... i
Table of Authorities ....................................................................................... iv
Supplemental Brief of Plaintiffs-Appellees ..................................................... 1
    I. *Moody* held that Section 7's millions of heartland applications are unconstitutional. ........................................................ 3
    II. The "actors" covered by Sections 2 and 7 are only the largest "social media platform[s]." ................................................................ 4
    III. Section 7 regulates large social media websites' curated feeds that employ "viewpoint"- or "geographic"-based content moderation .................................................................................. 5
    IV. Section 2's notice-complaint-appeal provisions are also facially unconstitutional. ................................................................... 9
Certificate of Service .................................................................................... 12
Certificate of Compliance ............................................................................ 12

## Table of Authorities

Page(s)

**Cases**

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011) ............................................................................ 8, 9

*City of L.A. v. Patel*,
  576 U.S. 409 (2015) ........................................................................ 2, 6, 8

*FEC v. WRTL, Inc.*,
  551 U.S. 449 (2007) .................................................................................. 3

*Garrett v. Lumpkin*,
  96 F.4th 896 (5th Cir. 2024) ..................................................................... 1

*Hiett v. United States*,
  415 F.2d 664 (5th Cir. 1969) .................................................................... 9

*Langdon v. Google, Inc.*,
  474 F. Supp. 2d 622 (D. Del. 2007) ........................................................ 6

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2024) .................................................................... *passim*

*NetChoice, L.L.C. v. Paxton*,
  49 F.4th 439 (5th Cir. 2022) ................................................................... 10

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) .................................................................................... 4

*Reuber v. Food Chem. News, Inc.*,
  925 F.2d 703 (4th Cir. 1991) (en banc) ................................................... 8

*Sable Commc'ns of Cal., Inc. v. FCC*,
  492 U.S. 115 (1989) .................................................................................. 9

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008) ................................................................................5

*Zhang v. Baidu.com, Inc.*,
   10 F. Supp. 3d 433 (S.D.N.Y. 2014) .....................................................6, 8

**Statutes**

Tex. Bus. & Com. Code § 120.001(1) ...................................................... 1, 4, 6, 7

Tex. Bus. & Com. Code § 120.001(1)(B) ............................................................6

Tex. Bus. & Com. Code § 120.001(C) .................................................................7

Tex. Bus. & Com. Code § 120.002(b) ............................................................. 1, 4

Tex. Bus. & Com. Code § 120.101(2) ...............................................................10

Tex. Bus. & Com. Code § 120.103(a)(1) ...........................................................10

Tex. Civ. Prac. & Rem. Code § 143A.002(a) ................................................. 5, 7

Tex. Civ. Prac. & Rem. Code § 143A.004(c) ................................................. 1, 4

**Other Authorities**

Merriam-Webster.com Dictionary ......................................................................5

Cambridge.org Dictionary ...................................................................................5

Plaintiffs challenge HB20 Sections 2 and 7. With respect to this Court's prior decision, the *Moody* majority held: "the Fifth Circuit got its likelihood-of-success finding wrong. Texas is not likely to succeed in enforcing its law against the platforms' application of their content-moderation policies to the feeds that were the focus of the proceedings below." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2403 (2024).[1] Section 7 prohibits the largest "social media platform[s]" from enforcing the viewpoint-based provisions of their content-moderation policies, which they do millions of times each year on curated feeds. *Id.*; *see* ROA.171-72; ROA.179; ROA.214-15. Indeed, "the parties treated the content-moderation choices reflected in Facebook's News Feed and YouTube's homepage as the laws' heartland applications because they *are* the principal things regulated." *Moody*, 144 S. Ct. at 2398.

