# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
November 7, 2024
Lyle W. Cayce
Clerk

No. 21-51178

---

NetChoice, L.L.C., *a 501(c)(6) District of Columbia organization doing business as* NetChoice; Computer & Communications Industry Association, *a 501(c)(6) non-stock Virginia Corporation doing business as* CCIA,

                                        *Plaintiffs—Appellees*,

*versus*

Ken Paxton, *in his official capacity as Attorney General of Texas*,

                                        *Defendant—Appellant*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:21-CV-840

---

ON REMAND FROM
THE SUPREME COURT OF THE UNITED STATES

Before Jones, Southwick, and Oldham, *Circuit Judges*.

Andrew S. Oldham, *Circuit Judge*:

In *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024), the Supreme Court emphasized that facial challenges to state laws are difficult to successfully mount. In the First Amendment context, such challenges require a court to "explore the law['s] *full range* of applications—the constitutionally

No. 21-51178

impermissible and permissible both—and compare the two sets." *Id.* at 2398 (emphasis added). Plaintiffs can meet this burden "only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 2397.

As the Supreme Court recognized, it is impossible to apply that standard here because "the record is underdeveloped." *Id.* at 2399. Who is covered by Texas House Bill 20 ("H.B. 20")? For these actors, which activities are covered by H.B. 20? For these covered activities, how do the covered actors moderate content? And how much does requiring each covered actor to explain its content-moderation decisions burden its expression? Because these are fact-intensive questions that must be answered by the district court in the first instance after thorough discovery, we remand.

*

The Court in *Moody* repeated a familiar refrain: "facial challenges are disfavored." *Id.* at 2409. There are a "host of good reasons" for this judicial skepticism. *Id.* at 2397. For example, facial challenges "rest on speculation," *ibid.* (quotation omitted), "short circuit the democratic process," *ibid.* (quotation omitted), and sit uncomfortably with Article III, *see id.* at 2413 (Thomas, J., concurring in the judgment). Because of the significant risks associated with facial challenges—even those under the First Amendment— challengers bear a heavy burden. *See id.* at 2397 (majority opinion); *id.* at 2409 (Barrett, J., concurring) ("[T]hese cases illustrate the dangers of bringing a facial challenge. . . . In fact, dealing with a broad swath of varied platforms and functions in a facial challenge strikes me as a daunting, if not impossible, task."); *id.* at 2411 (Jackson, J., concurring in part and concurring in the judgment) ("[A]s all Members of the Court acknowledge, plaintiffs bringing a facial challenge must clear a high bar."); *id.* at 2428 (Alito, J., concurring in the judgment) ("Facial challenges also strain the limits of the federal courts'

2

constitutional authority to decide only actual 'Cases' and 'Controversies,'" so "parties mounting facial attacks [must] satisfy demanding requirements.").

A proper First Amendment facial challenge proceeds in two steps. The "first step" is to determine every hypothetical application of the challenged law. *Id.* at 2398 (majority opinion). The second step is "to decide which of the law['s] applications violate the First Amendment, and to measure them against the rest." *Ibid.* If the "law's unconstitutional applications substantially outweigh its constitutional ones," then and only then is the law facially unconstitutional. *Id.* at 2397. "[T]he record" in this case "is underdeveloped" on both fronts. *See id.* at 2399; *see also id.* at 2410–11 (Barrett, J., concurring) (noting the record failed to "thoroughly expose[] the relevant facts about particular social-media platforms and functions"); *id.* at 2411 (Jackson, J., concurring in part and concurring in the judgment) (noting plaintiffs failed to show "how the regulated activities *actually function*"); *id.* at 2412 (Thomas, J., concurring in the judgment) (noting plaintiffs "failed to provide many of the basic facts necessary to evaluate their challenges to H.B. 20"); *id.* at 2422 (Alito, J., concurring in the judgment) (noting the "incompleteness of this record"). That is a consequence of how this case was litigated in district court:

> [T]he unfortunate posture of this case stems from the fact that NetChoice steadfastly opposed (and the district court blocked) the very discovery that *Moody* appears to require. In the district court, plaintiffs argued that no discovery was necessary because the issues were purely legal questions. And the district court largely agreed with that, requiring the State of Texas to complete discovery in a mere 30 days to avoid "burdening plaintiffs without good cause."