The parameters of Plaintiffs' facial challenge are easy to draw. The "actors" covered by HB20 are only "social media platform[s]" with 50 million or more monthly active U.S. users. Tex. Civ. Prac. & Rem. Code § 143A.004(c) (Section 7); Tex. Bus. & Com. Code § 120.002(b) (Section 2). The activities regulated are their curated feeds of user posts. *Moody*, 144 S. Ct. at 2406. There are "million[s]" of unconstitutional applications of Section 7. *Id.*

HB20's plain text—especially the "primary purpose" requirement, Tex. Bus. & Com. Code § 120.001(1)—excludes the activities and services beyond

---

[1] The *Moody* majority's "explication" of its First Amendment holding is binding authority. *Garrett v. Lumpkin*, 96 F.4th 896, 902 & n.4 (5th Cir. 2024).

Case: 21-51178      Document: 352      Page: 8      Date Filed: 09/25/2024

"social-media entities" raised by the Supreme Court. 144 S. Ct. at 2398. This law does not cover "email," "online marketplace[s]," "payment service[s]," "ride-sharing service[s]," or websites with the primary purpose of "direct messaging" or "events management." *Id.* Nor does it apply to (hypothetical) "feeds whose algorithms respond solely to how users act online . . . without any regard to independent content standards." *Id.* at 2404 n.5. Consequently, this law has no "plainly legitimate sweep." *Id.* at 2397.

Throughout this case, Defendant has never suggested that this law applies to anything beyond the curated feeds of "social media platforms" as defined by HB20. Rather, he has repeatedly argued HB20 "narrowly applies" to their curated feeds. Resp. to Pet. for Cert., *NetChoice, LLC v. Paxton*, No. 22-555, 2022 WL 17885133, at *6 (U.S. Dec. 20, 2022). Even if the State could hypothesize potential constitutional applications (and it cannot), they would have no material impact on the facial-challenge analysis, which "consider[s] only applications of the statute in which it actually authorizes or prohibits conduct." *City of L.A. v. Patel*, 576 U.S. 409, 418 (2015). Any such hypotheticals lie outside HB20's "heartland"—*i.e.*, the curated feeds HB20 expressly targets, which a Supreme Court majority held are constitutionally protected. *Moody*, 144 S. Ct. at 2397. At minimum, the "law's unconstitutional applications substantially outweigh its constitutional ones." *Id.*

Facial challenges under the First Amendment exist to facilitate cases like this, which need "minimal if any discovery, to allow parties to resolve disputes quickly without chilling speech through the threat of burdensome

2

litigation." *FEC v. WRTL, Inc.*, 551 U.S. 449, 469 (2007) (controlling plurality op.). Here, additional discovery is unnecessary to affirm the preliminary injunction of Section 7's operative provisions and Section 2's notice-complaint-appeal provisions.[2] The Court should affirm the injunction and then remand.

## I. *Moody* held that Section 7's millions of heartland applications are unconstitutional.

The majority in *Moody* held that the First Amendment protects "social media platform[s']" content-moderation standards and "editorial choices about the mix of speech [they] want[] to convey." 144 S. Ct. at 2403. This protection applies when "platforms write algorithms to implement those standards" even when "[t]he selection and ranking is most often based on a user's expressed interests and past activities." *Id.* That is why the Court squarely held that the "heartland applications" of HB20 are plainly unconstitutional as to "Facebook's News Feed" and "YouTube's homepage"—the websites that Texas expressly targeted in HB20. *Id.* at 2397, 2407.

The same goes for any equivalent service by any covered website. Under *Moody*, Section 7 has millions of unconstitutional applications. Plaintiffs' covered members "mak[e] millions" of "choices about what third-party speech to display and how to display it" "each day." *Id.* at 2393. These

---

[2] Plaintiffs maintain that the other Section 2 provisions violate the First Amendment. But Plaintiffs recognize that the Supreme Court did not grant review of this Court's contrary holdings on those provisions.

choices include "millions" of viewpoint-based decisions, such as removing "hate speech content." *Id.* at 2406; *see* ROA.171.

Section 7's "unconstitutional applications substantially outweigh" any possible "constitutional ones." *Moody*, 144 S. Ct. at 2397. This conclusion is self-evident from the plain text. No further discovery is needed to affirm the preliminary injunction of Section 7.