Order, *NetChoice, LLC v. Paxton*, No. 21-51178, at 4 (5th Cir. Sept. 18, 2024) (cleaned up).

No. 21-51178

\*

Here is how we expect the case to proceed on remand.

At the first step, the district court must determine "the full range of activities" that H.B. 20 covers. *Moody*, 144 S. Ct. at 2397 (majority opinion). That means it must determine "what actors" are covered by H.B. 20. *Id.* at 2398. The district court also must decide "[w]hat activities" by those actors are covered by H.B. 20. *Ibid.* Plaintiffs urge us (and the district court) to ignore the Supreme Court's instructions because, in plaintiffs' view, it is enough to consider H.B. 20's "heartland applications." *See* Supp. Br. of Plaintiffs–Appellees at 1, 2, 3, 5 (repeatedly arguing that "heartland applications" are enough). But that is the *precise* error the Supreme Court identified in *Moody*. *See* 144 S. Ct. at 2397–98 (explaining that plaintiffs approached this case more like an as-applied challenge than like a facial one because they "treated [H.B. 20] as having certain heartland applications, and mostly confined their battle to that terrain"). The *Moody* Court was emphatic that plaintiffs *cannot* succeed on their First Amendment facial claims by focusing on H.B. 20's "heartland applications." We therefore expect the district court to reject plaintiffs' invocation of H.B. 20's "heartland applications" on remand. The questions, broadly stated, are *who* and *what* is covered by H.B. 20—and the district court cannot truncate its evaluation of those questions at plaintiffs' behest.

Plaintiffs also claim the "parameters" of H.B. 20 are "easy to draw." Supp. Br. of Plaintiffs–Appellees at 1. Once again, the Supreme Court disagreed. The Court stated that H.B. 20, "at least on [its] face, appear[s] to apply beyond Facebook's News Feed and its ilk." *Moody*, 144 S. Ct. at 2398. It explicitly questioned whether H.B. 20 regulated "direct messaging or events management" services, or "how an email provider like Gmail filters incoming messages, how an online marketplace like Etsy displays customer

reviews, how a payment service like Venmo manages friends' financial exchanges, or how a ride-sharing service like Uber runs[.]" *Ibid.* (citations omitted). True, H.B. 20 excludes "electronic mail" from its definition of "[s]ocial media platform." TEX. BUS. & COM. CODE § 120.001(1)(B). But that is only one of the myriad possible applications of H.B. 20. And because the "online world is variegated and complex, encompassing an ever-growing number of apps, services, functionalities, and methods for communication and connection," those "examples" are only the tip of the iceberg. *Moody*, 144 S. Ct. at 2398. That is why the Supreme Court admonished: "[T]here is much work to do below" on the first step. *Id.* at 2394.

There is serious need of factual development at the second step of the analysis as well. To determine if any given application of H.B. 20's "content-moderation provisions"[1] is unconstitutional, the district court must determine "whether there is an intrusion on protected editorial discretion." *Id.* at 2398 (citation omitted). That requires a detailed understanding of *how* each covered actor moderates content on each covered platform. *See id.* at 2437 (Alito, J., concurring in the judgment) ("Without more information about how regulated platforms moderate content, it is not possible to determine whether these laws lack a plainly legitimate sweep." (quotation omitted)). Focusing primarily on Facebook's News Feed or YouTube's homepage will not suffice, as "[c]urating a feed and transmitting direct messages," for example, likely "involve different levels of editorial choice, so that the one creates an expressive product and the other does not." *Id.* at 2398 (majority opinion).