## II. The "actors" covered by Sections 2 and 7 are only the largest "social media platform[s]."

Sections 2 and 7 "appl[y] only to a social media platform that functionally has more than 50 million active users in the United States in a calendar month." Tex. Bus. & Com. Code § 120.002(b); Tex. Civ. Prac. & Rem. Code § 143A.004(c). The covered "actors" that are Plaintiffs' members are the largest "social media platform[s]": Facebook, Instagram, Pinterest, X (formerly Twitter), and YouTube.[3]

HB20 defines "social media platform" to mean: "an Internet website or application that is *open to the public*, allows a user to create an account, and enables users to communicate with other users for the *primary purpose* of *posting* information, comments, messages, or images." Tex. Bus. & Com. Code § 120.001(1) (emphases added). This definition tracks the ordinary usage of "social media platform," *Moody*, 144 S. Ct. at 2394-95; *see Packingham v. North*

---

[3] *See* Br. for Pet'rs., *NetChoice, LLC v. Paxton*, No. 22-555, 2023 WL 8437869, at *4 (U.S. Nov. 30, 2023) (citing ROA.2572). Plaintiffs seek relief only on behalf of their members. *See* ROA.63.

4

*Carolina*, 582 U.S. 98, 104 (2017), and "posting."[4] It also reflects the Legislature's finding that "social media platforms . . . are central public forums for public debate." ROA.66. HB20 thus covers social media "curated feed[s]," which publicly disseminate "users' posts." *Moody*, 144 S. Ct. at 2397-98.

### III. Section 7 regulates large social media websites' curated feeds that employ "viewpoint"- or "geographic"-based content moderation.

The activities and services plainly regulated by Section 7 are the curated feeds where the largest social media platforms engage in "viewpoint"- or "geographic"-based content moderation. Under Section 7, a "social media platform" cannot "censor" a "user's expression" based on "viewpoint" or "geographic location in [Texas]." Tex. Civ. Prac. & Rem. Code § 143A.002(a). Section 7's "heartland" applications—to the curated feeds targeted by the Legislature—are plainly unconstitutional. *Moody*, 144 S. Ct. at 2406.

It is thus Defendant, not Plaintiffs, that would have to "speculate about 'hypothetical' or 'imaginary' cases" to try to prevail. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). But such speculation does not bear on whether the law has a "plainly legitimate sweep." *Id.*; *see*

---

[4] *See, e.g.*, *Post*, Merriam-Webster.com Dictionary, https://perma.cc/5DS7-TP6E ("to publish (something, such as a message) in an online forum (such as an electronic message board)"); *Posting*, Cambridge.org Dictionary, https://perma.cc/64Z7-AR73 ("an electronic message or information that is put on a website in order to allow many people to see it").

*Patel*, 576 U.S. at 418. Regardless, any possible hypothesizing by Defendant about obscure applications cannot defeat this facial challenge.

Section 7's plain text excludes virtually all the activities and services raised in *Moody* beyond curated "social-media" feeds. 144 S. Ct. at 2398. The definition of "social media platform" expressly excludes "electronic mail." Tex. Bus. & Com. Code § 120.001(1)(B). It also limits coverage to websites whose "*primary purpose* [is] *posting* information, comments, messages, or images." *Id.* § 120.001(1) (emphasis added).[5] This requirement excludes "online marketplace[s]," "payment service[s]," "ride-sharing service[s]," and websites with the primary purpose of "direct messaging" or "events management." *Moody*, 144 S. Ct. at 2398. Defendant never suggested otherwise and disclaimed that HB20 would cover an online marketplace like "Etsy." Oral Arg. Tr. at 62, *NetChoice LLC v. Paxton*, No. 22-555 (U.S. Feb. 26, 2024).

The "primary purpose" of online marketplaces, payment services, and ride-sharing services is to engage in commercial transactions—not to publicly "post[] [users'] information, comments, messages, or images." Tex. Bus.