Moreover, one of the principal factual deficiencies in the current record, according to the Supreme Court, concerns the algorithms used by

_____

[1] *See* TEX. CIV. PRAC. & REM. CODE §§ 143A.002, 143A.004, 143A.006.

5

No. 21-51178

plaintiffs' members. *See, e.g.*, *id.* at 2404 n.5; *id.* at 2410–11 (Barrett, J., concurring); *id.* at 2424, 2427, 2436–38 (Alito, J., concurring in the judgment). It matters, for example, if an algorithm "respond[s] solely to how users act online," or if the algorithm incorporates "a wealth of user-agnostic judgments" about the kinds of speech it wants to promote. *Id.* at 2404 n.5 (majority opinion); *see also id.* at 2410 (Barrett, J., concurring). And this is only one example of how the "precise technical nature of the computer files at issue" in each covered platform's algorithm might change the constitutional analysis. ROA.539 (quotation omitted). It also bears emphasizing that the same covered actor might use a different algorithm (or use the same algorithm differently) on different covered services. For example, it might be true that X is a covered actor and that both its "For You" feed and its "Following" feed are covered services. But it might also be true that X moderates content differently or that its algorithms otherwise operate differently across those two feeds. That is why the district court must carefully consider how each covered actor moderates content on each covered service.

When performing the second step of the analysis, the district court must separately consider H.B. 20's individualized-explanation provisions.[2] As the Supreme Court has instructed, that requires "asking, again as to each thing covered, whether the required disclosures unduly burden expression." *Moody*, 144 S. Ct. at 2398 (majority opinion). The first issue to address here is the same one addressed above: whether each covered actor on each covered platform is even engaging in expressive activity at all when it makes content-

---

[2] *See* TEX. BUS. & COM. CODE §§ 120.101–.04. We previously held that the "one-and-done" disclosures and the "biannual transparency-report requirement" were facially constitutional, and the Supreme Court did not review that decision. *See NetChoice, LLC v. Paxton*, 49 F.4th 439, 485–86 (5th Cir. 2022). The parties correctly agree that holding still binds the district court on remand. *See* Supp. Br. of Appellant (Texas) at 9–10; Supp. Br. of Plaintiffs–Appellees at 3 n.2.

No. 21-51178

moderation decisions. *See id.* at 2399 n.3 (explaining that these provisions "violate the First Amendment" only "if they unduly burden *expressive activity*" (emphasis added)). Then for each covered platform engaging in expressive activity, the district court must assess how much the requirement to explain that platform's content-moderation decisions burdens the actor's expression. *See id.* at 2398.

Plaintiffs again object because, in their view, the "precise burdens on specific websites are not material." Supp. Br. of Plaintiffs–Appellees at 10. But it is hard to see how the district court could possibly determine whether each and every covered actor on each and every one of its covered services is facing an undue burden on its expression without considering, well, those burdens. And the Supreme Court has made clear that the district court must consider those burdens, including variations in those burdens across platforms. *Cf. Moody*, 144 S. Ct. at 2411 (Barrett, J., concurring) ("[T]he analysis is bound to be fact intensive, and it will surely vary from function to function and platform to platform.").

\*    \*    \*

It is plaintiffs' burden to develop a factual record to support their request for facial injunctive relief against enforcement of a state statute. Plaintiffs have not yet developed that record or proved their claims. Therefore, the cause is REMANDED for further proceedings consistent with this opinion.[3]

---

[3] Texas raises several additional arguments, including that plaintiffs do not have associational standing, that H.B. 20's severability provision must be considered if any provision is deemed facially unconstitutional, that many of H.B. 20's applications regulate only conduct, and that plaintiffs' position here is inconsistent with their stance on 47 U.S.C. § 230. We decline to address these arguments at this juncture. On remand, we expect that the district court will consider them thoroughly.