---

[5] HB20 does not cover Internet search engines like "Google Search," which is a different website than YouTube. *Moody*, 144 S. Ct. at 2409 (Barrett, J., concurring). A search engine's "primary purpose" directs users to web pages that are relevant to the user's search parameters—rather than allowing interactive public posts. Regardless, the First Amendment's editorial-discretion protections under *Moody* fully protect content moderation by a search engine. *E.g.*, *Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433, 437, 440 (S.D.N.Y. 2014); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-30 (D. Del. 2007).

& Com. Code § 120.001(1).[6] And "direct messaging" websites do not enable communication "for the primary purpose of *posting* information, comments, messages, or images." *Id.* (emphasis added). "Posting" involves *public* dissemination of user-generated speech, unlike direct messaging. *Supra* p.5. If HB20's text is somehow insufficient to exclude those websites from coverage, Plaintiffs' claim of unconstitutional vagueness is likely to succeed.

Even within a covered "social media platform," the plain sweep of Section 7 applies to curated feeds[7] where platforms moderate content based on "viewpoint" or geography (within Texas).[8] Tex. Civ. Prac. & Rem. Code § 143A.002(a). This excludes many secondary functions websites may offer. For example, Section 7 does not cover search functions on a "social media

---

[6] That is true even if users can post some amount of speech (like product reviews or comments appended to particular transactions). Posting users' speech is not these websites' "primary purpose." Tex. Bus. & Com. Code § 120.001(1). And websites such as Walmart.com and Amazon.com are also excluded as consisting "primarily" of "content that is not user generated." *Id.* § 120.001(C). Regardless, the First Amendment applies all the same to any "content moderation" choices "about what third-party speech to display and how to display it" by any website or app—including an online marketplace—that publicly disseminates user-generated speech through curated "comment[s]." *Moody*, 144 S. Ct. at 2393, 2395.

[7] Curated feeds include original posts as well as speech from viewers that "react to it, comment on it, or share it themselves." *Moody*, 144 S. Ct. at 2395.

[8] Content moderation of *spam* is not covered by Section 7 because that is not *viewpoint*-based but rather "content"-based. Br. for Resp., *NetChoice, LLC v. Paxton*, No. 22-555, 2024 WL 210234, at *9 (U.S. Jan. 16, 2024).

7

platform." Search functions rely on user input—not viewpoint or geography—to present relevant speech. *See Zhang*, 10 F. Supp. 3d at 437-38.

Similarly, Section 7 does not apply to "feeds whose algorithms respond solely to how users act online . . . without any regard to independent content standards." *Moody*, 144 S. Ct. at 2404 n.5. A hypothetical algorithm based solely on user activity falls outside Section 7 because it does not sort content based on "viewpoint" or "geographic" location.[9] In fact, Defendant has acknowledged that HB20 "specifically allows platforms to facilitate user choice as to what they want to hear and from whom."[10] In any event, the record shows that various covered websites moderate content based on viewpoint and do not rely solely on algorithms that respond to user conduct regardless of community guidelines. ROA.1770-1826.

Although Section 7 bans "geographic"-based content moderation, that would not affect the facial analysis even if it were "actually . . . prohibit[ing] conduct" of any website. *Patel*, 576 U.S. at 418. States must "specifically identify an actual problem in need of solving" to regulate speech, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799-800 (2011), but the Legislature made no

---

[9] Regardless, displaying speech based on user preference is an editorial "choice[] about what third-party speech to display and how to display it," so it should be fully protected by the First Amendment. *Moody*, 144 S. Ct. at 2393. After all, "it is hardly unusual for publications to print matter that will please their subscribers," and this does not vitiate free-speech rights. *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 716 (4th Cir. 1991) (en banc).

[10] Br. for Resp., *NetChoice, LLC v. Paxton*, No. 22-555, 2024 WL 210234, at *2 (U.S. Jan. 16, 2024).

8

finding to justify a ban on "geographic" moderation. In any case, that ban would violate the First Amendment, which prohibits "government efforts to alter an edited compilation of third party expression." *Moody*, 144 S. Ct. at 2393. Section 7's hypothetical application to "geographic"-based content moderation therefore does not change the plain sweep of the statute.

Likewise, the facial-challenge analysis is unaffected by possible "viewpoint"- or "geographic"-based content moderation of secondary direct-messaging or events-management functions on websites that primarily offer curated feeds.[11] The Legislature did not pass HB20 to fix "an actual problem" involving events-management or direct-messaging functions. *Brown*, 564 U.S. at 799. It passed HB20 to control the curated feeds it viewed as "central public forums for public debate." ROA.66. Section 7's hypothetical application to secondary functions cannot establish a "plainly legitimate sweep" offsetting millions of its unconstitutional primary applications.

## IV. Section 2's notice-complaint-appeal provisions are also facially unconstitutional.

Section 2's notice-complaint-appeal provisions are facially unconstitutional for many of the same reasons. Those provisions cover an even

---

[11] Regardless, regulations of individual-to-individual communications like direct messaging receive heightened First Amendment scrutiny. *See, e.g.*, *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) (telephone messages); *Hiett v. United States*, 415 F.2d 664, 669 (5th Cir. 1969) (postal regulation).

9

narrower set of activities and services: "remov[ing] content" when the "content" was publicly "posted by the user" on a "social media platform." Tex. Bus. & Com. Code § 120.101(2); *see id.* § 120.103(a)(1). Texas has "always been consistent[] about its interest: The objective is to correct the mix of speech that the major social-media platforms present." *Moody*, 144 S. Ct. at 2407. But Texas has no valid "interest in changing the content of the platforms' feeds" to "create a better speech balance." *Id.* at 2399, 2407.

The Supreme Court found that these burdensome provisions infringe protected expressive choices. "The Fifth Circuit was wrong in concluding that Texas's restrictions on the platforms' selection, ordering, and labeling of third-party posts do not interfere with expression." *Moody*, 144 S. Ct. at 2399. This holding "bears on how [this Court] should address the[se] individualized-explanation provisions."[12] *Id.* at 2399 n.3. The record shows that these provisions impose costly burdens on the exercise of First Amendment rights. *Id.* at 2406; *see* ROA.214 (YouTube, for instance, "would have to expand [appeal] systems' capacity by over 100X"). The precise burdens on specific websites are not material. Section 2's notice-complaint-appeal provisions are facially unconstitutional because they burden First Amendment rights for reasons the Supreme Court has declared illegitimate.

---

[12] *Moody* overrides this Court's prior analysis of these requirements—including its reasoning that "scal[ing] up" existing review mechanisms imposes no burden because "censorship" of user-generated content is not "protected speech." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 487 (5th Cir. 2022).

| | |
|---|---|
| DATED: September 25, 2024 | Respectfully submitted, |
| | |
| | */s/ Scott A. Keller* |
| Steven P. Lehotsky | Scott A. Keller |
| Jeremy Evan Maltz | Matthew H. Frederick |
| LEHOTSKY KELLER COHN LLP | Todd Disher |
| 200 Massachusetts Avenue, NW | LEHOTSKY KELLER COHN LLP |
| Washington, DC 20001 | 408 West 11th Street, 5th Floor |
| | Austin, TX 78701 |
| | scott@lkcfirm.com |
| | (512) 693-8350 |
| | *Counsel for Plaintiffs-Appellees* |

## CERTIFICATE OF SERVICE

On September 25, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses. No paper copies were filed in accordance with the COVID-19 changes ordered in General Docket No. 2020-3.

*/s/ Scott A. Keller*
Scott A. Keller

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the Court's supplemental briefing order because it contains no more than 10 pages; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

*/s/ Scott A. Keller*
Scott A. Keller